# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
CONSUMERS' CHECKBOOK,                    )
CENTER FOR THE STUDY OF SERVICES,        )
                                         )
            Plaintiff,                   )
                                         )
       v.                                )          Case No. 06-2201 (EGS)
                                         )
UNITED STATED DEPARTMENT OF              )
HEALTH AND HUMAN SERVICES,               )
                                         )
            Defendant.                   )
_____)
```

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant United States Department of Health and Human Services ("HHS"), hereby moves for summary judgment in this action brought pursuant to the Freedom of Information Act, 5 U.S.C. § 552. The reasons for this motion are set forth in the memorandum of points and authorities and supporting documents submitted herewith. A statement of material facts as to which there is no genuine dispute, the Declaration of Michael S. Marquis ("Marquis Declaration"), and a proposed order are attached.

Dated: March 1, 2007                    Respectfully submitted,


                                        /s/
                                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                                        United States Attorney


                                        /s/
                                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                                        Assistant United States Attorney


                                        /s/
                                        ANDREA McBARNETTE, D.C. Bar  # 483789
                                        Assistant United States Attorney
                                        555 Fourth Street, N.W.
                                        Washington, D.C. 20530

**UNITED STATES DISTRICT COURT**

2

**FOR THE DISTRICT OF COLUMBIA**

_____
CONSUMERS' CHECKBOOK,                       )
CENTER FOR THE STUDY OF SERVICES,           )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )        Case No. 06-2201 (EGS)
                                            )
UNITED STATED DEPARTMENT OF                 )
HEALTH AND HUMAN SERVICES,                  )
                                            )
            Defendant.                      )
_____)

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to LCvR 7.1(h), Defendant Department of Health and Human Services ("HHS") respectfully submits this statement of material facts as to which it contends there is no genuine dispute.

1.      Defendant received a FOIA request from Plaintiff, dated March 27, 2006.  In general, the request sought a subset of 29 specific data elements from a Centers for Medicare & Medicaid Services ("CMS") database containing physician Medicare claims records for the 2004 calendar year and for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia.  The request also sought a fee waiver.  Declaration of Michael S. Marquis ("Marquis Dec.") ¶ 4.

2.      On June 26, 2006, CMS issued a response to the request to Plaintiff that explained that CMS could not readily reproduce the requested data in the form or format requested.  In addition, because a denial was issued, CMS did not rule on the fee waiver request.  Marquis Dec. ¶ 5.

3.        In a letter dated, July 25, 2006, Plaintiff filed an administrative appeal, challenging the denial.  The appeal noted that because CMS had denied the request, the fee waiver had not been addressed in this matter.  Plaintiff stated that it retained the right to request a fee waiver in the event that the denial is overturned on appeal and the requested records are produced.  Marquis Dec. ¶ 6.

4.        On August 1, 2006, CMS acknowledged receipt of the appeal and in a letter dated, November 1, 2006, the Defendant informed Plaintiff of the status of its appeal.  Marquis Dec. ¶¶ 7-8.

5.        On December 26, 2006, Plaintiff filed the instant action claiming that the Defendant violated FOIA by denying its request for records.  Complaint Caption.

6.        On January 29, 2007, Defendant provided a letter to Plaintiff, explaining a revision of their previous denial of the request for records and that CMS had determined that it could extract the requested data and that it would review the data under FOIA to make a determination.  The letter explained that CMS denied Plaintiff's fee waiver request and informed Plaintiff that completion of the FOIA request would require a payment of $3,944.70.  Marquis Dec. ¶ 12.  The letter also explained that the Plaintiff had 30 days to appeal the fee waiver request denial to CMS's Deputy Administrator.  Marquis Dec., Ex. 6.

7.        Yesterday, February 28, 2007, Defendant received an appeal from the Plaintiff regarding the denial of the fee waiver request.  Marquis Dec. ¶ 14.

Dated: March 1, 2007                    Respectfully submitted,


                                        /s/
                                        _____
                                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                                        United States Attorney


                                        /s/
                                        _____
                                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                                        Assistant United States Attorney


                                        /s/
                                        _____
                                        ANDREA McBARNETTE, D.C. Bar  # 483789
                                        Assistant United States Attorney
                                        555 Fourth Street, N.W.
                                        Washington, D.C. 20530
                                        (202) 514-7153

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| CONSUMERS' CHECKBOOK, ) | |
| CENTER FOR THE STUDY OF SERVICES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-2201 (EGS) |
| ) | |
| UNITED STATED DEPARTMENT OF ) | |
| HEALTH AND HUMAN SERVICES, ) | |
| ) | |
| Defendant. ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b), of the Federal Rules of Civil Procedure, Defendant Department of Health and Human Services ("HHS") hereby submits this memorandum in support of its motion for summary judgment. Plaintiff brings this action pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

**BACKGROUND**

On March 27, 2006, the Department of Health and Human Services received a FOIA request from the Plaintiff which sought a subset of 29 specific data elements from a Centers for Medicare & Medicaid Services ("CMS") database containing physician Medicare claims records for the 2004 calendar year and for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. The request also sought a fee waiver. Exhibit A, Declaration of Michael S. Marquis ("Marquis Dec.") ¶ 4.

Defendant's response to the request, dated June 26, 2006, explained that CMS could not

readily reproduce the requested data in the form or format requested. In addition, because a denial was issued, Defendant did not rule on the fee waiver request. Marquis Dec. ¶ 5.

Plaintiff filed an administrative appeal challenging the denial in a letter dated July 25, 2006. The appeal noted that because CMS had denied the request, the fee waiver had not been addressed in this matter. Plaintiff stated that it retained the right to request a fee waiver in the event that the denial is overturned on appeal and the requested records are produced. Marquis Dec. ¶ 6. On August 1, 2006, CMS acknowledged receipt of the appeal and in a letter dated, November 1, 2006, the Defendant informed Plaintiff of the status of its appeal. Marquis Dec. ¶¶ 7-8.

On December 26, 2006, Plaintiff filed the instant action claiming that the Defendant violated FOIA by denying it request for records. Complaint Caption. On January 29, 2007, Defendant provided a letter to Plaintiff, explaining a revision of the previous denial of the request for records and that CMS had determined that it could extract the requested data and that it would review the data under FOIA to make a determination. The letter also explained that CMS denied Plaintiff's fee waiver request and informed Plaintiff that completion of the FOIA request would require a payment of $3,944.70. Marquis Dec. ¶¶ 12, 14. Yesterday, February 28, 2007, Defendant received an appeal from Plaintiff regarding the denial of the fee waiver request. Marquis Dec. ¶14.

## STANDARD OF REVIEW

### *Summary Judgment*

Summary judgment may be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).   In <u>Celotex Corp. v. Catrett</u> , 477 U.S. 317, 327 (1986), the

Supreme Court further instructed that the "[s]ummary judgment procedure is properly regarded

not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a

whole, which are designed 'to secure the just, speedy and inexpensive determination of every

action.'"  Summary judgment is the procedural vehicle by which nearly all FOIA cases are

resolved.  <u>See</u> <u>Cooper Cameron Corp. v. Dept. of Labor</u>, 238 F.3d 539, 543 (5th Cir. 2002).

Summary judgment is available to a defendant in a FOIA case if the agency proves that it

has fully discharged its obligations under the FOIA, after the underlying facts and the inferences

to be drawn from them are construed in the light most favorable to the FOIA requester.  <u>Miller v.</u>

<u>Department of State</u>, 779 F.2d 1378, 1382 (8th Cir. 1985), <u>citing</u> <u>Weisberg v. Department of</u>

<u>Justice</u>, 705 F.2d 1344, 1350 (D.C. Cir. 1983).  To discharge its FOIA obligations, the agency

must demonstrate that "each document that falls within the class requested either has been

produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements."

<u>Goland v. CIA</u>, 607 F.2d 339, 352  (D.C. Cir. 1978), <u>cert</u>. <u>denied</u>, 445 U.S. 927 (1980), <u>quoting</u>

<u>National Cable Television Ass'n. Inc. v. FCC</u>, 479 F.2d 183, 186 (D.C. Cir. 1973).  The agency

may sustain its burden by submitting detailed affidavits that identify the documents at issue and

explain why they fall under the claimed exemptions.  <u>See</u> <u>Summers v. Dept. of Justice</u>, 140 F.3d

1077, 1080 (D.C. Cir. 1998); <u>Miller</u>, 779 F.2d at1382.

Agencies establish that all of their obligations under the FOIA have been met through

declarations.  Thus, when the pleadings, supplemented by affidavits or declarations, show no

genuine issue as to any material fact and the defendant is entitled to judgment as a matter of law,

summary judgment should be granted to the defendant.  Perry v. Block, 684 F.2d 121 (D.C. Cir. 1982).

ARGUMENT

FOIA confers jurisdiction upon the Court to provide relief to a plaintiff only where requested documents have been "improperly withheld" by an agency.  5 U.S.C. § 552(a)(4)(B). The courts have interpreted this section of the statute to mean that jurisdiction exists only upon a showing by the plaintiff that the defendant (1) improperly (2) withheld (3) agency records.  See Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 150 (1980).  Indeed, "[t]he plaintiff must show that the agency 'contravened all three components of this obligation' in order for jurisdiction to be valid."  Kuffel v. U.S. Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995) (citing Kissinger, 445 U.S. at 151.)  Absent such a showing, FOIA confers no "judicial authority to devise remedies and enjoin agencies."  Id.

## I.     Exhaustion Requirement

Exhaustion of administrative remedies is required under FOIA before a party can seek judicial review.  Dettmann v. United States Dep't of Justice, 802 F.2d 1472, 1477 (D.C. Cir. 1986).  A FOIA requester is deemed to have failed to exhaust administrative remedies whenever the requester fails to comply with the administrative procedures set forth under FOIA, including complying with fee requirements.  Trueblood v. United States Dep't of Treasury, 943 F. Supp. 64, 68 (D.D.C. 1996).  Where a FOIA plaintiff attempts to obtain judicial review without having first fully exhausted his administrative remedies, his lawsuit is subject to dismissal for lack of subject matter jurisdiction.  Oglesby v. United States Dept. of the Army, 920 F.2d 57 (D.C. Cir. 1990).

FOIA requires agencies to establish fee schedules for the time taken to search for records and for the cost of copying records.  See 5 U.S.C. §552(a)(4)(A)(I); 45 C.F.R. § 5.43 (DOJ regulation implementing this provision).  Agencies may request advance payment of fees upon a determination that the fees will exceed $250.00 and agencies may require payment before records which have been processed are released.  See 5 U.S.C. §552(a)(4)(A)(v); Strout v. United States Parole Comm'n, 40 F.3d 136, 139 (6th Cir. 1994).  An agency may require payment of fees even if the FOIA request has become the subject of litigation.  See, e.g., Trueblood v. Dept. of Treasury, 943 F. Supp. 64, 68 (D.D.C. 1996) (failure to pay fees is a jurisdictional defense that can be raised at any time); see also Pollack v. Dept. of Justice, 49 F.3d 115, 119-20 (4th Cir. 1995).

## II.     Plaintiff failed to exhaust its administrative remedies

The Court should grant summary judgment in favor of the Defendant because Plaintiff failed to pay the requested fee.  On January 29, 2007, Defendant informed Plaintiff that it had revised its earlier denial of the FOIA request and determined that it could extract the requested data and that Defendant would review the data under FOIA to make a determination.  The letter also explained that the Defendant had denied Plaintiff's fee waiver request and that completion of the FOIA request would require a payment of $3,944.70.  Yesterday, February 28, 2007, Defendant appealed the denial of the fee waiver request.  See Marquis Dec. ¶¶ 12, 14.

Administrative exhaustion does not occur in the FOIA context until the required fees are paid in full or an appeal is taken from the refusal to waive fees.  See Crooker v. United States Secret Service, 577 F. Supp. 1218, 1219 (D.D.C 1983) (requester must pay fees or administratively appeal the requirement of fees before seeking judicial review of a FOIA

5

request).  An agency may require advance payment before work is begun on a request if the

assessable fee is likely to exceed $250.  See 5 U.S.C. § 552(a)(4)(A)(v).  Here, the Defendant

estimates the fee to be $3,944.70.  Marquis Dec. ¶¶ 12.  Plaintiff has not paid the fee request.

Marquis Dec. ¶ 14.

In addition, Plaintiff just yesterday administratively appealed the denial of its request for

a fee waiver.  Defendant's January 29, 2006 letter, which was signed by Michael Marquis, CMS

Director of the FOIA Group and sent to Plaintiff, explained that the Plaintiff could appeal the

denial of the fee waiver request to CMS's Deputy Administrator.  Marquis Dec., Ex. 6.  The

Defendant received Plaintiff's appeal just yesterday on February 28, 2007.  Marquis Dec. ¶ 14.

The Defendant has twenty (20) days from the receipt of the appeal to make a determination.  5

U.S.C. § 552(a)(6)(a)(ii).  Because Plaintiff has neither paid the fee nor finished the appeal

process for the denial of the fee waiver request, the Court should grant summary judgment for

the Defendant.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the Defendant respectfully requests that the Court grant summary judgment in favor of Defendant.

Dated: March 1, 2007                    Respectfully submitted,


                                        /s/
                                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                                        United States Attorney

                                        /s/
                                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                                        Assistant United States Attorney

                                        /s/
                                        ANDREA McBARNETTE, D.C. Bar  # 483789
                                        Assistant United States Attorney
                                        555 Fourth Street, N.W.
                                        Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing DEFENDANT'S SUMMARY JUDGMENT MOTION and the accompanying order was filed via the Court's electronic filing system on March 1, 2007 and is expected to be served by the Court's electronic transmission facilities to:

Patrick Carome
Stephen Albrecht
WILMER CUTLER PICKERING
1875 Pennsylvania Avenue, NW
Washington, DC 20006

                        _____/S/_____
                        ANDREA McBARNETTE
                        Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONSUMERS' CHECKBOOK,                    )
                                         )
        Plaintiff,                       )
                                         )
   v.                                    )        Case No. 1:06-cv-2201
                                         )
UNITED STATED DEPARTMENT OF              )
HEALTH AND HUMAN SERVICES.               )
                                         )
        Defendant.                       )
_____)

## DECLARATION OF MICHAEL S. MARQUIS

I, Michael S. Marquis, hereby declare as follows:

1. I am the Director of the Freedom of Information Group (FIG), Office of Strategic

Operations and Regulatory Affairs, Centers for Medicare & Medicaid Services (CMS), U.S.

Department of Health and Human Services (HHS). In this capacity, I am the Records Access

Officer for CMS. My duties include responding to requests under the Freedom of Information

Act (FOIA) for records of CMS. My duties also include determining whether to release or

withhold records or portions of records in accordance with the FOIA and HHS regulations

implementing the FOIA, and overseeing all FOIA activities within CMS.

2. FIG is the CMS central office component responsible for administering the FOIA, 5

U.S.C. § 552. FIG responsibilities include:

    a. referring requests to the appropriate office(s) within CMS, its regions or among

    carriers and intermediaries for collection of the requested documents,

    b. preparing replies to requesters.

1

c. drafting briefing materials and responses to administrative appeals and denial decisions,

d. consulting with the Office of the General Counsel and the HHS Freedom of Information Officer regarding denials, releases and appeals,

e. providing authoritative FOIA advice and guidance to CMS program components,

f. preparing guidelines and manual provisions to administer the FOIA program, and

h. maintaining accurate records of any charges levied for FOIA search activities.

3. I make this declaration based upon my personal knowledge and information available to me in my official capacity.

4. My office received a FOIA request from plaintiff, dated March 27, 2006. In general, the request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. The request also sought a fee waiver. See Ex. 1.

5. On June 26, 2006, we issued a response to the request. This response explained that CMS could not readily reproduce the requested data in the form or format requested. Because we issued a denial, we did not rule on the fee waiver request. See Ex. 2.

6. In a letter dated, July 25, 2006, plaintiff filed an administrative appeal, challenging the denial. The administrative appeal noted that because CMS had denied the request, the fee waiver had not been addressed in this matter. Plaintiff stated that it retained the right to request a fee waiver in the event that the denial is overturned on appeal and the requested records are produced. See Ex. 3.

2

7. On August 1, 2006, my office acknowledged receipt of the appeal. See Ex. 4.

8. In a letter dated, November 1, 2006, we informed plaintiff of the status of its appeal.

See Ex. 5.

9. Under the HHS FOIA regulation at 45 C.F.R. § 5.45(a), the agency will waive or reduce the fees it would otherwise charge if disclosure of the information meets both of the following tests:

(1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government, and

(2) It is not primarily in the commercial interest of the requester.

10. In analyzing the public interest, HHS considers the following factors:

(1) How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government?

(2) Would disclosure of the records reveal any meaningful information about government operations or activities? Can one learn from these records anything about such operations that is not already public knowledge?

(3) Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons?

(4) Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?

45 C.F.R. § 5.45(b)-(e).

11. In determining whether the commercial interest is the primary interest of the

requester, HHS considers the following factors:

(1) Would the disclosure further a commercial interest of the requester, or of someone on whose behalf the requester is acting? "Commercial interests" include interests relating to business, trade, and profit. Not only profit-making corporations have commercial interests—so do nonprofit corporations, individuals, unions, and other associations. The interest of a representative of the news media in using the information for news dissemination purposes will not be considered a commercial interest.

3

(2) If disclosure would further a commercial interest of the requester, would that effect outweigh the advancement of the public interest defined in paragraph (b) of this section [45 C.F.R. § 5.45]? Which effect is primary?

45 C.F.R. § 5.45(c).

12. On January 29, 2007, I provided a letter to plaintiff, explaining that we revised our prior denial. We reexamined the processes necessary to extract the requested data with CMS information technology staff, and we determined that we would be able to produce the requested information. We explained that once the data is produced, CMS will review the requested information under the FOIA to make our release determination. Also, we explained why we were denying plaintiff's fee waiver request. The explanation provided the following:

Within your March 27, 2006 request, you described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a non-profit entity which conducts studies of consumer services, including government services, and publishes material which informs or educates consumers concerning those services. You contend a fee waiver is appropriate because providing the requested information will enable Checkbook / CSS to analyze the data and subsequently publish that analysis, which you believe is in the public interest, and will contribute significantly to public scrutiny of the operations of CMS and the Medicare program. You further state that the commercial interests of your organization are not the primary basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the fees we would otherwise charge if disclosure of the information meets both of the following tests: (1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government; and (2) It is not primarily in the commercial interest of the requester." After careful consideration of the commercial nature in which Checkbook /CSS markets and sells its services, I have concluded that CheckBook /CSS has a primary commercial interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the public interest in this matter. I also conclude that you have not demonstrated that disclosure of the requested data will advance the understanding of the general public because disseminating on a subscription or fee basis will limit the general public's access to the requested data. Therefore, your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.

4

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

See Ex. 6.

13.  45 C.F.R. § 5.45(c) of the HHS FOIA regulations provides that if the estimated FOIA processing fees exceed $250, we will require an agreement to pay fees or deposit before we start searching for records.

5

14. On February 28, 2007, my office received from plaintiff an administrative appeal to the January 29, 2007 letter. <u>See</u> Ex. 7.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this **1st** day of March, 2007.

Michael S. Marquis

6



Center for the
Study of Services

March 27, 2006

**By Certified U.S. Mail**

Centers for Medicare & Medicaid Services (CMS)
Office of Strategic Operations and Regulatory Affairs
Freedom of Information Group
Room N2-20-16
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Dear Sir or Madam:

      Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, *et seq.* and corresponding regulations, Consumers' CHECKBOOK/Center for the Study of Services ("CHECKBOOK/CSS") hereby requests certain Medicare claims records compiled and maintained electronically by CMS in the Carrier SAF files (previously known as the Physician/Supplier Part B files). We request only a subset of the data elements from those records, listed in Attachment A of this letter. We also limit our request to:

    1)  Data records for Calendar Year 2004;
    2)  Data records generated from physician claims; and
    3)  Data records for which the Line NCH Provider State Code is DC, IL, MD, WA or VA.

      We request this data as it is maintained at CMS, and ask that it be supplied on 3490E IBM Standard label tape cartridges, DVD, or USB hard drive. We would like to receive the data in EBCDIC format, compressed, and preferably divided into individual files for each state requested.

**Privacy Issues**

      We understand that there may be concerns regarding Medicare beneficiary privacy associated with these data records. We are not requesting any data that directly identifies beneficiaries. If CMS believes that the requested data may nonetheless raise beneficiary identification or patient privacy concerns in any specific instances, please

Publisher of *Consumers'*
*CHECKBOOK* magazines

1625 K Street, NW, 8ᵗʰ Floor
Washington, DC 20006

Phone: 800-213-7283
Fax: 202-347-4000


GOVERNMENT
EXHIBIT
1

contact me so that we may discuss methods to protect beneficiary privacy while still providing the data that we request.

Additionally, we understand that CMS has previously relied on FOIA Exemption 6, 5 U.S.C. § 522(b)(6), as a justification for withholding physician identifying data on personal privacy grounds. We respectfully disagree with this assessment, and draw your attention to Public Citizen Health Research Group v. Dept. of Health, Education and Welfare, 477 F.Supp. 595 (D.D.C. 1979), rev'd on other grounds, 668 F.2d 537 (D.C. Cir. 1981), which squarely addressed this issue. In that case, District Court Judge Gesell balanced physician privacy interests against the public interest in receiving physician specific information that would provide a quality check on the performance of the Medicare and Medicaid programs. Judge Gesell held that, on balance, the public interest outweighed the privacy interest requiring disclosure of the information.[1] Id. at 604-5. Nonetheless, if CMS believes it has grounds to withhold the requested physician identifying information, I ask that you contact me to discuss the issue prior to proceeding with this matter, as the physician identifying information is essential to our request.

### Request for Fee Waiver

CHECKBOOK/CSS is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services (including services provided to consumers through government programs) and providing public benefit by publishing reports that educate consumers about such services. We believe that the provision of the requested information is in the public interest because, through our analysis of the requested data and our publication of findings, we will contribute significantly to the public's scrutiny of the operations and performance of CMS and the Medicare program. The commercial interests of CHECKBOOK/CSS are not primary to this request. Therefore, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45, we request that any fees associated with this request be waived. If you should determine that fees will not be waived, I ask that you contact me prior to providing the requested records to discuss the anticipated fees.

---

[1] Even though Public Citizen was decided prior to the Supreme Court's landmark decision in U.S. Dept. of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749 (1989), Judge Gesell followed the appropriate analysis required under Reporters Comm. by considering public benefits derived from the scrutiny of an agency and its performance, which are "at the core of FOIA." 477 F.Supp. at 604.

Consistent with 45 C.F.R. § 5.35, I would appreciate a response within 10 working days of receipt of this request. If you would like to discuss any issues related to this request, please contact me at (202) 454-3003. Thank you for your assistance.

Sincerely,

Robert Krughoff
President, CHECKBOOK/CSS

Enclosure

cc:     Stephen Albrecht, Esq.
        Wilmer Cutler Pickering Hale and Dorr LLP

**Attachment A**

Data elements requested from the Carrier SAF files:

        Claim Through Date (Year/Quarter)
        Carrier Number
        CWF Beneficiary Medicare Status Code
        Claim Principal Diagnosis Code
        Carrier Claim Payment Denial Code
        Claim Excepted/Non-Excepted Medical Treatment Code
        Carrier Claim Provider Assignment Indicator Switch
        Carrier Claim Referring PIN Number
        Care Plan Oversight (CPO) Provider Number
        Carrier Claim Diagnosis Code Count
        Carrier Claim Line Count
        Claim Diagnosis Code
        Carrier Line Performing PIN Number
        Carrier Line Performing UPIN Number
        Line NCH Provider State Code
        Line HCFA Provider Specialty Code
        Line Provider Participating Indicator Code
        Carrier Line Reduced Payment Physician Assistant Code
        Line Service Count
        Line HCFA Type Service Code
        Line Place of Service Code
        Line Last Expense Date (Year/Quarter)
        Line HCPCS Code
        Line HCPCS Initial Modifier Code
        Line HCPCS Second Modifier Code
        Line NCH BETOS Code
        Line Beneficiary Primary Payer Code
        Line Processing Indicator Code
        Line Diagnosis Code

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244–1850



<u>**Office of Strategic Operations and Regulatory Affairs/Freedom of Information Group**</u>

Refer to: C06FOI1318 (KJ)

JUN 2 6 2006

Robert Krughoff
Center for the Study of Services
1625 K Street, NW, 8th Floor
Washington, DC 20006

Dear Mr. Krughoff:

This is in response to your Freedom of Information request dated March 27, 2006,
seeking access to Medicare claims records compiled and maintained electronically by
the Centers for Medicare & Medicaid Services (CMS) in the Carrier SAF files
(previously known as the Physician/Supplier Part B files). You requested a subset of
the data elements from the Carrier SAF files. You limited your request to: data
records for Calendar Year 2004; data records generated from physician claims and;
data records for which the Line NCH Provider State Code is DC, IL, MD, WA or VA.

We are unable to comply with your request because the agency does not maintain a
record that is responsive to your request and because, under FOIA, we are not required
either to create records or to <u>furnish information in a particular form or format when a
record in such form or format is not readily reproducible employing reasonable efforts.</u>
See 5 U.S.C. § 552(a)(3)(B). We will not reproduce a record in a form or format that
would be responsive to your request because we cannot readily do so with reasonable
effort.

To explain, the carrier SAF is not the repository of the calendar year 2004 records you
have requested. Medicare claims records that cover calendar year 2004 are
maintained electronically by CMS in the National Claims History (NCH) files. The
NCH is a "flat file database" in which the files are generally read one record per line
in sequential order. The NCH contains approximately 829.4 million claims for
calendar year 2004. In order to process your request, each of the 829.4 million claims
that is identified with the provider state codes of interest to you would need to be
reformatted to include only the data elements that you have requested. The computer
analysis and generation time associated with this "reformatting" effort is
approximately two weeks or longer if a single file is produced. Hence, it is not
possible to satisfy your request with reasonable effort.



Page 2: Mr. Krughoff/C06FOI1318 (KJ)

I wish to point out that on June 1, 2006, CMS announced an effort to make health care more affordable and accessible, by making cost and quality data available. CMS posted the costs it pays hospitals for 30 common elective procedures and other hospital admissions at:

http://www.cms.hhs.gov/HealthCareConInit/

The information is categorized by state and county and includes a range of prices, the national average payment for the procedure, and the number of cases the hospital has handled.

CMS is working closely with a number of national and local organizations to develop more comprehensive and personalized information for common elective procedures of ambulatory services centers later this summer and common hospital outpatient and physician services this fall.

Additional information on transparency in health care costs and quality is located at:

http://www.hhs.gov/news/press/2006pres/20060601a.html

and,

http://www.cms.hhs.gov/apps/media/press/release.asp?Counter=1872

You may appeal this decision instead of requesting an informal review. To file an appeal, you must appeal in writing within 45 days of the date of this letter. Both your appeal letter and the envelope in which it is sent should be labeled "Freedom of Information Act Appeal." Enclosing a copy of this letter or referring to the "Refer to" number at the top of the first page of this letter will help to expedite matters. To file an appeal, mail your appeal to:

> Deputy Administrator
> Centers for Medicare & Medicaid Services
> 7500 Security Boulevard, Room C5-16-03
> Baltimore, Maryland 21244-1850

> Sincerely,
>
> Michael S. Marquis
> Director
> Freedom of Information Group

*FOIA Appeal*
*Case # C06 FoI 2229A*

**WILMERHALE**

July 25, 2006

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephan.albrecht@wilmerhale.com

**By United Parcel Service and Facsimile**

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Room C5-16-03
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOI1318*

Dear Sir or Madam:

On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services ("CSS") filed a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, with the Centers for Medicare & Medicaid Services ("CMS") requesting certain Medicare physician claim records ("the request"). CMS responded to the request in a letter dated June 26, 2006 from Mr. Michael S. Marquis, Director of the Centers for Medicare and Medicaid Services ("CMS") Freedom of Information Group ("the denial").[1] *See* Exhibits A-B.

In its response, CMS denied the request in its entirety and refused to produce even a single responsive record. Pursuant to 5 U.S.C. § 552 and 45 C.F.R. § 5.34, CSS hereby appeals the denial of the request.

I. Summary of Argument

On March 27, 2006, CSS[2] requested specific data items contained within a single database maintained electronically by CMS, and requested that the data be produced

---

[1] The denial stated that in order to file an appeal, CSS must appeal "in writing within 45 days of the date of this letter." *See* Ex. B. However, the Department of Health and Human Services ("HHS") FOIA regulations state that appeals must be filed "within *30* days from the date you *receive* [the response] letter...." 45 C.F.R. § 5.34(a) (emphasis added). Due to these conflicting deadlines, CSS has taken a conservative approach and filed this appeal within 30 days from the date of the denial letter. CSS does, however, reserve the right to supplement this appeal to the extent permitted under law or allowed under the guidance offered by CMS in the denial letter.

[2] CSS is a non-profit 501(c)(3) corporation, founded in 1974 for the purpose of conducting and encouraging studies and educating the public on the kinds and quality of consumer services available to the public, including those services provided through government programs. CSS publishes *Consumers' CHECKBOOK* magazine in seven metropolitan areas. The magazine rates

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Baltimore   Beijing   Berlin   Boston   Brussels   London   Munich   New York   Northern Virginia   Oxford   Palo Alto   Waltham   Washington

GOVERNMENT EXHIBIT
3

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 2

electronically "as it is maintained at CMS." *See* Ex. A. CMS denied the request on two grounds, neither of which constitutes a legitimate justification for denial.

- First, CMS claimed that "the agency does not maintain a record that is responsive to [the] request," and thus responding to the request would require it to "create records." *See* Ex. B. However, in the very same letter, CMS acknowledged that the requested data does exist as a part of a single electronic database maintained by CMS. Under the FOIA statute, relevant case law, and the CMS FOIA policies and procedures, a database is considered a "record," and extracting a subset of data from a larger database is not considered creating a new record.

- Second, CMS asserted that under 5 U.S.C. § 552(a)(3)(B), compliance with the request was not required because producing the requested records would entail producing data "in a particular form or format" that is not "readily reproducible employing reasonable efforts." *See* Ex. B. Under the FOIA statute, relevant case law and the CMS FOIA policies and procedures, the statutory provision cited by CMS is not a proper legal justification for the complete denial of a FOIA request.

The purpose of the FOIA is to "ensure that the Government's activities be opened to the sharp eye of the public scrutiny...." *United States Dept. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 774 (1989) (emphasis omitted). CSS has requested records maintained by CMS in order to assess the physician services that CMS is purchasing with taxpayer dollars through the Medicare program and to scrutinize and evaluate CMS's performance of its administrative duties. Unfortunately, CMS has denied this request so as to conceal its data, and conceal the internal workings of the Medicare program, from public scrutiny. CMS's denial violates the letter and the spirit of the FOIA and CMS's own policies, and must be overturned.

## II.     Medicare Data Background

CMS maintains the National Claims History ("NCH"), an electronic database containing data from millions of claims filed by various types of providers each year under the Medicare program. CMS routinely prepares subsets of the NCH for distribution to private parties for

---

many types of local service firms from auto repair shops to plumbers, from doctors to banks. CSS also publishes nationally distributed books including the Guide to Top Doctors, Consumers' Guide to Hospitals, and the Guide to Health Plans for Federal Employees, which is now in its 27th annual edition and is sold online to many federal agencies to assist their employees and retirees in making health plan decisions.

07/25/2006 18:10 FAX  2026336363          WCPHANDD                    ☒004/009

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 3

research purposes.[3/] A Standard Analytical File (SAF) is a typical "subset" of the NCH created by CMS to capture the claims submitted to Medicare for each specific type of provider.[4/] For example, the CMS web page explains that CMS creates a Home Health Agency SAF, which contains the subset of claims submitted by home health agencies to the Medicare program. Similarly, claims submitted by physicians under Medicare Part B are segregated into an SAF called the "Physician/Supplier Part B - Carrier File," also know as the Carrier SAF. *See* Ex. D.

In the request, CSS described the requested data as "records compiled and maintained electronically by CMS in the Carrier SAF files ...." *See* Ex. A. In an effort to simplify its request, CSS described the requested records by referencing the data in the specific SAF rather than the broader NCH. CMS, however, asserted "the carrier SAF is not the repository of the calendar year 2004 records you have requested. Medicare claims records that cover calendar year 2004 are maintained electronically by CMS in the National Claims History (NCH) files." *See* Ex. B. Based on CMS's own explanations of its data, there should be no practical difference in data content between the physician claims in the NCH and the claims in the Carrier SAF, which are extracted from the NCH.[5/] In fact, CSS contacted the Research Data Assistance Center ("ResDAC"), which contracts with CMS to assist researchers in their requests for data from CMS, and verified that the requested data does exist in the CMS files as described in the request. If as a technical matter, CMS prefers to obtain the requested records from the NCH rather than a corresponding SAF file, CSS does not object.

---

[3/]    A further explanation of the CMS data request process for research purposes is available on the CMS web page at http://www.cms.hhs.gov/PrivProtectedData/. *See* Exhibit C. CMS requires that researchers receiving this data sign a Data Use Agreement ("DUA"), which among other things, prohibits the public dissemination of physician specific data. Because CSS routinely publishes the findings of its consumer services analysis, this limitation makes the research request process unsuitable for CSS's purposes.

[4/]    A further explanation of the SAFs is available on the CMS web page at http://www.cms.hhs.gov/IdentifiableDataFiles/02_StandardAnalyticalFiles.asp#TopOfPage, and is attached hereto as Exhibit D.

[5/]    In fact, in a letter from Dennis G. Smith, Director, CMS Center for Medicaid and State Operations, to various State Medicaid Directors dated June 4, 2002, Mr. Smith provided instructions for state agencies to request Medicare claim data, explaining that the data resided in "Medicare's National Claims History (NCH) Standard Analytical Files (SAF)" for each state. This letter is available at http://www.cms.hhs.gov/smdl/downloads/smd060402.pdf, and is attached to hereto as Exhibit E.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 4

### III.    Argument

#### A.    Complying with the CSS request does not require the creation of "new records."

CMS asserted that it does not maintain a record that is responsive to the CSS request, and therefore complying with the request would require the creation of records. Under the FOIA statute, however, the contents of an electronic database are considered "records," and an agency is obligated to search agency records "manually or by automated means" in order to locate records that are responsive to a request. 5 U.S.C. §§ 552(a)(3)(C) & (D); see also Yeager v. Drug Enforcement Admin. et al., 678 F.2d 315, 321 (D.C. Cir. 1982) ("computer-stored records, whether stored in the central processing unit, on magnetic tape or in some other form, are still 'records' for purposes of the FOIA").

It is immaterial that the NCH database houses a set of data broader than CSS has requested. CMS admitted in the denial that the data CSS requested is maintained in the NCH, and that the requested items of data can be extracted from the full NCH for production. This extraction of data from a database is not the creation of new records, and any assertion to the contrary is inconsistent with the FOIA statute and relevant case law. See, e.g., Schladetsch v. U.S. Dept. of Housing and Urban Development, No. 99-0175, 2000 WL 33372125 at *3 (D.D.C. Apr. 4, 2000) ("Because HUD has conceded that it possesses in its databases the discrete pieces of information which [plaintiff] seeks, extracting and compiling that data does not amount to the creation of a new record").

CMS's Freedom of Information Group Policy and Procedural Guide further addresses the issue of when preparing requested data for disclosure will be deemed creating "new records." The Guide states:

> The FOIA does not require that new records or documents be created to respond to requests. Writing a new program(s) to extract data from multiple computer files in order to compile such data into a "new" record is considered creating a record. However, deleting non-releasable data, or data not within the scope of the request, from an existing record is not considered creating a record. This applies even if, for administrative convenience, we write a new program to edit the existing record rather than editing the record manually after the hard copy has been run.[9] See Ex. F at 10.

---

[9]    CMS Office of Strategic Operations and Regulatory Affairs, Freedom of Information Group, Policy and Procedural Guide (updated June 2006). The Guide is available at http://www.cms.hhs.gov/FOIA/downloads/CMS FOIA POLICY and Procedural Guide.pdf.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 5

CSS has not requested that CMS extract data from multiple sources to be aggregated into a "new record." CMS has acknowledged that the data CSS requested exists in a single electronic location – the NCH – not in multiple and disparate computer databases. CSS has requested a subset of the data in the NCH. In order to comply with the CSS request, CMS may delete the data that is outside the scope of the request from the full NCH. Under CMS's own policy, this procedure does not constitute creating a new record. Even if, for administrative efficiency, CMS decides to write a program to perform this editing function, it would not be creating a new record. CMS's assertion to the contrary in the denial letter is inconsistent with this policy, and inconsistent with applicable federal law.

> ### B. The FOIA provision cited by CMS does not justify a denial of the CSS request in its entirety.

When CMS asserted that it was not required to expend an unreasonable effort to comply with the CSS request, it mis-characterized the FOIA statute regarding the reasonableness of production in a specific form or format. In the denial letter, CMS cited to 5 U.S.C. § 552(a)(3)(B). This statutory provision must be read in conjunction with the preceding provision to understand its meaning. Section 522(a)(3)(A) states that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." With the prior understanding that a proper request has been made for existing records, section 522(a)(3)(B) goes on to explain:

> In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

With this context, it is clear that § 552(a)(3)(B) does not provide an agency with a justification for completely denying a FOIA request. Rather, it clarifies that once an agency has identified responsive records that will be produced, the agency must take reasonable steps to provide records in the form or format that a requestor prefers. *See, e.g., TPS, Inc. v. U.S. Dep't of Defense*, 330 F.3d 1191, 1195 (9th Cir. 2003) (agency conceded that electronic records were to be produced to a requestor, but argued under § 552(a)(3)(B) that the agency was not obligated to compress or "zip" the data files. The court held that if the agency used the "zip" technology in its "normal business as usual approach," then it would be reasonable to employ that technology for its FOIA response). Under § 552(a)(3)(B), if it would be unreasonable for an agency to transform a record into the requestor's preferred form or format, then the agency would still be required to provide the requested record in whatever form or format the record is maintained by the agency in normal course. *See also, Schladetsch*, 2000 WL 33372125 at *3, n.2 (explaining

07/25/2006 18:12 FAX 2026336363          WCPHANDD                                    ☒007/009

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 6

that "form or format" typically involves choices between microfiche or computer form or visicorder charts or paper form. Because plaintiff requested records as they were maintained by the agency, section (a)(3)(B) did not apply.)

CMS addressed § 552(a)(3)(B) in a FOIA Memorandum issued on April 24, 1997 following the implementation of the "EFOIA" Amendments of 1996.[2/] The memorandum states:

> The term "form" or "format" also can be interpreted to mean the organization or arrangement of information within a record. It has been our practice in the past to reproduce computerized records only *in the form or format in which we normally extract the record from our system.* However, in line with this provision, the following guidance will assist you when responding to requests for computerized records in a form or format other than that normally extracted from an automated database[.]

*See* Exhibit G at 2 (emphasis added). This FOIA policy statement makes clear that as a default rule, CMS will produce computerized records in the form in which they are normally extracted from CMS data systems. CSS has asked for nothing more than this simple extraction of data. CSS stated in the request that the Medicare claim data should be produced "as it is maintained at CMS." *See* Ex. A. CSS did request some further format specifications, including that the data be "in EBCDIC format, compressed, and *preferably* divided into individual files for each state requested." *See* Ex. A (emphasis added). If CMS believes that these formatting requests are "unreasonable" under 5 U.S.C. § 552(a)(3)(B), then CSS would expect an explanation to that effect. However, § 552(a)(3)(B) does not authorize CMS to deny the CSS request in its entirety on "form and format" grounds. CMS would be expected, at the very least, to provide the data in the form or format in which it is normally extracted from the NCH system. CMS's misguided attempt to deny the request in its entirety on formatting grounds under 5 U.S.C. § 552(a)(3)(B) must be reversed.

### C. The CSS request does not require an "unreasonable effort" from CMS.

The FOIA statute explains that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of those portions which are exempt under this subsection." 5 U.S.C. § 552(b). Courts interpret the "reasonably segregable" term very liberally, and have required that agencies expend significant resources to comply with FOIA

---

[2/]    Memorandum from Glenn W. Kendall, Acting Director, Freedom of Information and Privacy Office to Central and Regional Office Freedom of Information Act Coordinators (Apr. 24, 1997), available at http://www.cms.hhs.gov/FOIA/downloads/CMS%20FOIA%20Policy-E-FOIA-Form%20n%20Format.pdf.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 7

requests. For example, in *Long v. U.S. Internal Revenue Serv.*, the Ninth Circuit held that reviewing and editing over 200,000 pages of documentation and a series of data tapes at a cost of up to $160,000 was "not considered an unreasonable burden to place on an agency." 596 F.2d 362, 366-367 (9th Cir. 1979).[9/] The court explained that Congress has not limited the scope of the FOIA, despite the expenses that can be involved. "Congress has determined that access to government records is an important objective. We therefore cannot conclude that the costs of editing involved in this case are so extreme that segregation of revealable material is unreasonable as a matter of law." *Id.*

CMS estimated that it would take approximately 2 weeks to process the CSS request. In light of the Congressional mandate for the release of public records under the FOIA and the precedent courts have set requiring significant efforts to comply with FOIA requests, compliance with the CSS request cannot be deemed "unreasonable." Moreover, CMS cannot argue that complying with the CSS request would disrupt its normal work processes. As described above, CMS prepares data extracts comparable in size, scope and field selection to the CSS request on a routine basis for third-party researchers who request these data extracts. Furthermore, CMS employs contractors such as the Research Data Distribution Center, to process these research requests. Thus, CMS staff would not be required to perform the data processing required in this case if it elected to utilize its normal contractors. To the extent that CMS can rely on contractors' to prepare the data for the request, and because costs of production can be passed on to the requestor under some circumstances, it is difficult to understand how CMS would be burdened in any way by the CSS request.

The FOIA, and the EFOIA amendments of 1996 in particular, are a Congressional mandate for federal agencies to open their records for public scrutiny. In the EFOIA amendments, Congress particularly found that "[g]overnment agencies increasingly use computers to conduct agency business and to store publicly valuable agency records and information," and "[g]overnment agencies should use new technology to enhance public access to agency records and information." *TPS, Inc.*, 330 F.3d at 1195 (citing Pub. L. No. 104-231 at

---

[9/]     The Long court also catalogued a series of decisions whereby courts ordered agencies to commit significant resources to processing FOIA requests. For example, in a case involving a request for information regarding the Rosenberg trials, the U.S. District Court for the District of Columbia ordered the Department of Justice ("DOJ") to fulfill the request, requiring DOJ to commit 65 full-time and 21 part-time employees to processing a single FOIA request. 596 F.2d at 367 (citing *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 613 (D.C. Cir. 1976). *See also; Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 360 (5th Cir. 2001) (Army prepared to manually redact hundreds of thousands of records, and then rescan them into a computer database to comply with a FOIA request).

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 8

*2). Under this mandate, CMS cannot be allowed to use the technical aspects of data formatting and database extractions as a basis for denying access to its records. Rather, the CMS data systems should be employed to enhance public access to agency records. The FOIA statute, case law, and CMS's own policies require compliance with the request.

### IV.    Conclusion

For the foregoing reasons, the denial of the CSS FOIA request must be reversed, and the requested records produced. We look forward to your reply to this appeal within **twenty (20) working days**, as required under 5 U.S.C. § 552(a)(6)(A)(ii).

In the original request, CSS requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. Because CMS denied the request, the fee waiver has not been addressed in this matter. CSS retains the right to request a fee waiver in the event that the denial is overturned on appeal and the requested records are produced.

Sincerely,

Robert Krughoff
President, CHECKBOOK/CSS
1625 K St., NW, 8th Floor
Washington, DC 20006.
Tel: (800) 213-7283
Fax: (202) 347-4000
E-mail: Rkrughoff@checkbook.org

Stephen M. Albrecht
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6714
Fax: (202) 663-6363
E-mail: Stephen.Albrecht@wilmerhale.com

Enclosures

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group

**August 1, 2006**

__REFER TO:__   FOIA Appeal C06FOI2229A (DJP)

Mr. Stephen M. Albrecht, Esquire
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Dear Mr. Albrecht:

I am acknowledging receipt of your July 25, 2006 Freedom of Information Act
(FOIA) appeal, which you sent to the Deputy Administrator, Centers for Medicare &
Medicaid Services (CMS). We will process your appeal as expeditiously as possible,
consistent with Department of Health and Human Services FOIA rules set forth at
45 CFR Part 5.

Questions regarding your appeal should be directed to Ms. Deborah Peters at
(410) 786-3677.

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**Centers for Medicare & Medicaid Services**
**7500 Security Boulevard, N2-20-16**
**Baltimore, Maryland 21244-1850**



**Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group**

November 1, 2006

**Refer to: FOIA Appeal C06FOI2229A**

Mr. Stephen M. Albrecht, Esquire
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Dear Mr. Albrecht:

This letter is in response to your October 27, 2006 electronic mail, which you sent to Ms. Deborah Peters of my staff, concerning the July 25, 2006 Freedom of Information Act (FOIA) administrative appeal submitted by your client, Mr. Robert Krughoff of Consumer's Checkbook. Mr. Krughoff appealed the June 26, 2006 decision of the Centers for Medicare & Medicaid Services (CMS), within which we declined to produce the records requested, on the basis that CMS could not provide the requested records by employing reasonable efforts on the part of our agency.

In your email to Ms. Peters, you expressed your concerns regarding the length of time that had elapsed since the submission of the appeal, and that you had not received a response from CMS. You previously communicated with Ms. Peters regarding Mr. Krughoff's appeal on August 28, 2006, by telephone and email. At that time Ms. Peters explained the review process, and affirmed that CMS was working on this matter.

I apologize for any delay that has occurred in responding to Mr. Krughoff's appeal. Recently, it has been necessary for Ms. Peters to undertake a number of critical assignments, in conjunction with performing as the primary party in our office responsible for FOIA appeals. Inasmuch as these assignments and related issues have progressed toward resolution, Ms. Peters will now be able to refocus upon Mr. Krughoff's appeal.

Because the appeals process requires multiple levels of review and approval at both our Baltimore, Maryland and Washington, D.C. offices, it is difficult to project the precise response date. I would anticipate that CMS should be able to response to Mr. Krughoff's appeal by December 15, 2006.


GOVERNMENT
EXHIBIT

5

**<u>PAGE II.</u>** – Consumer's Checkbook / Appeal C06FOI2229A

I hope this is helpful in clarifying the status of Mr. Krughoff's appeal, and our efforts to address this matter. Should you have any questions regarding your appeal, you are welcome to contact Ms. Peters 410-786-3677, or at <u>Deborah.Peters@cms.hhs.gov</u> .

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group

cc: Mr. Robert Krughoff

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group

**January 29, 2007**

**Refer to: C06FOI1318 / C06FOI2229A**

Mr. Robert Krughoff, President
Mr. Stephen Albrecht, Esquire
Checkbook / Center for Study of Services
1625 K Street, N.W., 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff and Mr. Albrecht:

This letter revises my decision not to comply with your March 27, 2006 Freedom of Information (FOIA) request to obtain a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. Specifically, in response to your July 26, 2006 appeal of my decision, CMS has reexamined the processes necessary to extract the requested data with our information technology staff, and we have determined that we will be able to produce the requested information. Once produced, CMS will review the requested information under the FOIA to make our release determination.

You requested a waiver of fees for your FOIA request. Within your March 27, 2006 request, you described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a non-profit entity which conducts studies of consumer services, including government services, and publishes material which informs or educates consumers concerning those services. You contend a fee waiver is appropriate because providing the requested information will enable Checkbook / CSS to analyze the data and subsequently publish that analysis, which you believe is in the public interest, and will contribute significantly to public scrutiny of the operations of CMS and the Medicare program. You further state that the commercial interests of your organization are not the primary basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the fees we would otherwise charge if disclosure of the information meets both of the following tests: (1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government; and (2) It is not primarily in the commercial interest of the requester." After careful consideration of the commercial nature in which Checkbook /CSS markets and sells its services, I have concluded that CheckBook /CSS has a primary commercial interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the public interest in this matter. I also conclude that you have not demonstrated that disclosure of the requested data will advance the understanding of the general public because disseminating on a subscription or a fee basis will limit the general public's access to the requested data. Therefore, your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.



**PAGE II. – Consumers' Checkbook / CSS**

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

If you disagree with this decision to deny your fee waiver request, you may appeal. Your appeal should be mailed within 30 days of this letter to the: Deputy Administrator, Centers for Medicare & Medicaid Services, Mail Stop C5-2626, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. Please mark your letter "Freedom of Information Act Appeal", and enclose a copy of this letter.

Sincerely,

Michael S. Marquis
Director
FOIA Group

*C07FOI0907A*

**WILMERHALE**

2007 MAR -1  AM 9: 04

CMS FOI

February 28, 2007

**By Federal Express and Facsimile**

*C07FOI0907* A

Stephen M. Albrecht

+1 202 663 8714 (d
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-2626
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOI1318/C06FOI2229A*

Dear Sir or Madam:

    We write to appeal the decision of the Centers for Medicare & Medicaid Services ("CMS") Freedom of Information Group denying a fee waiver in the above referenced matter.

### Background

    On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services ("CSS") filed a request for information under the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552 *et seq.*, with CMS requesting certain Medicare physician claim records that detail the medical services provided by Medicare physicians ("the request"). CSS also requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. CMS denied the request in a letter dated June 26, 2006 ("the denial").

    On July 25, 2006, CSS appealed the denial to the office of the Deputy Administrator, but that office failed to answer the appeal in violation of the statutory requirements of the FOIA. On December 26, 2006, CSS filed a complaint in the United States District Court for the District of Columbia (Case No. 1:06CV02201) seeking injunctive relief to enjoin CMS from withholding the requested records and asking the Court to order CMS to release the information. This litigation is currently pending before the District Court.

    After the complaint was filed, CMS informed CSS in a letter dated January 29, 2007 that it had revised its decision not to comply with the original request. (*See* Exhibit A) However, CMS did <u>not</u> agree to release the requested records. Instead, the January 29 letter denied CSS's request for a fee waiver, and then informed CSS that it must pay a fee of $19,723.50[1] for CMS to "produce" the data *before* deciding if the data could be released to CSS. <u>The payment of almost $20,000 to CMS would not guarantee that CSS would actually receive any of the data it</u>

---

[1] CSS requested data records from five states. The January 29 letter stated that the cost for compiling the data for each state would be $3,944.70, yielding a total of $19,732.50 for all five states.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Baltimore   Beijing   Berlin   Boston   Brussels   London   Munich   New York   Northern Virginia   Oxford   Palo Alto   Waltham

GOVERNMENT EXHIBIT 7

# WILMERHALE

**FACSIMILE**

| | |
|---|---|
| Date February 28, 2007 | +1 202 683 6714 (t) |
| | +1 202 683 6363 (f) |
| | stephen.albrecht@wilmerhale.com |

| | | |
|---|---|---|
| To  Deputy Administrator, CMS | Fax | 202-690-6262 |
| | Tel | 202-690-6726 |

cc

| | | |
|---|---|---|
| From  Stephen M. Albrecht | Pages | 13 (including cover) |

Re  **Freedom of Information Act Appeal**

Following is an appeal of CMS's denial of the fee waiver of FOIA case #
C06FOI1318/C06FOI2229A.   An original copy of the appeal has been sent to:

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Room C5-16-03
Baltimore, MD 21244-1850

Wilmer Cutler Pickering Hale and Dorr LLP. 1875 Pennsylvania Avenue NW, Washington. DC 20006

Baltimore   Beijing   Berlin   Boston   Brussels   London   Munich   New York   Northern Virginia   Oxford   Palo Alto   Waltham   Washington

This facsimile transmission is confidential and may be privileged. If you are not the intended recipient, please immediately call the sender or, if the sender is not available, call +1 202 663 6712 and destroy all copies of this transmission. If the transmission is incomplete or illegible, please call the sender or, if the sender is not available, call +1 202 663 6712. Thank you.



WILMERHALE

FACSIMILE

+1 202 663 8714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

Date February 28, 2007

To Deputy Administrator, CMS

Fax   202-690-6262
Tel   202-690-6726

cc

From Stephen M. Albrecht

Pages 13 (including cover)

Re Freedom of Information Act Appeal

Following is an appeal of CMS's denial of the fee waiver of FOIA case #
C06FOI1318/C06FOI2229A.  An original copy of the appeal has been sent to:

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Room C5-16-03
Baltimore, MD 21244-1850

This facsimile transmission is confidential and may be privileged. If you are not the intended recipient, please immediately call the sender or, if the sender is not available, call +1 202 663 6712 and destroy all copies of this transmission. If the transmission is incomplete or illegible, please call the sender or, if the sender is not available, call +1 202 663 6712. Thank you.

WILMERHALE

February 28, 2007

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

By Federal Express and Facsimile

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-2626
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOI1318/C06FOI2229A*

Dear Sir or Madam:

We write to appeal the decision of the Centers for Medicare & Medicaid Services ("CMS") Freedom of Information Group denying a fee waiver in the above referenced matter.

## Background

On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services ("CSS") filed a request for information under the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552 *et seq.*, with CMS requesting certain Medicare physician claim records that detail the medical services provided by Medicare physicians ("the request"). CSS also requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. CMS denied the request in a letter dated June 26, 2006 ("the denial").

On July 25, 2006, CSS appealed the denial to the office of the Deputy Administrator, but that office failed to answer the appeal in violation of the statutory requirements of the FOIA. On December 26, 2006, CSS filed a complaint in the United States District Court for the District of Columbia (Case No. 1:06CV02201) seeking injunctive relief to enjoin CMS from withholding the requested records and asking the Court to order CMS to release the information. This litigation is currently pending before the District Court.

After the complaint was filed, CMS informed CSS in a letter dated January 29, 2007 that it had revised its decision not to comply with the original request. (*See* Exhibit A) However, CMS did not agree to release the requested records. Instead, the January 29 letter denied CSS's request for a fee waiver, and then informed CSS that it must pay a fee of $19,723.50[1] for CMS to "produce" the data *before* deciding if the data could be released to CSS. The payment of almost $20,000 to CMS would not guarantee that CSS would actually receive any of the data it

---

[1] CSS requested data records from five states. The January 29 letter stated that the cost for compiling the data for each state would be $3,944.70, yielding a total of $19,732.50 for all five states.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006
Baltimore   Beijing   Berlin   Boston   Brussels   London   Munich   New York   Northern Virginia   Oxford   Palo Alto   Waltham   Washington

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 2

requested. The letter did not specify why CMS needed to compile the data at a cost of almost $20,000 before determining whether the records can be released.

Because CMS has not agreed to release the requested records, CSS is proceeding with the pending litigation before the District Court seeking CMS's compliance with the Act and release of the requested information. Additionally, by this letter, CSS appeals CMS's January 29, 2007 decision to deny the fee waiver pursuant to 5 U.S.C. § 552 and 45 C.F.R. § 5.34. CSS files this appeal without prejudice to its rights to proceed with the litigation currently pending before the District Court.[2]

### The Agency's Denial of the Fee Waiver Should Be Reversed.

CMS asserted in the January 29 letter that CSS has a primary commercial interest in the records it requested, and that this asserted commercial interest outweighs the public interest in this matter. CMS also concluded that CSS has not demonstrated that disclosure of the requested records will advance the understanding of the general public because CSS disseminates consumer information in its magazine on a subscription basis, which, according to CMS, may limit public access. CMS has failed to consider several relevant factors in this matter, and therefore the denial of the fee waiver must be overturned.

I.     The Records Requested by CSS Meet the Public Interest Test.

Agencies are to rely on four factors in determining whether the release of records will serve a public interest. *See Judicial Watch, Inc. v. Rossoti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003). The Department of Health and Human Services FOIA regulations address these factors as four separate questions to be considered. *See* 45 C.F.R. § 5.45. The release of records requested by CSS easily satisfies the Agency's public interest criteria, as set forth below.

1.     *How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government?* The Medicare program's core activity is the provision of medical services to the nation's elderly population. CSS has requested claim records from physicians in the Medicare program that document this core activity.

---

[2] *See, e.g., Pollack v. Dept. of Justice*, 49 F.3d 115 (4th Cir. 1995) (holding that once a FOIA plaintiff has exhausted administrative remedies and files suit in District Court, the Court will retain jurisdiction over the case even though the administrative process may continue regarding the payment of fees).

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 3

2.    *Would disclosure of the records reveal any meaningful information about
      government operations or activities? Can one learn from these records anything
      about such operations that is not already in the public knowledge?* The requested
      records will contain information regarding the medical services that physicians in
      the Medicare program provide to Medicare beneficiaries. This information is not
      currently in the public domain because CMS has not previously released
      physician specific data for public distribution. Once released, CSS will be able to
      study the data to analyze the quality of the medical services provided in the
      Medicare program, and assess the Medicare program's efforts to control or
      improve quality within the program. This assessment cannot be adequately
      performed without public release of the requested records.

3.    *Will the disclosure advance the understanding of the general public as
      distinguished from a narrow segment of interested persons?* CSS publishes
      consumer data in a variety of formats, including through its Consumers'
      CHECKBOOK magazine, through its website at www.checkbook.org, and
      through various reports such as the Guide to Top Doctors and the Guide to Health
      Plans for Federal Employees. CSS estimates its magazine subscriber population
      to be approximately 110,000 people. However, CSS expects information
      regarding quality in the Medicare program derived from the requested records to
      be disseminated much more broadly. CSS often releases the results of its quality
      studies through press releases, which are made available to the broader media and
      are posted on the checkbook.org website for access by the general public. For
      example, CSS posted findings and advice from its evaluations of hospitals in
      2002.[3] These findings, in turn, were reported by more than 125 newspapers and
      TV and radio stations, ranging from the Miami Herald, Washington Post, and
      Saint Louis Post Dispatch to the Today Show, KGO TV (San Francisco), and
      WBEZ public radio (Chicago). Similarly, CSS's research was used as the basis
      for the "50 Top Hospitals" article in AARP's Modern Maturity magazine,
      distributed to more than 30 million AARP members. The Washington, D.C. Fox
      News outlet also covers Consumers' CHECKBOOK quality evaluations and
      consumer advice approximately three times per month on its morning news
      program.

---

[3] *See* Press Release, Consumers' CHECKBOOK, Consumers' CHECKBOOK Reveals Big
Differences in Quality Among Hospitals (June 20, 2002), available at
http://www.checkbook.org/press/cgh.cfm. (See Exhibit B)

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 4

Furthermore, CSS often makes free content available on the checkbook.org
website – including articles on how to choose and when to change a physician;
why board certification matters; how to get good care in a hospital; and keeping
an eye on Medicare's impact on choice of physicians. CSS also has developed
relationships with other organizations to make CSS's information available to
their constituents without subscription. For example, CSS contracts with many
government agencies to provide their employees (more than 700,000 employees
in 2006-2007) free online access to Consumers' CHECKBOOK's Guide to Health
Plans for Federal Employees. Lastly, many public library systems in the
metropolitan areas where CHECKBOOK magazine is published subscribe to the
magazine in print and online for library users.

Media reports have already displayed a significant public interest in obtaining
information about the quality of services in the Medicare program.[4] It is a virtual
certainty that public interest in CMS's Medicare quality studies derived from the
requested records will be substantial.

4.    *Will the contribution to public understanding be a significant one? Will the
public's understanding of the government's operations be substantially greater as
a result of the disclosure?* Despite the wealth of data that is collected by CMS
regarding the provision of medical services by physicians in the Medicare
program, that data is not sufficiently studied or published so as to provide the
public with an understanding of the quality of services available in the program.
The disclosure of this information will provide a significant benefit to the general
public, as it will allow Medicare beneficiaries and their caretakers to better
understand the quality of services available through Medicare. For example,
studies have shown that for some medical procedures, physicians that perform a
high volume of the procedures produce superior quality outcomes for their
patients. The requested records will allow CSS to highlight this and other
important quality indicators within the Medicare program. Furthermore, release
of the records will focus public attention on whether the Medicare program is
adequately assessing issues of quality within the program.

---

[4] *See, e.g.,* Robert Pear, *Employers Push White House to Disclose Medicare Data,* N.Y. Times,
April 11, 2006, at A1.

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 5

II.    **The Public Interest in Obtaining the Requested Records Outweighs Any
        Commercial Interest of CSS.**

CSS is a non-profit entity dedicated to informing the public about consumer information.
Any commercial interest CSS may have in the requested records (insofar as CSS operates as a
not-for-profit business) is de minimus compared to the public's interest in learning about the
activities of the Medicare program. The quality of health services available to the Medicare
population is of critical importance to the well-being of the nation's elderly, and to the millions
of Americans who care for this population. Moreover, assessing Medicare's efforts to address
and improve the quality of medical care is of great public importance, as it will allow the public
and policy makers to assess the effectiveness of this large government program.

Once armed with this information, consumers will be able to make better decisions about
the health services they obtain. Consumers in this instance include the millions of Medicare
beneficiaries in the states covered by the CSS request, plus the millions of family members or
caretakers who help coordinate care for those beneficiaries. Beyond this concrete and immediate
benefit to this vast consumer group, CSS's reporting on Medicare quality likely will serve as a
model for other quality studies to be performed and published by CSS or other entities including
state governments, health insurers, and employers. Thus, the expected public interest in
obtaining this information is extremely broad and important.

For the foregoing reasons, CMS's January 29, 2007 decision to deny CSS's request for a
fee waiver should be reversed.

Sincerely,

*Robert Krughoff (SA)*

Robert Krughoff
President, CHECKBOOK/CSS
1625 K St., NW, 8th Floor
Washington, DC 20006
Tel: (800) 213-7283
Fax: (202) 347-4000
E-mail: Rkrughoff@checkbook.org

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 6

Stephen M. Albrecht
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6714
Fax: (202) 663-6363
E-mail: Stephen.Albrecht@wilmerhale.com

Enclosures

cc:  Michael Marquis, Director, FOIA Group, CMS

FEB-28-2007   20:01                    HCFH  OH                                         202 200 7037    P.06/40

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group
January 29, 2007

Refer to:  C06FOI1318 / C06FOI2229A

Mr. Robert Krughoff, President
Mr. Stephen Albrecht, Esquire
Checkbook / Center for Study of Services
1625 K Street, N.W., 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff and Mr. Albrecht:

This letter revises my decision not to comply with your March 27, 2006 Freedom of Information
(FOIA) request to obtain a subset of 29 specific data elements from a CMS database containing
physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C.,
Illinois, Maryland, Washington, or Virginia.  Specifically, in response to your July 26, 2006 appeal of
my decision, CMS has reexamined the processes necessary to extract the requested data with our
information technology staff, and we have determined that we will be able to produce the requested
information.  Once produced, CMS will review the requested information under the FOIA to make
our release determination.

You requested a waiver of fees for your FOIA request.  Within your March 27, 2006 request, you
described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a
non-profit entity which conducts studies of consumer services, including government services, and
publishes material which informs or educates consumers concerning those services.  You contend a fee
waiver is appropriate because providing the requested information will enable Checkbook / CSS to
analyze the data and subsequently publish that analysis, which you believe is in the public interest,
and will contribute significantly to public scrutiny of the operations of CMS and the Medicare
program.  You further state that the commercial interests of your organization are not the primary
basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and
Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the
fees we would otherwise charge if disclosure of the information meets both of the following tests:
(1) It is in the public interest because it is likely to contribute significantly to public understanding of
the operations and activities of the government; and (2) It is not primarily in the commercial interest
of the requester."  After careful consideration of the commercial nature in which Checkbook / CSS
markets and sells its services, I have concluded that CheckBook / CSS has a primary commercial
interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the
public interest in this matter.  I also conclude that you have not demonstrated that disclosure of the
requested data will advance the understanding of the general public because disseminating on a
subscription or a fee basis will limit the general public's access to the requested data.  Therefore,
your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.

EXHIBIT A

Case 1:06-cv-02201-EGS   Document 9-2   Filed 03/01/2007   Page 36 of 40
FEB-28-2007  20:02       HCFA DA                              202 260 7837   P.09/40
## PAGE II. – Consumers' Checkbook / CSS

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

If you disagree with this decision to deny your fee waiver request, you may appeal. Your appeal should be mailed within 30 days of this letter to the: Deputy Administrator, Centers for Medicare & Medicaid Services, Mail Stop C5-2626, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. Please mark your letter "Freedom of Information Act Appeal", and enclose a copy of this letter.

Sincerely,

Michael S. Marquis
Director
FOIA Group

**EXHIBIT A**

# CHECKBOOK A Nonprofit Consumer Information & Service Resource

February 26, 2007

| | | |
|---|---|---|
| Strictly Embargoed Until: | Contact: | **Caroline Phillips** |
| Thursday, June 20th | | (202) 454-3006 |

# Consumers' CHECKBOOK Reveals Big Differences in Quality Among Hospitals

### Nonprofit Research Organization, Consumers' CHECKBOOK, Rates 4,500 Hospitals Nationwide

In an effort to help patients make the best and safest choices, Consumers' CHECKBOOK has released its *Consumers' Guide to Hospitals*. The 360-page *Guide* compares 4,500 hospitals across the country based on death rates, estimated rates of complications, ratings from a survey of more than 260,000 physicians, evaluation scores given by independent inspectors who visited the hospitals for accreditation reviews, and the ongoing training programs the hospitals provide for doctors. Many medical consumers may not realize how widely these measures of quality vary among facilities and what it could mean to their well-being in the event of hospitalization. (Death rates and complication rates are risk-adjusted to take into account the fact that some hospitals care for patients who are more sick or frail than the patients of other hospitals.)

## How Do Various Hospitals Around the Country Rate?

### Death Rates:

The risk-adjusted death rate for a broad selection of difficult cases was:

8.6% at Lankenau Hospital in the Philadelphia suburb of Wynnewood

16.0% at Mercy Suburban Hospital a few miles away in Norristown, PA

9.4% at Baptist Hospital of Miami

15.0% at Parkway Regional Medical Center in North Miami Beach

9.4% at Cedars-Sinai Medical Center in Los Angeles

13.8% at Verdugo Hills Hospital in nearby Glendale, CA

### Ratings by Physicians:

When thousands of doctors were asked to rate the hospitals in their local areas for "surgery on an adult in cases where the risk of complications is high," the proportion of very good or excellent ratings was:

70% for Lankenau Hospital

3% for Mercy Suburban Hospital

**EXHIBIT B**

2/26/2007

79% for Baptist Hospital of Miami

9% for Parkway Regional Medical Center

83% for Cedars-Sinai Medical Center

14% for Verdugo Hills Hospital

<u>Regional Differences Were Substantial</u>

Based on information in the *Guide*, Consumers' CHECKBOOK compared scores in 40 different major urban areas. These encompassed the 40 largest metropolitan statistical areas in the U.S.

- Average risk-adjusted mortality rates ranged from **10.1% in the San Antonio, TX**, area to **14.8% in the Portland, OR,** area.
- The average percentage of doctors who rated the local hospitals with which they were familiar either very good or excellent ranged from **57% in the Norfolk, VA,** area to **23% in the New York City, Long Island, and Westchester** area.
- The overall evaluation scores given by the Joint Commission on the Accreditation of Healthcare Organizations based on detailed on-site inspections (maximum possible score 100) ranged from an average of **95.3 in the Charlotte, NC,** area to **87.9 in the Indianapolis, IN,** area.

Fact & Figures

Roughly one out of ten Americans will be admitted to a hospital this year. Hospitals are dangerous places. An authoritative study released by the Institute of Medicine indicates that at least 44,000, and possibly as many as 98,000, patients die in hospitals each year as a result of preventable medical errors. That is more than the number who die from motor vehicle accidents.

"Consumers need to take responsibility for hospital choice," said Robert Krughoff, Consumers' CHECKBOOK's president, "by choosing doctors and health plans that are affiliated with good hospitals, and by examining with their doctors the pros and cons of available facilities prior to any hospital admission."

The *Consumers' Guide to Hospitals* gives ratings for specific categories of cases, including complex medical care for adults, high-risk adult surgery, low-risk adult surgery, high-risk surgery on a child, high-risk delivery of a baby, and uncomplicated delivery of a baby. It also identifies hospitals that have significantly better or worse than average rates of deaths and complications for patients with specific diseases or needing specific procedures, including heart attack, stroke, kidney failure, and bypass surgery.

The *Guide* reveals:

- Hospitals rated higher than average by physicians also tended to get higher than average ratings from consumers.
- Hospitals rated higher than average by physicians also tended to have lower than average death rates.
- Hospitals closely affiliated with medical schools tended to have lower than average death rates and tended to be rated higher than average by physicians.
- Larger hospitals (those with more beds) tended to have lower death rates than smaller hospitals.

<u>Advice for Patients Faced With Hospitalization</u>

**EXHIBIT B**
2/26/2007

The *Consumers' Guide to Hospitals* gives extensive advice for consumers faced with a hospitalization. It exhorts patients not to go into a hospital—even for a routine case—without getting a second opinion from an independent doctor. Patients (or families and friends if the patient is not able) should discuss with their doctors—

- What is the basis for the diagnosis? Are there other possible explanations for the symptoms? Might it make sense to do further tests or simply to wait awhile to get a surer diagnosis?
- What are the alternative ways of treating the problem? What are the pros and cons of each—the chances of various outcomes in terms of lifestyle and ability to function?
- How complicated is the treatment? Does it require sophisticated medical staff or advanced equipment?
- What are the risks of complications? Will it be important to have close monitoring and quick access to sophisticated medical staff and equipment at all times?
- Why are the recommended hospital, and the particular doctor, good choices for the care? Is the required treatment one for which special training or frequent experience is important? Are there certain hospitals or specialists who have more skill, more experience, and higher success rates than others with this treatment?

## About Author Robert Krughoff

Robert Krughoff, President of Consumers' CHECKBOOK, has extensive background in health care quality measurement and consumer information, including having served as Director of Research and Evaluation Planning for the U.S. Department of Health, Education, and Welfare (now Health and Human Services); as an appointed member of the federal government's National Advisory Council for Health Care Policy, Research, and Evaluation; on the Committee on Performance Measurement of the National Committee for Quality Assurance; as an appointed member of several panels of the Institute of Medicine; as Chairman of the External Audit Committee of the ECRI Technology Assessment Program; on the Board of Directors of the American Pain Foundation; and on the Board of Directors of the Consumer Federation of America. He is a winner of the National Press Club's First Place Award for Excellence in Consumer Journalism, a recipient of the annual Esther Peterson Consumer Service Award from the Consumer Federation of America, and a winner of the annual Advocate's Award from the National Association of Consumer Agency Administrators.

## Interviews Available

Interviews with Robert Krughoff and with other co-authors of the *Guide* are available by request. Contact Caroline Phillips, Director of Public Relations, by phone at (202) 454-3006 or via email at press@checkbook.org for more information.

## Purchasing *Consumers' Guide to Hospitals*

The *Consumers' Guide to Hospitals* is available for $19.95 including shipping (payable to "Hospital Guide"), from Hospital Guide, 733 15th Street, NW, # 820, Washington, DC 20005. It can be ordered with a major credit card by calling (800) 213-7283 or on the web at www.checkbook.org. Alternatively, consumers may subscribe for two years of online access to the same information that appears in the printed *Guide* for $19.95 at www.checkbook.org.

## About Consumers' CHECKBOOK

The *Guide* is published by the nonprofit Consumers' CHECKBOOK organization. Founded in 1974, the organization also has recently published the *Consumers' Guide to Health Plans* and will soon release a new edition of its *Consumers' Guide to Top Doctors*. Since 1976, the organization has published local editions of Consumers' CHECKBOOK magazine in the Washington, DC, and San Francisco metropolitan areas; these magazines, with a combined paid circulation of 75,000 among local consumers in those two areas, are a "consumer reports" for local services, from auto repair shops to plumbers to hospitals. This fall, new editions of the magazine will appear in five additional metropolitan areas. Consumers' CHECKBOOK is fully funded through subscription and publication sales, fees for survey and information services, and consumer donations. Consumers' CHECKBOOK's magazines and websites accept no advertising.

**EXHIBIT B**
2/26/2007

FEB-28-2007  20:03          HCFA OA                            202 260 7837   P.13/40

CHECKBOOK Press Room

Home    Privacy    Security    About Us    Contact Us    Press Room    Make a Donation

Copyright 2007 Center for the Study of Services. All Rights Reserved.
CHECKBOOK is a trademark and service mark of the Center for the Study of Services and is registered with the US Patent and Trademark Office.

**EXHIBIT B**
2/26/2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
CONSUMERS' CHECKBOOK,                       )
CENTER FOR THE STUDY OF SERVICES,           )
                                            )
              Plaintiff,                    )
                                            )
       v.                                   )        Case No. 06-2201 (EGS)
                                            )
UNITED STATED DEPARTMENT OF                 )
HEALTH AND HUMAN SERVICES,                  )
                                            )
              Defendant.                    )
_____)

ORDER

UPON CONSIDERATION of Defendant's dispositive motion, the memorandum of

points and authorities in support thereof, any opposition thereto, any reply, and the record herein,

it is hereby ORDERED that the motion is GRANTED.

SO ORDERED, on this _____ day of _____, 2007.

_____
United States District Court Judge