# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No: 06-02201 (EGS) |
| vs. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et. al. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION FOR A SCHEDULING CONFERENCE

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff, Consumers' CHECKBOOK / Center for the Study of Services ("CSS"), hereby opposes Defendants' Motion for Summary Judgment. Pursuant to Rule 16(a) of the Federal Rules of Civil Procedure, Plaintiff hereby moves for a scheduling conference so that the Court and the parties may agree to deadlines for Defendants to (1) respond to Plaintiff's appeal of the denial of its fee waiver request; (2) complete processing the requested records; (3) make determinations about the releasability of the records; and (4) produce the records to Plaintiff.

In support of this Motion, CSS is filing herewith (a) a Statement of Material Facts in Genuine Dispute; (b) a Memorandum of Points and Authorities; (c) a Declaration of Robert Krughoff including exhibits; and (d) a proposed Order.

Respectfully submitted,

Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'*
*CHECKBOOK, Center for the Study of Services*

March 12, 2007

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

CONSUMERS' CHECKBOOK, CENTER FOR
THE STUDY OF SERVICES

        Plaintiff,

    vs.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et. al.

        Defendants.

:
:
:
:
:  Case No: 06-02201 (EGS)
:
:
:
:
:
:
:

## STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE

Pursuant to LCvR 7(h), Plaintiff Consumers' CHECKBOOK, Center for the Study of

Services ("CSS") respectfully submits this statement of material facts as to which there is a

genuine dispute necessary to be litigated.

1.     On June 26, 2006, Defendants sent a letter to Plaintiff denying Plaintiff's request

for records submitted under the Freedom of Information Act.  The letter stated:

> We are unable to comply with your request because the agency does not maintain a
> record that is responsive to your request and because, under FOIA, we are not required
> either to create records or to <u>furnish information in a particular form or format when a
> record in such form or format is not readily reproducible employing reasonable efforts.</u>
> See 5 U.S.C. § 552(a)(3)(B).  We will not reproduce a record in a form or format that
> would be responsive to your request because we cannot readily do so with reasonable
> effort.

Declaration of Robert Krughoff ("Krughoff Dec.") ¶3, Ex. 2.

2.      On December 26, 2006, Plaintiff filed the instant action seeking injunctive relief to enjoin defendants, their agents, officers and employees from withholding the information that Plaintiff requested and order Defendants to produce the requested information.  Complaint Prayer for Relief.

3.      On January 29, 2007, Defendants sent a letter to Plaintiff revising its prior decision to deny Plaintiff's request.  Krughoff Dec. ¶6, Ex. 4.  In the letter, Defendants denied Plaintiff's request for a fee waiver, and asked that Plaintiff agree to pay fees associated with processing five sets of state-specific records requested.  The estimated fee for each state was $3,944.70.  Defendants also stated that Plaintiff could narrow the scope of the request to reduce the fees.  Defendants clarified in the letter that they had not yet determined whether the records would be released, and would only make that determination after processing the records. Because Plaintiff exhausted its administrative remedies, Defendants' assessment of whether or not the requested records will be released is a material fact that must be determined under the jurisdiction of the Court.

4.      In a letter dated February 28, 2007 to the Deputy Administrator of CMS, Plaintiff appealed Defendants' denial of its request for a fee waiver.  Krughoff Dec. ¶7, Ex. 5.  On March 2, 2007, CMS sent a letter to Plaintiff acknowledging receipt of the appeal.  Krughoff Dec. ¶8, Ex. 6.  Because Plaintiff has exhausted its administrative remedies, the issue of whether CMS will respond to the appeal and how it will resolve the appeal is a material fact that must be determined under the jurisdiction of the Court.

5.      On March 8, 2007, Plaintiff sent a letter to Defendants agreeing to pay the fees associated with processing the requested records unless Plaintiff were to prevail through its appeal of the fee waiver denial or through judicial review of the agency's fee waiver

determination.   Krughoff Dec. ¶9, Ex. 7.  In order to reduce the potential costs, Plaintiff also

agreed to limit the scope of its request to records for which the Line NCH Provider State Code is

"DC."  Plaintiff also noted that as a practical matter, it appeared that CMS could determine the

releasability of the physician-identifying information in the requested records before the records

were retrieved and processed.  Plaintiff requested that if such a determination has already been

made, or could be made, by CMS before incurring the significant costs of processing the data,

that CMS inform Plaintiff of that decision prior to incurring the costs.  Plaintiff reserved the right

to challenge the assessment of fees if Defendants had already determined, or could determine

prior to processing the records, that the physician-identifying information in the requested

records would not be released.  The issue of whether Defendants have already determined, or

could determine, the releasability of physician-identifying information in the requested records is

a material fact as to which there is a genuine dispute necessary to be litigated under the

jurisdiction of the Court.

Respectfully submitted,

Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'
CHECKBOOK, Center for the Study of Services*

March 12, 2007

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES    : <br><br>              Plaintiff,   : <br>                     : <br>      vs.            : <br>                     : <br> UNITED STATES DEPARTMENT OF HEALTH  : <br> AND HUMAN SERVICES, et. al.   : <br>                     : <br>           Defendants.   : | Case No: 06-02201 (EGS) |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF PLAINTIFF'S MOTION FOR A SCHEDULING CONFERENCE

## INTRODUCTION

On March 1, 2007, Defendants filed a Motion for Summary Judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure instead of answering the complaint filed by Plaintiff in this action brought under the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552 et seq. Defendants erroneously argue that Plaintiff failed to exhaust its administrative remedies because (1) Plaintiff has not paid the fee for processing the requested records, and (2) Plaintiff has not *finished* the appeal process for the denial of its fee waiver request. In fact, Plaintiff has consistently taken all steps required to exhaust its administrative remedies in this case -- first by appealing Defendants' denial of its FOIA request, and then by

timely appealing the denial of its request for a fee waiver.  It is the Defendants who have failed

to meet their obligations under the Act, requiring the Court to intervene and enforce compliance.

Defendants' Motion obscures the record in this case, is inconsistent with the law, and

must be denied.  In order to move this case forward towards resolution, Plaintiff now requests

that the Court hold a status/scheduling conference pursuant to Federal Rule of Civil Procedure

16(a) to establish deadlines for Defendants to process the requested records, make any final

release determinations, and then release the records to Plaintiff as required under the FOIA.

## BACKGROUND

Plaintiff in this case is Consumers' CHECKBOOK, Center for the Study of Services, a

non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer

services, including services provided to consumers through government programs, and

publishing Consumers' CHECKBOOK magazine and other reports that educate consumers about

such services.  Krughoff Declaration ("Krug. Dec.") ¶1.  Defendants are the United States

Department of Health and Human Services, Centers for Medicare and Medicaid Services

("CMS"), Michael O. Leavitt in his official capacity as Secretary of Health and Human Services,

and Leslie V. Norwalk in her official capacity as Administrator (acting) of CMS.

On March 27, 2006, Plaintiff submitted to CMS a request for information under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., seeking certain Medicare

physician claim records that detail the medical services provided by Medicare physicians ("the

request").  Krug. Dec. ¶2.  On June 26, 2006, after a delay of approximately two months beyond

the statutory time limit for a response to a FOIA request, Defendants denied the request on the

grounds that the effort needed to process the request (approximately two weeks by CMS's

calculation) was unreasonable.  Krug. Dec. ¶3.  Plaintiff appealed the denial to the Deputy

Administrator of CMS, and after waiting five months for an answer to the appeal,[1] Plaintiff filed the Instant Complaint before this Court seeking to enjoin Defendants from withholding the requested information and to compel Defendants to provide the records.  Krug. Dec. ¶¶4-5.

On January 24, 2007, just days before Defendants' answer to the complaint was due, Defendants filed a Motion to Extend the time limit for its response to the Complaint by over four months so that the Defendants could "complete the processing of the FOIA request by finalizing the search for the requested records and processing and then analyzing the results." Defendants' Motion to Extend at 1.  Plaintiff opposed the motion to extend, and on January 29, 2007, the Court denied the four-month extension, and instead granted a one-month extension of time.  See Court Minute Order, Jan. 29, 2007.

On January 29, 2007, *the same day* that the Court denied Defendants' request for a four-month extension, CMS sent a letter to Plaintiff revising its original denial of Plaintiff's request. Krug. Dec. ¶6.  In the letter, CMS did not agree to release the requested records.  Instead, CMS denied Plaintiff's request for a fee waiver, and for the first time asked that Plaintiff agree to pay fees of approximately $20,000 in order to process and produce the requested data.[2]  CMS made clear that Plaintiff's agreement to pay almost $20,000 in data processing costs would not ensure that the records would be released.  Instead, CMS stated that "[o]nce produced, CMS will review the requested information under the FOIA to make our release determination" Krug. Dec. ¶6, Ex. 4 at 1 (emphasis in original). Defendants' request for fees was a significant departure from

---

[1] CMS's five-month delay was well in excess of the 20-day period for responding to appeals established under the statute.  5 U.S.C. § 552(a)(6)(A)(ii).

[2] Plaintiff requested data records from five states: Maryland, Virginia, District of Columbia, Illinois and Washington.  The January 29 letter from CMS stated that the cost for compiling the data for each state would be approximately $3,944.70, yielding a total of $19,732.50 for all five states. Krug Dec. ¶6, Ex. 4.

its prior position, when Defendants were apparently willing to process the requested records without fees during the four-month extension of time that Defendants requested from the Court.

The January 29 letter from CMS stated that Plaintiff could appeal the denial of the fee waiver to the Deputy Administrator of CMS within 30 days. On February 28, 2007, Plaintiff filed an appeal of the fee waiver denial within the 30-day deadline. Krug. Dec. ¶7.

On March 1, 2007, Defendants' filed its Motion for Summary Judgment, arguing that Plaintiff has failed to exhaust its administrative remedies "[b]ecause Plaintiff has neither paid the fee nor finished the appeal process for the denial of the fee waiver request...." Def's. Memorandum at 6.

On March 8, 2007, Plaintiff wrote to Defendants agreeing, on a provisional basis, to reduce the scope of the requested records to reduce costs and to pay the associated fees for processing the records in the event the fee waiver is ultimately denied. Krug. Dec. ¶9. Specifically, Plaintiff agreed to limit the request to records from the District of Columbia. Id., Ex. 7.

Plaintiff now opposes the pending Motion for Summary Judgment and requests that the Court hold a status/scheduling conference to establish deadlines for Defendants to respond to the pending fee waiver appeal and process and release the requested records.

## **STANDARD OF REVIEW**

Summary judgment may only be granted if there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## ARGUMENT

Defendants' Motion for Summary Judgment attempts to confuse the issues in this case by focusing on the recent denial of a fee waiver, a position that Defendants took *after* this case was filed, and diverting attention away from Defendants' failure to comply with the Act. First, Plaintiff exhausted its administrative remedies in July of 2006 when it properly and timely appealed Defendants' denial of its FOIA request, and Defendants never responded to the appeal. Because Plaintiff exhausted administrative remedies and filed the Instant Complaint, the Act grants the Court jurisdiction to oversee the agency's review of the requested records and enforce compliance with the Act. 5 U.S.C. § 552(a)(6)(C)(i). Second, Defendants are completely wrong in contending that a FOIA plaintiff who has already exhausted its administrative remedies may lose its place in court were, as here, an agency first seeks to impose FOIA processing fees after Plaintiff has already filed suit on its FOIA request, and nonetheless, Plaintiff continues to exhaust its administrative remedies with regards to the processing fees. Defendants' legal argument regarding exhaustion of administrative remedies through payment of fees is fundamentally flawed, and does not merit judgment as a matter of law. In addition to denying Defendants' Motion for Summary Judgment, the Court should hold a scheduling conference to establish deadlines for Defendants to (1) respond to the pending fee waiver appeal, (2) process the requested records, and (3) release the records to Plaintiff.

## I.    The Court Maintains Jurisdiction Over This Case Because Plaintiff Has Exhausted Its Administrative Remedies

Plaintiff exhausted its administrative remedies in July of 2006 when it appealed Defendants' denial of its FOIA request, and Defendants never responded to the appeal. Krug. Dec. ¶4. After Plaintiff filed its complaint in this case, Defendants revised their decision and agreed to consider whether the requested records are releasable. Krug. Dec. ¶6. Yet, this

eleventh hour revision does not affect the Court's jurisdiction over this action.  In a typical FOIA

case, the factual record before a court will include items such as the agency's final decision

regarding the releasability of the requested records, the agency's application of the FOIA

exemptions to justify withholding records, and the final disposition of any request for a fee

waiver.  <u>See</u>, <u>e.g.</u>, <u>Summers v. United States Dep't of Justice</u>, 140 F.3d 1077, 1080 (D.C. Cir.

1998) (explaining that upon proper motions for summary judgment, the court will review the

factual questions arising out of the agency's final determinations regarding the release of records

or the withholding of records under the FOIA exemptions).  In this case, these final factual

determinations have not yet been made, as the agency has not decided the releasability of records

or the applicability of the FOIA exemptions.  Instead, the Defendants originally refused to

process the requested records, refused to respond to the appeal of that decision, and only recently

revised their original decision and agreed to process the requested records to make a releasability

determination.  Krug. Dec. ¶6, Ex. 4.

Exhaustion of administrative remedies is "a condition precedent to judicial review of a

FOIA suit," <u>Trueblood v. United States Dep't of Treasury</u>, 943 F. Supp. 64, 68 (D.D.C. 1996)

(citing <u>Stebbins v. Nationwide Mutual Ins.</u>, 757 F.2d 364, 366 (D.C. Cir. 1985)).  The FOIA

specifically contemplates jurisdiction in cases where a plaintiff exhausts administrative remedies

and files suit before the completion of the normal administrative process.  Specifically, the FOIA

statute provides the court with jurisdiction to maintain oversight of the case while the agency

completes its work:

> Any person making a request to any agency for records under … this subsection shall be
> deemed to have exhausted his administrative remedies with respect to such request if the
> agency fails to comply with the applicable time limit provisions of this paragraph. If the
> Government can show exceptional circumstances exist and that the agency is exercising
> due diligence in responding to the request, the court may <u>retain jurisdiction</u> and allow the
> agency additional time to complete its review of the records.

5 U.S.C. § 552(a)(6)(C)(i) (emphasis added).   Then, if the agency determines that the records are releasable, the Act explains "the records shall be made promptly available to such person making such request." Id.

Federal courts have consistently adopted this approach, and have held that the statutory function for courts ends "once all requested records are surrendered." Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982).   Alternatively, the agency may sustain its burden before a court by identifying the documents at issue and explaining why they fall under the claimed exemptions through the creation of a Vaughn index. See, e.g., Summers, 140 F.3d at 1080.   In this case, the Defendants have neither surrendered all requested records, nor explained why the requested records fall under claimed exemptions.   Therefore, the Court must maintain jurisdiction over the case to enforce timely compliance with the Act and verify that Defendants meet one of these two requirements.

## II.    Plaintiff Also Exhausted Administrative Remedies Regarding Fees

Defendants' only argument in support of summary judgment is that Paintiff has failed to exhaust administrative remedies because Plaintiff has "neither paid the fee nor *finished* the appeal process for the denial of the fee waiver request...." Defendants' Memorandum at 6 (emphasis added).   Defendants' argument misses the mark.   Exhaustion of administrative remedies in the FOIA fee waiver context requires either "payment of required fees *or an appeal within the agency from a decision refusing to waive fees*." Schwarz v. United States Dep't of Treasury, 131 F. Supp. 2d 142, 148 (D.D.C. 2000)(emphasis added)(citing Oglesby v. United States Dep't of the Army, 920 F.2d 57, 66 (D.C. Cir. 1990); Trueblood, 943 F.Supp. at 68).   As will be explained in greater detail below, Plaintiff has exhausted its administrative remedies by appealing the denial of the fee waiver, and Defendants' motion should be denied.

First, Plaintiff exhausted its administrative remedies with regards to the fee waiver denial by timely filing an appeal to the Deputy Administrator of CMS on February 28, 2007.  Krug. Dec. ¶7.  In a letter to Plaintiff dated March 2, 2007, CMS acknowledged receipt of the appeal and stated that the appeal would be processed expeditiously.  Krug. Dec. ¶8.  Defendants' assertion that Plaintiff must not only file an appeal of the denial of the fee waiver request, but also finish the appeal process before some unexplained deadline in order to exhaust administrative remedies, is completely inconsistent with the requirements of the FOIA and common sense.  Once an appeal of a fee waiver denial has been filed, the agency is allowed 20 days to respond to the appeal.  See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003).  While awaiting a response from the agency, Plaintiff is powerless to "finish" the appeal process.  Defendants' assertion that this failure to finish the appeal somehow results in a failure to exhaust administrative remedies is completely unsupported in the law.

Second, Defendants did not assert that Plaintiff must actually pay a fee before the agency will proceed with processing the requested records.  In its letter dated January 29, 2007 addressing the fee waiver issue, CMS's FOIA Director, Michael Marquis, stated "[p]lease let me know whether you agree to pay these fees, so we may continue and complete the processing of your request."  Krug. Dec. ¶6, Ex. 4 at 2.  Defendants did not demand immediate payment, only an agreement to make a future payment.  Thus, contrary to Defendants' assertion, payment of the fees was not a requirement at this juncture, and cannot be deemed a necessary step in exhaustion of administrative remedies.

Third, Plaintiff actually has agreed to pay the requested fees.  After preparing and submitting its fee waiver appeal, Plaintiff wrote to Defendants on March 8, 2007 explaining that in order to avoid any unnecessary delay in processing the records, Plaintiff would agree to pay

the estimated fees if Plaintiff does not ultimately prevail on its fee waiver appeal either at the administrative level or upon judicial review.[3]  Krug. Dec. ¶9.

Defendants' Motion for Summary Judgment hinges upon a misstatement of the law regarding exhaustion of administrative remedies in a FOIA case, and a distortion of the record in this matter.  Moreover, the motion is premature and constitutes yet another example of Defendants taking evasive steps to avoid their obligations under the Act.  Defendants' Motion for Summary Judgment must be denied.

### III.    A Scheduling Conference Should Be Held to Impose Deadlines on the Defendants and Enforce Compliance with the FOIA

Defendants have displayed a pattern of delay in this case, and a practice of wasting valuable time and resources.  First, Defendants delayed their response to Plaintiff's original request by two months beyond the statutory deadline.  Krug. Dec. ¶3.  Next, Defendants *never responded* to Plaintiff's appeal of the original denial.  Krug. Dec. ¶4.  Furthermore, Defendants represented in their original denial letter dated June 26, 2006 that the time needed to process Plaintiff's request was approximately two weeks.  Krug. Dec. ¶3, Ex. 2.  Defendants could have completed this two-week processing task at any time over the intervening eight months since the denial letter was issued.  Yet, Defendants did not even acknowledge that they had a

---

[3] Plaintiff included one condition to its agreement to pay the requested fees.  Plaintiff's request includes physician-identifying information, which is a critical component of the request.  It is Plaintiff's understanding that previously CMS has categorically denied FOIA requests that contain physician-identifying information on personal privacy grounds under FOIA exemption 6, 5 U.S.C. § 552(b)(6).  In an effort to avoid wasting the government's and Plaintiff's time and resources, Plaintiff requested that if CMS either has made, or could make, a determination regarding the releasability of the requested physician-identifying information before processing the records, then CMS should inform Plaintiff of that determination immediately so as to avoid any unnecessary costs of processing the records.  Plaintiff reserved the right to challenge the imposition of fees for processing the requested records where CMS has already determined, or could have determined, before processing the records, that the physician-identifying information in the records may not be released under the FOIA.

responsibility under the FOIA to process the requested records until after the Complaint in this case was filed and Defendants issued their January 29, 2007 letter revising the prior denial. Still, rather than agreeing to process the records in order to make a release determination, Defendants informed Plaintiff for the very first time that up to $20,000 in fees would be required just for CMS to determine whether any of the requested records actually could be released.

Moreover, processing the requested records may not be necessary for Defendants to make a release determination. As Plaintiff explained in the original request letter dated March 27, 2006 and reiterated in its letter dated March 8, 2007, Plaintiff's request includes certain physician-identifying information, which is a critical component of the request. Krug. Dec. ¶¶2 & 9. Plaintiff understands that CMS previously has denied requests submitted under the FOIA for physician-identifying information on personal privacy grounds under FOIA exemption six, 5 U.S.C. § 552(b)(6). Krug. Dec. ¶9, Ex. 7. If Defendants have already determined, or could determine, whether the requested physician-identifying records are releasable under the FOIA without incurring the significant expense of processing the records, then Defendants should be ordered to make that determination immediately, rather than continuing to delay the process and unnecessarily incurring costs that Defendants intend to seek to shift to Plaintiff.

Because of the pattern of delay exhibited by Defendants in this case, Plaintiff requests a scheduling conference with the Court pursuant to Fed. R. Civ. P. 16(a) in order to set a schedule of deadlines for Defendants to (1) respond to Plaintiff's appeal of the denial of its fee waiver; (2) complete processing the requested records; (3) make determinations about the releasability of the records; and (4) produce all non-exempt records to Plaintiff. Plaintiff also proposes to establish a schedule for any motions or briefing required to resolve legal questions that may arise through this process. Based on Defendants prior estimates of the time needed to process the requested

records, Defendants should be allowed no more than two weeks to process the requested records

and make determinations about their release, followed by immediate production to Plaintiff.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

Motion for Summary Judgment and grant Plaintiff's Motion for a Scheduling Conference.

Respectfully submitted,

Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Plaintiff Consumers'*
*CHECKBOOK, Center for the Study of Services*

March 12, 2007

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DISTRICT OF COLUMBIA

CONSUMERS' CHECKBOOK, CENTER FOR   :
THE STUDY OF SERVICES   :
     :
    Plaintiff,   :
     :  Case No: 06-02201 (EGS)
    vs.   :
     :
UNITED STATES DEPARTMENT OF HEALTH  :
AND HUMAN SERVICES, et. al.   :
     :
    Defendant.   :
     :

## **ORDER**

This matter having come before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Opposition to Summary Judgment and Motion for a Scheduling Conference, and the Court having reviewed the motions, the parties' respective support and opposition thereto, and the entire record herein, it is

ORDERED that Defendants' Motion for Summary Judgment be, and it hereby is, denied; and it is further

ORDERED that Plaintiff's Motion for a Scheduling Conference be, and it hereby is, granted.

The Scheduling Conference shall be held before this Court at _____ on the _____ day of _____, 2007.


SO ORDERED, on this _____ day of _____, 2007.


_____
United States District Court Judge

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et. al. | : |
| | : |
| Defendants. | : |
| | : |

Case No: 06-02201 (EGS)

---

## DECLARATION OF ROBERT KRUGHOFF

I, Robert Krughoff, hereby declare as follows:

1. I am the President of Consumers' CHECKBOOK, Center for the Study of Services ("CSS"). CSS is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services, including services provided to consumers through government programs, and publishing Consumers' CHECKBOOK magazine and other reports that educate consumers about such services.

2. On March 27, 2006, CSS submitted to the Centers for Medicare and Medicaid Services ("CMS") a written request for records pursuant to the Freedom of Information Act (the "request"). The request asked CMS to provide certain Medicare claim records compiled and maintained electronically by CMS, and divided among five states (DC, IL, MD, WA and VA). The request also sought a fee waiver for the cost of the production. See Exhibit 1.

3.  By letter dated June 26, 2006, CMS denied the request stating that the agency did not maintain records responsive to the request, and that "under FOIA, we are not required either to create records or to <u>furnish information in a particular form or format when a record in such form or format is not readily reproducible employing reasonable efforts</u>. 5 U.S.C. § 552(a)(3)(B)." (emphasis in original).  <u>See</u> Exhibit 2.

4.  By letter dated July 25, 2006, CSS appealed CMS's denial of the request.  <u>See</u> Exhibit 3. <u>CMS never answered the appeal</u>.

5.  On December 26, 2006, CSS filed the instant lawsuit seeking to enjoin CMS from withholding the requested records.

6.  By letter dated January 29, 2007, CMS revised its decision not to comply with the request, but did not agree to release the requested records.  CMS denied the requested fee waiver, and noted that CSS could appeal the fee waiver denial within 30 days.  CMS also for the first time provided an estimate of the fees required to produce the records, totaling $3,944.70 for each of the five sets of state-specific records requested.  The letter asked CSS to agree to pay the fees so CMS could complete the processing of the request, or alternatively to amend or narrow the request to reduce costs.  CMS clarified that it had not determined whether the records would be released, and would only do so after the records were processed.  <u>See</u> Exhibit 4.

7.  On February 28, 2007, CSS sent a letter to the Deputy Administrator of CMS appealing the denial of the fee waiver.  <u>See</u> Exhibit 5.

8.  On March 2, 2007, CMS acknowledged receipt of the fee waiver appeal and stated that it would process the appeal as expeditiously as possible.  <u>See</u> Exhibit 6.

9.  On March 8, 2007, CSS, through counsel, sent a letter to CMS temporarily agreeing to (a) limit the request to records from Washington, DC, and (b) pay the record processing fees in

the event that CSS does not prevail in its fee waiver appeal either at the administrative level or

before a court of competent jurisdiction.  CSS also explained the following:

> CMS stated in its January 29 letter that *after* the agency processed the requested
> information (at substantial cost to CSS), *then* it would review the requested information
> under the FOIA to make a release determination.  However, as CSS stated in the original
> request, the physician-identifying information contained in the requested records is a
> critical component of the request.  It would appear that, as a practical matter, CMS could
> determine whether physician-identifying information is or is not categorically releasable
> under the FOIA *before* the requested records are actually retrieved and processed.  In
> fact, it is our understanding that CMS has denied prior FOIA requests for physician-
> identifying information on personal privacy grounds under FOIA Exemption 6, 5 U.S.C.
> § 552(b)(6).  If CMS either has made or can make a determination regarding the
> releasability of the requested physician-identifying information prior to processing the
> records, CSS asks that CMS inform it immediately of that determination, so as to avoid
> incurring any unnecessary costs.  CSS expressly reserves the right to challenge the
> imposition of fees for processing the requested records where CMS has already
> determined, or could have determined, prior to processing the records, that the physician-
> identifying information in the records may not be released under the FOIA.

See Exhibit 7.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my

knowledge and belief.

Executed this ⎣2ᵗᵉ day of March, 2007.

Robert Krughoff

# EXHIBIT 1



Center for the
Study of Services

March 27, 2006

**By Certified U.S. Mail**

Centers for Medicare & Medicaid Services (CMS)
Office of Strategic Operations and Regulatory Affairs
Freedom of Information Group
Room N2-20-16
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Dear Sir or Madam:

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, *et seq.* and corresponding regulations, Consumers' CHECKBOOK/Center for the Study of Services ("CHECKBOOK/CSS") hereby requests certain Medicare claims records compiled and maintained electronically by CMS in the Carrier SAF files (previously known as the Physician/Supplier Part B files). We request only a subset of the data elements from those records, listed in Attachment A of this letter. We also limit our request to:

1) Data records for Calendar Year 2004;
2) Data records generated from physician claims; and
3) Data records for which the Line NCH Provider State Code is DC, IL, MD, WA or VA.

We request this data as it is maintained at CMS, and ask that it be supplied on 3490E IBM Standard label tape cartridges, DVD, or USB hard drive. We would like to receive the data in EBCDIC format, compressed, and preferably divided into individual files for each state requested.

**Privacy Issues**

We understand that there may be concerns regarding Medicare beneficiary privacy associated with these data records. We are not requesting any data that directly identifies beneficiaries. If CMS believes that the requested data may nonetheless raise beneficiary identification or patient privacy concerns in any specific instances, please

Publisher of *Consumers'*
*CHECKBOOK* magazines

1625 K Street, NW, 8th Floor
Washington, DC 20006

Phone: 800-213-7283
Fax: 202-347-4000

contact me so that we may discuss methods to protect beneficiary privacy while still providing the data that we request.

Additionally, we understand that CMS has previously relied on FOIA Exemption 6, 5 U.S.C. § 522(b)(6), as a justification for withholding physician identifying data on personal privacy grounds. We respectfully disagree with this assessment, and draw your attention to Public Citizen Health Research Group v. Dept. of Health, Education and Welfare, 477 F.Supp. 595 (D.D.C. 1979), rev'd on other grounds, 668 F.2d 537 (D.C. Cir. 1981), which squarely addressed this issue. In that case, District Court Judge Gesell balanced physician privacy interests against the public interest in receiving physician specific information that would provide a quality check on the performance of the Medicare and Medicaid programs. Judge Gesell held that, on balance, the public interest outweighed the privacy interest requiring disclosure of the information.[1] Id. at 604-5. Nonetheless, if CMS believes it has grounds to withhold the requested physician identifying information, I ask that you contact me to discuss the issue prior to proceeding with this matter, as the physician identifying information is essential to our request.

**Request for Fee Waiver**

CHECKBOOK/CSS is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services (including services provided to consumers through government programs) and providing public benefit by publishing reports that educate consumers about such services. We believe that the provision of the requested information is in the public interest because, through our analysis of the requested data and our publication of findings, we will contribute significantly to the public's scrutiny of the operations and performance of CMS and the Medicare program. The commercial interests of CHECKBOOK/CSS are not primary to this request. Therefore, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45, we request that any fees associated with this request be waived. If you should determine that fees will not be waived, I ask that you contact me prior to providing the requested records to discuss the anticipated fees.

---

[1] Even though Public Citizen was decided prior to the Supreme Court's landmark decision in U.S. Dept. of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749 (1989), Judge Gesell followed the appropriate analysis required under Reporters Comm. by considering public benefits derived from the scrutiny of an agency and its performance, which are "at the core of FOIA." 477 F.Supp. at 604.

Consistent with 45 C.F.R. § 5.35, I would appreciate a response within 10 working days of receipt of this request. If you would like to discuss any issues related to this request, please contact me at (202) 454-3003. Thank you for your assistance.

Sincerely,

Robert Krughoff
President, CHECKBOOK/CSS

Enclosure

cc:     Stephen Albrecht, Esq.
        Wilmer Cutler Pickering Hale and Dorr LLP

**Attachment A**

Data elements requested from the Carrier SAF files:

> Claim Through Date (Year/Quarter)
> Carrier Number
> CWF Beneficiary Medicare Status Code
> Claim Principal Diagnosis Code
> Carrier Claim Payment Denial Code
> Claim Excepted/Non-Excepted Medical Treatment Code
> Carrier Claim Provider Assignment Indicator Switch
> Carrier Claim Referring PIN Number
> Care Plan Oversight (CPO) Provider Number
> Carrier Claim Diagnosis Code Count
> Carrier Claim Line Count
> Claim Diagnosis Code
> Carrier Line Performing PIN Number
> Carrier Line Performing UPIN Number
> Line NCH Provider State Code
> Line HCFA Provider Specialty Code
> Line Provider Participating Indicator Code
> Carrier Line Reduced Payment Physician Assistant Code
> Line Service Count
> Line HCFA Type Service Code
> Line Place of Service Code
> Line Last Expense Date (Year/Quarter)
> Line HCPCS Code
> Line HCPCS Initial Modifier Code
> Line HCPCS Second Modifier Code
> Line NCH BETOS Code
> Line Beneficiary Primary Payer Code
> Line Processing Indicator Code
> Line Diagnosis Code

# EXHIBIT 2

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



## Office of Strategic Operations and Regulatory Affairs/Freedom of Information Group

Refer to:  C06FOI1318 (KJ)

JUN 2 6 2006

Robert Krughoff
Center for the Study of Services
1625 K Street, NW, 8th Floor
Washington, DC 20006

Dear Mr. Krughoff:

This is in response to your Freedom of Information request dated March 27, 2006, seeking access to Medicare claims records compiled and maintained electronically by the Centers for Medicare & Medicaid Services (CMS) in the Carrier SAF files (previously known as the Physician/Supplier Part B files). You requested a subset of the data elements from the Carrier SAF files. You limited your request to: data records for Calendar Year 2004; data records generated from physician claims and; data records for which the Line NCH Provider State Code is DC, IL, MD, WA or VA.

We are unable to comply with your request because the agency does not maintain a record that is responsive to your request and because, under FOIA, we are not required either to create records or to furnish information in a particular form or format when a record in such form or format is not readily reproducible employing reasonable efforts. See 5 U.S.C. § 552(a)(3)(B). We will not reproduce a record in a form or format that would be responsive to your request because we cannot readily do so with reasonable effort.

To explain, the carrier SAF is not the repository of the calendar year 2004 records you have requested. Medicare claims records that cover calendar year 2004 are maintained electronically by CMS in the National Claims History (NCH) files. The NCH is a "flat file database" in which the files are generally read one record per line in sequential order. The NCH contains approximately 829.4 million claims for calendar year 2004. In order to process your request, each of the 829.4 million claims that is identified with the provider state codes of interest to you would need to be reformatted to include only the data elements that you have requested. The computer analysis and generation time associated with this "reformatting" effort is approximately two weeks or longer if a single file is produced. Hence, it is not possible to satisfy your request with reasonable effort.

Page 2: Mr. Krughoff/C06FOI1318 (KJ)

I wish to point out that on June 1, 2006, CMS announced an effort to make health care more affordable and accessible, by making cost and quality data available. CMS posted the costs it pays hospitals for 30 common elective procedures and other hospital admissions at:

http://www.cms.hhs.gov/HealthCareConInit/

The information is categorized by state and county and includes a range of prices, the national average payment for the procedure, and the number of cases the hospital has handled.

CMS is working closely with a number of national and local organizations to develop more comprehensive and personalized information for common elective procedures of ambulatory services centers later this summer and common hospital outpatient and physician services this fall.

Additional information on transparency in health care costs and quality is located at:

http://www.hhs.gov/news/press/2006pres/20060601a.html

and,

http://www.cms.hhs.gov/apps/media/press/release.asp?Counter=1872

You may appeal this decision instead of requesting an informal review. To file an appeal, you must appeal in writing within 45 days of the date of this letter. Both your appeal letter and the envelope in which it is sent should be labeled "Freedom of Information Act Appeal." Enclosing a copy of this letter or referring to the "Refer to" number at the top of the first page of this letter will help to expedite matters. To file an appeal, mail your appeal to:

> Deputy Administrator
> Centers for Medicare & Medicaid Services
> 7500 Security Boulevard, Room C5-16-03
> Baltimore, Maryland 21244-1850

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group

# EXHIBIT 3

WILMERHALE

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

July 25, 2006

<u>By United Parcel Service and Facsimile</u>

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Room C5-16-03
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOII318*

Dear Sir or Madam:

On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services ("CSS") filed a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, with the Centers for Medicare & Medicaid Services ("CMS") requesting certain Medicare physician claim records ("the request"). CMS responded to the request in a letter dated June 26, 2006 from Mr. Michael S. Marquis, Director of the Centers for Medicare and Medicaid Services ("CMS") Freedom of Information Group ("the denial").[1] *See* Exhibits A-B.

In its response, CMS denied the request in its entirety and refused to produce even a single responsive record. Pursuant to 5 U.S.C. § 552 and 45 C.F.R. § 5.34, CSS hereby appeals the denial of the request.

I. Summary of Argument

On March 27, 2006, CSS[2] requested specific data items contained within a single database maintained electronically by CMS, and requested that the data be produced

---

[1]     The denial stated that in order to file an appeal, CSS must appeal "in writing within 45 days of the date of this letter." *See* Ex. B. However, the Department of Health and Human Services ("HHS") FOIA regulations state that appeals must be filed "within *30* days from the date you *receive* [the response] letter…." 45 C.F.R. § 5.34(a) (emphasis added). Due to these conflicting deadlines, CSS has taken a conservative approach and filed this appeal within 30 days from the date of the denial letter. CSS does, however, reserve the right to supplement this appeal to the extent permitted under law or allowed under the guidance offered by CMS in the denial letter.

[2]     CSS is a non-profit 501(c)(3) corporation, founded in 1974 for the purpose of conducting and encouraging studies and educating the public on the kinds and quality of consumer services available to the public, including those services provided through government programs. CSS publishes *Consumers' CHECKBOOK* magazine in seven metropolitan areas. The magazine rates

---

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 2

electronically "as it is maintained at CMS." *See* Ex. A. CMS denied the request on two grounds, neither of which constitutes a legitimate justification for denial.

- First, CMS claimed that "the agency does not maintain a record that is responsive to [the] request," and thus responding to the request would require it to "create records." *See* Ex. B. However, in the very same letter, CMS acknowledged that the requested data does exist as a part of a single electronic database maintained by CMS. Under the FOIA statute, relevant case law, and the CMS FOIA policies and procedures, a database is considered a "record," and extracting a subset of data from a larger database is not considered creating a new record.

- Second, CMS asserted that under 5 U.S.C. § 552(a)(3)(B), compliance with the request was not required because producing the requested records would entail producing data "in a particular form or format" that is not "readily reproducible employing reasonable efforts." *See* Ex. B. Under the FOIA statute, relevant case law and the CMS FOIA policies and procedures, the statutory provision cited by CMS is not a proper legal justification for the complete denial of a FOIA request.

The purpose of the FOIA is to "ensure that the Government's activities be opened to the sharp eye of the public scrutiny...." *United States Dept. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 774 (1989) (emphasis omitted). CSS has requested records maintained by CMS in order to assess the physician services that CMS is purchasing with taxpayer dollars through the Medicare program and to scrutinize and evaluate CMS's performance of its administrative duties. Unfortunately, CMS has denied this request so as to conceal its data, and conceal the internal workings of the Medicare program, from public scrutiny. CMS's denial violates the letter and the spirit of the FOIA and CMS's own policies, and must be overturned.

II.    **Medicare Data Background**

CMS maintains the National Claims History ("NCH"), an electronic database containing data from millions of claims filed by various types of providers each year under the Medicare program. CMS routinely prepares subsets of the NCH for distribution to private parties for

---

many types of local service firms from auto repair shops to plumbers, from doctors to banks. CSS also publishes nationally distributed books including the <u>Guide to Top Doctors</u>, <u>Consumers' Guide to Hospitals</u>, and the <u>Guide to Health Plans for Federal Employees</u>, which is now in its 27th annual edition and is sold online to many federal agencies to assist their employees and retirees in making health plan decisions.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 3

research purposes.[3]  A Standard Analytical File (SAF) is a typical "subset" of the NCH created by CMS to capture the claims submitted to Medicare for each specific type of provider.[4]  For example, the CMS web page explains that CMS creates a Home Health Agency SAF, which contains the subset of claims submitted by home health agencies to the Medicare program. Similarly, claims submitted by physicians under Medicare Part B are segregated into an SAF called the "Physician/Supplier Part B - Carrier File," also know as the Carrier SAF. *See* Ex. D.

In the request, CSS described the requested data as "records compiled and maintained electronically by CMS in the Carrier SAF files ...." *See* Ex. A. In an effort to simplify its request, CSS described the requested records by referencing the data in the specific SAF rather than the broader NCH. CMS, however, asserted "the carrier SAF is not the repository of the calendar year 2004 records you have requested. Medicare claims records that cover calendar year 2004 are maintained electronically by CMS in the National Claims History (NCH) files." *See* Ex. B. Based on CMS's own explanations of its data, there should be no practical difference in data content between the physician claims in the NCH and the claims in the Carrier SAF, which are extracted from the NCH.[5]  In fact, CSS contacted the Research Data Assistance Center ("ResDAC"), which contracts with CMS to assist researchers in their requests for data from CMS, and verified that the requested data does exist in the CMS files as described in the request. If as a technical matter, CMS prefers to obtain the requested records from the NCH rather than a corresponding SAF file, CSS does not object.

---

[3]      A further explanation of the CMS data request process for research purposes is available on the CMS web page at http://www.cms.hhs.gov/PrivProtectedData/. *See* Exhibit C. CMS requires that researchers receiving this data sign a Data Use Agreement ("DUA"), which among other things, prohibits the public dissemination of physician specific data. Because CSS routinely publishes the findings of its consumer services analysis, this limitation makes the research request process unsuitable for CSS's purposes.

[4]      A further explanation of the SAFs is available on the CMS web page at http://www.cms.hhs.gov/IdentifiableDataFiles/02_StandardAnalyticalFiles.asp#TopOfPage, and is attached hereto as Exhibit D.

[5]      In fact, in a letter from Dennis G. Smith, Director, CMS Center for Medicaid and State Operations, to various State Medicaid Directors dated June 4, 2002, Mr. Smith provided instructions for state agencies to request Medicare claim data, explaining that the data resided in "Medicare's National Claims History (NCH) Standard Analytical Files (SAF)" for each state. This letter is available at http://www.cms.hhs.gov/smdl/downloads/smd060402.pdf, and is attached to hereto as Exhibit E.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 4

### III.    Argument

#### A.  Complying with the CSS request does not require the creation of "new records."

CMS asserted that it does not maintain a record that is responsive to the CSS request, and therefore complying with the request would require the creation of records.  Under the FOIA statute, however, the contents of an electronic database are considered "records," and an agency is obligated to search agency records "manually or by automated means" in order to locate records that are responsive to a request.  5 U.S.C. §§ 552(a)(3)(C) & (D); see also *Yeager v. Drug Enforcement Admin. et al.*, 678 F.2d 315, 321 (D.C. Cir. 1982) ("computer-stored records, whether stored in the central processing unit, on magnetic tape or in some other form, are still 'records' for purposes of the FOIA").

It is immaterial that the NCH database houses a set of data broader than CSS has requested.  CMS admitted in the denial that the data CSS requested is maintained in the NCH, and that the requested items of data can be extracted from the full NCH for production.  This extraction of data from a database is not the creation of new records, and any assertion to the contrary is inconsistent with the FOIA statute and relevant case law.  *See, e.g., Schladetsch v. U.S. Dept. of Housing and Urban Development*, No. 99-0175, 2000 WL 33372125 at *3 (D.D.C. Apr. 4, 2000) ("Because HUD has conceded that it possesses in its databases the discrete pieces of information which [plaintiff] seeks, extracting and compiling that data does not amount to the creation of a new record").

CMS's Freedom of Information Group Policy and Procedural Guide further addresses the issue of when preparing requested data for disclosure will be deemed creating "new records."  The Guide states:

> The FOIA does not require that new records or documents be created to respond to requests.  Writing a new program(s) to extract data from multiple computer files in order to compile such data into a "new" record is considered creating a record.  However, deleting non-releasable data, or data not within the scope of the request, from an existing record is not considered creating a record.  This applies even if, for administrative convenience, we write a new program to edit the existing record rather than editing the record manually after the hard copy has been run.[6/] *See* Ex. F at 10.

---

[6/]    CMS Office of Strategic Operations and Regulatory Affairs, Freedom of Information Group, Policy and Procedural Guide (updated June 2006).  The Guide is available at http://www.cms.hhs.gov/FOIA/downloads/CMS FOIA POLICY and Procedural Guide.pdf.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 5

CSS has not requested that CMS extract data from multiple sources to be aggregated into a "new record." CMS has acknowledged that the data CSS requested exists in a single electronic location – the NCH –, not in multiple and disparate computer databases. CSS has requested a subset of the data in the NCH. In order to comply with the CSS request, CMS may delete the data that is outside the scope of the request from the full NCH. Under CMS's own policy, this procedure does not constitute creating a new record. Even if, for administrative efficiency, CMS decides to write a program to perform this editing function, it would not be creating a new record. CMS's assertion to the contrary in the denial letter is inconsistent with this policy, and inconsistent with applicable federal law.

> **B.  The FOIA provision cited by CMS does not justify a denial of the CSS request in its entirety.**

When CMS asserted that it was not required to expend an unreasonable effort to comply with the CSS request, it mis-characterized the FOIA statute regarding the reasonableness of production in a specific form or format. In the denial letter, CMS cited to 5 U.S.C. § 552(a)(3)(B). This statutory provision must be read in conjunction with the preceding provision to understand its meaning. Section 522(a)(3)(A) states that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." With the prior understanding that a proper request has been made for existing records, section 522(a)(3)(B) goes on to explain:

> In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

With this context, it is clear that § 552(a)(3)(B) does not provide an agency with a justification for completely denying a FOIA request. Rather, it clarifies that once an agency has identified responsive records that will be produced, the agency must take reasonable steps to provide records in the form or format that a requestor prefers. *See, e.g., TPS, Inc. v. U.S. Dep't of Defense*, 330 F.3d 1191, 1195 (9th Cir. 2003) (agency conceded that electronic records were to be produced to a requestor, but argued under § 552(a)(3)(B) that the agency was not obligated to compress or "zip" the data files. The court held that if the agency used the "zip" technology in its "normal business as usual approach," then it would be reasonable to employ that technology for its FOIA response). Under § 552(a)(3)(B), if it would be unreasonable for an agency to transform a record into the requestor's preferred form or format, then the agency would still be required to provide the requested record in whatever form or format the record is maintained by the agency in normal course. *See also, Schladetsch*, 2000 WL 33372125 at *3, n.2 (explaining

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 6

that "form or format" typically involves choices between microfiche or computer form or visicorder charts or paper form. Because plaintiff requested records as they were maintained by the agency, section (a)(3)(B) did not apply.)

CMS addressed § 552(a)(3)(B) in a FOIA Memorandum issued on April 24, 1997 following the implementation of the "EFOIA" Amendments of 1996.[2] The memorandum states:

> The term "form" or "format" also can be interpreted to mean the organization or arrangement of information within a record. It has been our practice in the past to reproduce computerized records only *in the form or format in which we normally extract the record from our system.* However, in line with this provision, the following guidance will assist you when responding to requests for computerized records in a form or format other than that normally extracted from an automated database[.]

*See* Exhibit G at 2 (emphasis added). This FOIA policy statement makes clear that as a default rule, CMS will produce computerized records in the form in which they are normally extracted from CMS data systems. CSS has asked for nothing more than this simple extraction of data. CSS stated in the request that the Medicare claim data should be produced "as it is maintained at CMS." *See* Ex. A. CSS did request some further format specifications, including that the data be "in EBCDIC format, compressed, and *preferably* divided into individual files for each state requested." *See* Ex. A (emphasis added). If CMS believes that these formatting requests are "unreasonable" under 5 U.S.C. § 552(a)(3)(B), then CSS would expect an explanation to that effect. However, § 552(a)(3)(B) does not authorize CMS to deny the CSS request in its entirety on "form and format" grounds. CMS would be expected, at the very least, to provide the data in the form or format in which it is normally extracted from the NCH system. CMS's misguided attempt to deny the request in its entirety on formatting grounds under 5 U.S.C. § 552(a)(3)(B) must be reversed.

## C. The CSS request does not require an "unreasonable effort" from CMS.

The FOIA statute explains that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of those portions which are exempt under this subsection." 5 U.S.C. § 552(b). Courts interpret the "reasonably segregable" term very liberally, and have required that agencies expend significant resources to comply with FOIA

---

[2]     Memorandum from Glenn W. Kendall, Acting Director, Freedom of Information and Privacy Office to Central and Regional Office Freedom of Information Act Coordinators (Apr. 24, 1997), available at http://www.cms.hhs.gov/FOIA/downloads/CMS%20FOIA%20Policy-E-FOIA-Form%20n%20Format.pdf.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 7

requests. For example, in *Long v. U.S. Internal Revenue Serv.*, the Ninth Circuit held that reviewing and editing over 200,000 pages of documentation and a series of data tapes at a cost of up to $160,000 was "not considered an unreasonable burden to place on an agency." 596 F.2d 362, 366-367 (9th Cir. 1979).[8/] The court explained that Congress has not limited the scope of the FOIA, despite the expenses that can be involved. "Congress has determined that access to government records is an important objective. We therefore cannot conclude that the costs of editing involved in this case are so extreme that segregation of revealable material is unreasonable as a matter of law." Id.

CMS estimated that it would take approximately 2 weeks to process the CSS request. In light of the Congressional mandate for the release of public records under the FOIA and the precedent courts have set requiring significant efforts to comply with FOIA requests, compliance with the CSS request cannot be deemed "unreasonable." Moreover, CMS cannot argue that complying with the CSS request would disrupt its normal work processes. As described above, CMS prepares data extracts comparable in size, scope and field selection to the CSS request on a routine basis for third-party researchers who request these data extracts. Furthermore, CMS employs contractors such as the Research Data Distribution Center, to process these research requests. Thus, CMS staff would not be required to perform the data processing required in this case if it elected to utilize its normal contractors. To the extent that CMS can rely on contractors to prepare the data for the request, and because costs of production can be passed on to the requestor under some circumstances, it is difficult to understand how CMS would be burdened in any way by the CSS request.

The FOIA, and the EFOIA amendments of 1996 in particular, are a Congressional mandate for federal agencies to open their records for public scrutiny. In the EFOIA amendments, Congress particularly found that "[g]overnment agencies increasingly use computers to conduct agency business and to store publicly valuable agency records and information," and "[g]overnment agencies should use new technology to enhance public access to agency records and information." *TPS, Inc.*, 330 F.3d at 1195 (citing Pub. L. No. 104-231 at

---

[8/] The Long court also catalogued a series of decisions whereby courts ordered agencies to commit significant resources to processing FOIA requests. For example, in a case involving a request for information regarding the Rosenberg trials, the U.S. District Court for the District of Columbia ordered the Department of Justice ("DOJ") to fulfill the request, requiring DOJ to commit 65 full-time and 21 part-time employees to processing a single FOIA request. 596 F.2d at 367 (citing *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 613 (D.C. Cir. 1976). *See also, Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 360 (5th Cir. 2001) (Army prepared to manually redact hundreds of thousands of records, and then rescan them into a computer database to comply with a FOIA request).

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 8

*2). Under this mandate, CMS cannot be allowed to use the technical aspects of data formatting and database extractions as a basis for denying access to its records. Rather, the CMS data systems should be employed to enhance public access to agency records. The FOIA statute, case law, and CMS's own policies require compliance with the request.

### IV.     Conclusion

For the foregoing reasons, the denial of the CSS FOIA request must be reversed, and the requested records produced. We look forward to your reply to this appeal within **twenty (20) working days,** as required under 5 U.S.C. § 552(a)(6)(A)(ii).

In the original request, CSS requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. Because CMS denied the request, the fee waiver has not been addressed in this matter. CSS retains the right to request a fee waiver in the event that the denial is overturned on appeal and the requested records are produced.

Sincerely,

Robert Krughoff
President, CHECKBOOK/CSS
1625 K St., NW, 8th Floor
Washington, DC 20006
Tel: (800) 213-7283
Fax: (202) 347-4000
E-mail: Rkrughoff@checkbook.org

Stephen M. Albrecht
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6714
Fax: (202) 663-6363
E-mail: Stephen.Albrecht@wilmerhale.com

Enclosures

# EXHIBIT 4

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**Centers for Medicare & Medicaid Services**
**7500 Security Boulevard, Mail Stop N2-20-16**
**Baltimore, Maryland 21244-1850**


CENTERS for MEDICARE & MEDICAID SERVICES

**Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group**
**January 29, 2007**

**Refer to:  C06FOI1318 / C06FOI2229A**

Mr. Robert Krughoff, President
Mr. Stephen Albrecht, Esquire
Checkbook / Center for Study of Services
1625 K Street, N.W., 8th Floor
Washington, D.C.  20006

Dear Mr. Krughoff and Mr. Albrecht:

This letter revises my decision not to comply with your March 27, 2006 Freedom of Information (FOIA) request to obtain a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia.  Specifically, in response to your July 26, 2006 appeal of my decision, CMS has reexamined the processes necessary to extract the requested data with our information technology staff, and we have determined that we will be able to produce the requested information.  Once produced, CMS will review the requested information under the FOIA to make our release determination.

You requested a waiver of fees for your FOIA request.  Within your March 27, 2006 request, you described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a non-profit entity which conducts studies of consumer services, including government services, and publishes material which informs or educates consumers concerning those services. You contend a fee waiver is appropriate because providing the requested information will enable Checkbook / CSS to analyze the data and subsequently publish that analysis, which you believe is in the public interest, and will contribute significantly to public scrutiny of the operations of CMS and the Medicare program.  You further state that the commercial interests of your organization are not the primary basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the fees we would otherwise charge if disclosure of the information meets both of the following tests: (1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government; and (2) It is not primarily in the commercial interest of the requester."  After careful consideration of the commercial nature in which Checkbook /CSS markets and sells its services, I have concluded that CheckBook /CSS has a primary commercial interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the public interest in this matter.  I also conclude that you have not demonstrated that disclosure of the requested data will advance the understanding of the general public because disseminating on a subscription or a fee basis will limit the general public's access to the requested data.  Therefore, your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.

**PAGE II. – Consumers' Checkbook / CSS**

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

If you disagree with this decision to deny your fee waiver request, you may appeal. Your appeal should be mailed within 30 days of this letter to the: Deputy Administrator, Centers for Medicare & Medicaid Services, Mail Stop C5-2626, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. Please mark your letter "Freedom of Information Act Appeal", and enclose a copy of this letter.

Sincerely,

Michael S. Marquis
Director
FOIA Group

# EXHIBIT 5

WILMERHALE

February 28, 2007

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

**By Federal Express and Facsimile**

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-2626
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOI1318/C06FOI2229A*

Dear Sir or Madam:

    We write to appeal the decision of the Centers for Medicare & Medicaid Services ("CMS") Freedom of Information Group denying a fee waiver in the above referenced matter.

## Background

    On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services ("CSS") filed a request for information under the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552 *et seq.*, with CMS requesting certain Medicare physician claim records that detail the medical services provided by Medicare physicians ("the request"). CSS also requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. CMS denied the request in a letter dated June 26, 2006 ("the denial").

    On July 25, 2006, CSS appealed the denial to the office of the Deputy Administrator, but that office failed to answer the appeal in violation of the statutory requirements of the FOIA. On December 26, 2006, CSS filed a complaint in the United States District Court for the District of Columbia (Case No. 1:06CV02201) seeking injunctive relief to enjoin CMS from withholding the requested records and asking the Court to order CMS to release the information. This litigation is currently pending before the District Court.

    After the complaint was filed, CMS informed CSS in a letter dated January 29, 2007 that it had revised its decision not to comply with the original request. (*See* Exhibit A) However, CMS did <u>not</u> agree to release the requested records. Instead, the January 29 letter denied CSS's request for a fee waiver, and then informed CSS that it must pay a fee of $19,723.50[1] for CMS to "produce" the data *before* deciding if the data could be released to CSS. <u>The payment of almost $20,000 to CMS would not guarantee that CSS would actually receive any of the data it</u>

---

[1] CSS requested data records from five states. The January 29 letter stated that the cost for compiling the data for each state would be $3,944.70, yielding a total of $19,732.50 for all five states.

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 2

requested. The letter did not specify why CMS needed to compile the data at a cost of almost $20,000 before determining whether the records can be released.

Because CMS has not agreed to release the requested records, CSS is proceeding with the pending litigation before the District Court seeking CMS's compliance with the Act and release of the requested information. Additionally, by this letter, CSS appeals CMS's January 29, 2007 decision to deny the fee waiver pursuant to 5 U.S.C. § 552 and 45 C.F.R. § 5.34. CSS files this appeal without prejudice to its rights to proceed with the litigation currently pending before the District Court.[2]

### The Agency's Denial of the Fee Waiver Should Be Reversed.

CMS asserted in the January 29 letter that CSS has a primary commercial interest in the records it requested, and that this asserted commercial interest outweighs the public interest in this matter. CMS also concluded that CSS has not demonstrated that disclosure of the requested records will advance the understanding of the general public because CSS disseminates consumer information in its magazine on a subscription basis, which, according to CMS, may limit public access. CMS has failed to consider several relevant factors in this matter, and therefore the denial of the fee waiver must be overturned.

I.    **The Records Requested by CSS Meet the Public Interest Test.**

Agencies are to rely on four factors in determining whether the release of records will serve a public interest. *See Judicial Watch, Inc. v. Rossoti,* 326 F.3d 1309, 1312 (D.C. Cir. 2003). The Department of Health and Human Services FOIA regulations address these factors as four separate questions to be considered. *See* 45 C.F.R. § 5.45. The release of records requested by CSS easily satisfies the Agency's public interest criteria, as set forth below.

1.    *How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government?* The Medicare program's core activity is the provision of medical services to the nation's elderly population. CSS has requested claim records from physicians in the Medicare program that document this core activity.

---

[2] *See, e.g., Pollack v. Dept. of Justice,* 49 F.3d 115 (4th Cir. 1995) (holding that once a FOIA plaintiff has exhausted administrative remedies and files suit in District Court, the Court will retain jurisdiction over the case even though the administrative process may continue regarding the payment of fees).

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 3

2.    *Would disclosure of the records reveal any meaningful information about*
      *government operations or activities? Can one learn from these records anything*
      *about such operations that is not already in the public knowledge?* The requested
      records will contain information regarding the medical services that physicians in
      the Medicare program provide to Medicare beneficiaries. This information is not
      currently in the public domain because CMS has not previously released
      physician specific data for public distribution. Once released, CSS will be able to
      study the data to analyze the quality of the medical services provided in the
      Medicare program, and assess the Medicare program's efforts to control or
      improve quality within the program. This assessment cannot be adequately
      performed without public release of the requested records.

3.    *Will the disclosure advance the understanding of the general public as*
      *distinguished from a narrow segment of interested persons?* CSS publishes
      consumer data in a variety of formats, including through its Consumers'
      CHECKBOOK magazine, through its website at www.checkbook.org, and
      through various reports such as the Guide to Top Doctors and the Guide to Health
      Plans for Federal Employees. CSS estimates its magazine subscriber population
      to be approximately 110,000 people. However, CSS expects information
      regarding quality in the Medicare program derived from the requested records to
      be disseminated much more broadly. CSS often releases the results of its quality
      studies through press releases, which are made available to the broader media and
      are posted on the checkbook.org website for access by the general public. For
      example, CSS posted findings and advice from its evaluations of hospitals in
      2002.[3] These findings, in turn, were reported by more than 125 newspapers and
      TV and radio stations, ranging from the Miami Herald, Washington Post, and
      Saint Louis Post Dispatch to the Today Show, KGO TV (San Francisco), and
      WBEZ public radio (Chicago). Similarly, CSS's research was used as the basis
      for the "50 Top Hospitals" article in AARP's Modern Maturity magazine,
      distributed to more than 30 million AARP members. The Washington, D.C. Fox
      News outlet also covers Consumers' CHECKBOOK quality evaluations and
      consumer advice approximately three times per month on its morning news
      program.

---

[3] *See* Press Release, Consumers' CHECKBOOK, Consumers' CHECKBOOK Reveals Big
Differences in Quality Among Hospitals (June 20, 2002), available at
http://www.checkbook.org/press/cgh.cfm. (See Exhibit B)

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 4

Furthermore, CSS often makes free content available on the checkbook.org website – including articles on how to choose and when to change a physician; why board certification matters; how to get good care in a hospital; and keeping an eye on Medicare's impact on choice of physicians. CSS also has developed relationships with other organizations to make CSS's information available to their constituents without subscription. For example, CSS contracts with many government agencies to provide their employees (more than 700,000 employees in 2006-2007) free online access to Consumers' CHECKBOOK's Guide to Health Plans for Federal Employees. Lastly, many public library systems in the metropolitan areas where CHECKBOOK magazine is published subscribe to the magazine in print and online for library users.

Media reports have already displayed a significant public interest in obtaining information about the quality of services in the Medicare program.[4] It is a virtual certainty that public interest in CMS's Medicare quality studies derived from the requested records will be substantial.

4.    *Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?* Despite the wealth of data that is collected by CMS regarding the provision of medical services by physicians in the Medicare program, that data is not sufficiently studied or published so as to provide the public with an understanding of the quality of services available in the program. The disclosure of this information will provide a significant benefit to the general public, as it will allow Medicare beneficiaries and their caretakers to better understand the quality of services available through Medicare. For example, studies have shown that for some medical procedures, physicians that perform a high volume of the procedures produce superior quality outcomes for their patients. The requested records will allow CSS to highlight this and other important quality indicators within the Medicare program. Furthermore, release of the records will focus public attention on whether the Medicare program is adequately assessing issues of quality within the program.

---

[4] *See, e.g.,* Robert Pear, *Employers Push White House to Disclose Medicare Data,* N.Y. Times, April 11, 2006, at A1.

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 5

**II.    The Public Interest in Obtaining the Requested Records Outweighs Any
       Commercial Interest of CSS.**

CSS is a non-profit entity dedicated to informing the public about consumer information.
Any commercial interest CSS may have in the requested records (insofar as CSS operates as a
not-for-profit business) is de minimus compared to the public's interest in learning about the
activities of the Medicare program. The quality of health services available to the Medicare
population is of critical importance to the well-being of the nation's elderly, and to the millions
of Americans who care for this population. Moreover, assessing Medicare's efforts to address
and improve the quality of medical care is of great public importance, as it will allow the public
and policy makers to assess the effectiveness of this large government program.

Once armed with this information, consumers will be able to make better decisions about
the health services they obtain. Consumers in this instance include the millions of Medicare
beneficiaries in the states covered by the CSS request, plus the millions of family members or
caretakers who help coordinate care for those beneficiaries. Beyond this concrete and immediate
benefit to this vast consumer group, CSS's reporting on Medicare quality likely will serve as a
model for other quality studies to be performed and published by CSS or other entities including
state governments, health insurers, and employers. Thus, the expected public interest in
obtaining this information is extremely broad and important.

For the foregoing reasons, CMS's January 29, 2007 decision to deny CSS's request for a
fee waiver should be reversed.

Sincerely,

Robert Krughoff (SA)

Robert Krughoff
President, CHECKBOOK/CSS
1625 K St., NW, 8th Floor
Washington, DC 20006
Tel: (800) 213-7283
Fax: (202) 347-4000
E-mail: Rkrughoff@checkbook.org

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 6

Stephen M. Albrecht
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6714
Fax: (202) 663-6363
E-mail: Stephen.Albrecht@wilmerhale.com

Enclosures

cc: Michael Marquis, Director, FOIA Group, CMS

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group

January 29, 2007

Refer to: C06FOI1318 / C06FOI2229A

Mr. Robert Krughoff, President
Mr. Stephen Albrecht, Esquire
Checkbook / Center for Study of Services
1625 K Street, N.W., 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff and Mr. Albrecht:

This letter revises my decision not to comply with your March 27, 2006 Freedom of Information (FOIA) request to obtain a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. Specifically, in response to your July 26, 2006 appeal of my decision, CMS has reexamined the processes necessary to extract the requested data with our information technology staff, and we have determined that we will be able to produce the requested information. Once produced, CMS will review the requested information under the FOIA to make our release determination.

You requested a waiver of fees for your FOIA request. Within your March 27, 2006 request, you described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a non-profit entity which conducts studies of consumer services, including government services, and publishes material which informs or educates consumers concerning those services. You contend a fee waiver is appropriate because providing the requested information will enable Checkbook / CSS to analyze the data and subsequently publish that analysis, which you believe is in the public interest, and will contribute significantly to public scrutiny of the operations of CMS and the Medicare program. You further state that the commercial interests of your organization are not the primary basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the fees we would otherwise charge if disclosure of the information meets both of the following tests: (1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government; and (2) It is not primarily in the commercial interest of the requester." After careful consideration of the commercial nature in which Checkbook /CSS markets and sells its services, I have concluded that CheckBook /CSS has a primary commercial interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the public interest in this matter. I also conclude that you have not demonstrated that disclosure of the requested data will advance the understanding of the general public because disseminating on a subscription or a fee basis will limit the general public's access to the requested data. Therefore, your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.

**PAGE II. – Consumers' Checkbook / CSS**

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

If you disagree with this decision to deny your fee waiver request, you may appeal. Your appeal should be mailed within 30 days of this letter to the: Deputy Administrator, Centers for Medicare & Medicaid Services, Mail Stop C5-2626, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. Please mark your letter "Freedom of Information Act Appeal", and enclose a copy of this letter.

Sincerely,

Michael S. Marquis
Director
FOIA Group



A Nonprofit Consumer Information & Service Resource                    February 26, 2007

**Strictly Embargoed Until:**                    **Contact:**      **Caroline Phillips**

**Thursday, June 20th**                                            **(202) 454-3006**

# Consumers' CHECKBOOK Reveals Big Differences in Quality Among Hospitals

Nonprofit Research Organization, Consumers' CHECKBOOK, Rates 4,500 Hospitals Nationwide

In an effort to help patients make the best and safest choices, Consumers' CHECKBOOK has released its ***Consumers' Guide to Hospitals***.  The 360-page *Guide* compares 4,500 hospitals across the country based on death rates, estimated rates of complications, ratings from a survey of more than 260,000 physicians, evaluation scores given by independent inspectors who visited the hospitals for accreditation reviews, and the ongoing training programs the hospitals provide for doctors.  Many medical consumers may not realize how widely these measures of quality vary among facilities and what it could mean to their well-being in the event of hospitalization.  (Death rates and complication rates are risk-adjusted to take into account the fact that some hospitals care for patients who are more sick or frail than the patients of other hospitals.)

## How Do Various Hospitals Around the Country Rate?

### Death Rates:

The risk-adjusted death rate for a broad selection of difficult cases was:

**8.6% at Lankenau Hospital** in the Philadelphia suburb of Wynnewood

**16.0% at Mercy Suburban Hospital** a few miles away in Norristown, PA


**9.4% at Baptist Hospital of Miami**

**15.0% at Parkway Regional Medical Center** in North Miami Beach


**9.4% at Cedars-Sinai Medical Center** in Los Angeles

**13.8% at Verdugo Hills Hospital** in nearby Glendale, CA

### Ratings by Physicians:

When thousands of doctors were asked to rate the hospitals in their local areas for "surgery on an adult in cases where the risk of complications is high," the proportion of very good or excellent ratings was:

**70% for Lankenau Hospital**

**3% for Mercy Suburban Hospital**

**79% for Baptist Hospital of Miami**

**9% for Parkway Regional Medical Center**

**83% for Cedars-Sinai Medical Center**

**14% for Verdugo Hills Hospital**

## Regional Differences Were Substantial

Based on information in the *Guide*, Consumers' CHECKBOOK compared scores in 40 different major urban areas. These encompassed the 40 largest metropolitan statistical areas in the U.S.

- Average risk-adjusted mortality rates ranged from **10.1% in the San Antonio, TX,** area to **14.8% in the Portland, OR,** area.
- The average percentage of doctors who rated the local hospitals with which they were familiar either very good or excellent ranged from **57% in the Norfolk, VA,** area to **23% in the New York City, Long Island, and Westchester** area.
- The overall evaluation scores given by the Joint Commission on the Accreditation of Healthcare Organizations based on detailed on-site inspections (maximum possible score 100) ranged from an average of **95.3 in the Charlotte, NC,** area to **87.9 in the Indianapolis, IN,** area.

### Fact & Figures

Roughly one out of ten Americans will be admitted to a hospital this year. Hospitals are dangerous places. An authoritative study released by the Institute of Medicine indicates that at least 44,000, and possibly as many as 98,000, patients die in hospitals each year as a result of preventable medical errors. That is more than the number who die from motor vehicle accidents.

"Consumers need to take responsibility for hospital choice," said Robert Krughoff, Consumers' CHECKBOOK's president, "by choosing doctors and health plans that are affiliated with good hospitals, and by examining with their doctors the pros and cons of available facilities prior to any hospital admission."

The *Consumers' Guide to Hospitals* gives ratings for specific categories of cases, including complex medical care for adults, high-risk adult surgery, low-risk adult surgery, high-risk surgery on a child, high-risk delivery of a baby, and uncomplicated delivery of a baby. It also identifies hospitals that have significantly better or worse than average rates of deaths and complications for patients with specific diseases or needing specific procedures, including heart attack, stroke, kidney failure, and bypass surgery.

The *Guide* reveals:

- Hospitals rated higher than average by physicians also tended to get higher than average ratings from consumers.
- Hospitals rated higher than average by physicians also tended to have lower than average death rates.
- Hospitals closely affiliated with medical schools tended to have lower than average death rates and tended to be rated higher than average by physicians.
- Larger hospitals (those with more beds) tended to have lower death rates than smaller hospitals.

## Advice for Patients Faced With Hospitalization

The *Consumers' Guide to Hospitals* gives extensive advice for consumers faced with a hospitalization. It exhorts patients not to go into a hospital—even for a routine case—without getting a second opinion from an independent doctor. Patients (or families and friends if the patient is not able) should discuss with their doctors—

- What is the basis for the diagnosis? Are there other possible explanations for the symptoms? Might it make sense to do further tests or simply to wait awhile to get a surer diagnosis?
- What are the alternative ways of treating the problem? What are the pros and cons of each—the chances of various outcomes in terms of lifestyle and ability to function?
- How complicated is the treatment? Does it require sophisticated medical staff or advanced equipment?
- What are the risks of complications? Will it be important to have close monitoring and quick access to sophisticated medical staff and equipment at all times?
- Why are the recommended hospital, and the particular doctor, good choices for the care? Is the required treatment one for which special training or frequent experience is important? Are there certain hospitals or specialists who have more skill, more experience, and higher success rates than others with this treatment?

## About Author Robert Krughoff

Robert Krughoff, President of Consumers' CHECKBOOK, has extensive background in health care quality measurement and consumer information, including having served as Director of Research and Evaluation Planning for the U.S. Department of Health, Education, and Welfare (now Health and Human Services); as an appointed member of the federal government's National Advisory Council for Health Care Policy, Research, and Evaluation; on the Committee on Performance Measurement of the National Committee for Quality Assurance; as an appointed member of several panels of the Institute of Medicine; as Chairman of the External Audit Committee of the ECRI Technology Assessment Program; on the Board of Directors of the American Pain Foundation; and on the Board of Directors of the Consumer Federation of America. He is a winner of the National Press Club's First Place Award for Excellence in Consumer Journalism, a recipient of the annual Esther Peterson Consumer Service Award from the Consumer Federation of America, and a winner of the annual Advocate's Award from the National Association of Consumer Agency Administrators.

## Interviews Available

Interviews with Robert Krughoff and with other co-authors of the *Guide* are available by request. Contact Caroline Phillips, Director of Public Relations, by phone at (202) 454-3006 or via email at press@checkbook.org for more information.

## Purchasing *Consumers' Guide to Hospitals*

The *Consumers' Guide to Hospitals* is available for $19.95 including shipping (payable to "Hospital Guide"), from Hospital Guide, 733 15th Street, NW, # 820, Washington, DC 20005. It can be ordered with a major credit card by calling (800) 213-7283 or on the web at www.checkbook.org. Alternatively, consumers may subscribe for two years of online access to the same information that appears in the printed *Guide* for $19.95 at www.checkbook.org.

## About Consumers' CHECKBOOK

The *Guide* is published by the nonprofit Consumers' CHECKBOOK organization. Founded in 1974, the organization also has recently published the *Consumers' Guide to Health Plans* and will soon release a new edition of its *Consumers' Guide to Top Doctors*. Since 1976, the organization has published local editions of **Consumers' CHECKBOOK** magazine in the Washington, DC, and San Francisco metropolitan areas; these magazines, with a combined paid circulation of 75,000 among local consumers in those two areas, are a "consumer reports" for local services, from auto repair shops to plumbers to hospitals. This fall, new editions of the magazine will appear in five additional metropolitan areas. Consumers' CHECKBOOK is fully funded through subscription and publication sales, fees for survey and information services, and consumer donations. Consumers' CHECKBOOK's magazines and websites accept no advertising.

CHECKBOOK Press Room

Home    Privacy    Security    About Us    Contact Us    Press Room    Make a Donation

Copyright 2007 Center for the Study of Services. All Rights Reserved.
CHECKBOOK is a trademark and service mark of the Center for the Study of Services and is registered with the US Patent and Trademark Office.

# EXHIBIT 6

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group

March 2, 2007

**REFER TO:**  FOIA Appeal C07FOI0907A
Original Request No. C06FOI1318 / C06FOI2229A

Mr. Stephen M. Albrecht, Esquire
Mr. Robert Krughoff, President
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006

Dear Mr. Albrecht and Mr. Krughoff:

I am acknowledging receipt of your February 28, 2007 Freedom of Information Act
(FOIA) appeal, which you sent to the Deputy Administrator, Centers for Medicare &
Medicaid Services (CMS).  We will process your appeal as expeditiously as possible,
consistent with Department of Health and Human Services FOIA rules set forth at
45 CFR Part 5.

Questions regarding your appeal should be directed to Ms. Melodye L. Hardy
at 410-786-5358.

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group

# EXHIBIT 7

WilmerHale

March 8, 2007

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

Via Electronic Mail and U.S. Mail

Michael S. Marquis
Director, FOIA Group
Department of Health & Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, MD 21244-1850

    Re:    C06FOI1318 / C06FOI2229A

Dear Mr. Marquis:

    On behalf of my client, Consumers' CHECKBOOK/Center for the Study of Services ("CSS"), I write in response to your letter dated January 29, 2007 revising your decision not to comply with my client's Freedom of Information Act ("FOIA") request dated March 27, 2006 (the "request") and denying my client's request for a fee waiver.

    On March 6 and 7, 2007, I spoke with Assistant United States Attorney Andrea McBarnette, counsel to CMS for the related FOIA litigation currently pending before the U.S. District Court for the District of Columbia, to discuss the following matters.

    In the January 29 letter, you asked whether my client would agree to pay the fees associated with processing the requested information, or alternatively whether my client would like to amend or narrow the request to reduce costs. As you are aware, my client appealed your denial of its request for a fee waiver on February 28, 2007, and we expect a response to that appeal within 20 days.[1] At the same time, however, we would like to move this matter forward as rapidly as possible so that CMS can process and release the requested information.

    Accordingly, without prejudice to CSS's February 28 administrative appeal of the denial of the fee waiver or to CSS's rights to seek all records sought in the original request at a later date, CSS provisionally narrows its request as follows: CSS asks that CMS now produce to it only those records sought by the request for which the Line NCH Provider State Code is "DC."

---

[1] *See, e.g., Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (DC Cir. 2003) (noting that in the context of a fee waiver, "[a] requester is considered to have constructively exhausted administrative remedies and may seek judicial review immediately if … the agency fails to answer the request within twenty days").

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Baltimore    Beijing    Berlin    Boston    Brussels    London    New York    Oxford    Palo Alto    Waltham    Washington

WILMERHALE

Michael S. Marquis
March 8, 2007
Page 2

CSS also agrees to pay the fees associated with these records, unless CSS prevails in its pending appeal of the fee waiver request or in any subsequent review of the fee waiver before a court of competent jurisdiction. CSS's agreement to pay the fees is also subject to the condition in the following paragraph.

CMS stated in its January 29 letter that *after* the agency processed the requested information (at substantial cost to CSS), *then* it would review the requested information under the FOIA to make a release determination. However, as CSS stated in the original request, the physician-identifying information contained in the requested records is a critical component of the request. It would appear that, as a practical matter, CMS could determine whether physician-identifying information is or is not categorically releasable under the FOIA *before* the requested records are actually retrieved and processed. In fact, it is our understanding that CMS has denied prior FOIA requests for physician-identifying information on personal privacy grounds under FOIA Exemption 6, 5 U.S.C. § 552(b)(6). If CMS either has made or can make a determination regarding the releasability of the requested physician-identifying information prior to processing the records, CSS asks that CMS inform it immediately of that determination, so as to avoid incurring any unnecessary costs. CSS expressly reserves the right to challenge the imposition of fees for processing the requested records where CMS has already determined, or could have determined, prior to processing the records, that the physician-identifying information in the records may not be released under the FOIA.

Due to the significant delay that CMS has already caused in this matter through its original decision not to comply with the request, we ask that CMS proceed with this request as expeditiously as possible to prepare and release the requested information. Having already exhausted its administrative remedies in this matter, CSS reserves its right to proceed with the litigation pending before the District Court to assure that CMS complies with its statutory duties under the FOIA, and to enforce timely compliance as necessary.

Sincerely,

Stephen M. Albrecht

cc:    Andrea McBarnette, Assistant United States Attorney