# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES<br>1625 K Street, NW, 8th Floor<br>Washington, DC 20006<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Centers for Medicare and Medicaid Services<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>   and<br>MICHAEL O. LEAVITT in his official capacity as Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>   and<br>LESLIE V. NORWALK in her official capacity as Administrator (Acting)<br>Centers for Medicare and Medicaid Services<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>: CASE NO. 1:06-CV-02201 (EGS)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF

1.  Pursuant to Fed. R. Civ. P. 15(a), plaintiff Consumers' CHECKBOOK/Center for

the Study of Services ("CSS"), through its undersigned counsel, hereby files its Amended

Complaint for Injunctive Relief.  Plaintiff makes this filing as a matter of right, and without need

for leave, because defendants have not yet served any pleading in response to plaintiff's original complaint.[1]

2.       This is an action under the United States Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., to compel defendants to produce certain Medicare claim records compiled and maintained electronically by the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS") and to enjoin defendants from assessing fees for the search, processing and production costs of such records.

3.       CMS maintains, in an electronic records system known as the National Claims History ("NCH"), claims submitted by physicians seeking reimbursement for medical services performed under the Medicare health insurance program. These claims records are of significant public importance as they provide information about the services that are purchased under the Medicare program, how CMS administers the Medicare program, and whether Medicare recipients are receiving medical services that meet quality standards.

4.       Defendants have violated the plaintiff's statutory rights under the FOIA by: (a) denying its request for certain Medicare claims records on the grounds that CMS does not maintain the specified records, while at the same time admitting that the records are maintained in the NCH; (b) misconstruing 5 U.S.C. § 552(a)(3)(B) as a complete bar to the production of the requested records, although this provision only governs the *format* in which records will be produced, and not the underlying question of whether records may be produced; (c) failing to respond to plaintiff's timely appeal of the agency's denial of its request; (d) failing to either release the requested records or offer a statutory exemption as a basis for withholding the

---

[1] See, e.g., James V. Hurson Associates, Inc. v. Glickman, 229 F.3d 277, 282-283 (D.C. Cir. 2000) (holding that a motion to dismiss or motion for summary judgment are not responsive pleadings for purposes of Rule 15(a)).

records; and (e) denying plaintiff's request for a fee waiver when the release of the requested

information will serve a significant public interest that outweighs any commercial interest that

could be attributed to the plaintiff.

JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B).

6.    Venue is proper in this Court pursuant to 5 U.S.C. § 552(a)(4)(B).

PARTIES

7.    Plaintiff, CSS, is incorporated as a not-for-profit organization in Washington,

D.C. and has its principal place of business in Washington, D.C.  CSS publishes Consumers'

CHECKBOOK magazine, a consumer information guide, on a subscriber basis in the following

general metropolitan areas:  Washington, DC, Boston, Philadelphia/Delaware Valley, Chicago,

Minneapolis/St. Paul, Seattle/Tacoma, and San Francisco Bay Area.  CSS also publishes the

Guide to Top Doctors; the Guide to Health Plans for Federal Employees; and the Consumers'

Guide to Hospitals.

8.    Defendant the Department of Health and Human Services ("HHS") is a United

States government agency established pursuant to 5 U.S.C. § 101 and 42 U.S.C. § 3501.  HHS is

an "agency" within the meaning of 5 U.S.C. § 552(f).  CMS, previously known as the Health

Care Financing Administration, was organized in 1977 pursuant to the authority of the Secretary

of HHS, previously known as Health, Education and Welfare ("HEW"), as a principal operating

component under HHS.  See Department of Health, Education, and Welfare, Office of the

Secretary, Health Care Financing Administration et al., Reorganization Order, 42 Fed. Reg.

13262 (March 9, 1977).

9.      Defendant Michael O. Leavitt is the Secretary of HHS; he is sued in his official capacity.

10.     Defendant Leslie V. Norwalk is the Administrator (Acting) of CMS; she is sued in her official capacity.

<u>CAUSE OF ACTION</u>

11.     On or about March 27, 2006, plaintiff, through its President, Robert Krughoff, mailed to the CMS Freedom of Information Group a written request for the production of a specified subset of the "Medicare claim records compiled and maintained electronically by CMS...." Plaintiff requested the information "as it is maintained at CMS." The request covered claim records from five states: Washington, DC, Maryland, Virginia, Illinois and Washington State. Plaintiff's request was expressly made pursuant to the Freedom of Information Act. A copy of plaintiff's March 27 FOIA request, subsequently labeled Request No. C06FOI1318 by CMS, is attached as Exhibit A.

12.     In the FOIA request, plaintiff explicitly stated that it was not requesting any data that would specifically identify any Medicare beneficiaries, and requested that CMS contact the plaintiff if CMS believed that the request would nonetheless implicate patient privacy issues. CMS did not raise any privacy issues in response to the FOIA request.

13.     In the FOIA request, plaintiff requested a waiver of the fees associated with the request pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. Plaintiff explained that through its analysis of the requested information and publication of its findings, it will contribute significantly to the public's scrutiny of the operations and performance of CMS and the Medicare program, and that Plaintiff's commercial interests were not primary to the request. <u>See</u> Exhibit A.

14.     Under 5 U.S.C. § 552, the public is entitled to receive all public records except those that are expressly exempted by statute.

## I.  DENIAL OF THE REQUEST FOR RECORDS

15.     By letter dated June 26, 2006, the Director of the Freedom of Information Group of CMS, Mr. Michael Marquis, wrote to plaintiff explaining that plaintiff's request for specific Medicare claims records was denied on two grounds.  First, CMS explained that "the agency does not maintain a record that is responsive to your request."  Second, CMS asserted that "under FOIA, we are not required either to create records or to <u>furnish information in a particular form or format when a record in such form or format is not readily reproducible employing reasonable efforts</u>. 5 U.S.C. § 552(a)(3)(B)."  (emphasis in original)  A copy of Director Marquis' June 26 letter is attached as Exhibit B.

16.     By letter dated July 25, 2006, plaintiff appealed Director Marquis' June 26 ruling to the Deputy Administrator of CMS.  A copy of the July 25 appeal letter is attached as Exhibit C.  Plaintiff's appeal stated two grounds for reversing the Director's denial.  First, CMS admitted in the June 26 denial letter that the agency does, in fact, maintain the requested information in a single electronic database.  CMS explained that the requested records are "maintained electronically by CMS in the National Claims History (NCH) files," and that the requested records could be retrieved in approximately two weeks.  <u>See</u> Exhibit B at 1.  CMS's own internal policies clarify that extracting a subset of information from an existing record or database (such as the NCH) is <u>not</u> considered creating a new record.  <u>See</u> Exhibit C at 4.  Second, 5 U.S.C. § 552(a)(3)(B) does not provide a legal basis for denying a FOIA request.  Rather, 5 U.S.C. § 552(a)(3)(B) provides that an agency shall provide records to a requestor in any "form or format requested by the person if the record is readily producible by the agency in that form or format."

This provision presumes that records will be produced under the FOIA, and only governs the *format* of the production. Plaintiff requested the information "as it is maintained at CMS," and CMS may not rely on this statutory provision to completely deny the request. See Exhibit C at 5-6.

17.     By letter dated August 1, 2006, Director Marquis acknowledged receipt of the July 25 appeal. A copy of the August 1 letter is attached as Exhibit D.

18.     Under 5 U.S.C. § 552(a)(6)(A)(ii), an agency must make a determination with respect to an appeal within twenty (20) working days. The agency's determination regarding plaintiff's appeal dated July 25, 2006 was statutorily required to be completed on or around August 22, 2006.

19.     Although 5 U.S.C. § 552(a)(6)(B)(i) provides for an extension of time limits for appeal determinations in "unusual circumstances," such extensions for appeals are limited to ten (10) working days. A time extension under this subsection would have expired on or about September 6, 2006.

20.     The agency did not issue a determination regarding plaintiff's appeal, and therefore failed to comply with the applicable time limit provisions of the FOIA.

21.     Plaintiff exhausted its administrative remedies, pursuant to 5 U.S.C. § 552(a)(6)(C)(i), in that plaintiff filed all specified appeals and the agency failed to respond within the time limits designated by statute, and plaintiff elected to exercise its right, pursuant to 5 U.S.C. § 552(a)(4)(B), to bring suit in the United States District Court for the District of Columbia to enjoin defendants from withholding the information sought and to compel the production of the information sought.

22.     Plaintiff filed a complaint before this Court on December 26, 2006 (the "Original Complaint") seeking injunctive relief to enjoin defendants from withholding the information that plaintiff requested and to order defendants to produce the requested information; seeking reasonable attorney fees and other costs of the litigation; and seeking such other and further relief as the Court may deem just and proper.

23.     By letter dated January 29, 2007 – over a month after plaintiff filed the Original Complaint in this matter – defendants revised their decision not to comply with the request, but did not fully address the issues raised in plaintiff's original appeal dated July 25, 2006. Defendants stated that "CMS has reexamined the processes necessary to extract the requested data with our information technology staff, and we have determined that we will be able to produce the requested information." A copy of the January 29, 2007 letter is attached as Exhibit E.

24.     Defendants' January 29, 2007 letter did not specifically address the basis for plaintiff's original appeal regarding CMS' prior assertion that it would completely withhold records on the grounds that the records were not readily reproducible employing reasonable efforts pursuant to 5 U.S.C. § 552(a)(3)(B). Defendants seemed to maintain their position regarding the applicability of 5 U.S.C. § 552(a)(3)(B) as a basis for completely denying a FOIA request, but instead determined after re-examination that processing plaintiff's request was reasonable. See Exhibit E at 1. Defendants' interpretation of and reliance on 5 U.S.C. § 552(a)(3)(B) is inconsistent with the FOIA.

25.     In their January 29, 2007 letter, defendants denied plaintiff's request for a fee waiver, provided an estimate of the costs for producing the requested records, explained that paying the fee to "produce" the records would not guarantee that defendants would actually

release the records, and asked whether plaintiff would like to amend or narrow the request to reduce costs. See Exhibit E. Plaintiff responded in a letter dated March 8, 2007 agreeing, on a provisional basis pending resolution of its fee waiver appeal and potential court adjudication, and without waiving its right to still seek all requested records, to pay for those records for which the Line NCH Provider State Code is "DC." Thus, in order to avoid further processing delay, plaintiff agreed to pay for the records from Washington, DC and maintained its right to receive the records from Maryland, Virginia, Illinois and Washington State. A copy of the March 8, 2007 letter is attached as Exhibit F.

26.     In a letter dated March 16, 2007, defendants wrote to plaintiff explaining that they had initiated production of the requested data from Washington, DC, and that it would be released in full, and *without redaction.* A copy of the March 16, 2007 letter is attached as Exhibit G. Defendants' letter did not state whether the records from Maryland, Virginia, Illinois and Washington State that were sought under the request would also be released without redaction if plaintiff agreed to pay for those records as well.

27.     Because defendants never fully answered plaintiff's original appeal clarifying whether or not the defendants could completely deny a request on the grounds that records are not readily reproducible employing reasonable efforts pursuant to 5 U.S.C. § 552(a)(3)(B), and because defendants did not address whether they would release the requested records from all five states without redaction, plaintiff does not know whether the records from Maryland, Virginia, Illinois and Washington State, or from any other states that may be requested in the future, will be released if plaintiff agrees to pay the associated fees, or obtains an order from this Court granting a fee waiver.

28.     Defendants have not released the Washington, DC records sought by plaintiff.

29.     Defendants have not released the Maryland, Virginia, Illinois and Washington state records sought by plaintiff.

30.     Plaintiff exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C) in that plaintiff filed all specified appeals, and defendants have not produced the records sought under the request.

31.     The withholding of this information by defendants is not supported by 5 U.S.C. § 552(a)(3)(B), nor any exemptions under 5 U.S.C. § 552(b).  Therefore, plaintiff is entitled, pursuant to 5 U.S.C. § 552(a)(2), to receive production of the information sought through its FOIA request.

## II.  DENIAL OF THE FEE WAIVER REQUEST

32.     In the January 29, 2007 letter revising its original decision, defendants did not agree to release the requested records.  Instead, defendants denied plaintiff's request for a fee waiver, and noted that plaintiff could appeal the fee waiver denial within 30 days.  Defendants also for the first time provided an estimate of the fees required to produce the records, totaling $3,944.70 for each of the five sets of state-specific records requested.  The letter asked plaintiff to agree to pay the fees so defendants could complete the processing of the request, or alternatively to amend or narrow the request to reduce costs.  Defendants clarified that they had not yet determined whether the records would be released, and would only make such a determination after the records were processed at a cost of approximately $3,944.70 per state. See Exhibit E.

33.     On February 28, 2007, plaintiff sent a letter to the Deputy Administrator of CMS appealing the denial of the fee waiver within the 30 day time limit established by defendants.  A copy of the February 28, 2007 appeal is attached as Exhibit H.  In the appeal, plaintiff explained

that (a) the requested records pertain to the core activity of CMS and the Medicare program; (b) the release of the records would reveal meaningful information about government operations that is not already in the public knowledge; (c) plaintiff has a long history of informing the broad public, beyond its subscriber base, about the findings of its quality studies, and would do the same regarding the requested information; and (d) any commercial interest of plaintiff is *de minimus* compared to the significant public benefit to be derived from the requested information.

34.     On March 2, 2007, defendants acknowledged receipt of the fee waiver appeal.  A copy of the March 2, 2007 letter is attached as Exhibit I.

35.     Defendants responded to plaintiff's fee waiver appeal in a letter dated March 16, 2007.  With regards to the analysis of public interest, defendants stated "we do not dispute that the requested records pertains [sic] to operations or activities of the Federal Government and that the disclosure of the records would reveal meaningful information about government operations and activities."  See Exhibit G at 2.  However, defendants questioned whether disclosure to plaintiff would advance the understanding of the general public, and questioned whether plaintiff's public distribution of summary findings from its analysis would be a "significant contribution to public understanding."  See Exhibit G at 3.  Defendants also found that plaintiff had not satisfactorily established that its commercial interest in the request was not primary. Defendants thus upheld the denial of plaintiff's fee waiver request.

36.     Plaintiff exhausted its administrative remedies with respect to the fee waiver request in that plaintiff filed all specified appeals, and the agency upheld the denial of plaintiff's request for a fee waiver.  Plaintiff has elected to exercise its right, pursuant to 5 U.S.C. § 552(a)(4)(B), to bring suit in the United States District Court for the District of Columbia to

enjoin defendants from assessing fees for the cost of searching for, reviewing and producing the information sought.

37.    Plaintiff has a strong interest in prompt access to the requested information, and the public interest in this information is of great magnitude.  In connection with the administration of the Medicare program, questions have been raised as to whether the medical services provided to Medicare beneficiaries are of sufficient quality given the cost of such services, and whether CMS is meeting its duties in administering the program.

38.    The information requested is essential to assess cost and quality issues relevant to the Medicare program, and to assess HHS's performance of its statutory duties with regards to the administration of the Medicare program.

39.    This information is a matter of serious, legitimate, public concern.

40.    Defendants have not previously released to the public the requested information regarding physician services provided under the Medicare program.  Through production of the requested information, plaintiff will be able to conduct quality studies of the services provided to beneficiaries under the Medicare program, providing a significant public benefit by advancing the understanding of the general public about the government's operation of the Medicare program, about the shortcomings of the government's quality improvement efforts under Medicare, and about the quality of the services available to Medicare beneficiaries.

41.    Plaintiff will publicly release the findings from its analysis of the requested information, thereby conferring a significant public benefit.  Pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45, plaintiff is entitled to a waiver of fees associated with the request.

III.  AWARD OF ATTORNEY'S FEES

42.     Defendants did not begin to meet their statutory obligations under the FOIA until after plaintiff filed suit in this case, and even throughout the litigation, Defendants continued to avoid their statutory obligations.  For example:

    a.   Defendants never responded to plaintiff's appeal of the original denial of its FOIA request dated July 25, 2006, and only agreed to even process the request in a letter dated January 29, 2007, over one month after the Original Complaint was filed.  Furthermore, defendants' January 29, 2007 letter revising their original denial did not specifically overturn their prior assertion that CMS could completely deny a FOIA request if the records are not readily producible employing reasonable efforts pursuant to 5 U.S.C. § 552(a)(3)(B). See Exhibit E.  Unless this Court orders defendants to fully comply with the request, defendants' misguided application of this statutory provision leaves open the possibility that defendants will continue to deny at least portions of plaintiff's request if they are deemed unduly burdensome.

    b.   Despite acknowledging in the original denial letter dated June 26, 2006 that the requested records could be processed in approximately two weeks (See Exhibit B), defendants alleged in a Motion to Extend the time to answer the Original Complaint that the processing and review time would take over three months.  See Defendants' Motion to Extend filed on January 24, 2007.

    c.   In the January 29, 2007 letter acknowledging that they would process the requested records, defendants maintained that they would not be able to make a release determination until after processing the records at a cost of

approximately $3,944.70 per state, leaving plaintiff in the position of having to expend large sums of money without any guarantee of actually receiving the requested records. See Exhibit E. In response, plaintiff argued in a letter to CMS dated March 8, 2007 that CMS should be able to make a release determination prior to processing the records, so as to avoid incurring unnecessary expense. See Exhibit F. Defendants responded by conceding in their letter dated March 16, 2007 – before processing the records – that the Washington, DC records would be released *without redaction*. See Exhibit G.

d. Finally, defendants agreed to release the Washington, DC records without redaction because plaintiff agreed to pay the associated fees if it does not ultimately prevail on its request for a fee waiver. See Exhibit G. But, defendants have not agreed to release the records from Virginia, Maryland, Illinois or Washington State in an unredacted form, leaving the releasability of these records in question.

43.    In order to vindicate its rights under the FOIA to receive all information requested in the March 27, 2006 request, plaintiff requires a court order mandating the release of all records without the assessment of fees. Due to the history of delay and avoidance perpetrated by defendants, which has only partially been overcome by plaintiff's filing of the instant suit and continued advocacy, plaintiff should be awarded attorney's fees pursuant to 5 U.S.C. § 552(a)(4)(E).

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that the Court:

(1)    Enjoin defendants, their agents, officers and employees from withholding the Washington, DC records that plaintiff has requested and order defendants to produce the requested information.

(2)    Enjoin defendants, their agents, officers and employees from withholding the Virginia, Maryland, Illinois and Washington State records that plaintiff has requested and order defendants to produce the requested information.

(3)    Enjoin defendants, their agents, officers and employees from assessing fees for the search, review and duplication costs associated with the request.

(4)    Grant plaintiff its reasonable attorney fees and other costs of this litigation, as provided under 5 U.S.C. § 552(a)(4)(E); and

(5)    Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted,


Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'*
*CHECKBOOK, Center for the Study of Services*

Date: April 4, 2007

# EXHIBIT A



**Center for the
Study of Services**

March 27, 2006

**By Certified U.S. Mail**


Centers for Medicare & Medicaid Services (CMS)
Office of Strategic Operations and Regulatory Affairs
Freedom of Information Group
Room N2-20-16
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Dear Sir or Madam:

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, *et seq.* and corresponding regulations, Consumers' CHECKBOOK/Center for the Study of Services ("CHECKBOOK/CSS") hereby requests certain Medicare claims records compiled and maintained electronically by CMS in the Carrier SAF files (previously known as the Physician/Supplier Part B files). We request only a subset of the data elements from those records, listed in Attachment A of this letter. We also limit our request to:

1) Data records for Calendar Year 2004;
2) Data records generated from physician claims; and
3) Data records for which the Line NCH Provider State Code is DC, IL, MD, WA or VA.

We request this data as it is maintained at CMS, and ask that it be supplied on 3490E IBM Standard label tape cartridges, DVD, or USB hard drive. We would like to receive the data in EBCDIC format, compressed, and preferably divided into individual files for each state requested.


**Privacy Issues**


We understand that there may be concerns regarding Medicare beneficiary privacy associated with these data records. We are not requesting any data that directly identifies beneficiaries. If CMS believes that the requested data may nonetheless raise beneficiary identification or patient privacy concerns in any specific instances, please

Publisher of *Consumers'*
*CHECKBOOK* magazines

1625 K Street, NW, 8ᵗʰ Floor
Washington, DC 20006

Phone: 800-213-7283
Fax: 202-347-4000

contact me so that we may discuss methods to protect beneficiary privacy while still providing the data that we request.

Additionally, we understand that CMS has previously relied on FOIA Exemption 6, 5 U.S.C. § 522(b)(6), as a justification for withholding physician identifying data on personal privacy grounds. We respectfully disagree with this assessment, and draw your attention to Public Citizen Health Research Group v. Dept. of Health, Education and Welfare, 477 F.Supp. 595 (D.D.C. 1979), rev'd on other grounds, 668 F.2d 537 (D.C. Cir. 1981), which squarely addressed this issue. In that case, District Court Judge Gesell balanced physician privacy interests against the public interest in receiving physician specific information that would provide a quality check on the performance of the Medicare and Medicaid programs. Judge Gesell held that, on balance, the public interest outweighed the privacy interest requiring disclosure of the information.[1] Id. at 604-5. Nonetheless, if CMS believes it has grounds to withhold the requested physician identifying information, I ask that you contact me to discuss the issue prior to proceeding with this matter, as the physician identifying information is essential to our request.

### Request for Fee Waiver

CHECKBOOK/CSS is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services (including services provided to consumers through government programs) and providing public benefit by publishing reports that educate consumers about such services. We believe that the provision of the requested information is in the public interest because, through our analysis of the requested data and our publication of findings, we will contribute significantly to the public's scrutiny of the operations and performance of CMS and the Medicare program. The commercial interests of CHECKBOOK/CSS are not primary to this request. Therefore, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45, we request that any fees associated with this request be waived. If you should determine that fees will not be waived, I ask that you contact me prior to providing the requested records to discuss the anticipated fees.

---

[1] Even though Public Citizen was decided prior to the Supreme Court's landmark decision in U.S. Dept. of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749 (1989), Judge Gesell followed the appropriate analysis required under Reporters Comm. by considering public benefits derived from the scrutiny of an agency and its performance, which are "at the core of FOIA." 477 F.Supp. at 604.

Consistent with 45 C.F.R. § 5.35, I would appreciate a response within 10 working days of receipt of this request. If you would like to discuss any issues related to this request, please contact me at (202) 454-3003. Thank you for your assistance.

Sincerely,

Robert Krughoff
President, CHECKBOOK/CSS

Enclosure

cc:     Stephen Albrecht, Esq.
        Wilmer Cutler Pickering Hale and Dorr LLP

**Attachment A**

Data elements requested from the Carrier SAF files:

Claim Through Date (Year/Quarter)
Carrier Number
CWF Beneficiary Medicare Status Code
Claim Principal Diagnosis Code
Carrier Claim Payment Denial Code
Claim Excepted/Non-Excepted Medical Treatment Code
Carrier Claim Provider Assignment Indicator Switch
Carrier Claim Referring PIN Number
Care Plan Oversight (CPO) Provider Number
Carrier Claim Diagnosis Code Count
Carrier Claim Line Count
Claim Diagnosis Code
Carrier Line Performing PIN Number
Carrier Line Performing UPIN Number
Line NCH Provider State Code
Line HCFA Provider Specialty Code
Line Provider Participating Indicator Code
Carrier Line Reduced Payment Physician Assistant Code
Line Service Count
Line HCFA Type Service Code
Line Place of Service Code
Line Last Expense Date (Year/Quarter)
Line HCPCS Code
Line HCPCS Initial Modifier Code
Line HCPCS Second Modifier Code
Line NCH BETOS Code
Line Beneficiary Primary Payer Code
Line Processing Indicator Code
Line Diagnosis Code

# EXHIBIT B

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



## Office of Strategic Operations and Regulatory Affairs/Freedom of Information Group

Refer to:  C06FOI1318 (KJ)                                    JUN 2 6 2006

Robert Krughoff
Center for the Study of Services
1625 K Street, NW, 8th Floor
Washington, DC 20006

Dear Mr. Krughoff:

This is in response to your Freedom of Information request dated March 27, 2006,
seeking access to Medicare claims records compiled and maintained electronically by
the Centers for Medicare & Medicaid Services (CMS) in the Carrier SAF files
(previously known as the Physician/Supplier Part B files).  You requested a subset of
the data elements from the Carrier SAF files.  You limited your request to: data
records for Calendar Year 2004; data records generated from physician claims and;
data records for which the Line NCH Provider State Code is DC, IL, MD, WA or VA.

We are unable to comply with your request because the agency does not maintain a
record that is responsive to your request and because, under FOIA, we are not required
either to create records or to furnish information in a particular form or format when a
record in such form or format is not readily reproducible employing reasonable efforts.
See 5 U.S.C. § 552(a)(3)(B).  We will not reproduce a record in a form or format that
would be responsive to your request because we cannot readily do so with reasonable
effort.

To explain, the carrier SAF is not the repository of the calendar year 2004 records you
have requested.   Medicare claims records that cover calendar year 2004 are
maintained electronically by CMS in the National Claims History (NCH) files.  The
NCH is a "flat file database" in which the files are generally read one record per line
in sequential order.  The NCH contains approximately 829.4 million claims for
calendar year 2004.  In order to process your request, each of the 829.4 million claims
that is identified with the provider state codes of interest to you would need to be
reformatted to include only the data elements that you have requested.  The computer
analysis and generation time associated with this "reformatting" effort is
approximately two weeks or longer if a single file is produced.  Hence, it is not
possible to satisfy your request with reasonable effort.

Page 2: Mr. Krughoff/C06FOI1318 (KJ)

I wish to point out that on June 1, 2006, CMS announced an effort to make health care more affordable and accessible, by making cost and quality data available. CMS posted the costs it pays hospitals for 30 common elective procedures and other hospital admissions at:

http://www.cms.hhs.gov/HealthCareConInit/

The information is categorized by state and county and includes a range of prices, the national average payment for the procedure, and the number of cases the hospital has handled.

CMS is working closely with a number of national and local organizations to develop more comprehensive and personalized information for common elective procedures of ambulatory services centers later this summer and common hospital outpatient and physician services this fall.

Additional information on transparency in health care costs and quality is located at:

http://www.hhs.gov/news/press/2006pres/20060601a.html

and,

http://www.cms.hhs.gov/apps/media/press/release.asp?Counter=1872

You may appeal this decision instead of requesting an informal review. To file an appeal, you must appeal in writing within 45 days of the date of this letter. Both your appeal letter and the envelope in which it is sent should be labeled "Freedom of Information Act Appeal." Enclosing a copy of this letter or referring to the "Refer to" number at the top of the first page of this letter will help to expedite matters. To file an appeal, mail your appeal to:

> Deputy Administrator
> Centers for Medicare & Medicaid Services
> 7500 Security Boulevard, Room C5-16-03
> Baltimore, Maryland 21244-1850

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group

# EXHIBIT C

WILMERHALE

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

July 25, 2006

**By United Parcel Service and Facsimile**

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Room C5-16-03
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOI1318*

Dear Sir or Madam:

On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services ("CSS") filed a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, with the Centers for Medicare & Medicaid Services ("CMS") requesting certain Medicare physician claim records ("the request"). CMS responded to the request in a letter dated June 26, 2006 from Mr. Michael S. Marquis, Director of the Centers for Medicare and Medicaid Services ("CMS") Freedom of Information Group ("the denial").[1] *See* Exhibits A-B.

In its response, CMS denied the request in its entirety and refused to produce even a single responsive record. Pursuant to 5 U.S.C. § 552 and 45 C.F.R. § 5.34, CSS hereby appeals the denial of the request.

## I. Summary of Argument

On March 27, 2006, CSS[2] requested specific data items contained within a single database maintained electronically by CMS, and requested that the data be produced

---

[1]    The denial stated that in order to file an appeal, CSS must appeal "in writing within 45 days of the date of this letter." *See* Ex. B. However, the Department of Health and Human Services ("HHS") FOIA regulations state that appeals must be filed "within *30* days from the date you *receive* [the response] letter...." 45 C.F.R. § 5.34(a) (emphasis added). Due to these conflicting deadlines, CSS has taken a conservative approach and filed this appeal within 30 days from the date of the denial letter. CSS does, however, reserve the right to supplement this appeal to the extent permitted under law or allowed under the guidance offered by CMS in the denial letter.

[2]    CSS is a non-profit 501(c)(3) corporation, founded in 1974 for the purpose of conducting and encouraging studies and educating the public on the kinds and quality of consumer services available to the public, including those services provided through government programs. CSS publishes *Consumers' CHECKBOOK* magazine in seven metropolitan areas. The magazine rates

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 2

electronically "as it is maintained at CMS." *See* Ex. A. CMS denied the request on two grounds, neither of which constitutes a legitimate justification for denial.

- First, CMS claimed that "the agency does not maintain a record that is responsive to [the] request," and thus responding to the request would require it to "create records." *See* Ex. B. However, in the very same letter, CMS acknowledged that the requested data does exist as a part of a single electronic database maintained by CMS. Under the FOIA statute, relevant case law, and the CMS FOIA policies and procedures, a database is considered a "record," and extracting a subset of data from a larger database is <u>not</u> considered creating a new record.

- Second, CMS asserted that under 5 U.S.C. § 552(a)(3)(B), compliance with the request was not required because producing the requested records would entail producing data "in a particular form or format" that is not "readily reproducible employing reasonable efforts." *See* Ex. B. Under the FOIA statute, relevant case law and the CMS FOIA policies and procedures, the statutory provision cited by CMS is <u>not</u> a proper legal justification for the complete denial of a FOIA request.

The purpose of the FOIA is to "ensure that the Government's activities be opened to the sharp eye of the public scrutiny...." *United States Dept. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 774 (1989) (emphasis omitted). CSS has requested records maintained by CMS in order to assess the physician services that CMS is purchasing with taxpayer dollars through the Medicare program and to scrutinize and evaluate CMS's performance of its administrative duties. Unfortunately, CMS has denied this request so as to conceal its data, and conceal the internal workings of the Medicare program, from public scrutiny. CMS's denial violates the letter and the spirit of the FOIA and CMS's own policies, and must be overturned.

II.     **Medicare Data Background**

CMS maintains the National Claims History ("NCH"), an electronic database containing data from millions of claims filed by various types of providers each year under the Medicare program. CMS routinely prepares subsets of the NCH for distribution to private parties for

---

many types of local service firms from auto repair shops to plumbers, from doctors to banks. CSS also publishes nationally distributed books including the <u>Guide to Top Doctors</u>, <u>Consumers' Guide to Hospitals</u>, and the <u>Guide to Health Plans for Federal Employees</u>, which is now in its 27th annual edition and is sold online to many federal agencies to assist their employees and retirees in making health plan decisions.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 3

research purposes.[3/]  A Standard Analytical File (SAF) is a typical "subset" of the NCH created by CMS to capture the claims submitted to Medicare for each specific type of provider.[4/]  For example, the CMS web page explains that CMS creates a Home Health Agency SAF, which contains the subset of claims submitted by home health agencies to the Medicare program. Similarly, claims submitted by physicians under Medicare Part B are segregated into an SAF called the "Physician/Supplier Part B - Carrier File," also know as the Carrier SAF. *See* Ex. D.

In the request, CSS described the requested data as "records compiled and maintained electronically by CMS in the Carrier SAF files ...." *See* Ex. A.  In an effort to simplify its request, CSS described the requested records by referencing the data in the specific SAF rather than the broader NCH.  CMS, however, asserted "the carrier SAF is not the repository of the calendar year 2004 records you have requested.  Medicare claims records that cover calendar year 2004 are maintained electronically by CMS in the National Claims History (NCH) files." *See* Ex. B.  Based on CMS's own explanations of its data, there should be no practical difference in data content between the physician claims in the NCH and the claims in the Carrier SAF, which are extracted from the NCH.[5/]  In fact, CSS contacted the Research Data Assistance Center ("ResDAC"), which contracts with CMS to assist researchers in their requests for data from CMS, and verified that the requested data does exist in the CMS files as described in the request.  If as a technical matter, CMS prefers to obtain the requested records from the NCH rather than a corresponding SAF file, CSS does not object.

---

[3/]    A further explanation of the CMS data request process for research purposes is available on the CMS web page at http://www.cms.hhs.gov/PrivProtectedData/. *See* Exhibit C.  CMS requires that researchers receiving this data sign a Data Use Agreement ("DUA"), which among other things, prohibits the public dissemination of physician specific data.  Because CSS routinely publishes the findings of its consumer services analysis, this limitation makes the research request process unsuitable for CSS's purposes.

[4/]    A further explanation of the SAFs is available on the CMS web page at http://www.cms.hhs.gov/IdentifiableDataFiles/02_StandardAnalyticalFiles.asp#TopOfPage, and is attached hereto as Exhibit D.

[5/]    In fact, in a letter from Dennis G. Smith, Director, CMS Center for Medicaid and State Operations, to various State Medicaid Directors dated June 4, 2002, Mr. Smith provided instructions for state agencies to request Medicare claim data, explaining that the data resided in "Medicare's National Claims History (NCH) Standard Analytical Files (SAF)" for each state. This letter is available at http://www.cms.hhs.gov/smdl/downloads/smd060402.pdf, and is attached to hereto as Exhibit E.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 4

### III.    Argument

#### A.  Complying with the CSS request does not require the creation of "new records."

CMS asserted that it does not maintain a record that is responsive to the CSS request, and therefore complying with the request would require the creation of records. Under the FOIA statute, however, the contents of an electronic database are considered "records," and an agency is obligated to search agency records "manually or by automated means" in order to locate records that are responsive to a request. 5 U.S.C. §§ 552(a)(3)(C) & (D); see *also Yeager v. Drug Enforcement Admin. et al.*, 678 F.2d 315, 321 (D.C. Cir. 1982) ("computer-stored records, whether stored in the central processing unit, on magnetic tape or in some other form, are still 'records' for purposes of the FOIA").

It is immaterial that the NCH database houses a set of data broader than CSS has requested. CMS admitted in the denial that the data CSS requested is maintained in the NCH, and that the requested items of data can be extracted from the full NCH for production. This extraction of data from a database is not the creation of new records, and any assertion to the contrary is inconsistent with the FOIA statute and relevant case law. *See, e.g., Schladetsch v. U.S. Dept. of Housing and Urban Development*, No. 99-0175, 2000 WL 33372125 at *3 (D.D.C. Apr. 4, 2000) ("Because HUD has conceded that it possesses in its databases the discrete pieces of information which [plaintiff] seeks, extracting and compiling that data does not amount to the creation of a new record").

CMS's Freedom of Information Group Policy and Procedural Guide further addresses the issue of when preparing requested data for disclosure will be deemed creating "new records." The Guide states:

> The FOIA does not require that new records or documents be created to respond to requests. Writing a new program(s) to extract data from multiple computer files in order to compile such data into a "new" record is considered creating a record. However, deleting non-releasable data, or data not within the scope of the request, from an existing record is not considered creating a record. This applies even if, for administrative convenience, we write a new program to edit the existing record rather than editing the record manually after the hard copy has been run.[6] *See* Ex. F at 10.

---

[6]    CMS Office of Strategic Operations and Regulatory Affairs, Freedom of Information Group, Policy and Procedural Guide (updated June 2006). The Guide is available at http://www.cms.hhs.gov/FOIA/downloads/CMS FOIA POLICY and Procedural Guide.pdf.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 5

CSS has not requested that CMS extract data from multiple sources to be aggregated into a "new record." CMS has acknowledged that the data CSS requested exists in a single electronic location – the NCH –, not in multiple and disparate computer databases. CSS has requested a subset of the data in the NCH. In order to comply with the CSS request, CMS may delete the data that is outside the scope of the request from the full NCH. Under CMS's own policy, this procedure does not constitute creating a new record. Even if, for administrative efficiency, CMS decides to write a program to perform this editing function, it would not be creating a new record. CMS's assertion to the contrary in the denial letter is inconsistent with this policy, and inconsistent with applicable federal law.

> B. **The FOIA provision cited by CMS does not justify a denial of the CSS request in its entirety.**

When CMS asserted that it was not required to expend an unreasonable effort to comply with the CSS request, it mis-characterized the FOIA statute regarding the reasonableness of production in a specific form or format. In the denial letter, CMS cited to 5 U.S.C. § 552(a)(3)(B). This statutory provision must be read in conjunction with the preceding provision to understand its meaning. Section 522(a)(3)(A) states that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." With the prior understanding that a proper request has been made for existing records, section 522(a)(3)(B) goes on to explain:

> In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

With this context, it is clear that § 552(a)(3)(B) does not provide an agency with a justification for completely denying a FOIA request. Rather, it clarifies that once an agency has identified responsive records that will be produced, the agency must take reasonable steps to provide records in the form or format that a requestor prefers. *See, e.g., TPS, Inc. v. U.S. Dep't of Defense*, 330 F.3d 1191, 1195 (9th Cir. 2003) (agency conceded that electronic records were to be produced to a requestor, but argued under § 552(a)(3)(B) that the agency was not obligated to compress or "zip" the data files. The court held that if the agency used the "zip" technology in its "normal business as usual approach," then it would be reasonable to employ that technology for its FOIA response). Under § 552(a)(3)(B), if it would be unreasonable for an agency to transform a record into the requestor's preferred form or format, then the agency would still be required to provide the requested record in whatever form or format the record is maintained by the agency in normal course. *See also, Schladetsch*, 2000 WL 33372125 at *3, n.2 (explaining

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 6

that "form or format" typically involves choices between microfiche or computer form or visicorder charts or paper form. Because plaintiff requested records as they were maintained by the agency, section (a)(3)(B) did not apply.)

CMS addressed § 552(a)(3)(B) in a FOIA Memorandum issued on April 24, 1997 following the implementation of the "EFOIA" Amendments of 1996.[2] The memorandum states:

> The term "form" or "format" also can be interpreted to mean the organization or arrangement of information within a record. It has been our practice in the past to reproduce computerized records only *in the form or format in which we normally extract the record from our system.* However, in line with this provision, the following guidance will assist you when responding to requests for computerized records in a form or format other than that normally extracted from an automated database[.]

*See* Exhibit G at 2 (emphasis added). This FOIA policy statement makes clear that as a default rule, CMS will produce computerized records in the form in which they are normally extracted from CMS data systems. CSS has asked for nothing more than this simple extraction of data. CSS stated in the request that the Medicare claim data should be produced "as it is maintained at CMS." *See* Ex. A. CSS did request some further format specifications, including that the data be "in EBCDIC format, compressed, and *preferably* divided into individual files for each state requested." *See* Ex. A (emphasis added). If CMS believes that these formatting requests are "unreasonable" under 5 U.S.C. § 552(a)(3)(B), then CSS would expect an explanation to that effect. However, § 552(a)(3)(B) does not authorize CMS to deny the CSS request in its entirety on "form and format" grounds. CMS would be expected, at the very least, to provide the data in the form or format in which it is normally extracted from the NCH system. CMS's misguided attempt to deny the request in its entirety on formatting grounds under 5 U.S.C. § 552(a)(3)(B) must be reversed.

### C. The CSS request does not require an "unreasonable effort" from CMS.

The FOIA statute explains that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of those portions which are exempt under this subsection." 5 U.S.C. § 552(b). Courts interpret the "reasonably segregable" term very liberally, and have required that agencies expend significant resources to comply with FOIA

---

[2]    Memorandum from Glenn W. Kendall, Acting Director, Freedom of Information and Privacy Office to Central and Regional Office Freedom of Information Act Coordinators (Apr. 24, 1997), available at http://www.cms.hhs.gov/FOIA/downloads/CMS%20FOIA%20Policy-E-FOIA-Form%20n%20Format.pdf.

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 7

requests. For example, in *Long v. U.S. Internal Revenue Serv.*, the Ninth Circuit held that reviewing and editing over 200,000 pages of documentation and a series of data tapes at a cost of up to $160,000 was "not considered an unreasonable burden to place on an agency." 596 F.2d 362, 366-367 (9th Cir. 1979).[8] The court explained that Congress has not limited the scope of the FOIA, despite the expenses that can be involved. "Congress has determined that access to government records is an important objective. We therefore cannot conclude that the costs of editing involved in this case are so extreme that segregation of revealable material is unreasonable as a matter of law." Id.

CMS estimated that it would take approximately 2 weeks to process the CSS request. In light of the Congressional mandate for the release of public records under the FOIA and the precedent courts have set requiring significant efforts to comply with FOIA requests, compliance with the CSS request cannot be deemed "unreasonable." Moreover, CMS cannot argue that complying with the CSS request would disrupt its normal work processes. As described above, CMS prepares data extracts comparable in size, scope and field selection to the CSS request on a routine basis for third-party researchers who request these data extracts. Furthermore, CMS employs contractors such as the Research Data Distribution Center, to process these research requests. Thus, CMS staff would not be required to perform the data processing required in this case if it elected to utilize its normal contractors. To the extent that CMS can rely on contractors to prepare the data for the request, and because costs of production can be passed on to the requestor under some circumstances, it is difficult to understand how CMS would be burdened in any way by the CSS request.

The FOIA, and the EFOIA amendments of 1996 in particular, are a Congressional mandate for federal agencies to open their records for public scrutiny. In the EFOIA amendments, Congress particularly found that "[g]overnment agencies increasingly use computers to conduct agency business and to store publicly valuable agency records and information," and "[g]overnment agencies should use new technology to enhance public access to agency records and information." *TPS, Inc.*, 330 F.3d at 1195 (citing Pub. L. No. 104-231 at

---

[8]    The *Long* court also catalogued a series of decisions whereby courts ordered agencies to commit significant resources to processing FOIA requests. For example, in a case involving a request for information regarding the Rosenberg trials, the U.S. District Court for the District of Columbia ordered the Department of Justice ("DOJ") to fulfill the request, requiring DOJ to commit 65 full-time and 21 part-time employees to processing a single FOIA request. 596 F.2d at 367 (citing *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 613 (D.C. Cir. 1976). *See also, Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 360 (5th Cir. 2001) (Army prepared to manually redact hundreds of thousands of records, and then rescan them into a computer database to comply with a FOIA request).

WILMERHALE

CMS Deputy Administrator
July 25, 2006
Page 8

*2). Under this mandate, CMS cannot be allowed to use the technical aspects of data formatting and database extractions as a basis for denying access to its records. Rather, the CMS data systems should be employed to enhance public access to agency records. The FOIA statute, case law, and CMS's own policies require compliance with the request.

### IV.   Conclusion

For the foregoing reasons, the denial of the CSS FOIA request must be reversed, and the requested records produced. We look forward to your reply to this appeal within **twenty (20) working days**, as required under 5 U.S.C. § 552(a)(6)(A)(ii).

In the original request, CSS requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. Because CMS denied the request, the fee waiver has not been addressed in this matter. CSS retains the right to request a fee waiver in the event that the denial is overturned on appeal and the requested records are produced.

Sincerely,

Robert Krughoff
President, CHECKBOOK/CSS
1625 K St., NW, 8th Floor
Washington, DC 20006
Tel: (800) 213-7283
Fax: (202) 347-4000
E-mail: Rkrughoff@checkbook.org

Stephen M. Albrecht
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6714
Fax: (202) 663-6363
E-mail: Stephen.Albrecht@wilmerhale.com

Enclosures

# EXHIBIT D

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group

August 1, 2006

**REFER TO:**  **FOIA Appeal C06FOI2229A (DJP)**

Mr. Stephen M. Albrecht, Esquire
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Dear Mr. Albrecht:

I am acknowledging receipt of your July 25, 2006 Freedom of Information Act
(FOIA) appeal, which you sent to the Deputy Administrator, Centers for Medicare &
Medicaid Services (CMS). We will process your appeal as expeditiously as possible,
consistent with Department of Health and Human Services FOIA rules set forth at
45 CFR Part 5.

Questions regarding your appeal should be directed to Ms. Deborah Peters at
(410) 786-3677.

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group

# EXHIBIT E

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**Centers for Medicare & Medicaid Services**
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



**Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group**
January 29, 2007

Refer to:  **C06FOI1318 / C06FOI2229A**

Mr. Robert Krughoff, President
Mr. Stephen Albrecht, Esquire
Checkbook / Center for Study of Services
1625 K Street, N.W., 8th Floor
Washington, D.C.  20006

Dear Mr. Krughoff and Mr. Albrecht:

This letter revises my decision not to comply with your March 27, 2006 Freedom of Information (FOIA) request to obtain a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia.  Specifically, in response to your July 26, 2006 appeal of my decision, CMS has reexamined the processes necessary to extract the requested data with our information technology staff, and we have determined that we will be able to produce the requested information.  <u>Once produced, CMS will review the requested information under the FOIA to make our release determination.</u>

You requested a waiver of fees for your FOIA request.  Within your March 27, 2006 request, you described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a non-profit entity which conducts studies of consumer services, including government services, and publishes material which informs or educates consumers concerning those services.  You contend a fee waiver is appropriate because providing the requested information will enable Checkbook / CSS to analyze the data and subsequently publish that analysis, which you believe is in the public interest, and will contribute significantly to public scrutiny of the operations of CMS and the Medicare program.  You further state that the commercial interests of your organization are not the primary basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the fees we would otherwise charge if disclosure of the information meets both of the following tests: (1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government; and (2) It is not primarily in the commercial interest of the requester."  After careful consideration of the commercial nature in which Checkbook /CSS markets and sells its services, I have concluded that CheckBook /CSS has a primary commercial interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the public interest in this matter.  I also conclude that you have not demonstrated that disclosure of the requested data will advance the understanding of the general public because disseminating on a subscription or a fee basis will limit the general public's access to the requested data.  Therefore, your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.

**PAGE II. – Consumers' Checkbook / CSS**

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced at its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

If you disagree with this decision to deny your fee waiver request, you may appeal. Your appeal should be mailed within 30 days of this letter to the: Deputy Administrator, Centers for Medicare & Medicaid Services, Mail Stop C5-2626, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. Please mark your letter "Freedom of Information Act Appeal", and enclose a copy of this letter.

Sincerely,

Michael S. Marquis
Director
FOIA Group

# EXHIBIT F

WILMERHALE

March 8, 2007

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

Via Electronic Mail and U.S. Mail

Michael S. Marquis
Director, FOIA Group
Department of Health & Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, MD 21244-1850

    Re:    C06FOI1318 / C06FOI2229A

Dear Mr. Marquis:

On behalf of my client, Consumers' CHECKBOOK/Center for the Study of Services ("CSS"), I write in response to your letter dated January 29, 2007 revising your decision not to comply with my client's Freedom of Information Act ("FOIA") request dated March 27, 2006 (the "request") and denying my client's request for a fee waiver.

On March 6 and 7, 2007, I spoke with Assistant United States Attorney Andrea McBarnette, counsel to CMS for the related FOIA litigation currently pending before the U.S. District Court for the District of Columbia, to discuss the following matters.

In the January 29 letter, you asked whether my client would agree to pay the fees associated with processing the requested information, or alternatively whether my client would like to amend or narrow the request to reduce costs. As you are aware, my client appealed your denial of its request for a fee waiver on February 28, 2007, and we expect a response to that appeal within 20 days.[1] At the same time, however, we would like to move this matter forward as rapidly as possible so that CMS can process and release the requested information.

Accordingly, without prejudice to CSS's February 28 administrative appeal of the denial of the fee waiver or to CSS's rights to seek all records sought in the original request at a later date, CSS provisionally narrows its request as follows: CSS asks that CMS now produce to it only those records sought by the request for which the Line NCH Provider State Code is "DC."

---

[1] See, e.g., *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (DC Cir. 2003) (noting that in the context of a fee waiver, "[a] requester is considered to have constructively exhausted administrative remedies and may seek judicial review immediately if … the agency fails to answer the request within twenty days").

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Baltimore    Beijing    Berlin    Boston    Brussels    London    New York    Oxford    Palo Alto    Waltham    Washington

WILMERHALE

Michael S. Marquis
March 8, 2007
Page 2

CSS also agrees to pay the fees associated with these records, unless CSS prevails in its pending appeal of the fee waiver request or in any subsequent review of the fee waiver before a court of competent jurisdiction. CSS's agreement to pay the fees is also subject to the condition in the following paragraph.

CMS stated in its January 29 letter that *after* the agency processed the requested information (at substantial cost to CSS), *then* it would review the requested information under the FOIA to make a release determination. However, as CSS stated in the original request, the physician-identifying information contained in the requested records is a critical component of the request. It would appear that, as a practical matter, CMS could determine whether physician-identifying information is or is not categorically releasable under the FOIA *before* the requested records are actually retrieved and processed. In fact, it is our understanding that CMS has denied prior FOIA requests for physician-identifying information on personal privacy grounds under FOIA Exemption 6, 5 U.S.C. § 552(b)(6). If CMS either has made or can make a determination regarding the releasability of the requested physician-identifying information prior to processing the records, CSS asks that CMS inform it immediately of that determination, so as to avoid incurring any unnecessary costs. CSS expressly reserves the right to challenge the imposition of fees for processing the requested records where CMS has already determined, or could have determined, prior to processing the records, that the physician-identifying information in the records may not be released under the FOIA.

Due to the significant delay that CMS has already caused in this matter through its original decision not to comply with the request, we ask that CMS proceed with this request as expeditiously as possible to prepare and release the requested information. Having already exhausted its administrative remedies in this matter, CSS reserves its right to proceed with the litigation pending before the District Court to assure that CMS complies with its statutory duties under the FOIA, and to enforce timely compliance as necessary.

Sincerely,

Stephen M. Albrecht

cc:    Andrea McBarnette, Assistant United States Attorney

# EXHIBIT G

DEPARTMENT OF HEALTH & HUMAN SERVICES          Centers for Medicare & Medicaid Services

RE: Appeal Case Number C07FOI0907A

MAR 1 6 2007

*Deputy Administrator*
Baltimore, MD  21244-1850

Mr. Robert Krughoff
President, CHECKBOOK/CSS
1625 K Street, 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff:

This is in response to your February 28, 2007 letter appealing the decision of Michael S. Marquis, Director, Freedom of Information Group (FIG), Centers for Medicare & Medicaid Services (CMS), to deny your request for a waiver of fees for processing your March 27, 2006 Freedom of Information Act (FOIA) request.  Your request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia.  Before rendering my appeal decision, I note that I have been advised that contingent upon the court's final decision on the fee waiver issue in the litigation that is pending over this FOIA request, you are willing to pay the FOIA processing fees for CMS to produce the requested 29 fields of data listed on Attachment A of your request only for those records for which the Line NCH Provider State Code is Washington, D.C.  Based upon your agreement to pay, we have initiated production of the requested data.  It will be released to you in full, and without redaction.  The estimated computer time to generate the data will be approximately three to four weeks.  My appeal ruling follows.

**Background:** Your original FOIA request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia.  The request also sought a fee waiver.  Specifically, your fee waiver request provided that CHECKBOOK/CSS is a non-profit organization that conducts and supports studies of consumer services and publishes reports that educate consumers about such services.  Your request also stated that you believed your analysis of the requested data and publication of the findings would contribute significantly to the public's scrutiny of the operation and performance of CMS and the Medicare program.  Your request asserted that the commercial interests of CHECKBOOK/CSS are not primary to the FOIA request.

Mr. Marquis' January 29, 2007 letter explained the reasons for the denial.  The denial noted that the fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience.  In addition, the denial reviewed the services provided by CHECKBOOK/CSS, as described on the web sites www.checkbook.org and www.cssresearch.org, and noted that CHECKBOOK/CSS charges fees for survey and research services, to individual consumers, governments, and commercial entities.  The denial pointed out that Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00.  The denial also showed that CHECKBOOK/CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors.  Additionally, the denial explained that CHECKBOOK/CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by

**PAGE II. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

its web site at http://www.cssresearch.org/exp.cfm. In support of his decision concerning the commercial interests of your organization, Mr. Marquis provided an example of CHECKBOOK/CSS' description of itself as an approved vendor to administer Hospital Consumer Assessment of Health Plans (HCAHPS) hospital surveys, for which it charges an annual fee of $2,900. Based on the foregoing, Mr. Marquis found that the commercial interests of CHECKBOOK/CSS were primary to the FOIA request.

You appealed the fee waiver denial on February 28, 2007, arguing that your organization met the Department's public interest criteria for a fee waiver and that the public interest in obtaining the requested records outweighs any commercial interest of your organization.

**Analysis of Public Interest**: It is the policy of this Department to waive or reduce fees if disclosure of the information meets both the following tests: (1) it is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) it is not primarily in the commercial interest of the requester.

In analyzing the public interest, we consider the following factors:

(1) How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government?

(2) Would disclosure of the records reveal meaningful information about government operations or activities? Can one learn from these records anything about such operations that is not already public knowledge?

(3) Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons?

(4) Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?

With respect to the first two above public interest factors, we do not dispute that the requested records pertains to operations or activities of the Federal Government and that the disclosure of the records would reveal meaningful information about government operations or activities.

With regard to the third public interest factor, we question whether the disclosure will advance the understanding of the general public as distinguished from a narrow segment of interested persons. Your appeal included an attachment of a press release as an example of how your organization releases the results of its quality studies through press releases. This sample press release, in the first two and a half pages, generally explains your organization's 360-page Consumers' Guide to Hospitals (the Guide) and then explains that if consumers want the Guide, they can pay $19.95 or subscribe for two years of online access to the same information in the Guide for $19.95. This press release shows that if the public wants access to the full Guide, they have to pay for it, a circumstance which may well limit access to the information.

**PAGE III. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

Your appeal does not specify how the general public's understanding will be advanced in light of the fact that your organization charges for some of the information that it obtains, and it is not clear to us how much your organization intends to charge for the requested records. Your appeal states that your organization often makes free content available on its website. Your appeal, however, does not adequately explain how CHECKBOOK/CSS intends to convey the requested data to the general public. Your amended FOIA request is for 29 data elements about all Medicare physicians in the District of Columbia for the 2004 calendar year. This is a large amount of information, and it is not clear from your appeal how news articles, press releases, or media reports will convey this vast amount of information to the general public.

With respect to the fourth public interest factor, using the sample press release as an example (Exhibit B of your appeal), you haven't shown how releasing a press release of a few pages in length will be a significant contribution to public understanding, in light of the fact that you are requesting 29 data elements for Medicare physicians for the 2004 calendar year. As we noted in our review of the first and second public interest factors, the data you have requested would allow the public to see the volume and types of procedures performed by individual physicians within Washington, D.C. during the one-year period of 2004, specifically for claims submitted to Medicare. While we do not dispute that the number of times a specific procedure is performed may contribute to a physician's expertise and skill, this quantitative data within a limited context cannot be equated as an overall quality analysis. Nor does this information, in and of itself, shed light upon whether the Medicare program is adequately assessing quality of care issues.

**Analysis of Commercial Interest**: Even though you did not meet the third and fourth factors of the public interest test, we also considered whether your organization's commercial interest is the primary interest. In determining whether the commercial interest is the primary interest of the requester, HHS considers the following factors:

(1) Would the disclosure further a commercial interest of the requester, or of someone on whose behalf the requester is acting? "Commercial interests" include interests relating to business, trade, and profit. Not only profit-making corporations have commercial interests—so do nonprofit corporations, individuals, unions, and other associations. The interest of a representative of the news media in using the information for news dissemination purposes will not be considered a commercial interest.

(2) If disclosure would further a commercial interest of the requester, would that effect outweigh the advancement of the public interest defined in paragraph (b) of this section [45 C.F.R. § 5.45]? Which effect is primary?

## PAGE IV. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A

Within your appeal, you did not challenge the initial denial's assertion that your organization markets itself as an expert in conducting studies, surveys, data collection and analysis. As was also pointed out in the initial denial, your organization has exhibited a pattern of charging consumers and others for certain information that it obtains. As we previously stated, Exhibit B of your appeal confirms that consumers must pay $19.95 to gain access to the Consumers Guide to Hospitals. In regard to a supporting argument raised on the fourth page of your appeal, in which you stated that CHECKBOOK/CSS has contracted with government agencies to provide federal employees with free access to the <u>Consumers Checkbook Guide to Health Plans</u>, your organization <u>charges</u> the subscribing agencies for this access. The Department of Health and Human Services paid $12,000 to your organization during 2006 for this access. To reiterate a prior example of CHECKBOOK/CSS' commercial activities, your organization is an approved vendor to administer the HCAHPS hospital survey and charges an annual fee of $2,900 to each facility for those services. In addition to those examples of fee-for-service activities, we also note that CHECKBOOK/CSS charges $24.95 for its <u>Guide to Top Doctors</u>, as stated on the website at http://www.checkbook.org/doctors/pageone.cfm, and as also stated in a recent subscription renewal letter to a CHECKBOOK subscriber. That subscription renewal letter stated the following: "You will enjoy *free* subscriber-only online access to our nationwide *Top Doctors* Ratings to help you find the best health care providers for yourself, your friends, and your family, both locally and nationwide (thousand of consumers pay $24.95 for online access to those ratings alone)".

In addition, your organization's website at http://www.checkbook.org/about.cfm explains that the organization is supported entirely by subscription payments and donations from individual consumers who subscribe to its magazines, and by fees for your survey and information services and books. Even though your website acknowledges that your organization is supported by subscription payments and donations from individual consumers who subscribe to your organization's magazine and by fees for your services and books, your appeal makes a conclusory statement that your commercial interest is "de minimus," and it does not inform us as to how much your organization intends to charge the public for access to the data elements that you are requesting from CMS so we can weigh the commercial interest against the public interest

**Conclusion:** It is the responsibility of the FOIA requester to demonstrate and substantiate his eligibility for a fee waiver. As a FOIA requester, you have not met this burden, in that you have not satisfactorily established that your organization's commercial interest was not primary, nor have you demonstrated how you would disseminate the requested data to edify and inform a broad segment of the population.

Based upon my careful consideration of your appeal arguments discussed above, I find it both reasonable and warranted that CHECKBOOK/CSS should compensate this agency for the costs of producing the requested data. Therefore, I am upholding the denial of your fee waiver request. Your FOIA request has been placed in the "commercial" fee category; FOIA requesters in this category are charged for search, review, and duplication costs.

**PAGE V. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

This letter constitutes the final decision of the Department of Health and Human Services in the matter. If you disagree with this decision, the law at 5 U.S.C. § 552(a)(4)(B) provides for judicial review in the District of Columbia District Court, or in a U.S. district court where you reside or have your principal place of business, or where the agency records are situated.

Sincerely yours,

Herb B. Kuhn
Acting Deputy Administrator

cc: Mr. Stephen M. Albrecht, Esq.

# EXHIBIT H

WILMERHALE

February 28, 2007

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (t)
stephen.albrecht@wilmerhale.com

**By Federal Express and Facsimile**

Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-2626
Baltimore, MD 21244-1850

Re: *Freedom of Information Act Appeal - C06FOI1318/C06FOI2229A*

Dear Sir or Madam:

    We write to appeal the decision of the Centers for Medicare & Medicaid Services
("CMS") Freedom of Information Group denying a fee waiver in the above referenced matter.

**Background**

    On March 27, 2006, Consumers' CHECKBOOK/Center for the Study of Services
("CSS") filed a request for information under the Freedom of Information Act ("FOIA" or the
"Act"), 5 U.S.C. § 552 *et seq.*, with CMS requesting certain Medicare physician claim records
that detail the medical services provided by Medicare physicians ("the request"). CSS also
requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45. CMS
denied the request in a letter dated June 26, 2006 ("the denial").

    On July 25, 2006, CSS appealed the denial to the office of the Deputy Administrator, but
that office failed to answer the appeal in violation of the statutory requirements of the FOIA. On
December 26, 2006, CSS filed a complaint in the United States District Court for the District of
Columbia (Case No. 1:06CV02201) seeking injunctive relief to enjoin CMS from withholding
the requested records and asking the Court to order CMS to release the information. This
litigation is currently pending before the District Court.

    After the complaint was filed, CMS informed CSS in a letter dated January 29, 2007 that
it had revised its decision not to comply with the original request. (*See* Exhibit A) However,
CMS did not agree to release the requested records. Instead, the January 29 letter denied CSS's
request for a fee waiver, and then informed CSS that it must pay a fee of $19,723.50[1] for CMS
to "produce" the data *before* deciding if the data could be released to CSS. The payment of
almost $20,000 to CMS would not guarantee that CSS would actually receive any of the data it

---

[1] CSS requested data records from five states. The January 29 letter stated that the cost for
compiling the data for each state would be $3,944.70, yielding a total of $19,732.50 for all five
states.

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 2

<u>requested.</u>  The letter did not specify why CMS needed to compile the data at a cost of almost
$20,000 before determining whether the records can be released.

Because CMS has not agreed to release the requested records, CSS is proceeding with the
pending litigation before the District Court seeking CMS's compliance with the Act and release
of the requested information.  Additionally, by this letter, CSS appeals CMS's January 29, 2007
decision to deny the fee waiver pursuant to 5 U.S.C. § 552 and 45 C.F.R. § 5.34.  CSS files this
appeal without prejudice to its rights to proceed with the litigation currently pending before the
District Court.[2]

## The Agency's Denial of the Fee Waiver Should Be Reversed.

CMS asserted in the January 29 letter that CSS has a primary commercial interest in the
records it requested, and that this asserted commercial interest outweighs the public interest in
this matter.  CMS also concluded that CSS has not demonstrated that disclosure of the requested
records will advance the understanding of the general public because CSS disseminates
consumer information in its magazine on a subscription basis, which, according to CMS, may
limit public access.  CMS has failed to consider several relevant factors in this matter, and
therefore the denial of the fee waiver must be overturned.

I.    **The Records Requested by CSS Meet the Public Interest Test.**

Agencies are to rely on four factors in determining whether the release of records will
serve a public interest.  *See Judicial Watch, Inc. v. Rossoti*, 326 F.3d 1309, 1312 (D.C. Cir.
2003).  The Department of Health and Human Services FOIA regulations address these factors
as four separate questions to be considered.  *See* 45 C.F.R. § 5.45.  The release of records
requested by CSS easily satisfies the Agency's public interest criteria, as set forth below.

1.    *How, if at all, do the records to be disclosed pertain to the operations or activities
of the Federal Government?*  The Medicare program's core activity is the
provision of medical services to the nation's elderly population.  CSS has
requested claim records from physicians in the Medicare program that document
this core activity.

---

[2] *See, e.g., Pollack v. Dept. of Justice*, 49 F.3d 115 (4th Cir. 1995) (holding that once a FOIA
plaintiff has exhausted administrative remedies and files suit in District Court, the Court will
retain jurisdiction over the case even though the administrative process may continue regarding
the payment of fees).

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 3

2.    *Would disclosure of the records reveal any meaningful information about government operations or activities? Can one learn from these records anything about such operations that is not already in the public knowledge?* The requested records will contain information regarding the medical services that physicians in the Medicare program provide to Medicare beneficiaries. This information is not currently in the public domain because CMS has not previously released physician specific data for public distribution. Once released, CSS will be able to study the data to analyze the quality of the medical services provided in the Medicare program, and assess the Medicare program's efforts to control or improve quality within the program. This assessment cannot be adequately performed without public release of the requested records.

3.    *Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons?* CSS publishes consumer data in a variety of formats, including through its Consumers' CHECKBOOK magazine, through its website at www.checkbook.org, and through various reports such as the Guide to Top Doctors and the Guide to Health Plans for Federal Employees. CSS estimates its magazine subscriber population to be approximately 110,000 people. However, CSS expects information regarding quality in the Medicare program derived from the requested records to be disseminated much more broadly. CSS often releases the results of its quality studies through press releases, which are made available to the broader media and are posted on the checkbook.org website for access by the general public. For example, CSS posted findings and advice from its evaluations of hospitals in 2002.[3/] These findings, in turn, were reported by more than 125 newspapers and TV and radio stations, ranging from the Miami Herald, Washington Post, and Saint Louis Post Dispatch to the Today Show, KGO TV (San Francisco), and WBEZ public radio (Chicago). Similarly, CSS's research was used as the basis for the "50 Top Hospitals" article in AARP's Modern Maturity magazine, distributed to more than 30 million AARP members. The Washington, D.C. Fox News outlet also covers Consumers' CHECKBOOK quality evaluations and consumer advice approximately three times per month on its morning news program.

---

[3/] *See* Press Release, Consumers' CHECKBOOK, Consumers' CHECKBOOK Reveals Big Differences in Quality Among Hospitals (June 20, 2002), available at http://www.checkbook.org/press/cgh.cfm. (See Exhibit B)

WilmerHale

CMS Deputy Administrator
February 28, 2007
Page 4

Furthermore, CSS often makes free content available on the checkbook.org website – including articles on how to choose and when to change a physician; why board certification matters; how to get good care in a hospital; and keeping an eye on Medicare's impact on choice of physicians. CSS also has developed relationships with other organizations to make CSS's information available to their constituents without subscription. For example, CSS contracts with many government agencies to provide their employees (more than 700,000 employees in 2006-2007) free online access to Consumers' CHECKBOOK's Guide to Health Plans for Federal Employees. Lastly, many public library systems in the metropolitan areas where CHECKBOOK magazine is published subscribe to the magazine in print and online for library users.

Media reports have already displayed a significant public interest in obtaining information about the quality of services in the Medicare program.[4] It is a virtual certainty that public interest in CMS's Medicare quality studies derived from the requested records will be substantial.

4.      *Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?* Despite the wealth of data that is collected by CMS regarding the provision of medical services by physicians in the Medicare program, that data is not sufficiently studied or published so as to provide the public with an understanding of the quality of services available in the program. The disclosure of this information will provide a significant benefit to the general public, as it will allow Medicare beneficiaries and their caretakers to better understand the quality of services available through Medicare. For example, studies have shown that for some medical procedures, physicians that perform a high volume of the procedures produce superior quality outcomes for their patients. The requested records will allow CSS to highlight this and other important quality indicators within the Medicare program. Furthermore, release of the records will focus public attention on whether the Medicare program is adequately assessing issues of quality within the program.

---

[4] *See, e.g.*, Robert Pear, *Employers Push White House to Disclose Medicare Data*, N.Y. Times, April 11, 2006, at A1.

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 5

II.    **The Public Interest in Obtaining the Requested Records Outweighs Any Commercial Interest of CSS.**

CSS is a non-profit entity dedicated to informing the public about consumer information. Any commercial interest CSS may have in the requested records (insofar as CSS operates as a not-for-profit business) is de minimus compared to the public's interest in learning about the activities of the Medicare program. The quality of health services available to the Medicare population is of critical importance to the well-being of the nation's elderly, and to the millions of Americans who care for this population. Moreover, assessing Medicare's efforts to address and improve the quality of medical care is of great public importance, as it will allow the public and policy makers to assess the effectiveness of this large government program.

Once armed with this information, consumers will be able to make better decisions about the health services they obtain. Consumers in this instance include the millions of Medicare beneficiaries in the states covered by the CSS request, plus the millions of family members or caretakers who help coordinate care for those beneficiaries. Beyond this concrete and immediate benefit to this vast consumer group, CSS's reporting on Medicare quality likely will serve as a model for other quality studies to be performed and published by CSS or other entities including state governments, health insurers, and employers. Thus, the expected public interest in obtaining this information is extremely broad and important.

For the foregoing reasons, CMS's January 29, 2007 decision to deny CSS's request for a fee waiver should be reversed.

Sincerely,

Robert Krughoff (SA)

Robert Krughoff
President, CHECKBOOK/CSS
1625 K St., NW, 8th Floor
Washington, DC 20006
Tel: (800) 213-7283
Fax: (202) 347-4000
E-mail: Rkrughoff@checkbook.org

WILMERHALE

CMS Deputy Administrator
February 28, 2007
Page 6

Stephen M. Albrecht
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6714
Fax: (202) 663-6363
E-mail: Stephen.Albrecht@wilmerhale.com

Enclosures

cc:  Michael Marquis, Director, FOIA Group, CMS

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



*CENTERS for MEDICARE & MEDICAID SERVICES*

Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group
January 29, 2007

Refer to: C06FOI1318 / C06FOI2229A

Mr. Robert Krughoff, President
Mr. Stephen Albrecht, Esquire
Checkbook / Center for Study of Services
1625 K Street, N.W., 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff and Mr. Albrecht:

This letter revises my decision not to comply with your March 27, 2006 Freedom of Information (FOIA) request to obtain a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. Specifically, in response to your July 26, 2006 appeal of my decision, CMS has reexamined the processes necessary to extract the requested data with our information technology staff, and we have determined that we will be able to produce the requested information. <u>Once produced, CMS will review the requested information under the FOIA to make our release determination.</u>

You requested a waiver of fees for your FOIA request. Within your March 27, 2006 request, you described your organization, Checkbook / Center for the Study of Services (Checkbook / CSS) as a non-profit entity which conducts studies of consumer services, including government services, and publishes material which informs or educates consumers concerning those services. You contend a fee waiver is appropriate because providing the requested information will enable Checkbook / CSS to analyze the data and subsequently publish that analysis, which you believe is in the public interest, and will contribute significantly to public scrutiny of the operations of CMS and the Medicare program. You further state that the commercial interests of your organization are not the primary basis for your request.

We have reviewed your fee waiver request under the regulations of the Department of Health and Human Services, in accordance with C.F.R. § 5.45(a), which states: "We will waive or reduce the fees we would otherwise charge if disclosure of the information meets both of the following tests: (1) It is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government; and (2) It is not primarily in the commercial interest of the requester." After careful consideration of the commercial nature in which Checkbook /CSS markets and sells its services, I have concluded that CheckBook /CSS has a primary commercial interest in the requested disclosure and that Checkbook / CSS's commercial interest outweighs the public interest in this matter. I also conclude that you have not demonstrated that disclosure of the requested data will advance the understanding of the general public because disseminating on a subscription or a fee basis will limit the general public's access to the requested data. Therefore, your request fails to satisfy both fee waiver tests, and I cannot grant the requested fee waiver.

**EXHIBIT A**

**PAGE II. – Consumers' Checkbook / CSS**

To explain, in reviewing your request for a fee waiver, we have carefully examined the evidence of any commercial interest, in relation to any public interest that may exist. Within this context, it is appropriate for agencies to consider the identity of the requester, the circumstances surrounding the request, and the manner in which the information will be disseminated. Although a public interest may exist and be served by disclosure of the requested data, its dissemination on a subscription or fee basis limits its public accessibility. Your fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In reviewing the services provided by your organization, as described at your web sites www.checkbook.org and www.cssresearch.org, we noted that Checkbook / CSS charges fees for its survey and research services, to individual consumers, governments, and commercial entities. To illustrate, Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. Checkbook / CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, Checkbook /CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by its web site at www.cssresearch.org/exp.cfm. As an example, Checkbook / CSS describes itself as an approved vendor to administer HCAHPS hospital surveys, for which it charges an annual fee of $2,900. Based upon my review of Checkbook / CSS' activities, I conclude that a commercial interest exists, and your FOIA request will be assessed fees, under our agency's FOIA fee schedule.

The following fees are estimated to produce the requested data, separated by geographical area, as you requested: each data extraction and production, by state, is estimated to cost $3,944.70. This represents an estimated $315.00 in human resource costs, and $3,629.70 in computer costs to extract and provide the information, on tape or cartridges. Should you decide to obtain all the data in one file, as opposed to receiving separate files for each state, this may lessen your costs. Production of the data may require a three to four week period.

Please let me know whether you agree to pay these fees, so we may continue and complete the processing of your request. Alternatively, please let us know if you would like to amend or narrow your request to reduce costs.

If you disagree with this decision to deny your fee waiver request, you may appeal. Your appeal should be mailed within 30 days of this letter to the: Deputy Administrator, Centers for Medicare & Medicaid Services, Mail Stop C5-2626, 7500 Security Boulevard, Baltimore, Maryland 21244-1850. Please mark your letter "Freedom of Information Act Appeal", and enclose a copy of this letter.

Sincerely,

Michael S. Marquis
Director
FOIA Group

**EXHIBIT A**

CHECKBOOK Press Room



**A Nonprofit Consumer Information & Service Resource**          February 26, 2007

| **Strictly Embargoed Until:** | **Contact:** | **Caroline Phillips** |
|---|---|---|
| **Thursday, June 20th** | | **(202) 454-3006** |

# Consumers' CHECKBOOK Reveals Big Differences in Quality Among Hospitals

Nonprofit Research Organization, Consumers' CHECKBOOK, Rates 4,500 Hospitals Nationwide

In an effort to help patients make the best and safest choices, Consumers' CHECKBOOK has released its ***Consumers' Guide to Hospitals***. The 360-page *Guide* compares 4,500 hospitals across the country based on death rates, estimated rates of complications, ratings from a survey of more than 260,000 physicians, evaluation scores given by independent inspectors who visited the hospitals for accreditation reviews, and the ongoing training programs the hospitals provide for doctors. Many medical consumers may not realize how widely these measures of quality vary among facilities and what it could mean to their well-being in the event of hospitalization. (Death rates and complication rates are risk-adjusted to take into account the fact that some hospitals care for patients who are more sick or frail than the patients of other hospitals.)

## How Do Various Hospitals Around the Country Rate?

### Death Rates:

The risk-adjusted death rate for a broad selection of difficult cases was:

**8.6% at Lankenau Hospital** in the Philadelphia suburb of Wynnewood

**16.0% at Mercy Suburban Hospital** a few miles away in Norristown, PA

**9.4% at Baptist Hospital of Miami**

**15.0% at Parkway Regional Medical Center** in North Miami Beach

**9.4% at Cedars-Sinai Medical Center** in Los Angeles

**13.8% at Verdugo Hills Hospital** in nearby Glendale, CA

### Ratings by Physicians:

When thousands of doctors were asked to rate the hospitals in their local areas for "surgery on an adult in cases where the risk of complications is high," the proportion of very good or excellent ratings was:

**70% for Lankenau Hospital**

**3% for Mercy Suburban Hospital**

**EXHIBIT B**

CHECKBOOK Press Room

79% for Baptist Hospital of Miami

9% for Parkway Regional Medical Center


83% for Cedars-Sinai Medical Center

14% for Verdugo Hills Hospital

## Regional Differences Were Substantial

Based on information in the *Guide*, Consumers' CHECKBOOK compared scores in 40 different major urban areas. These encompassed the 40 largest metropolitan statistical areas in the U.S.

- Average risk-adjusted mortality rates ranged from **10.1% in the San Antonio, TX,** area to **14.8% in the Portland, OR,** area.
- The average percentage of doctors who rated the local hospitals with which they were familiar either very good or excellent ranged from **57% in the Norfolk, VA,** area to **23% in the New York City, Long Island, and Westchester** area.
- The overall evaluation scores given by the Joint Commission on the Accreditation of Healthcare Organizations based on detailed on-site inspections (maximum possible score 100) ranged from an average of **95.3 in the Charlotte, NC,** area to **87.9 in the Indianapolis, IN,** area.

## Fact & Figures

Roughly one out of ten Americans will be admitted to a hospital this year. Hospitals are dangerous places. An authoritative study released by the Institute of Medicine indicates that at least 44,000, and possibly as many as 98,000, patients die in hospitals each year as a result of preventable medical errors. That is more than the number who die from motor vehicle accidents.

"Consumers need to take responsibility for hospital choice," said Robert Krughoff, Consumers' CHECKBOOK's president, "by choosing doctors and health plans that are affiliated with good hospitals, and by examining with their doctors the pros and cons of available facilities prior to any hospital admission."

The *Consumers' Guide to Hospitals* gives ratings for specific categories of cases, including complex medical care for adults, high-risk adult surgery, low-risk adult surgery, high-risk surgery on a child, high-risk delivery of a baby, and uncomplicated delivery of a baby. It also identifies hospitals that have significantly better or worse than average rates of deaths and complications for patients with specific diseases or needing specific procedures, including heart attack, stroke, kidney failure, and bypass surgery.

The *Guide* reveals:

- Hospitals rated higher than average by physicians also tended to get higher than average ratings from consumers.
- Hospitals rated higher than average by physicians also tended to have lower than average death rates.
- Hospitals closely affiliated with medical schools tended to have lower than average death rates and tended to be rated higher than average by physicians.
- Larger hospitals (those with more beds) tended to have lower death rates than smaller hospitals.

## Advice for Patients Faced With Hospitalization

**EXHIBIT B**

2/26/2007

CHECKBOOK Press Room

The **Consumers' Guide to Hospitals** gives extensive advice for consumers faced with a hospitalization. It exhorts patients not to go into a hospital—even for a routine case—without getting a second opinion from an independent doctor. Patients (or families and friends if the patient is not able) should discuss with their doctors—

- What is the basis for the diagnosis? Are there other possible explanations for the symptoms? Might it make sense to do further tests or simply to wait awhile to get a surer diagnosis?
- What are the alternative ways of treating the problem? What are the pros and cons of each—the chances of various outcomes in terms of lifestyle and ability to function?
- How complicated is the treatment? Does it require sophisticated medical staff or advanced equipment?
- What are the risks of complications? Will it be important to have close monitoring and quick access to sophisticated medical staff and equipment at all times?
- Why are the recommended hospital, and the particular doctor, good choices for the care? Is the required treatment one for which special training or frequent experience is important? Are there certain hospitals or specialists who have more skill, more experience, and higher success rates than others with this treatment?

### About Author Robert Krughoff

Robert Krughoff, President of Consumers' CHECKBOOK, has extensive background in health care quality measurement and consumer information, including having served as Director of Research and Evaluation Planning for the U.S. Department of Health, Education, and Welfare (now Health and Human Services); as an appointed member of the federal government's National Advisory Council for Health Care Policy, Research, and Evaluation; on the Committee on Performance Measurement of the National Committee for Quality Assurance; as an appointed member of several panels of the Institute of Medicine; as Chairman of the External Audit Committee of the ECRI Technology Assessment Program; on the Board of Directors of the American Pain Foundation; and on the Board of Directors of the Consumer Federation of America. He is a winner of the National Press Club's First Place Award for Excellence in Consumer Journalism, a recipient of the annual Esther Peterson Consumer Service Award from the Consumer Federation of America, and a winner of the annual Advocate's Award from the National Association of Consumer Agency Administrators.

### Interviews Available

Interviews with Robert Krughoff and with other co-authors of the *Guide* are available by request. Contact Caroline Phillips, Director of Public Relations, by phone at (202) 454-3006 or via email at press@checkbook.org for more information.

### Purchasing *Consumers' Guide to Hospitals*

The **Consumers' Guide to Hospitals** is available for $19.95 including shipping (payable to "Hospital Guide"), from Hospital Guide, 733 15th Street, NW, # 820, Washington, DC 20005. It can be ordered with a major credit card by calling (800) 213-7283 or on the web at www.checkbook.org. Alternatively, consumers may subscribe for two years of online access to the same information that appears in the printed *Guide* for $19.95 at www.checkbook.org.

### About Consumers' CHECKBOOK

The *Guide* is published by the nonprofit Consumers' CHECKBOOK organization. Founded in 1974, the organization also has recently published the **Consumers' Guide to Health Plans** and will soon release a new edition of its **Consumers' Guide to Top Doctors**. Since 1976, the organization has published local editions of **Consumers' CHECKBOOK** magazine in the Washington, DC, and San Francisco metropolitan areas; these magazines, with a combined paid circulation of 75,000 among local consumers in those two areas, are a "consumer reports" for local services, from auto repair shops to plumbers to hospitals. This fall, new editions of the magazine will appear in five additional metropolitan areas. Consumers' CHECKBOOK is fully funded through subscription and publication sales, fees for survey and information services, and consumer donations. Consumers' CHECKBOOK's magazines and websites accept no advertising.

**EXHIBIT B**

CHECKBOOK Press Room

Home     Privacy     Security     About Us     Contact Us     Press Room     Make a Donation

Copyright 2007 Center for the Study of Services. All Rights Reserved.
CHECKBOOK is a trademark and service mark of the Center for the Study of Services and is registered with the US Patent and Trademark Office.

**EXHIBIT B**

# EXHIBIT I

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs / Freedom of Information Group

March 2, 2007

REFER TO:    FOIA Appeal C07FOI0907A
                       Original Request No. C06FOI1318 / C06FOI2229A

Mr. Stephen M. Albrecht, Esquire
Mr. Robert Krughoff, President
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006

Dear Mr. Albrecht and Mr. Krughoff:

I am acknowledging receipt of your February 28, 2007 Freedom of Information Act
(FOIA) appeal, which you sent to the Deputy Administrator, Centers for Medicare &
Medicaid Services (CMS).  We will process your appeal as expeditiously as possible,
consistent with Department of Health and Human Services FOIA rules set forth at
45 CFR Part 5.

Questions regarding your appeal should be directed to Ms. Melodye L. Hardy
at 410-786-5358.

Sincerely,

Michael S. Marquis
Director
Freedom of Information Group