# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CONSUMERS' CHECKBOOK, | ) | |
| CENTER FOR THE STUDY OF SERVICES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-2201 (EGS) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## SUPPLEMENT TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Department of Health and Human Services ("HHS") hereby submits this

supplement to its reply in support of its motion for summary judgment.  In its filings, Defendant

argued that the Court should dismiss the case because the Defendant intended to release the

documents in full based on Plaintiff's statement that it will pay the fees in the event that the fee

waiver is ultimately denied and based on Plaintiff's reduced scope request.  Reply p. 2.[1]  While

the requested information was being complied, however, Defendant became aware that the

release of some of the requested information would be inappropriate.  Therefore, the Defendant

files the herein supplement and invokes Exemption 6 of the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552(b)(6), to withhold certain information.  Because this supplement adds

a new legal argument, Defendant has no objection to Plaintiff's filing of a response to this

Supplement.

---

[1]     The Defendant also argued in its motion for summary judgment that Plaintiff failed to
exhaust its remedies and that the Defendant properly denied Plaintiff's fee waiver request.

**BACKGROUND**

During the course of the lawsuit, the Defendant indicated that it would release the requested data in full (based on the Plaintiff's reduced scope request), and it estimated that the computer time needed to extract the data would be about 3-4 weeks.  MSJ, Exhibit A  While the requested data was being generated, it came to the attention of the Centers for Medicare and Medicaid Services ("CMS") FOIA Officer that some of the requested information, when combined with publicly available data about Medicare physician fee schedules and about Uniform Physician Identification Numbers (UPINs), would lead to the disclosure of annual Medicare reimbursement amounts for individual, identified providers.  Supplemental Declaration of Michael S. Marquis, CMS FOIA Officer ("Supp. Marquis Dec.") ¶ 4.  As a result, the CMS FOIA Officer had to revise his initial determination to fully release the requested data (based on the Plaintiff's reduced scope request) and now invokes FOIA Exemption 6, 5 U.S.C. § 552(b)(6), to withhold any data elements, which would, in combination with readily available public information, lead to the disclosure of individual physician reimbursement amounts.  Supp. Marquis Dec. ¶ 5.  The CMS FOIA Officer intends to release only those data elements which would not, in combination with readily available public information, lead to the disclosure of individual physician reimbursement amounts.  Supp. Marquis Dec. ¶ 5.  All non-exempt, reasonably segregable information will be released.  Supp. Marquis Dec. ¶ 5.

**ACCESS TO INDIVIDUAL PROVIDER REIMBURSEMENT AMOUNTS**

Two important developments in the public availability of Medicare information would enable the Plaintiff to pin point the individual providers and their Medicare reimbursement amounts if the requested information were released.  First, the Omnibus Budget Reconciliation

Act ("OBRA") of 1990, Public Law 101-508, required CMS to disseminate UPIN data to the

public.  UPINs are assigned to physicians and other healthcare practitioners when they enroll in

Medicare.  CMS contracts with NHIC, Inc., which maintains a free website

([www.upinregistry.com](www.upinregistry.com)) where the public can post either the physician's name or a UPIN

number.  Declaration of Spike Duzor ("Duzor Dec.") ¶ 9.  When the public queries the UPIN

database, by physician name or UPIN, they receive the following information: the physician's

name, the zip code of the physician's office, medical or surgical speciality, and UPIN.  Duzor

Dec. ¶ 9.

Second, the OBRA of 1989 (Public Law 101-239) required that a physician fee schedule

be implemented beginning January 1, 1992.  The purpose of the physician fee schedule is to help

address longstanding imbalances between Medicare payments to urban and rural physicians and

primary care physicians and surgeons.  The key element of the fee schedule is that CMS

establishes a relative value representing the resources needed by the physician to perform the

medical service or procedure.  Duzor Dec. ¶ 12.  Over the years, Congress and CMS have

refined the physician fee schedule.  Currently, the relative value units ("RVUs") for a physician

service/procedure include a component for work, facility, and malpractice.  The RVUs are

calculated for each procedural code.  Duzor Dec. ¶ 13.

Medicare and other health insurance programs use a national standardized coding system

to identify medical services and procedures provided by physicians.  Duzor Dec. ¶ 10.  The

Health Care Physician Coding System ("HCPCS") is one of the standardized coding systems.

HCPCS uses the Current Procedural Terminology ("CPT 4"), a numeric coding system

maintained by the American Medical Association.  The HCPCS/CPT 4 consists of 5 numeric

digits and can identify over 9,000 unique physician medical services and procedures.  Duzor

Dec. ¶ 10.  In addition to pinpointing the actual services and procedures that were performed, this coding system includes a series of modifiers that differentiate whether the physician is the primary surgeon or an assistant surgeon.  Duzor Dec. ¶ 10.  With respect to the physician Medicare fee schedule, RVUs are calculated for each HCPCS/CPT 4 code. The RVUs are multiplied by a conversion factor and a geographic price index.  Each year, CMS publishes a regulation which asks for public comment to proposed changes to the RVUs, conversion factor, and geographic adjustments.  After the public comments have been analyzed, CMS publishes a final regulation containing the components for next year's fee schedule.  Duzor Dec. ¶ 13.

CMS maintains a free website, (www.cms.hhs.gov/PhysicianFeeSched/PFSRVF/list.asp) containing the values of the components that comprise the fee schedule and how to calculate the fee for each physician service and procedure.  Duzor Dec. ¶ 14.  In addition, most physician specialty organizations maintain their own websites to help their members calculate fees. Furthermore, there are over a dozen commercial venders which offer products to help calculate physician fees.  One such example of a commercial vender website is http://www.pfss.com. Duzor Dec. ¶ 14.  While CMS makes a number of refinements and modifications to the fee schedule each year, the overall physician payment growth rates have been flat for several years. Most physicians' charges are higher than the fee schedule but they have agreed to accept the Medicare fee schedule payment.  Consequently, the physician fee schedule for a specific service or procedure is the actual Medicare payment amount.  Duzor Dec. ¶ 15.

Here, Plaintiff requested all the data related to medical services and procedure codes that a physician submits to the Medicare program for payment.  By combining the requested UPIN identifiers with the HCPCS/CPT 4 coding data, it is possible to profile an individual physician

4

and identify all the services and procedures that were billed to Medicare.  Duzor Dec. ¶ 11.  It

will also be very easy to calculate annual Medicare reimbursement amounts for identified,

individual physicians, which were held to be protected by Exemption 6 in <u>Florida Med. Ass'n v.</u>

<u>Department of Health, Education, and Welfare</u>, 479 F. Supp. 1291, 1305 (M.D. Fla. 1979).

     To show how easy it is to determine total annual Medicare payments to an individual

physician, CMS provided a CMS analyst with the following information and supplies: UPIN

number for a provider, HCPCS code 33533, internet access, and a $5 calculator.  Duzor Dec. ¶

16.  CMS asked the analyst to identify the physician and the Medicare payment in 2005 dollars.

Twenty minutes later, the analyst identified that Medicare paid $1,970.08 for a CABG, single

arterial to an identified, individual physician ("Dr. X.").    Duzor Dec. ¶ 16 & Attachment C.

This exercise is similar to calculating a federal employee's salary knowing his or her grade, step,

and duty station.  The Office of Personnel Management maintains a free website, which

combines those three data elements into an easy-to-use chart.  Duzor Dec. ¶ 16  To calculate the

total Medicare payments to Dr. X, an analyst would only need the physician billings for the year

and then the analyst could ask for a total.

     This is the exact information that Plaintiff is requesting–all physician billings with

HCPCS codes linked to individual UPIN identifiers.[2]  Duzor Dec. ¶ 16.  By having all the

---

[2]  Some physicians bill Medicare under a group UPIN so it is not possible to identify the
physician who actually performed the Medicare service or procedure.   Duzor Dec. ¶ 17.
Physicians that tend to use a group practice UPIN are those specialities that do not see patients
directly, such as pathologists or radiologists.  In addition, Medicare does not receive individual
billings from physicians who treat patients in Medicare Advantage/managed care plans, making
it impossible to track total physician services and procedures under those plans.  Nevertheless,
CMS believes that the majority of physicians, whether they are in a group practice or by
themselves, bill Medicare via an individual UPIN.  Duzor Dec. ¶ 17.

HCPCS codes performed by each UPIN-identified provider for 2004, the Plaintiff could look up the name and zip code of the provider on www.upinregistry.com and the particular physician fee schedule for each HCPCS code on the CMS website or other websites containing the Medicare physician fee schedule, and discover the annual Medicare reimbursement amounts for identified, individual providers.  Thus, disclosure of the requested information is in effect, the disclosure of the annual Medicare reimbursement amounts for identified, individual providers.

## ARGUMENT

I.    **Defendant properly invokes Exemption 6 to prevent disclosure of annual Medicare reimbursement amounts for identified, individual providers.**

The FOIA request at issue in this litigation requests data elements from a Privacy Act-protected system of records, known as the National Claims History.  See Supp. Marquis Dec. ¶ 4; see also 71 Fed. Reg. 67137 (2006) (describing the National Claims History system of records).  The National Claims History system of records contains billing and utilization information on Medicare beneficiaries and includes provider characteristics, assigned provider numbers, admission dates, service dates, diagnosis and procedural codes, total charges, and Medicare payment amounts.  See 71 Fed. Reg. at 67141.  In general, the Privacy Act prohibits disclosure without the consent of the individual who is the subject of the records.  5 U.S.C. § 552a(b).  There are exceptions to that general disclosure prohibition, including one for "required" FOIA disclosures.  5 U.S.C. § 552a(b) (Privacy Act exception that allows disclosure under the FOIA if disclosure is "required" by the FOIA).  If a FOIA exemption applies to the requested records, the Privacy Act-protected records cannot be disclosed because the disclosure is not "required" under the FOIA.  Id.; see Department of Defense v. FLRA, 510 U.S. 487, 502 (1994); Department of Defense v. FLRA, 964 F.2d 26, 30 n.6 (D.C. Cir. 1992).  Here,

Exemption 6 applies to certain information.

     *1.    Exemption 6*

Exemption 6 of the FOIA protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The Supreme Court has interpreted the phrase 'similar files' to include <u>all information</u> that applies to a particular individual." <u>Lepelletier v. FDIC</u>, 164 F.3d 37, 46 (D.C. Cir. 1999) (emphasis added) *quoting* <u>Department of State v. Washington Post Co.</u>, 456 U.S. 595, 602 (1982). The Court has also emphasized that "both the common law and the literal understanding of privacy encompass the individual's control of information concerning his or her person." <u>U.S. Department of Justice v. Reporters Committee for Freedom of the Press</u>, 489 U.S. 749, 763 (1989).[3]

In order to determine whether there would be a "clearly unwarranted invasion of personal privacy," the court must balance the interests of protecting "an individual's private affairs from unnecessary public scrutiny," and "the public's right to governmental information." <u>Lepelletier</u>, 164 F.3d at 46 (interior quotation marks omitted) *citing* <u>United States Dept. of Defense Dept. of Military Affairs v. FLRA</u>, 964 F.2d 26, 29 (D.C. Cir. 1992), quoting <u>Department of Air Force v. Rose</u>, 425 U.S. 352, 372 (1976). In determining how to balance the private and public interests involved, the Supreme Court has sharply limited the notion of "public interest" under

---

    [3] HHS has also enacted regulations, 45 C.F.R. Part 5, implementing the FOIA. These regulations set forth the conditions under which HHS (and its components) may withhold personal privacy information. Under these regulations, CMS may withhold records about individuals if disclosure "would constitute a clearly unwarranted invasion of personal privacy." 45 C.F.R. § 5.67(a).

the FOIA: "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" Lepelletier, 164 F.3d at 46 (editing by the court, emphasis supplied, interior quotation marks omitted), quoting United States Dept. of Defense v. FLRA, 510 U.S. 487, 497 (1994). See also Reporters Committee, 489 U.S. at 773. Information that does not directly reveal the operation or activities of the federal government "falls outside the ambit of the public interest that the FOIA was enacted to serve." Id. at 775. Further, "something, even a modest privacy interest, outweighs nothing every time." National Ass'n of Retired Fed. Employees v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989); but see Lepelletier, 164 F.3d at 48 (in extraordinary circumstance where the individuals whose privacy the government seeks to protect have a "clear interest" in release of the requested information, the balancing under Exemption 6 must include consideration of that interest).

In this case, the requested information, at issue, is about services provided by providers to Medicare beneficiaries for calendar year 2004 in the District of Columbia. To the extent the providers are individuals, this service information applies to particular individual providers. The requested information at issue are 29 data elements for all Medicare providers in the District of Columbia for calendar year 2004. Duzor Dec. ¶ 3 & Attachments A & B. These 29 elements are a subset of the information that a physician submits for payment to the Medicare program for providing medical services and procedures to a Medicare beneficiary. Duzor Dec. ¶ 5. Plaintiff did not ask for any data that would easily identify an individual Medicare beneficiary, however, plaintiff did request data elements that identified the name, zip code, and speciality of an

individual physician linked to the detailed medical services and procedures that a physician

provided to an individual Medicare beneficiary.   The data elements that plaintiff requested to

calculate the number of physician procedures can be used to calculate the payment for each

procedure and that information can easily lead to the disclosure of the total Medicare payments

in calendar year 2004 to an identified, individual physician.  Duzor Dec. ¶ 5.

Disclosure of Medicare reimbursement records in such a manner as to identify individual

physicians and the amount which they received would constitute a clearly unwarranted invasion

of their personal privacy within the meaning of the Exemption 6 from the Freedom of

Information Act for personnel and medical records.  Florida Med. Ass'n v. Department of

Health, Education, and Welfare, 479 F. Supp. 1291, 1305 (M.D. Fla. 1979) (information on the

amounts paid to individual providers under Medicare was excluded from mandatory disclosures

pursuant to Exemption 6); cf. Public Citizen Health Research Group v. Department of Health,

Educ., and Welfare, 477 F. Supp. 595, 605 (D.D.C. 1979) (The Plaintiff sought no data

concerning fees, payment schedules, or other commercial arrangements, and the U.S. District

Court for the District of Columbia in 1979 held that Exemption 6 did not prevent the disclosure

of physician identities in profiles or medical care evaluation studies prepared by peer review

organizations.) reversed on other grounds, 668 F.2d 537 (D.C. Cir. 1981).  In Florida Med. Ass'n

v. Department of Health, Education, and Welfare, 479 F. Supp. 1291 (M.D. Fla. 1979), the court

held that disclosure of the annual amounts of reimbursements to individual providers of services

under the Medicare Act would not only constitute a clearly unwarranted invasion of personal

privacy, and was therefore included within Exemption 6 of the FOIA, but that the release of such

individually identifying information, without the "prior written consent" of those individually

identified providers, was prohibited by the Privacy Act, 5 U.S.C. § 552a.  The Court issued a

permanent injunction against the Department, which enjoins it from disclosing any list of annual

Medicare reimbursement amounts for any years, which would personally and individually

identify those providers of services under the Medicare program who are physicians licensed in

Florida or who are members of the American Medical Association.  This injunction is applicable

to those physicians in the District of Columbia who are members of the American Medical

Association.

  As recognized in Florida Med. Ass'n , physicians do have a privacy interest in their

annual Medicare reimbursement amounts.  479 F. Supp. at 1303-05.  In Florida Med. Ass'n , the

court balanced the individual physicians' privacy interest in annual Medicare reimbursement

amounts against the public's interest in shedding light on the Medicare program, and the court

found that the privacy interest outweighed the public interest because the public interest was not

further advanced by disclosing the identities of individual providers and their reimbursement

amounts.  Id. at 1304-05.  These amounts are part of the individual providers' gross income, and

income amounts have been recognized by courts as valid privacy interests that outweigh the

public's interest in shedding light on government operations and activities.  See Public Citizen,

Inc. v. Resolution Trust Corp., Civil No. 92-0010, 1993 WL 1617868, at *5 (D.D.C. Mar. 19,

1993) (unpublished opinion); see also Hopkins v. United States Dep't of Housing & Urban Dev.,

929 F.2d 81,89 (2d Cir. 1991) (upholding the withholding of payroll records under Exemption

6); National Ass'n of Retired Fed. Employees v. Horner, 879 F.2d 873, 875-80 (D.C. Cir. 1989)

(finding person's privacy interest is significant when their names are combined with financial

information).  Therefore, Defendant has properly invoked Exemption 6 to withhold data

elements, which would, in combination with readily available public information, lead to the

disclosure of individual physicians' annual Medicare reimbursement amounts.  All non-exempt,

reasonably segregable information will be released.  Supp. Marquis Dec. ¶ 5.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Defendant respectfully requests that the Court grant summary judgment in favor of Defendant.

Dated: April 30, 2007                    Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/
ANDREA McBARNETTE, D.C. Bar  # 483789
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530

.
•

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONSUMERS' CHECKBOOK,                          )
CENTER FOR THE STUDY OF SERVICES,              )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )    Case No. 1:06-cv-2201
                                               )
UNITED STATES DEPARTMENT OF                    )
HEALTH AND HUMAN SERVICES, ET AL.,             )
                                               )
          Defendants.                          )
_____)

## SUPPLEMENTAL DECLARATION OF MICHAEL S. MARQUIS

I, Michael S. Marquis, hereby declare as follows:

1. I am the Director of the Freedom of Information Group (FIG), Office of Strategic

Operations and Regulatory Affairs, Centers for Medicare & Medicaid Services (CMS), U.S.

Department of Health and Human Services (HHS). In this capacity, I am the Records Access

Officer for CMS. My duties include responding to requests under the Freedom of Information

Act (FOIA) for records of CMS. My duties also include determining whether to release or

withhold records or portions of records in accordance with the FOIA and HHS regulations

implementing the FOIA, and overseeing all FOIA activities within CMS.

2. I make this declaration based upon my personal knowledge and information available

to me in my official capacity.

3. This declaration supplements my previously filed declaration in this matter.

4. CMS issued a decision to plaintiff's administrative appeal of the agency's fee waiver

denial in a letter dated, March 16, 2007. See Ex. A. In that decision, the agency noted that it

would release the requested information in full, without redaction. That statement was based on

my decision to release the requested records in full. My decision was made before the data was generated by computer. While the data was being generated by computer, I learned that some of the requested information, when combined with publicly available data about Medicare physician fee schedules and about Uniform Physician Identification Numbers, would lead to the disclosure of annual Medicare reimbursement amounts for individual, identified providers. A separate agency declaration is being filed to explain how one could determine the annual Medicare reimbursement amounts of individual, identified providers. In 1979, a Florida district court held that FOIA Exemption 6 protected the annual Medicare reimbursement amounts for individual, identified providers from disclosure. See Florida Med. Ass'n v. Department of Health, Education, and Welfare, 479 F. Supp. 1291 (M.D. Fla. 1979). Since the requested records come from a Privacy Act system of records, known as the National Claims History system of records, we have to consider whether any FOIA exemptions apply before releasing the records to a FOIA requester. If a FOIA exemption does apply, we cannot release these Privacy Act-protected records. See 5 U.S.C. § 552a(b)(2) (allowing disclosure under the Privacy Act when the disclosure is "required" to be disclosed under the FOIA). Based on this new information, I have to revise my prior decision and withhold some of the requested information under FOIA Exemption 6.

5. We intend to withhold, under Exemption 6, any data elements which would, in combination with readily available public information, lead to the disclosure of individual physician reimbursement amounts. We intend to release only those data elements which would not, in combination with readily available public information, lead to the disclosure of individual physician reimbursement amounts. All non-exempt, reasonably segregable information will be released.

2

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this $13^{7h}$day of April, 2007.

Michael S. Marquis



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

RE: Appeal Case Number C07FOI0907A        MAR 16 2007        **Deputy Administrator**
                                                            Baltimore, MD 21244-1850

Mr. Robert Krughoff
President, CHECKBOOK/CSS
1625 K Street, 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff:

This is in response to your February 28, 2007 letter appealing the decision of Michael S. Marquis, Director, Freedom of Information Group (FIG), Centers for Medicare & Medicaid Services (CMS), to deny your request for a waiver of fees for processing your March 27, 2006 Freedom of Information Act (FOIA) request. Your request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. Before rendering my appeal decision, I note that I have been advised that contingent upon the court's final decision on the fee waiver issue in the litigation that is pending over this FOIA request, you are willing to pay the FOIA processing fees for CMS to produce the requested 29 fields of data listed on Attachment A of your request <u>only</u> for those records for which the Line NCH Provider State Code is <u>Washington, D.C.</u> Based upon your agreement to pay, we have initiated production of the requested data. It will be released to you in full, and without redaction. The estimated computer time to generate the data will be approximately three to four weeks. My appeal ruling follows.

**Background:** Your original FOIA request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. The request also sought a fee waiver. Specifically, your fee waiver request provided that CHECKBOOK/CSS is a non-profit organization that conducts and supports studies of consumer services and publishes reports that educate consumers about such services. Your request also stated that you believed your analysis of the requested data and publication of the findings would contribute significantly to the public's scrutiny of the operation and performance of CMS and the Medicare program. Your request asserted that the commercial interests of CHECKBOOK/CSS are not primary to the FOIA request.

Mr. Marquis' January 29, 2007 letter explained the reasons for the denial. The denial noted that the fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In addition, the denial reviewed the services provided by CHECKBOOK/CSS, as described on the web sites www.checkbook.org and www.cssresearch.org, and noted that CHECKBOOK/CSS charges fees for survey and research services, to individual consumers, governments, and commercial entities. The denial pointed out that Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. The denial also showed that CHECKBOOK/CSS also sells access to health publications such as the <u>Guide to Health Plans for Federal Employees</u> and the <u>Guide to Top Doctors</u>. Additionally, the denial explained that CHECKBOOK/CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by



**PAGE II. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

its web site at http://www.cssresearch.org/exp.cfm. In support of his decision concerning the commercial interests of your organization, Mr. Marquis provided an example of CHECKBOOK/CSS' description of itself as an approved vendor to administer Hospital Consumer Assessment of Health Plans (HCAHPS) hospital surveys, for which it charges an annual fee of $2,900. Based on the foregoing, Mr. Marquis found that the commercial interests of CHECKBOOK/CSS were primary to the FOIA request.

You appealed the fee waiver denial on February 28, 2007, arguing that your organization met the Department's public interest criteria for a fee waiver and that the public interest in obtaining the requested records outweighs any commercial interest of your organization.

**Analysis of Public Interest**: It is the policy of this Department to waive or reduce fees if disclosure of the information meets both the following tests: (1) it is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) it is not primarily in the commercial interest of the requester.

In analyzing the public interest, we consider the following factors:

(1) How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government?

(2) Would disclosure of the records reveal meaningful information about government operations or activities? Can one learn from these records anything about such operations that is not already public knowledge?

(3) Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons?

(4) Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?

With respect to the first two above public interest factors, we do not dispute that the requested records pertains to operations or activities of the Federal Government and that the disclosure of the records would reveal meaningful information about government operations or activities.

With regard to the third public interest factor, we question whether the disclosure will advance the understanding of the general public as distinguished from a narrow segment of interested persons. Your appeal included an attachment of a press release as an example of how your organization releases the results of its quality studies through press releases. This sample press release, in the first two and a half pages, generally explains your organization's 360-page Consumers' Guide to Hospitals (the Guide) and then explains that if consumers want the Guide, they can pay $19.95 or subscribe for two years of online access to the same information in the Guide for $19.95. This press release shows that if the public wants access to the full Guide, they have to pay for it, a circumstance which may well limit access to the information.

**PAGE III.** – **CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

Your appeal does not specify how the general public's understanding will be advanced in light of the fact that your organization charges for some of the information that it obtains, and it is not clear to us how much your organization intends to charge for the requested records. Your appeal states that your organization often makes free content available on its website. Your appeal, however, does not adequately explain how CHECKBOOK/CSS intends to convey the requested data to the general public. Your amended FOIA request is for 29 data elements about all Medicare physicians in the District of Columbia for the 2004 calendar year. This is a large amount of information, and it is not clear from your appeal how news articles, press releases, or media reports will convey this vast amount of information to the general public.

With respect to the fourth public interest factor, using the sample press release as an example (Exhibit B of your appeal), you haven't shown how releasing a press release of a few pages in length will be a significant contribution to public understanding, in light of the fact that you are requesting 29 data elements for Medicare physicians for the 2004 calendar year. As we noted in our review of the first and second public interest factors, the data you have requested would allow the public to see the volume and types of procedures performed by individual physicians within Washington, D.C. during the one-year period of 2004, specifically for claims submitted to Medicare. While we do not dispute that the number of times a specific procedure is performed may contribute to a physician's expertise and skill, this quantitative data within a limited context cannot be equated as an overall quality analysis. Nor does this information, in and of itself, shed light upon whether the Medicare program is adequately assessing quality of care issues.

**Analysis of Commercial Interest:** Even though you did not meet the third and fourth factors of the public interest test, we also considered whether your organization's commercial interest is the primary interest. In determining whether the commercial interest is the primary interest of the requester, HHS considers the following factors:

> (1) Would the disclosure further a commercial interest of the requester, or of someone on whose behalf the requester is acting? "Commercial interests" include interests relating to business, trade, and profit. Not only profit-making corporations have commercial interests—so do nonprofit corporations, individuals, unions, and other associations. The interest of a representative of the news media in using the information for news dissemination purposes will not be considered a commercial interest.

> (2) If disclosure would further a commercial interest of the requester, would that effect outweigh the advancement of the public interest defined in paragraph (b) of this section [45 C.F.R. § 5.45]? Which effect is primary?

**PAGE IV. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

Within your appeal, you did not challenge the initial denial's assertion that your organization markets itself as an expert in conducting studies, surveys, data collection and analysis. As was also pointed out in the initial denial, your organization has exhibited a pattern of charging consumers and others for certain information that it obtains. As we previously stated, Exhibit B of your appeal confirms that consumers must pay $19.95 to gain access to the Consumers Guide to Hospitals. In regard to a supporting argument raised on the fourth page of your appeal, in which you stated that CHECKBOOK/CSS has contracted with government agencies to provide federal employees with free access to the <u>Consumers Checkbook Guide to Health Plans</u>, your organization <u>charges</u> the subscribing agencies for this access. The Department of Health and Human Services paid $12,000 to your organization during 2006 for this access. To reiterate a prior example of CHECKBOOK/CSS' commercial activities, your organization is an approved vendor to administer the HCAHPS hospital survey and charges an annual fee of $2,900 to each facility for those services. In addition to those examples of fee-for-service activities, we also note that CHECKBOOK/CSS charges $24.95 for its <u>Guide to Top Doctors</u>, as stated on the website at <u>http://www.checkbook.org/doctors/pageone.cfm</u>, and as also stated in a recent subscription renewal letter to a CHECKBOOK subscriber. That subscription renewal letter stated the following: "You will enjoy *free* subscriber-only online access to our nationwide *Top Doctors* Ratings to help you find the best health care providers for yourself, your friends, and your family, both locally and nationwide (thousand of consumers pay $24.95 for online access to those ratings alone)".

In addition, your organization's website at <u>http://www.checkbook.org/about.cfm</u> explains that the organization is supported entirely by subscription payments and donations from individual consumers who subscribe to its magazines, and by fees for your survey and information services and books. Even though your website acknowledges that your organization is supported by subscription payments and donations from individual consumers who subscribe to your organization's magazine and by fees for your services and books, your appeal makes a conclusory statement that your commercial interest is "de minimus," and it does not inform us as to how much your organization intends to charge the public for access to the data elements that you are requesting from CMS so we can weigh the commercial interest against the public interest

**Conclusion:**  It is the responsibility of the FOIA requester to demonstrate and substantiate his eligibility for a fee waiver. As a FOIA requester, you have not met this burden, in that you have not satisfactorily established that your organization's commercial interest was not primary, nor have you demonstrated how you would disseminate the requested data to edify and inform a broad segment of the population.

Based upon my careful consideration of your appeal arguments discussed above, I find it both reasonable and warranted that CHECKBOOK/CSS should compensate this agency for the costs of producing the requested data. Therefore, I am upholding the denial of your fee waiver request. Your FOIA request has been placed in the "commercial" fee category; FOIA requesters in this category are charged for search, review, and duplication costs.

**PAGE V. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

This letter constitutes the final decision of the Department of Health and Human Services in the matter. If you disagree with this decision, the law at 5 U.S.C. § 552(a)(4)(B) provides for judicial review in the District of Columbia District Court, or in a U.S. district court where you reside or have your principal place of business, or where the agency records are situated.

Sincerely yours,

Herb B. Kuhn
Acting Deputy Administrator

cc: Mr. Stephen M. Albrecht, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONSUMERS' CHECKBOOK,                          )
CENTER FOR THE STUDY OF SERVICES,              )
                                               )
            Plaintiff,                         )
                                               )
    v.                                         )     Case No. 1:06-cv-2201
                                               )
UNITED STATES DEPARTMENT OF                    )
HEALTH AND HUMAN SERVICES, ET AL.,             )
                                               )
            Defendants.                        )
                                               )

## DECLARATION OF SPIKE DUZOR

I, Spike Duzor, hereby declare as follows:

1. I work in the Office for Research, Development and Information at the Centers
for Medicare & Medicaid Services (CMS), U.S. Department of Health and Human
Services (HHS). My duties include being the Chair of the CMS Privacy Board. The
Privacy Board was established in April 2003, in accordance with the provisions of the
Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule. This
Board reviews all researcher requests for individually identifiable data and provides
advice to CMS senior leadership on privacy issues relating to disclosure of CMS data. I
have been the chair of the Board since its inception and have over 33 years of Federal
service in the Medicare program.

2. I make this declaration based upon my personal knowledge and information
available to me in my official capacity.

3. I understand the plaintiff has filed a Freedom of Information Act (FOIA) request for 29 data elements for all Medicare providers in the District of Columbia for an entire calendar year, in this case, for calendar year 2004.

4. The purpose of this declaration is to explain how some of the requested information, when combined with readily available, publicly accessible information, leads to the disclosure of the annual Medicare reimbursement rates for identified individual providers.

5. The plaintiff requested 29 data elements from the Medicare Physician claims file. Attachment A to this declaration lists the 29 elements, and Attachment B provides a technical description of the requested data elements. These 29 elements are a subset of the information that a physician submits for payment to the Medicare program for providing medical services and procedures to a Medicare beneficiary. The plaintiff did not ask for any data that would easily identify an individual Medicare beneficiary, such as the patient's name, social security number, or age. However, the plaintiff did request data elements that identified the name, zip code, and specialty of an individual physician linked to the detailed medical services and procedures that a physician provided to an individual Medicare beneficiary.

6. The data elements that the plaintiff requested to calculate the number of physician procedures can also be used to calculate the payment for each procedure and that information can be used to easily derive the total Medicare payments to an individual physician.

2

7. Below is a "road map" that illustrates how easy it is to take the requested data and link it to widely available data in the public domain that would allow the data user to calculate total Medicare payments to an individual physician.

8. Unique Physician Identification Numbers (UPINs) and Provider Identification Numbers (PINs) are assigned to physicians and other healthcare practitioners when they enroll in Medicare. While a physician should have only one UPIN number, he/she may have several PIN numbers. A different PIN number is assigned for each practice setting (location, specialty, and group affiliation) in which the physician participates. The Physician is required to submit his/her PIN on all billing claims to Medicare. The Carrier (the Medicare contractor that processes the claims forms) enters the physician UPIN on the claim. Plaintiff requested the physician's PIN and UPIN for every Medicare physician claim from Washington D. C. This information allows the user to easily identify individual physicians.

9. The Omnibus Budget Reconciliation Act (OBRA) of 1990 (Public Law 101-508) requires CMS to disseminate UPIN data to the public. CMS contracts with NHIC, Inc., which maintains a free website where the public can post either the physician's name or a UPIN number. See www.upinregistry.com. When the public queries the UPIN database, by physician name or UPIN, they receive the following information: the physician's name, the zip code of the physician's office, medical or surgical specialty, and UPIN number.

10. Medicare and other health insurance programs use a national standardized coding system to identify medical services and procedures provided by physicians. The Health Care Physician Coding System (HCPCS) is one of the standardized coding

3

systems. HCPCS uses the Current Procedural Terminology (CPT 4), a numeric coding system maintained by the American Medical Association. The HCPCS/CPT 4 consists of 5 numeric digits and can identify over 9,000 unique physician medical services and procedures. For example this coding system contains 25 separate codes for just coronary artery bypass surgery. These codes are able to differentiate the number of grafts used to repair the heart and what part of the body supplied the arterial-venous grafts, such as mammary artery, gastroepiploic artery, etc. In addition to pinpointing the actual services and procedures that were performed, this coding system includes a series of modifiers that differentiate whether the physician is the primary surgeon or an assistant surgeon.

11. Plaintiff requested all the data related to medical service and procedure codes that a physician submits to the Medicare program for payment. By combining the UPIN identifiers with the coding data, it is possible to profile an individual physician and identify all the services and procedures that were billed to Medicare.

12. The OBRA of 1989 (Public Law 101-239) required that a physician fee schedule be implemented beginning January 1, 1992. The purpose of the physician fee schedule is to help address longstanding imbalances between Medicare payments to urban and rural physicians and between primary care physicians and surgeons. The key element of the fee schedule is that CMS establishes a relative value representing the resources needed by the physician to perform the medical service or procedure.

13. Over the years, Congress and CMS have refined the physician fee schedule. Currently, the relative value units (RVUs) for a physician service/procedure include a component for work, facility, and malpractice. The RVUs are calculated for each HCPCS/CPT code. The RVUs are multiplied by a conversion factor and a geographic

4

price index. Each year CMS publishes a regulation which asks for public comment to proposed changes to the RVUs, conversion factor, and geographic adjustments. After the public comments have been analyzed, CMS publishes a final regulation containing the components for next year's fee schedule.

14. CMS maintains a free website containing the values of the components that comprise the fee schedule and how to calculate the fee for each physician service and procedure. See http://www.cms.hhs.gov/PhysicianFeeSched/PFSRVF/list.asp. In addition, most physician specialty organizations maintain their own websites to help their members calculate fees. And finally, there are over a dozen commercial venders which offer products to help calculate physician fees. One such example of a commercial vender is http://www.pfss.com.

15. While CMS makes a number of refinements and modifications to the fee schedule each year, the overall physician payment growth rates have been flat for several years. Most physicians' charges are higher then the fee schedule but they have agreed to accept the Medicare fee schedule payment. Consequently, the physician fee schedule for a specific service or procedure is the actual Medicare payment amount.

16. In order to prove the point that it is very easy to calculate total Medicare payments for an individual physician, CMS needs to demonstrate that it is possible to replicate the Medicare payments for a specific service or procedure by possessing a physician's UPIN linked to the actual HCPCS/CPT codes. CMS based its demonstration on data from the Medicare Current Beneficiary Survey (MCBS). The MCBS is a household survey in which CMS interviews Medicare beneficiaries and links the individual's responses to the actual Medicare utilization and payment. To show how easy

it is to determine total Medicare payments to an individual physician, we provided a CMS analyst with the following information and supplies: UPIN number for a provider and HCPCS code 33533, internet access, and a $5 calculator. We asked the analyst to identify the physician and the Medicare payment in 2005 dollars. Twenty minutes later the analyst identified Medicare paid $1,970.08 for a CABG, single arterial to the actual physician. (We removed the actual UPIN number used for privacy reasons). Attachment C is a worksheet that shows how to calculate the Medicare reimbursement amount for an identified individual provider. This exercise is similar to calculating a federal employee's salary knowing his or her grade, step, and duty station. The Office of Personnel Management maintains a free website, which combines those three elements into an easy-to-use chart. The CMS analyst information was correct and if we wanted to calculate the total Medicare payments to Dr. "X", we would provide the analyst with all the physician billings for the year and ask for a total. This is the exact information that Plaintiff is requesting -- all physician billings with HCPCS codes linked to individual UPIN identifiers.

17. Some physicians bill Medicare under a group UPIN so that it is not possible to identify the physician that actually performed the medical service or procedure. Physicians that tend to use a group practice UPIN are those specialties that do not see patients directly, for example pathologists and radiologists. In addition, Medicare does not receive individual billings from physicians who treat patients in Medicare Advantage/manage care plans, making it impossible to track total physician services and procedures under those plans. CMS believes that the majority of physicians, whether they are in a group practice or by themselves, bill Medicare via an individual UPIN.

6

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this 13 day of April, 2007.

Spike Duzor

**Attachment A**

Data elements requested from the Carrier SAF files:

Claim Through Date (Year/Quarter)
Carrier Number
CWF Beneficiary Medicare Status Code
Claim Principal Diagnosis Code
Carrier Claim Payment Denial Code
Claim Excepted/Non-Excepted Medical Treatment Code
Carrier Claim Provider Assignment Indicator Switch
Carrier Claim Referring PIN Number
Care Plan Oversight (CPO) Provider Number
Carrier Claim Diagnosis Code Count
Carrier Claim Line Count
Claim Diagnosis Code
Carrier Line Performing PIN Number
Carrier Line Performing UPIN Number
Line NCH Provider State Code
Line HCFA Provider Specialty Code
Line Provider Participating Indicator Code
Carrier Line Reduced Payment Physician Assistant Code
Line Service Count
Line HCFA Type Service Code
Line Place of Service Code
Line Last Expense Date (Year/Quarter)
Line HCPCS Code
Line HCPCS Initial Modifier Code
Line HCPCS Second Modifier Code
Line NCH BETOS Code
Line Beneficiary Primary Payer Code
Line Processing Indicator Code
Line Diagnosis Code

Attachment A

Data elements requested:

Claim Through Date – The last day on the billing statement covering services rendered to the beneficiary (a.k.a Statement Covers Thru Date).

Carrier Number – This identification number assigned by CMS to a carrier authorized to process claims from a physician or supplier.

CWF Beneficiary Medicare Status Code – The CWF-derived reason for a beneficiary's entitlement to Medicare benefits, as of the reference date (CLM_THRU_DT).

Claim Principal Diagnosis Code – The ICD-9-CM diagnosis code identifying the diagnosis, condition, problem or other reason for the admission/encounter/visit shown in the medical record to be chiefly responsible for the services provided.

Carrier Claim Payment Denial Code – The code on a noninstitutional claim indicating to whom payment was made or if the claim was denied.

Claim Excepted/Non-Excepted Medical Treatment Code – The code used to identify whether or not the medical care or treatment received by a beneficiary, who has elected care from a Religious Nonmedical Health Care Institution (RNHCI), is excepted or nonexcepted.

Carrier Claim Provider Assignment Indicator Switch – A switch indicating whether or not the provider accepts assignment for the noninstitutional claim.

Carrier Claim Referring PIN Number – A placeholder field for storing the NPI assigned to the referring physician.

Carrier Plan Oversight (CPO) Provider Number – The Medicare provider number of the HHA or Hospice rendering Medicare covered services during period the physician is providing care plan oversight. The purpose of this field is to ensure compliance with the CPO requirement that the beneficiary must be receiving covered HHA or Hospice services during the billing period. There can be only one CPO provider number per claim, and no other services but CPO physician services are to be reported on the claim. This field is only present on the nonDMERC processed carrier claim.

Carrier Claim Diagnosis Code Count – The count of the number of diagnosis codes (both principal and other) reported on a carrier claim. The purpose of this count is to indicate how many claim diagnosis trailers are present.

Carrier Claim Line Count – The count of the number of line items reported on the carrier claim. The purpose of this count is to indicate how many line item trailers are present.

Claim Diagnosis Code – The ICD-9-CM based code identifying the beneficiary's principal or other diagnosis (included E code).

Carrier Line Performing PIN Number – The profiling identification number (PIN) of the physician/supplier (assigned by the carrier) who performed the service for this line item on the carrier claim (non-DMERC).

Carrier Line Performing UPIN Number – The unique physician identification number (UPIN) of the physician who performed the service for this line item on the carrier claim (non-DMERC).

Line NCH Provider State Code – The two position SSA state code where provider facility is located.

Line HCFA Provider Specialty Code – CMS specialty code used for pricing the line item service on the noninstitutional claim.

Line Provider Participating Indicator Code – Code indicating whether or not a provider is participating or accepting assignment for this line item service on the noninstitutional claim.

Carrier Line Reduced Payment Physician Assistant Code – Code indicating whether or not a provider is participating or accepting assignment for this line item service on the noninstitutional claim.

Attachment B

Line Service Count – The count of the total number of services processed for the line item on the non-institutional claim.

Line HCFA Type Service Code – Code indicating the type of service, as defined in the CMS Medicare Carrier Manual, for this line item on the noninstitutional claim.

Line Place of Service Code – The code indicating the place of service, as defined in the Medicare Carrier Manual, for this line item on the noninstitutional claim.

Line Last Expense Date – The ending date (last expense) for the line item service on the noninstitutional claim.

Line HCPCS Code – The Health Care Common Procedure Coding System (HCPCS) is a collection of codes that represent procedures, supplies, products and services which may be provided to Medicare beneficiaries and to individuals enrolled in private health insurance programs. The codes are divided into three levels, or groups.

Line HCPCS Initial Modifier Code – A first modifier to the HCPCS procedure code to enable more specific procedure identification for the line item service on the noninstitutional claim.

Line HCPCS Second Modifier Code – A second modifier to the HCPCS procedure code to make it more specific than the first modifier code to identify the line item procedures for this claim.

Line NCH BETOS Code - The Berenson-Eggers type of service (BETOS) for the procedure code based on generally agreed upon clinically meaningful groupings of procedures and services. This field is included as a line item on the noninstitutional claim.

Line Beneficiary Primary Payer Code · The codes specifying a federal non-Medicare program or other source that has primary responsibility for the payment of the Medicare beneficiary's medical bills relating to the line item service on the noninstitutional claim.

Line Processing Indicator Code – The code indicating the reason a line item on the noninstitutional claim was allowed or denied.

Line Diagnosis Code · The ICD-9-CM code indicating the diagnosis supporting this line item procedure/service on the noninstitutional claim.

From the claim
Procedure performed:  HCPC 33533 (CABG, arterial, single)
Performing UPIN:  (removed for privacy concerns)
Provider zip code:  21208 (Baltimore)
Referring UPIN:  (removed for privacy concerns)

Physician information available online from NHIC and other free web lookup sources
(type "UPIN" in Google). Enter the UPIN and it returns provider name, office locations,
credentials and specialty.
Performing physician is Dr. "X" and referring physician is Dr. "Y".  Maryland is the
state.

Medicare physician fee schedule
http://www.cms.hhs.gov/PhysicianFeeSched/PFSRVF/list.asp

For 2005, for procedure 33533
Relative value units (RVUs)
        Work            29.96
        Facility        16.46
        Malpractice     4.33

Conversion factor    $37.8975

Geographic price index for Baltimore and surrounding counties
        Work            1.017
        Facility        1.058
        Malpractice     0.947

To compute Medicare's allowable charge

    Work          $1.017 \times 29.96 = 30.4693$
    Facility      $1.058 \times 16.46 = 17.4147$
    Malpractice   $0.947 \times \phantom{0}4.33 = \underline{\phantom{0}4.1005}$
                                    51.9845
                         x $\underline{\$37.8975}$ (conversion factor)
                           $1,970.08  (allowable charge)

Payment to physician at 80% of allowable charge (with 20% coinsurance paid by
beneficiary).
        Medicare pays the provider S1,576.06.
    .   Beneficiary liability is $394.02.

                                            Attachment C