# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES | : |
| | : |
| Plaintiff, | : |
| | : Case No: 06-02201 (EGS) |
| vs. | : |
| | : |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et. al. | : |
| | : |
| Defendants. | : |
| | : |

---

### PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff, Consumers' CHECKBOOK, Center for the Study of Services (the "Checkbook"), hereby moves for summary judgment.  In support of this motion, Checkbook is filing herewith (a) a Statement of Material Facts as to Which Plaintiff Contends There Is No Genuine Issue, (b) a Memorandum of Points and Authorities, (c) an Appendix of Exhibits and Authorities (which includes the Second Declaration of Robert Krughoff) and (d) a proposed Order.

As set forth more fully in the accompanying materials, Checkbook is entitled to summary judgment because there is no genuine issue as to any material fact concerning Defendants' improper withholding of the information about the Medicare program that Checkbook has sought under the Freedom of Information Act, and Checkbook is entitled to judgment as a matter of law.

Respectfully submitted,


_____/s/ Stephen Albrecht_____
Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'*
*CHECKBOOK, Center for the Study of Services*

May 18, 2007

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DISTRICT OF COLUMBIA

———————————————————————

CONSUMERS' CHECKBOOK, CENTER FOR   :
THE STUDY OF SERVICES                          :
                                         :
               Plaintiff,          :
                                         :   Case No: 06-02201 (EGS)
          vs.                   :
                                         :
UNITED STATES DEPARTMENT OF HEALTH  :
AND HUMAN SERVICES, et. al.          :
                                         :
           Defendants.        :
                                         :

———————————————————————

## <u>ORDER</u>

This matter having come before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment, and the Court having reviewed the motions, the parties' respective support and opposition thereto, and the entire record herein, it is

ORDERED that Plaintiff's Cross-Motion for Summary Judgment be, and it hereby is, granted; and it is further

ORDERED that Defendants' Motion for Summary Judgment be, and it hereby is, denied; and it is further

ORDERED that Defendants provide to Plaintiff within ten (10) days a complete

production of the Medicare records as requested by Plaintiff including all requested records from

Washington DC, Maryland, Illinois, Virginia and Washington; and it is further

ORDERED that Defendants shall not charge Plaintiff fees for the search, review and

duplication or production costs associated with processing the request.

 

_____
HON. EMMET G. SULLIVAN
United States District Court Judge

DATE:_____

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | :   Case No: 06-02201 (EGS) |
| | : |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et. al. | : |
| | : |
| Defendants. | : |
| | : |

_____

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO DEFENDANTS' SUPPLEMENT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'
CHECKBOOK, Center for the Study of Services*

May 18, 2007

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE.................................................................................3

    Physician Claims In The Medicare Program ....................................................3

    The Demand For Quality and Efficiency Studies in the Medicare Program ......................5

    Use of Medicare Claims Records to Scrutinize the Performance of CMS and the
        Medicare Program...............................................................................8

    Public Scrutiny of Medicare Claims Records Is Likely to Reveal Program
        Performance Problems ........................................................................10

    Consumers' CHECKBOOK / The Center for the Study of Services................................12

    Procedural History ...............................................................................13

ARGUMENT ......................................................................................................19

    I.    Physician Identifying Information Within the Requested Records Is Not
        Subject to Prior Injunction and Does Not Fall within the Narrow Contours
        of Exemption 6...................................................................................19

        A.    The Injunction Issued by the District Court in the Middle District of
            Florida in 1979 Does Not Apply to the Present Case. ..............................21

        B.    Disclosure of the Requested Information Will Not Cause a Significant
            Invasion of Personal Privacy. ...............................................................26

            1.    Disclosure Will Not Constitute a Significant Invasion of
                Personal Privacy Because the Requested Information
                Pertains Only to the Physicians' Business Activities. ...................26

            2.    Disclosure Will Not Reveal Any Intimate or Embarrassing
                Fact About Any Person's Personal Affairs....................................29

        C.    There Is a Strong Countervailing Public Interest in Disclosure of the
            Requested Information.........................................................................30

        D.    The Public Interest in Disclosure of the Physician-Identifying Data
            Greatly Outweighs Any Privacy Interests.................................................33

    II.    Checkbook Qualifies For A Fee Waiver..............................................................35

A.    Checkbook's request meets the public interest standards for a fee waiver established in the Act and HHS regulations ...............................................36

   1.    The requested records pertain to the operations and activities of the Federal Government, and disclosure of the records will reveal meaningful information about government operations and activities...............................................36

   2.    Disclosure of the records to Checkbook will advance the understanding of the general public, not just a narrow segment of interested persons. ........................................................37

   3.    The contribution to public understanding will be significant....................................................................................39

B.    The public interest in obtaining the requested records outweighs any commercial interest of Checkbook ...........................................................42

CONCLUSION....................................................................................................................43

# TABLE OF AUTHORITIES

## CASES

Page(s)

United States Department of Justice v. Reporters Committee for Freedom of the Press,
489 U.S. 749 (1989).................................................................................................23, 25, 31

Alirez v. NLRB,
676 F.2d 423 (10th Cir. 1982) ..................................................................................20

Arieff v. Department of the Navy,
712 F.2d 1462 (D.C. Cir. 1983)................................................................................20

Board of Trade v. Commodity Futures Trading Commission,
627 F.2d 392 (D.C. Cir. 1980)..................................................................................28

Carney v. United States Department of Justice,
19 F.3d 807 (2nd Cir. 1994)......................................................................................37

Citizens for Environmental Quality, Inc. v. Department of Agriculture,
602 F. Supp. 534 (D.D.C. 1984) ...............................................................................33

Cohen v. EPA,
575 F. Supp. 425 (D.D.C. 1983) ...............................................................................28

Department of Air Force v. Rose,
425 U.S. 352 (1976).......................................................................................19, 29, 30

Department of State v. Ray,
502 U.S. 164 (1991)..............................................................................................20, 31

Ditlow v. Shultz,
517 F.2d 166 (D.C. Cir. 1975) ..................................................................................29

Florida Medical Association, Inc. v. Department of Health, Education & Welfare,
479 F. Supp. 1291 (M.D. Fla. 1979) ................................................................ passim

Ivanhoe Citrus Association v. Handley,
612 F. Supp. 1560 (D.D.C. 1985) .............................................................................28

Judicial Watch Inc. v. Department of Justice,
365 F.3d 1108 (D.C. Cir. 2004) ................................................................................37

<u>Judicial Watch, Inc. v. Rossotti</u>,
326 F.3d 1309 (D.C. Cir. 2003) ...............................................................................35, 38

<u>Kurzon v. HHS</u>,
649 F.2d 65 (1st Cir. 1981) ......................................................................................20, 28

<u>Multnomah County Medical Society v. Scott</u>,
825 F.2d 1410 (9th Cir. 1987) .......................................................................................33

<u>National Association of Retired Federal Employees v. Homer</u>,
879 F.2d 873 (D.C. Cir. 1989), <u>cert. denied</u>, 494 U.S. 1078 (1990).........................20, 34

<u>National Parks & Conservation Association v. Kleppe</u>,
547 F.2d 673 (D.C. Cir. 1976) .......................................................................................28

<u>Public Citizen Health Research Group v. Department of Health, Education & Welfare</u>,
477 F.Supp. 595 (D.D.C. 1979) <u>rev'd on other grounds</u>, 668 F.2d 537 (D.C. Cir. 1981) .......27, 30

<u>Robles v. EPA</u>,
484 F.2d 843 (4th Cir. 1973) .........................................................................................32

<u>Rural Housing Alliance v. Department of Agriculture</u>,
498 F.2d 73 (D.C. Cir. 1974) .........................................................................................30

<u>Sims v. CIA</u>,
642 F.2d 562 (D.C. Cir. 1980) ..................................................................................27, 28

<u>Washington Post Co. v. Department of Justice</u>,
863 F.2d 96 (D.C. Cir. 1988) .........................................................................................27

<u>Washington Post Co. v. HHS</u>,
690 F.2d 252 (D.C. Cir. 1982) ................................................................................ passim

<u>Washington Post Co. v. United States Department of Agriculture</u>,
943 F.Supp. 31 (D.D.C. 1996) .............................................................................28, 32, 34

## STATUTES

45 C.F.R. § 5.35(b) .........................................................................................................13

45 C.F.R. § 5.45 ..................................................................................................... passim

Exec. Order No. 13,410, 71 Fed. Reg. 51,089-51,090 (Aug. 28, 2006).........................5

H.R. Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966) .............................................20, 29

S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)......................................................................20, 29

5 U.S.C. § 552 et seq................................................................................................. passim

42 U.S.C. § 1320c et seq..........................................................................................5, 25

42 U.S.C. § 1395cc-3(b) ......................................................................................3, 5, 33

42 U.S.C. § 1395w-4(k) ........................................................................................5

42 U.S.C. § 1395y(g) .............................................................................................5, 25

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

_____

CONSUMERS' CHECKBOOK, CENTER FOR     :
THE STUDY OF SERVICES                                  :
                                                                         :
                        Plaintiff,                                   :
                                                                         :    Case No: 06-02201 (EGS)
            vs.                                                        :
                                                                         :
UNITED STATES DEPARTMENT OF HEALTH  :
AND HUMAN SERVICES, et. al.                       :
                                                                         :
                        Defendants.                              :
                                                                         :
_____

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO DEFENDANTS' SUPPLEMENT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This case presents issues of extraordinary delay and obfuscation on the part of a government agency that not only has failed to meet its obligations under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, but also has wasted the time and resources of the Plaintiff and this Court as it has repeatedly lurched from one position to another in an attempt to deny public access to government records whose disclosure can have a profound effect on the public's knowledge and understanding of the Medicare program.

Plaintiff, Consumers' CHECKBOOK/Center for the Study of Services ("Checkbook" or "Plaintiff"), brought this suit under the FOIA to compel the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS" or

"Defendants") to produce certain physician claims records compiled and maintained electronically by CMS. Checkbook believes this information will greatly assist the public in understanding the operations of CMS, assessing the quality and efficiency of physician services available under the Medicare program, and evaluating CMS's efforts to improve and enhance the quality and efficiency of services available to Medicare beneficiaries and reduce waste in the program.

In June 2006, CMS originally withheld the requested records under a misapplication of the FOIA's provision, 5 U.S.C. § 552(a)(3)(B), claiming that the agency did not need to comply with the request because doing so would require an unreasonable effort. After Checkbook filed an administrative appeal of the original denial, which went unanswered, Checkbook commenced this lawsuit. After litigating for over a month, CMS changed its position and agreed to process Checkbook's request, but at the same time denied Checkbook's request for a waiver of the fees -- which CMS claimed would total approximately $20,000 -- associated with processing the FOIA request. To facilitate a resolution, Checkbook agreed to accept a subset of the requested records in a preliminary production so as to limit the potential fees, pending the outcome of its appeal of the denial of the fee waiver.

CMS then shifted ground once again, agreeing to make a preliminary production to Checkbook of a smaller set of records *in full and without redaction* within three to four weeks. At that point, Defendants told this Court that summary judgment should be granted in their favor based on their promise to release the subset of the requested documents in full. After six weeks of further delay, however, CMS once again reversed field, and *for the first time* asserted that portions of he requested records -- namely the portions that purportedly tie Medicare claims data to individual physicians who participate in the Medicare program -- are exempt from disclosure

on personal privacy grounds under FOIA Exemption 6, 5 U.S.C. § 552(b)(6).  Even though

Checkbook's original FOIA request in March 2006 and its subsequent correspondence with CMS

had repeatedly and explicitly flagged for CMS that CMS had previously (and erroneously)

indicated Exemption 6 might be a cause for withholding such physician-identifying data,

Defendants now claim that the notion that Exemption 6 might be applicable first occurred to

them only after they processed some of the requested records in April 2007.  This latest gyration

is simply unbelievable, although it is fully consistent with the pattern of delay and obfuscation on

the part of Defendants that has stymied Checkbook's 14-month effort to obtain disclosure of

these important government records.

The records requested by Plaintiff are not subject to Exemption 6, and Defendants'

thirteenth hour reliance on this provision must be overturned.  Furthermore, Plaintiff has

demonstrated that it meets the requisite standards for a fee waiver pursuant to 5 U.S.C. §

552(a)(4)(A)(iii) and 45 C.F.R. § 5.45.  All of the records requested by Plaintiff must be released

in full and without redaction, and the associated fees for the search, review and duplication costs

must be waived.

## STATEMENT OF THE CASE

### Physician Claims In The Medicare Program

The Medicare program is a federally funded program that pays health care costs,

primarily for the disabled and beneficiaries 65 years of age and older.[1]  In 2006, Medicare

provided health services for 43.2 million beneficiaries.  See The Boards of Trustees, Federal

Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, 2007 Annual

---

[1]  See 42 U.S.C. §§1395 et seq.

Report (2007) at 2.[2/]  Medicare is divided into several components, including Medicare Part A,

which covers hospital costs, Medicare Part B, which covers doctors' services and outpatient care,

and Medicare Part D which covers prescription drugs.[3/]  Id. at 1.  In 2006, Medicare spent

approximately $58.4 billion on physician services under Medicare Part B, almost a third of

Medicare's total expenditures.  Id. at 5.  Physicians who elect to participate in the Medicare

program provide essential medical services to Medicare beneficiaries and submit claims to

Medicare for reimbursement for those services based on an established fee schedule.[4/]  The

claims include, among other things, data about the patient, information about the physician

providing the service, and an explanation of the procedure or service provided.  CMS retains all

of this data from the physician claims in the National Claims History ("NCH") database.  See

Krughoff Declaration ("Krug. Dec.") Ex. 2 at 1.

The data in the NCH is organized by physician claim and contains dozens of data fields

that describe each encounter between a Medicare beneficiary and a Medicare physician,

including the Medicare code for the medical procedure performed, the date of service, the

principal diagnosis code for the patient, the state in which the service was provided, and the

identification number for the physician who provided the service, known as the "UPIN" number.

See Krughoff Second Declaration ("Krug. Second Dec.") ¶13.  Checkbook has requested a

subset of 29 data elements from the NCH database from five states (Washington DC, Illinois,

Maryland, Washington and Virginia) for calendar year 2004.  See Krug. Dec. Ex. 1.  Plaintiff did

---

[2/]   The Medicare Annual Report is available at
http://www.cms.hhs.gov/ReportsTrustFunds/downloads/tr2007.pdf.  An excerpt from the report is
included in the attached Appendix as Attachment A.

[3/]   A complete explanation of the Medicare program components is available on the CMS web site at
http://www.cms.hhs.gov/MedicareGenInfo/.

[4/]   CMS publishes the Medicare physician fee schedule on its web page at
http://www.cms.hhs.gov/PhysicianFeeSched/01_Overview.asp#TopOfPage.

not request any data that would identify the patients who received the Medicare services, but did request data elements that would identify the Medicare physician who submitted each claim and the medical services provided.  Id.  CMS's latest position before this Court is that it is prohibited from disclosing the data fields that identify the Medicare physicians who submitted each claim for reimbursement due to FOIA Exemption 6, although CMS is purportedly willing to disclose all of the other requested data elements from the NCH.  See Def. Supp. Br. at 10-11.

### The Demand For Quality and Efficiency Studies in the Medicare Program

Over the past two decades, and particularly over the past several years, the federal government has engaged in efforts to improve the quality and efficiency of health services provided to patients in the Medicare program and to empower beneficiaries to select cost-effective health services.  As an early example, in 1982 Congress established the Medicare Utilization and Quality Control Peer Review Program (P.L. 97-248, Sec. 149), codified at 42 U.S.C. § 1320c et seq. and 42 U.S.C. § 1395y(g).  This program authorized CMS to contract with Peer Review Organizations, later renamed Quality Improvement Organizations ("QIOs"), in order to promote the "effective, efficient, and economical delivery of health care services" within the Medicare program.  42 U.S.C. § 1395y(g).

More recently, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA") (Pub.L 108-173) established the Medicare Health Care Quality Demonstration Program, which provides CMS with the authority to create projects that "examine health delivery factors that encourage the delivery of improved quality in patient care."  42 U.S.C. § 1395cc-3(b).  On August 22, 2006, the President signed an Executive Order titled "Promoting Quality and Efficient Health Care in Federal Government Administered or Sponsored Health Care Programs."  Exec. Order No. 13,410, 71 Fed. Reg. 51,089 (Aug. 28, 2006).  See also Krug. Second Dec. ¶11 & Ex. 3.  Effective January 1, 2007, the Order requires all federal health care

programs to take steps to promote quality of health care and increase the transparency to consumers of the prices and costs of health care services. Fed. Reg. at 51,090. The Order mandates that federal health programs perform these functions in collaboration with multi-stakeholder groups. Id. Similarly, on December 20, 2006, the President signed the Tax Relief and Health Care Act of 2006 (P.L. 109-432), which included a provision authorizing CMS to establish a Physician Quality Reporting Initiative ("PQRI"). See 42 U.S.C. § 1395w-4(k). See also Krug. Second Dec. ¶11 & Ex. 4. The PQRI provides financial incentives for Medicare physicians to self-report a set of quality measures along with their Medicare claims.[5] These quality-centered initiatives and analyses are but a few examples of how the federal government, and CMS in particular, has been directed to track and improve the quality and efficiency of health care services provided through the Medicare program. By statute and executive order, improving quality and efficiency is a priority for CMS.

The private sector has also attempted to work with CMS to assess quality in the federal health care programs, and extrapolate those quality findings to the larger health system. In April of 2006, the *New York Times* reported that the Business Roundtable, an organization comprised of some of the largest companies in the United States, had requested that the Bush administration release all of the claims records collected by CMS through the Medicare program (the very same category of records sought in this case). See Robert Pear, Employers Push White House to Disclose Medicare Data, N.Y. Times, April 11, 2006, at A1. See Krug. Second Dec. ¶12 & Ex. 6. The companies sought the records to enable them to study the quality and cost effectiveness of services provided by Medicare physicians, and compare and rate those doctors "to rein in soaring health costs." Id. According to the *Times* article, administrators from HHS denied the

---

[5] An overview of the PQRI program is available on the CMS web site at http://www.cms.hhs.gov/pf/printpage.asp?ref=http://www.cms.hhs.gov/PQRI/01_Overview.asp.

request, claiming that the records could not be released due to an injunction imposed by a federal court in 1979.[6/]  The *Times* further reported that, upon request from the Business Roundtable, HHS administrators were "reviewing" that court decision to determine if it was still applicable to the records in the Medicare database.  Id.  Consumer groups and unions were also reported to be joining the Business Roundtable in requesting access to this same Medicare data, noting a shared interest in studying the data to determine the most efficient physicians in the Medicare program. Id.

In follow-up to the Business Roundtable request, on July 13, 2006, G. Richard Wagoner, Jr., Chairman and Chief Executive Officer of the General Motors Corporation, testified before the Senate Special Committee on Aging to discuss the impact of caring for American seniors on the country's total health care costs.  During that testimony, Mr. Wagoner reiterated his request, along with colleagues in the Business Roundtable, for Medicare to "[r]elease [ ] the complete Medicare Claims Database."[7/]  See Krug. Second Dec. ¶12 & Ex. 8 at 15.  "By getting price and quality information about physicians, hospitals, and other providers available to the public," Mr. Wagoner explained,  "consumers can make better choices about the health care they receive . . . [to] enhance quality and efficiency in the delivery of Medicare services as well as health care services overall."[8/]

---

[6/]  The 1979 federal case referenced in the article is the same case on which Defendants now rely to deny Plaintiff's request pursuant to Exemption 6.  However, Defendants made no reference to any Exemption 6 issue until April 2007, more than 13 months after Plaintiff's FOIA request and more than four months after commencement of this lawsuit.  The public debate over the past year regarding the applicability of this old case to current Medicare records makes it difficult to understand why Defendants did not address Exemption 6 earlier in this case.  Raising Exemption 6 either in response to the original FOIA request or at least in the early stages of this litigation would have saved Plaintiff and the Court significant time and resources by allowing the parties to deal with the actual merits of the case from the outset.

[7/]  From Medicaid to Retiree Benefits: How Seniors Impact America's Health Care Costs: Hearing Before the Special Committee on Aging, 109th Cong. At 15 (2006) (statement of G. Richard Wagoner, Jr.), available at http://aging.senate.gov/events/hr160rw.pdf.

[8/]  Id. at 15.

Similarly, in June 2006 the Consumer-Purchaser Disclosure Group, an organization that includes labor and consumer organizations such as Consumers Union (publisher of Consumer Reports), the National Partnership for Women and Families, the Center for Medical Consumers, and the Service Employees International Union, sent a letter to the Administrator of CMS advocating that CMS "make available physician-identifiable Medicare claims data (fully protecting patient privacy), to allow for better quality and efficiency performance reporting." See Krug. Second Dec. ¶12 & Ex. 7.

## Use of Medicare Claims Records to Scrutinize the Performance of CMS and the Medicare Program

Health researchers and federal agencies have proposed several ways that records from the Medicare claims database may be used to analyze the quality and efficiency of the health services that the government is delivering to citizens through the Medicare program.  For example, recent studies have shown that for certain health procedures, physicians performing a high volume of procedures have significantly better patient outcomes than low-volume providers.  See Krug. Dec. ¶14 & Ex. 9 (Birkmeyer, J., et al., Surgeon Volume and Operative Mortality in the United States, 349 New Eng. J. Med. 2117 (2003)).  The Medicare claims database can be used to develop profiles of participating physicians – including counts of the annual volume of specific procedures performed by the physicians for Medicare beneficiaries -- thus providing beneficiaries with an indication of which Medicare providers are likely to offer the highest standard of care for specific procedures.  See Krug. Second Dec. ¶¶13-16.

Notwithstanding the numerous quality-oriented directives it has received, CMS fails to disclose to the public data reflecting the volume of specific procedures performed on Medicare beneficiaries by Medicare participating physicians, even though such data would enable beneficiaries to choose high-volume doctors who would be expected to deliver superior quality,

and would allow the public to scrutinize the extent to which Medicare is allowing and paying for physicians to perform procedures for which they have less than optimum levels of experience and qualifications.[9/]  The Medicare claims records requested by Checkbook will enable this type of volume reporting, as well as many other forms of quality and efficiency reporting.  Release of the requested records will also enable consumer advocacy groups and other representatives of the public to perform independent quality studies that will serve as a check on the quality initiatives that are allegedly already underway at CMS.

In addition, the U.S. Government Accountability Office ("GAO") recently conducted an assessment of program efficiency under the Medicare program, and looked specifically at the potential benefits to be gained from profiling physicians, concluding that "Medicare's data-rich environment is conducive to conducting profiling analyses designed to identify physicians whose medical practices are inefficient compared with their peers."  U.S. Government Accountability Office, GAO-07-307, <u>MEDICARE Focus on Physician Practice Patterns Can Lead to Greater Program Efficiency</u> (2007) at 17.  The report also stated:

> In our view, physician profiling offers a promising, targeted approach that could be one of an array of measures collectively aimed at realigning the imbalance between Medicare's outlays and revenues.  Given the contribution of physicians to Medicare spending in total, we are recommending that CMS develop a profiling system that identifies individual physicians with inefficient practice patterns and, seeking legislative changes as necessary, uses the results to improve the efficiency of care financed by Medicare.

---

[9/]    There is reason to believe that the benefits from utilizing high volume providers are not being realized in the Medicare program.  For example, the Birkmeyer study cited above found that surgeons who performed 100 or fewer coronary artery bypass graft (CABG) procedures per year had 1.35 times the mortality rate found with surgeons who performed over 162 procedures per year.  <u>See</u> Krug. Second Dec. ¶14 & Ex. 9.  Yet, data published by the Center for Medical Consumers of New York State (the only state for which individual physician procedure data is available) shows that about 30% of CABG procedures in that state were performed by physicians who did less than 100 procedures per year.  <u>Id</u>. (citing data found at www.medicalconsumers.org).

Id. at 6.  See Krug. Second Dec. ¶11 & Ex. 5.[10/]

      The physician profiling that can be conducted with the data requested by Checkbook will allow the public to scrutinize, among other things, (1) whether the government is allowing and paying for Medicare physicians with less-than-optimal levels of experience to perform difficult procedures; (2) whether the government is allowing Medicare physicians with insufficient board certifications, histories of disciplinary actions, or poor scores on independent quality assessments to perform high volumes of difficult procedures for which they may not be qualified; and (3) whether Medicare physicians are exhibiting practice patterns that conform with existing guidelines (e.g. whether physicians treating patients with specific diagnoses are providing annual exams and screenings recommended for those patients).  See Krug. Second Dec. ¶24.   Arming the public with information about Medicare physicians will allow citizens to make more informed choices about their utilization of Medicare services, and may also lead the public to advocate for Medicare reforms if significant shortcomings in the program are identified.  A well-informed public may also advocate for further research to determine how to better address the quality and efficiency problems identified in the program.  See Krug. Second Dec. ¶19.

**Public Scrutiny of Medicare Claims Records Is Likely to Reveal Program Performance Problems**

      There is good reason to believe that the scrutiny of Medicare physician services that will be possible with the requested records will reveal serious quality and efficiency problems in the Medicare program.  For example, a major study of health services provided to adults in the U.S.

---

[10/]   See also U.S. Government Accountability Office, GAO-07-862T, MEDICARE Providing Systematic Feedback to Physicians on their Practice Patterns Is a Promising Step Toward Encouraging Program Efficiency (2007) available at http://www.gao.gov/new.items/d07862t.pdf (noting that CMS data may be used to evaluate physician' practices for efficiency);  Hearing on Options to Improve Quality and Efficiency Among Medicare Physicians: Hearing Before the Subcommittee on Health of the House Ways and Means Committee, 110th Cong. (2007) (statement of Glenn M. Hackbarth, Chairman, Medicare Payment Advisory Commission) available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5893 (recommending that CMS institute claim-based process measures to incentivize physician performance).

found that participants received only 54.9 percent of recommended care, and concluded that a key component of any solution to this problem would involve "availability of information on [physician] performance at all levels . . . ." <u>See</u> Krug. Second Dec. ¶19 & Ex. 10 at 2644 (McGlynn, E. <u>et</u> <u>al</u>., <u>The Quality of Health Care Delivered to Adults in the United States</u>, 348 New Eng. J. Med. 2635, 2644 (2003)). This shortcoming found in the provision of care for all U.S. adults is no doubt a problem that affects the Medicare program, and the requested records are one source of information that will help identify those Medicare physicians who may be failing to meet recommended care standards.

Similarly, a recent study of physician practice patterns in the Medicare program revealed that, on average, Medicare physicians provided services that met established quality standards only 69.5% of the time in 1998-1999 and only 73.45% of the time in 2000-2001. <u>See</u> Krug. Second Dec. ¶20 & Ex. 11 (Jencks, S., <u>et</u> <u>al</u>., <u>Change in the Quality of Care Delivered to Medicare Beneficiaries, 1998-1999 to 2000-2001</u>, 289 JAMA 305 (2003). Although health services research has identified these shortcomings in the Medicare program generally, only an analysis using physician-identifying data can determine which tax-payer funded physicians are meeting care guidelines and which are falling short.

To allow important types of public scrutiny of the Medicare program, it is essential that claims records be released without redaction of physician identifiers. As mentioned above, physician profiles reflecting the volumes of procedures performed by specific Medicare physicians and their compliance with established care guidelines can only be useful to Medicare beneficiaries if the identities of the physicians are disclosed. Once such records are disclosed and publicly analyzed, Medicare beneficiaries can make more informed decisions about how to

obtain quality services under the program, and assess whether or not the Medicare program is fulfilling its mission of providing high quality services to its beneficiaries.

Furthermore, when Medicare physician identities are released additional mechanisms for scrutinizing the Medicare program will be possible.  For example, physician profiles generated from Medicare data can be paired with other physician profiles and data from state-level or private sources to further enhance the information available for each doctor.  See Krug. Second Dec. ¶24.  Public physician profiles can also be paired with public information about physician board certifications and disciplinary actions to alert the public as to whether doctors performing significant volumes of Medicare procedures have either positive or negative information in their public record.  See Krug. Second Dec. ¶17.  What's more, public oversight of quality and efficiency measures for identified Medicare physicians will provide the physicians themselves with an incentive to become more active participants in improving the multi-billion-dollar Medicare program, ensuring the accuracy of data regarding their performance, and taking steps to improve their performance.  See Krug. Second Dec. ¶¶24-25.

### Consumers' CHECKBOOK / The Center for the Study of Services

Plaintiff in this case, Checkbook, is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services, including services provided to consumers through government programs, and publishing *Consumers' CHECKBOOK* magazine and other reports that educate consumers about such services.  Krug. Second Dec. ¶1. Checkbook places a particular focus on studying health services and programs, and publishes several reports including the *Guide to Top Doctors*, *Consumers' Guide to Hospitals*, and the *Guide to Health Plans for Federal Employees* (now in its 27th annual print edition).  Krug. Second Dec. ¶2.

In addition to conducting research for and issuing its own publications, Checkbook works with health care organizations, government agencies, and others to collect, analyze, and disseminate survey information about health plans and physicians.  Checkbook has administered several large scale surveys of patient experience with individual doctors for groups such as the Massachusetts Health Quality Partners and the Pacific Business Group on Health.  Checkbook has also conducted more than 350 provider satisfaction surveys covering over 340,000 physicians.  For the federal government, Checkbook has been responsible for data analysis involving quality measures used by the Federal Employees Health Benefits ("FEHB") program, managed by the U.S. Office of Personnel Management ("OPM").  Krug. Second Dec. ¶4.

**Procedural History**

On March 27, 2006, Plaintiff submitted to CMS a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., seeking certain Medicare physician claim records concerning the medical services provided through the Medicare program in five states (DC, IL, MD, WA and VA) during calendar year 2004 ("the request").  Krug. Dec. ¶2.  The request letter explained that Checkbook was aware that CMS had previously denied similar requests for physician-identifying records on the basis of personal privacy under FOIA Exemption 6, 5 U.S.C. § 552(b)(6).  Checkbook's request letter pointed CMS to case law supporting the proposition that Exemption 6 does not apply to the requested records, and asked that if Exemption 6 were to become a relevant issue in processing the request, then CMS should contact Checkbook "prior to proceeding with this matter, as the physician identifying information is essential to [Checkbook's] request."  Krug. Dec. Ex. 1.

On June 26, 2006, after a delay of approximately two months beyond the statutory time limit for a response to a FOIA request,[11/] Defendants denied the request on the grounds that the effort needed to respond to the request -- approximately two weeks by CMS's calculation -- was unreasonable.  See Krug. Dec. ¶3 & Ex. 2.  Defendants' denial made no mention of Exemption 6 as a supposed basis for withholding any of the requested information.

On July 25, 2006, Plaintiff administratively appealed the denial to the Deputy Administrator of CMS.  CMS failed to respond to this appeal before the statutory 20-day deadline (See 5 U.S.C. § 552(a)(6)(A)(ii)), and as of December 2006 -- five months after the appeal, had still failed to respond.

On December 26, 2006, Plaintiff commenced this lawsuit against the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, Michael O. Leavitt in his official capacity as Secretary of Health and Human Services, and Leslie V. Norwalk in her official capacity as Administrator (acting) of CMS.  The Complaint sought to enjoin Defendants from withholding the requested information and to compel Defendants to provide the records.  Krug. Dec. ¶¶4-5.

On January 24, 2007, just days before their answer to the complaint was due, Defendants filed a Motion to Extend the time limit for their response to the Complaint by over four months, supposedly so that the Defendants could "complete the processing of the FOIA request by finalizing the search for the requested records and processing and then analyzing the results."  Defendants' Motion to Extend at 1.  Plaintiff opposed the motion to extend on the basis that, among other things, CMS had already asserted in its original denial letter that the time needed to process the requested records was only two weeks.  See Plaintiff's Opposition to Defendants'

---

[11/]  The HHS regulations require that the agency respond to FOIA requests within 10 working days.  45 C.F.R. § 5.35(b).  CMS took approximately three months to respond to Plaintiff's original request.

Motion to Extend at 2. The Court denied the request for a four-month extension, and instead granted a one-month extension. See Court Minute Order, Jan. 29, 2007.

On January 29, 2007, *the same day* that the Court denied Defendants' request for a four-month extension, CMS sent a letter to Checkbook purporting to revise its original denial of Checkbook's request. Krug. Dec. ¶6 & Ex. 4. In that letter, CMS did not agree to release the requested records. Instead, CMS denied Plaintiff's request for a waiver of administration fees associated with searching, reviewing and copying the requested records. Moreover, and for the first time, CMS insisted that Checkbook agree to pay fees of approximately $20,000 as a pre-condition to processing and producing the requested data.[12] CMS further made clear that even if Checkbook agreed to pay, there would be no assurance that the records would be released. Instead, CMS stated that "[o]nce produced, CMS will review the requested information under the FOIA to make our release determination" Krug. Dec. ¶6, Ex. 4 at 1 (emphasis in original). Defendants' demand for fees for processing costs departed from its prior stance before this Court, in which they apparently were willing to process the requested records without fees during the four-month extension of time that they had requested.

CMS's January 29 letter stated that Checkbook could appeal the denial of the fee waiver to the Deputy Administrator of CMS within 30 days, and added that Checkbook could narrow its request to reduce the fees that CMS would impose. Krug. Dec. Ex. 4. On February 28, 2007, Checkbook submitted a written administrative appeal of the fee waiver denial to the Deputy Administrator of CMS. Krug. Dec. ¶7 & Ex. 5. In the appeal, Checkbook argued that it had met the requirements of 5 U.S.C. § 552(a)(4)(A)(iii) to receive a waiver of fees associated with the request because the records sought would reveal significant information about the operations of

---

[12] The January 29 letter from CMS stated that the cost for compiling the data for each state would be approximately $3,944.70, yielding a total of $19,732.50 for all five states. Krug Dec. ¶6, Ex. 4.

government, because Checkbook had the capability to broadly distribute the significant

information to the public at large, and because Checkbook's interest in obtaining the records was

based on providing a public benefit to consumers and not Checkbook's own commercial

interests.  Krug. Dec. ¶7 & Ex. 5.

On March 1, 2007, rather than answering Checkbook's Complaint in this case,

Defendants moved for summary judgment, arguing that Checkbook somehow had failed to

exhaust its administrative remedies, despite the fact that it had timely appealed all adverse

decisions in the case, and that CMS had not even responded to those appeals.  On March 12,

2007, Plaintiff opposed the motion for summary judgment and requested a status conference so

that the Court could establish deadlines for the production and release of the requested records.

See Pl.'s Opp. Br. at 1-2.

On March 8, 2007, Checkbook wrote to Defendants agreeing, on a provisional basis, to

temporarily reduce the scope of the requested records in order to reduce the amount of fees being

demanded by Defendants, and to pay the associated fees for processing the records in the event

the request for a waiver of those fees were ultimately denied.  Krug. Dec. ¶9, Ex. 7.  Specifically,

Checkbook agreed to temporarily limit the request to records from the District of Columbia, but

also clarified that it was reserving the right to demand production of all remaining requested

records at its discretion.  Id.  Checkbook's March 8 letter also noted again that CMS had

previously denied FOIA requests for physician-identifying information on personal privacy

grounds under Exemption 6.  In order to avoid unnecessary costs, Checkbook requested that

CMS inform Checkbook before processing the records if CMS already had or could make a

determination regarding the releasability of the requested physician-identifying information

under Exemption 6.  Id.

In a letter to Checkbook dated March 16, 2007, CMS recognized Checkbook's agreement to pay for the production costs of the District of Columbia records, and pledged to release those records to Checkbook "in full, and without redaction." Krug. Second Dec. ¶5 & Ex. 1. That letter made no reference to Exemption 6. The March 16 letter also formally denied Checkbook's appeal of the denial of its fee waiver request. Id. In denying the appeal, Defendants purported to consider, as required under 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45, the balance between the public interest in disclosure of the information versus the commercial interest of Checkbook in receiving the information. Defendants conceded that the requested records pertained to the operations or activities of the Federal Government, and that disclosure would reveal meaningful information about government operations. Krug. Second Dec. Ex. 1 at 2. Defendants concluded, however, that Checkbook had not established that its commercial interest was not primary, and had not demonstrated how it would disseminate the requested data to "edify and inform a broad segment of the population." Id. at 4.

On March 20, 2007, Defendants filed a reply in support of their motion for summary judgment. Once again, this filing announced a radical change in Defendants' legal position. Rather than relying exclusively on its earlier claim that Plaintiff had failed to exhaust administrative remedies, Defendants argued that the case had become moot because they were complying with Checkbook's request. Specifically, Defendants' reply argued that "[t]he Court should dismiss this action because Defendant intends to release in full the requested documents." Def. Reply Br. at 2.

On April 4, 2007, Plaintiff filed an Amended Complaint for Injunctive Relief, which added a claim for reversal of Defendants' denial of Checkbook's request for a waiver of processing fees. The full package of relief sought in the Amended Complaint included (1) an

order requiring the Defendants to disclose all of the records requested by Plaintiff, including the

District of Columbia records that Defendants had promised to release in full, as well as the

requested records relating to four other states (Illinois, Maryland, Washington, and Virginia); (2)

an order barring Defendants from assessing fees for the search, review, and duplication costs

associated with the request; and (3) an award of Plaintiff's reasonable attorney fees and other

costs of this litigation.  See Amended Complaint at 14.

Four weeks later, Defendants once again completely shifted course.  On April 30, 2007,

without leave of Court, they filed a supplement to their motion for summary judgment, in which

they revoked their prior pledge to produce the D.C. records in full and without redaction, and

instead invoked Exemption 6 to withhold the physician identifying information from the records.

Def. Supp. to Def. Summ. J. at 6.  In a Supplemental Declaration, Mr. Michael S. Marquis,

Director of the Freedom of Information Group at CMS, declared that his earlier promise to

produce the records in full was made "before the data was generated by computer."  Marquis

Supp. Dec. ¶4.  He further asserted that while the data was being generated, he learned that some

of the data, when combined with public information about Medicare fee schedules, would lead to

the disclosure of annual Medicare reimbursement amounts to individual Medicare providers,

supposedly providing a basis for withholding the records under Exemption 6.  Id.  Mr. Marquis

formally declared that he had only recently learned about the applicability of Exemption 6, and

counsel for Defendants asserted the same in their "supplement" before this Court,[13]

notwithstanding the facts that (1) Checkbook had explicitly flagged in its original FOIA request

in March 2006 that CMS had previously withheld similar records based on a claim of Exemption

6 (See Krug. Dec. Ex. 1); (2) Checkbook had similarly identified the possible Exemption 6 issue

---

[13]    Supplement to Defendants' Motion for Summary Judgment at 1.

in its March 2007 correspondence to CMS (<u>See</u> Krug. Dec. Ex. 7); and (3) there had been

substantial attention and controversy in newspaper articles and other public fora concerning

whether the FOIA privacy exemption should apply to Medicare claims data that identifies the

tax-payer-funded physicians through whom the federal government delivers billions of dollars of

health care to millions of Medicare beneficiaries.[14]

## ARGUMENT

I.     **Physician Identifying Information Within the Requested Records Is Not Subject to Prior Injunction and Does Not Fall within the Narrow Contours of Exemption 6.**

Congress enacted the FOIA "to pierce the veil of administrative secrecy and to open

agency action to the light of public scrutiny." <u>Department of Air Force v. Rose</u>, 425 U.S. 352,

361 (1976) (internal citation and quotation marks omitted). "[D]isclosure, not secrecy, is the

dominant objective of the Act," and accordingly the exemptions to the FOIA are "exclusive" and

"must be narrowly construed." <u>Id</u>. Exemption 6, which is the only exemption claimed by

Defendants,[15] permits withholding of only "personnel and medical files and similar files the

disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5

U.S.C. § 552(b)(6). Where an agency relies on Exemption 6 as a basis for withholding, "the

presumption in favor of disclosure is as strong as can be found anywhere in the Act."

<u>Washington Post Co. v. HHS</u>, 690 F.2d 252, 261 (D.C. Cir. 1982). To prevail on its claim of

---

[14]   <u>See</u>, <u>e.g.</u>, Krug Second Dec. Ex. 6 (Robert Pear, <u>Employers Push White House to Disclose Medicare Data</u>, N.Y. Times, April 11, 2006, at A1).

[15]   The Defendants also cite the Privacy Act, 5 U.S.C. § 552a, as a basis for withholding the requested information. (<u>See</u> Def. Supp. Br. at 6.) But, as Defendants concede (<u>see</u> <u>id.</u>), the Privacy Act does not permit withholding where "disclosure of the record would be . . . required" under the FOIA. 5 U.S.C. § 552a(b)(2). In the present case, the FOIA <u>requires</u> disclosure because Exemption 6, the only FOIA exemption invoked by the Defendants, is inapplicable to the requested information. Accordingly, no further inquiry need be made about the applicability of the Privacy Act to the records at issue.

Exemption 6, the Department would have to establish,[16] and this Court would have to find,[17] that two criteria have been met:  <u>first</u>, that disclosure of the physician identifying information sought by Checkbook would constitute a significant invasion of "personal privacy"; and <u>second</u>, even if a cognizable privacy interest were demonstrated, that the public interest in disclosure of this information does not outweigh the privacy interest.[18]  In restricting Exemption 6 to "clearly unwarranted" invasions, the statute both requires a balancing of interests and "instructs [the Court] to 'tilt the balance . . . in favor of disclosure.'"[19]

After switching their position several times throughout the course of this case -- but without once citing Exemption 6 (or any other FOIA exemption) as a basis for withholding any of the requested data -- Defendants have now suddenly (and belatedly) invoked Exemption 6 as a basis for withholding certain data elements from the set of 29 data elements requested by Checkbook.  <u>See</u> Def. Supp. Br. at 1.  Specifically, in a last minute departure from their recent representation to this Court that they would release data "in full," Defendants now claim that the data elements that identify the specific Medicare provider who submitted each claim for reimbursement from the Medicare program cannot be disclosed due to the privacy interest of the provider.  <u>Id</u>. at 11.

---

[16]  The burden of proving the applicability of any FOIA exemption falls squarely on the agency.  5 U.S.C. § 552(a)(4)(B).

[17]  The FOIA mandates that the Court exercise <u>de novo</u> review of agency withholding.  <u>Id.</u>

[18]  <u>See</u>, <u>e.g.</u>, <u>Department of State v. Ray</u>, 502 U.S. 164, 177-78 (1991); <u>National Ass'n of Retired Fed. Employees v. Homer</u>, 879 F.2d 873, 878 (D.C. Cir. 1989), <u>cert. denied</u>, 494 U.S. 1078 (1990); <u>Arieff v. Department of the Navy</u>, 712 F.2d 1462 (D.C. Cir. 1983) (Scalia, J.).

[19]  <u>Washington Post Co. v. HHS</u>, 690 F.2d at 261 (quoting <u>Ditlow v. Shultz</u>, 517 F.2d 166, 169 (D.C. Cir. 1975)); <u>see also Alirez v. NLRB</u>, 676 F.2d 423, 427 (10th Cir. 1982) (in balancing, "[a]ll doubts are resolved in favor of disclosure"); <u>Kurzon v. HHS</u>, 649 F.2d 65, 67 (1st Cir. 1981) (the "clearly unwarranted" requirement "erect[s] an imposing barrier to nondisclosure"); S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965); H.R. Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966).

Defendants' belated invocation of Exemption 6 to withhold the physician-identifying information erroneously relies on an injunction issued nearly thirty years ago by the District Court for the Middle District of Florida in a completely unrelated case.  See Def. Supp. Br. at 9 (citing Florida Med. Ass'n, Inc. v. Department of Health, Educ. & Welfare, 479 F. Supp. 1291, 1305 (M.D. Fla. 1979).  That injunction is not applicable to, or binding on, the legal or factual issues at hand, leaving this Court free to perform its own analysis of the Exemption 6 claim. (See Part A below.)  In the present case, disclosure of the requested physician identifying information will not constitute a significant invasion of personal privacy within the meaning of Exemption 6. (See Part B below.)  Moreover, there is a very strong public interest in disclosure because the requested information will greatly assist the public in assessing the quality and efficiency of services provided under the Medicare program and in evaluating the efforts of CMS to monitor and improve quality and efficiency in the program.  (See Part C below.)  In these circumstances, the balance of interests plainly favors the public interest and requires disclosure.  (See Part D below.).[20]

> ### A.     The Injunction Issued by the District Court in the Middle District of Florida in 1979 Does Not Apply to the Present Case.

Defendants argue that an injunction issued by Judge Scott of the Middle District of Florida in 1979 in Florida Medical Association, Inc. v. Department of Health, Education & Welfare, 479 F. Supp. 1291, 1305 (M.D. Fla. 1979), prohibiting the Secretary of Health Education and Welfare ("HEW") (the predecessor agency to HHS) from publishing the annual amounts of reimbursements paid to Medicare providers is also currently binding on CMS with

---

[20]  To prevail, the government would also have to demonstrate that the records in question satisfy the threshold requirement of Exemption 6, i.e., that they be "personnel [or] medical files [or] similar files."  5 U.S.C. § 552(b)(6).  The Plaintiff does not concede that any of the information at issue in this case satisfies this threshold test.  Given that the information at issue so clearly fails the substantive balancing test of Exemption 6, however, this brief principally focuses on the assessment and balancing of privacy interests and public interests.

respect to the FOIA request at issue in the present case.  This is wrong.  That injunction is not applicable here both because the Supreme Court and other courts have articulated significant changes in how Exemption 6 should be applied in the nearly three decades since that injunction, and because this case presents a completely different set of factual circumstances.

In Florida Medical Association, the plaintiff medical associations filed a reverse FOIA case to enjoin HEW from continuing to publish annual reimbursement amounts paid to Medicare participating physicians, which the Secretary of HEW had published in an effort to inform a legislative debate over national health insurance.  479 F.Supp. at 1295, 1304.  The court analyzed the claim under FOIA Exemption 6 to determine whether disclosure of the information would "constitute a clearly unwarranted invasion of personal privacy" when balanced against the "competing public and private interests at stake."  Id. at 1304.  The court recognized that Exemption 6, which only protects against "clearly uwarranted" invasions of personal privacy, was intended to tilt the balance towards disclosure.  Id. at 1305 (citing Rural Hous. Alliance v. United States Dep't of Agric., 498 F.2d 73, 77 (D.C. Cir. 1971)).  The court also noted, however, that the preference toward disclosure can be outweighed when the disclosures "unnecessarily contain personally identifying details."  479 F.Supp. at 1305.  The court found that although the public debate over national health insurance may be served by knowing the total amount of reimbursement paid to Medicare physicians generally, "that public concern is no further advanced by revealing the identity of individual providers and their annual reimbursement amounts. . . ." Id.[21/]  Therefore, the court held that whatever privacy interests the physicians may

---

[21/]  Defendants gloss over the public interest that was considered in the balancing test in Florida Medical Association, referring to it generally as "the public's interest in shedding light on the Medicare program."  Def. Supp. Br. at 10.  In fact, the court made very clear that "[t]he Secretary [of HEW] asserts the public's interest in knowing the amounts of public funds spent in reimbursing Medicare providers annually, especially in light of the ongoing legislative debate over national health insurance."  479 F.Supp. at 1304 (emphasis added).  Indeed, it was the court's finding that physician identities would not advance the

have had outweighed any public interest in disclosure, and accordingly, that Exemption 6 prohibited continued disclosure of the reimbursement information.  Id.

On its face, the Exemption 6 analysis conducted by the Florida court is no longer binding because it has been superseded by precedent from the Supreme Court.  In United States Department of Justice v. Reporters Committee for Freedom of the Press, the Court held that the public interest that should be weighed in a FOIA exemption balancing test is whether the disclosure will "open agency action to the light of public scrutiny," and is not dependent on the particular purpose for which the document is being requested.  489 U.S. 749, 772 (1989) (citation omitted).  The analysis undertaken in Florida Medical Association considered only the narrow public benefit asserted by the Secretary of HEW regarding informing a particular legislative debate over national health insurance.[22]  This analysis fails to comport with the standard subsequently announced in Reporters Committee.  First, it considers only the particular purpose asserted by the requester, and not the public interest at large.  Second, the particular purpose that the court considered did not specifically involve opening an agency's operations up to public scrutiny; it focused on informing a legislative debate before the Congress.  Therefore, the analysis undertaken in Florida Medical Association does not provide a sound legal basis to support the appropriate legal analysis under today's standards.[23]

Furthermore, even if Florida Medical Association were premised on sound current law, which it is not, the facts of that case differ so significantly from the present case that the 1979 injunction cannot reasonably be extended to this situation.  For example, in Florida Medical

---

legislative debate regarding universal insurance that determined the outcome of the court's balancing test. Id. at 1305.

[22] See 479 F.Supp. at 1305.

[23] In addition, under the principles of stare decisis, the ruling of a federal District Court in the Middle District of Florida, which is parallel to this Court, holds no precedential value over this Court.

Association, the agency disclosed explicit annual reimbursements paid to physicians as derived

from the "reasonable costs" charged by those Medicare participating physicians.  479 F.Supp. at

1296.  At that time, the annual reimbursement paid to physicians was partly discretionary based

on what the physicians charged for their services, and the fees charged by the physicians were

not otherwise public information.  Now, as Defendants themselves admit (See Def. Supp. Br. at

4), the only way to extrapolate to an annual reimbursement amount from the requested records is

to apply a publicly available fee schedule that was instituted under the Omnibus Budget

Reconciliation Act of 1989 (Public Law 101-239).  Under the statute, the fees earned by

Medicare participating physicians are now public information based on a fee structure that does

not allow any discretion to physicians regarding the amount of their charges.  The public nature

of Medicare payments to physicians under the current program due to the publication of the fee

schedules removes the sense of privacy that may have been recognized by the court in 1979

when the payments for individual services were not publicly disclosed, and were based on

discretionary fees charged by the doctors.[24/]

Additionally, the public benefit to be gained from releasing the information requested by

Checkbook is fundamentally different from that in Florida Medical Association.  In the 1979

case, the court found that disclosing the actual identity of the Medicare physicians was not

necessary to achieve the public benefit under consideration (i.e. informing a legislative debate).

479 F.Supp. at 1305.  By contrast, the physician-identifying information in the records requested

---

[24/]  As further illustration, the Declaration of Spike Duzor submitted with Defendants' Supplemental filing
explains how one may use the publicly available Medicare fee schedule to determine that a doctor
performing a coronary artery bypass graft (CABG) in Baltimore, MD would be paid $1,576.06 for that
service.  Therefore, the public already knows the amount of reimbursement any specific cardiac surgeon
in Baltimore receives each time he or she performs that procedure for a Medicare patient.  The only new
information that the records requested in this case could be used to determine is that a specific doctor
who, hypothetically speaking, performed the CABG procedure 10 times in a calendar year would have
been reimbursed a total of $15,760.60 during that year – hardly a dramatic revelation compared to the
information already publicly available in the Medicare fee schedule.

by Checkbook is a necessary component that will enable the public to scrutinize the operations

of the Medicare program.  As will be described in greater detail in section C below, there is a

significant public benefit to be gained from releasing the records of physician claims submitted

under the Medicare program.  Specifically, the requested records may be used by Plaintiff or any

other person or entity receiving the information[25/] to conduct analyses of the physician services

provided through the Medicare program, including quality and efficiency analyses of those

Medicare services, as well as assessments of the physician quality improvement efforts already

being conducted by CMS (or not conducted, as the case may be).  In contrast to <u>Florida Medical

Association</u>, the primary public benefits to be gained from the release of the requested records in

this case hinge upon the physician identifying information; without the physician identifying

information, these public benefits cannot be achieved.

Lastly, the Medicare program itself has changed significantly since 1979, and the benefits

to be gained from public scrutiny of the program have increased.  As the court found in <u>Florida

Medical Association</u>, Medicare's primary function in 1979 was to reimburse physicians for the

reasonable charges associated with providing medical services to Medicare beneficiaries.  479

F.Supp. at 1296.  However, beginning in 1982 with Congressional authorization for the Medicare

Utilization and Quality Control Peer Review Program (P.L. 97-248, Sec. 149),[26/] and continuing

to the present time with numerous additional quality initiatives (<u>See</u> <u>infra</u> at 5-6), the Medicare

program has been charged with not only paying for health services, but also improving the

quality of services available under the program.  With an increased emphasis on quality and

---

[25/]  Under <u>Reporters Committee</u>, the identity of the requestor cannot be taken into consideration when
evaluating the merits of the request.  489 U.S. at 764.  Therefore, the Court should consider all potential
uses of the requested records that would provide a public benefit, and not just those uses proposed by
Plaintiff.

[26/]  <u>See</u> 42 U.S.C. § 1320c <u>et</u> <u>seq</u>. and 42 U.S.C. § 1395y(g).

efficiency in Medicare since 1979, the public benefit to be gained from scrutinizing quality and efficiency in the program is significantly enhanced.

Because the relevant legal standards have changed since the injunction in <u>Florida Medical Association</u> was issued 28 years ago, because the Medicare reimbursement structure has changed to a much more publicly transparent system, and because the public benefit involved with the present case is completely different from that used in the Florida case, this Court must perform its own Exemption 6 analysis and find that the requested records must be released.

> **B.    Disclosure of the Requested Information Will Not Cause a Significant Invasion of Personal Privacy.**

There is no reason to expect, and the government certainly has not met its burden of proving, that disclosure of the names of participating physicians in the Medicare program, even if coupled with publicly available fee schedules to derive annual Medicare reimbursement amounts for the physicians, would constitute a significant invasion of anyone's personal privacy.

> **1.    Disclosure Will Not Constitute a Significant Invasion of Personal Privacy Because the Requested Information Pertains Only to the Physicians' Business Activities.**

To the extent that disclosure of the requested physician-identifying information will reveal anything at all about participating Medicare doctors who receive taxpayer dollars under the Medicare program, the revelations will pertain exclusively to the physicians' business activities. This is an indication that disclosure will not constitute a significant invasion of personal privacy.

Courts have frequently held that privacy interests cognizable under FOIA Exemption 6 are minimal or non-existent when the information sought pertains to business activities, and even less so when the business is funded by the federal government. For example, in a case closely resembling the present one, the late Judge Gesell rejected HEW's claim of Exemption 6 as a

basis for withholding information about medical services performed by doctors in the Medicare and Medicaid programs. Public Citizen Health Research Group v. Department of Health, Educ. & Welfare, 477 F.Supp. 595, 604-605 (D.D.C. 1979) rev'd on other grounds, 668 F.2d 537 (D.C. Cir. 1981).[27] Judge Gesell reasoned:

> Practitioners who contract with the government to provide medical services in exchange for federal payments perform a quasi-public function. The argument that substantial personal privacy rights attach to such performance loses much of its force when viewed in the context of Congress's abiding concern to deliver cost-efficient public health care and physicians' clear prerogative to avoid government business.

Id. at 604.[28]

Other courts, including the Court of Appeals for the D.C. Circuit, have repeatedly held that disclosure of information relating to individuals' business affairs does not impinge significantly upon any privacy interests that are cognizable under the FOIA. See, e.g., Washington Post Co. v. HHS, 690 F.2d 252, 261-62 (D.C. Cir. 1982) (disclosure of agency consultants' non-federal employment "would be only a minimal invasion of privacy"; disclosure of organizations in which consultants have financial interests "does not amount to a serious invasion"); Washington Post Co. v. Department of Justice, 863 F.2d 96, 100 (D.C. Cir. 1988) ("Information relating to business judgments and relationships does not qualify for exemption . . . , even if disclosure might tarnish someone's professional reputation.") (applying FOIA Exemption 7(C)); Sims v. CIA, 642 F.2d 562, 575 (D.C. Cir. 1980) ("Exemption 6 was developed to protect intimate details of personal and family life, not business judgments and

---

[27]  A copy of Judge Gesell's decision is included at Tab B in the accompanying Appendix. The D.C. Circuit Court reversed this decision on the grounds that the government entity maintaining the requested records was not an "agency" for purposes of the Act. 668 F.2d at 544.

[28]  Even though Public Citizen was decided before the Supreme Court decision in Reporters Comm., Judge Gesell nonetheless did consider the appropriate public interest in the Exemption 6 balancing test, namely "the goal of scrutinizing government performance which is at the core of FOIA . . . ." 477 F.Supp. at 604 (citing Ditlow v. Schultz, 358 F.2d 166, 172 (D.C. Cir. 1975).

relationships."); <u>Washington Post Co. v. United States Department of Agriculture</u>, 943 F.Supp.

31, 36 (D.D.C. 1996) (disclosure of names of individuals and the amount of subsidy received

from the government in the farming business context would not constitute an unwarranted

invasion of personal privacy); <u>Board of Trade v. Commodity Futures Trading Comm'n</u>, 627 F.2d

392, 399-400 (D.C. Cir. 1980) (only "slight privacy interest" implicated by disclosure of "purely

commercial matters").[29]

Additionally, many physicians practice either as personal corporations (P.C.) or in

corporate group practices or business associations.  It is well established that corporations and

business associations have no privacy interests that are congnizable under FOIA Exemption 6,

which means that data concerning claims submitted on behalf of such corporate entities is for

that reason alone outside the scope of the exemption.  <u>See</u>, <u>e.g.</u>, <u>Ivanhoe Citrus Ass'n v. Handley</u>,

612 F. Supp. 1560, 1567 (D.D.C. 1985) ("It is well-established [ ] that neither corporations nor

business associations possess protectible [sic] privacy interests."); <u>Sims v. CIA</u>, 642 F.2d at 572

n.47 ("Exemption 6 is applicable only to individuals."); <u>National Parks and Conservation Ass'n</u>

<u>v. Kleppe</u>, 547 F.2d 673, 685 n.44 (D.C. Cir. 1976) ("The sixth exemption has not been extended

to protect the privacy interests of businesses or corporations.").

Furthermore, any individual financial information that may potentially be derived from

the requested records with the aid of publicly available fee schedules would provide information

about only the Medicare portion of any physician's income, and only the gross compensation

---

[29]  <u>See</u> <u>also</u> <u>Kurzon v. HHS</u>, 649 F.2d 65, 69 (1st Cir. 1981) (only minimal privacy interest implicated by
disclosure of business information, since adverse effect of disclosure "is limited to the professional rather
than personal qualities of the applicant").  <u>Cohen v. EPA</u>, 575 F. Supp. 425, 429 (D.D.C. 1983) ("The
privacy exemption does not apply to information regarding professional or business activities.") (applying
FOIA Exemption 7(C)).

before any business expenses are subtracted.[30/]  Thus, to the extent that these records could be used to reveal any personal financial information about an individual physician, it would be an incomplete picture at best representing only a portion of gross revenue, and not any indication of the personal net income earned by the doctor or the corporate physician practice group.

In sum, because the information sought by Plaintiff's FOIA request pertains to physicians' operations strictly in a business context, and only in terms of a portion of potential gross revenues to a medical practice, disclosure will not cause a significant invasion of anyone's personal privacy.

### 2. Disclosure Will Not Reveal Any Intimate or Embarrassing Fact About Any Person's Personal Affairs.

The records at issue in this case do not implicate the classic sorts of privacy interests that Congress sought to protect when it enacted Exemption 6, and Defendants have not asserted any arguments alleging any invasion of privacy beyond the limited financial information that may be derived using publicly available fee schedules.  As the legislative reports on the FOIA demonstrate, Exemption 6 was designed principally to protect records, such as those amassed by social welfare agencies, "containing intimate details" about individuals.  H.R. Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966); S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965).  See also Dep't of Air Force v. Rose, 425 U.S. at 376 n.14 ("primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters in such files as those maintained by the Department of Health, Education, and Welfare, the Selective Service, and the Veterans' Administration"); Ditlow v. Shultz, 517 F.2d 166, 170 (D.C. Cir. 1975) ("[T]he exemption [is] directed at 'intimate details' such as 'marital status, legitimacy of children, identity of fathers of

---

[30/]  Defendants clarify this point, explaining the components that make up the Medicare fees such as facility expenses and malpractice insurance costs.  See Duzor Dec. Att. C.

children, medical condition, welfare payments, alcoholic consumption, family fights, reputation, and so on.'") (citation omitted); <u>Rural Hous. Alliance v. Department of Agric.</u>, 498 F.2d 73, 77 (D.C. Cir. 1974) (exemption intended to protect individuals by preventing disclosure of "intimate details of their lives").

As Judge Gesell found when considering Exemption 6 in the context of physician practice records, "[t]he revelation that a physician performs a large number of surgical procedures . . . does not possess that 'intimacy' which has protected records [in other cases]." 477 F.Supp. at 604 (citations omitted).  Moreover, most relevant personal information about Medicare providers is already available to the public by virtue of the physician's participation in the Medicare program.  Medicare publishes a complete list of participating physicians at its web site, www.Medicare.gov.  The listing includes names, addresses, phone numbers, and specialties as well as other biographical information such as medical school, graduation year, gender, and languages spoken.[31/]  In light of the personal information already publicly available for Medicare physicians, neither the information requested by Checkbook regarding the type and number of procedures performed, nor the gross reimbursement that can be calculated using the public fee schedule, raises the sort of privacy concern contemplated under Exemption 6.

**C.    There Is a Strong Countervailing Public Interest in Disclosure of the Requested Information.**

Even if this Court were to determine (contrary to the foregoing) that disclosure of the requested information would constitute a substantial invasion of personal privacy, Exemption 6 would still be inapplicable because there is a strong public interest in disclosure of the information.  This public interest outweighs any cognizable privacy interest and, therefore, disclosure is required.  <u>Rose</u>, 425 U.S. at 372. "[U]nless the invasion of privacy is 'clearly

---

[31/]  A description of the available physician information may be found on the Medicare website at http://www.medicare.gov.

unwarranted,' the public interest in disclosure must prevail." Department of State v. Ray, 502 U.S. at 177.

Plaintiff agrees with the Defendants that, under applicable Supreme Court decisions, the weight of the public interest in disclosure turns on the extent to which disclosure will assist the public in understanding the operations of government. See Ray, 502 U.S. at 177-78; Reporters Committee, 489 U.S. at 772 (relevant inquiry is whether disclosure will serve "the basic purpose of the [FOIA] to open agency action to the light of public scrutiny") (internal quotations and citation omitted). Defendants have explicitly conceded, however, that "the requested records pertains [sic] to operations or activities of the Federal Government and that the disclosure of the records would reveal meaningful information about government operations or activities." Krug. Second Dec. Ex. 1 (letter denying fee waiver request) at 2.[32] Defendants' admission about the probative nature of the requested records is not surprising, given the strong public demand to gain access to these records for Medicare quality study purposes, as explained more thoroughly above. (See infra at 5-8.) Because of the "tilt" in favor of disclosing records under the Exemption 6 balancing test when there is a meaningful public benefit to be gained,[33] Defendants' admission that the records would reveal "meaningful" information about government activities is virtually dispositive in this case.

---

[32] In denying Plaintiff's appeal of its fee waiver request, CMS explicitly agreed with Checkbook that the first two prongs of the fee waiver test, which require that the records pertain to the operations of the federal government and reveal meaningful information about government activities, had been met. CMS denied the fee waiver request under the third and fourth prongs of the test arguing that Checkbook's specific intended uses would not adequately educate the general public in a significant manner. (See Section II below.) However, for purposes of Exemption 6, the analysis is not limited to what a specific requester will do with the records, but rather must consider whatever public benefit may be derived from disclosure of the category of information. Reporters Committee, 489 U.S. at 764.

[33] Washington Post Co. v. HHS, 690 F.2d at 261.

Furthermore, Defendants have eschewed any analysis that would allow them to meet their burden of proving that whatever privacy interest physicians may have in their Medicare claims records outweighs the public interest in learning meaningful information about the operations of the Medicare program.  In fact, Defendants did not address the public benefit that may be derived from the requested information, and instead relied completely on the analysis from <u>Florida Medical Association</u>, which also did not address the public benefit to be derived from analyzing the services provided under the Medicare program. Without meeting this burden, Defendants cannot prevail in this case.  5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action").

The public release of information about the services provided under the Medicare program will serve an important public function.  The requested Medicare records are expected to facilitate useful quality studies regarding the services provided by Medicare physicians.  <u>See</u> Krug. Second Dec. ¶¶ 13-21.  These studies will allow the public to better understand the services available under Medicare, and provide insight into how the Medicare program operates. <u>See</u> Krug. Second Dec. ¶¶ 22-24.

The public interest in disclosure in this case is even further enhanced because of the mounting public concerns about the quality of services available under Medicare, and the taxpayer costs that could be saved if patients were steered to the most cost-effective physicians. (<u>See</u> <u>infra</u> at 5-8.)  Courts have recognized that such circumstances magnify the public interest in disclosure.  <u>Washington Post Co. v. HHS</u>, 690 F.2d 252, 264 (recent allegations and investigations on same subject as FOIA request magnify public interest in disclosure); <u>Robles v. EPA</u>, 484 F.2d 843, 847 (4th Cir. 1973) (public interest heightened due to beneficial effect of "calming . . . reasonable apprehensions" that something serious might be wrong); <u>Washington</u>

Post, 943 F.Supp. at 36 (public concern over agency's activities displayed in government reports and newspaper articles was sufficient to show public interest and justify disclosure).

As the factual discussion at the outset of this memorandum demonstrates, assessing quality and conducting cost benefit analysis of the services in the Medicare program is of paramount importance.  CMS itself has acknowledged this fact, and has been required by statute to institute its own quality improvement programs within Medicare.  See e.g., Medicare Health Care Quality Demonstration Program, 42 U.S.C. § 1395cc-3(b).  An important feature of the FOIA, however, is to allow citizens to see and assess for themselves whether the government is adequately meeting its goals, regardless of whether the government itself already is attempting to address an issue.  See Citizens for Envtl Quality, Inc. v. Department of Agric., 602 F. Supp. 534, 540 (D.D.C. 1984) (central purpose of FOIA is "to provide for disclosure of government documents so that the public may draw its own conclusions").[34/]  Particularly while CMS attempts to improve quality, it is critical that these records be released to allow citizens to perform its own analyses and draw their own conclusions regarding (a) the quality and efficiency of medical services that the government is providing to Medicare beneficiaries, and (b) whether the quality and efficiency improvement efforts that supposedly are underway within the Medicare are effective and sufficient.

### D.    The Public Interest in Disclosure of the Physician-Identifying Data Greatly Outweighs Any Privacy Interests.

A proper weighing of the relevant interests on either side of the balance plainly favors production of the requested records.  On the privacy side of the balance, if there is any cognizable privacy interest at all, it clearly has only minimal weight.  Other cases that have dealt

---

[34/]  See also Multnomah County Med. Soc. v. Scott, 825 F.2d 1410, 1415 (9th Cir. 1987) ("Congress intended the public to use FOIA . . . 'to ensure an informed citizenry . . . needed to check against corruption and to hold the governors accountable to the governed.'" (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978)).

with disclosures of business related information generally have found only minimal or modest privacy interests at stake. See, e.g., Homer, 879 F.2d at 879; Washington Post, 943 F.Supp. at 36. Given the circumstances of this case — in which the financial information sought to be protected by CMS can be derived only from public fee schedules; the information is purely commercial in nature; all of the physicians at issue voluntarily have chosen to participate in this public program; no "personal" or intimate details about the physicians would be disclosed; and many physicians operate as corporate entities that receive no personal privacy protection — the privacy interests (if any) that are present here are extremely minor.

On the other hand, the public interests in disclosure are weighty. Disclosure will provide the public (including Checkbook) with a unique opportunity to better understand the operation of the Medicare program, to evaluate the quality and efficiency of the services provided under the program, and to assess critically the quality enhancement efforts underway at CMS. Particularly given the clear evidence of public concern surrounding these issues, it is difficult to imagine a case in which the public interest in disclosure could be greater.

For all of the foregoing reasons, and particularly taking into account the mandate that the Court "tilt the balance . . . in favor of disclosure," Washington Post Co. v. HHS, 690 F.2d at 261, there can be no doubt that Exemption 6 is inapplicable in the instant case and that Plaintiff is entitled to summary judgment.[35/]

---

[35/] As explained in Plaintiff's amended complaint, even though Defendants revised their original denial in their letter dated January 29, 2007, Defendants did not explicitly overturn their prior position that the requested records could be withheld on "reasonableness" grounds under 5 U.S.C. § 552(a)(3)(B). Although a grant of summary judgment for Plaintiff coupled with an order from the Court compelling production of all requested records from all five states will obviate the need for the Court to address this issue, any judgment or order falling short of this complete relief would renew this issue as a relevant point of contention between the parties. Plaintiff respectfully reserves the right to challenge Defendants' interpretation of 5 U.S.C. § 552(a)(3)(B), as stated in their letter dated June 26, 2006, under such circumstances.

## II.        Checkbook Qualifies For A Fee Waiver.

In order to be eligible for a "public interest" fee waiver, a FOIA requester must demonstrate that the disclosure of the requested information "is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  See also 45 C.F.R. § 5.45 (HHS fee waiver regulations applied by CMS in this case).  A court reviews an agency's denial of a fee waiver de novo, but the review is "limited to the record before the agency."  5 U.S.C. § 552(a)(4)(A)(vii);  Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1311 (D.C. Cir. 2003) (quoting same).

CMS denied Checkbook's request for a fee waiver on January 29, 2007 (See Krug. Dec. ¶6 & Ex. 4), over a month after the original complaint in this case was filed.  Checkbook appealed that decision in a letter dated February 28, 2007 (See Krug. Dec. Ex. 5), and CMS denied the appeal in a letter dated March 16, 2007 (See Krug. Second Dec. Ex. 1).  Plaintiff amended its complaint to include a claim for the fee waiver on April 4, 2007.  See Amended Complaint.[36]

The analysis performed by CMS in denying the fee waiver was inadequate.  It failed to account for the strong public desire for, and interest in, the requested information; it discounted Plaintiff's proven record of broad public distribution of study findings; it focused inappropriately on the public distribution of the actual records requested, as opposed to the quality and efficiency analyses that can be performed based on the records; and it erroneously pre-judged the merits of one example of a quality study proposed by Plaintiff without accounting for the multitude of

---

[36]  Interestingly, Defendants briefed the fee waiver denial issue in their Reply In Support of Defendant's Motion for Summary Judgment filed on March 20, 2007 – two weeks before Plaintiff had amended its complaint to seek this Court's review of the fee waiver denial.

other possible studies or the value of allowing a public interest organization to perform quality

studies that will serve as a check on the quality studies already underway at CMS.  Due to these

errors and the compelling case for a fee waiver already established by Plaintiff, this Court should

overturn CMS' denial of Checkbook's request for a fee waiver.

### A.    Checkbook's request meets the public interest standards for a fee waiver established in the Act and HHS regulations.

The public interest analysis established under the Act to determine whether a FOIA

requester may obtain a fee waiver has been divided into a four-part analysis in the HHS

regulations that CMS applied in this case.  See 45 C.F.R. § 5.45.  Defendants erroneously applied

the public interest analysis, as described below, resulting in a fee waiver denial that must be

overturned.

#### 1.    The requested records pertain to the operations and activities of the Federal Government, and disclosure of the records will reveal meaningful information about government operations and activities.

The first two parts of the fee waiver test require that the requested records (1) pertain to,

and (2) reveal meaningful information about, government operations and activities.  45 C.F.R. §

5.45.  The medical services performed by Medicare participating physicians and reimbursed

through federal funds are one of the core activities of the Medicare program.  The requested

records document many details of these physician services, and will enable Checkbook to

perform quality and efficiency analyses that will reveal meaningful information about the

Medicare program.  There is no dispute that the requested records satisfy these first two

requirements, as Defendants conceded in their letter denying the fee waiver.  See Krug. Second

Dec. Ex. 1 at 2 ("we do not dispute that the requested records pertains [sic] to operations or

activities of the Federal Government and that the disclosure of the records would reveal

meaningful information about government operations or activities.").

**2. Disclosure of the records to Checkbook will advance the understanding of the general public, not just a narrow segment of interested persons.**

CMS disputed whether Checkbook would meet the third prong of the fee waiver analysis regarding the breadth of public distribution because (1) Checkbook has historically charged subscription fees for access to its publications, (2) Checkbook did not adequately explain its plan to distribute information to the general public, and (3) Checkbook did not explain how it would convey the vast amount of requested data to the public. See Krug. Second Dec. Ex. 1 at 2-3. All of these criticisms are flawed, because Checkbook did meet its burden of proving that it was prepared to distribute valuable information about the Medicare program to the general public.

As a preliminary matter, CMS' interpretation of the "general public" part of the fee waiver analysis is overbroad. Federal courts have clarified that "[i]nformation need not actually reach a broad cross-section of the public in order to benefit the public at large." Carney v. United States Dep't of Justice, 19 F.3d 807, 814 (2nd Cir. 1994) (holding that a requestor seeking to write a dissertation on a scholarly topic that would not likely be widely distributed could still benefit the public at large); Judicial Watch Inc. v. Department of Justice, 365 F.3d 1108, 1126 (D.C. Cir. 2004) (citing Carney). In any event, Checkbook has established that it intends to distribute information extremely broadly for the benefit of the general public.

First, Checkbook clarified that although it does publish much of its consumer information through publications that operate on a subscription basis, it expected "information regarding quality in the Medicare program derived from the requested records to be disseminated much more broadly." Krug. Dec. Ex. 5 at 3-4. Checkbook listed numerous avenues of public distribution that it anticipates, including (1) press releases with study findings made available to broader media outlets; (2) follow-on reporting by large volume media outlets including national

newspapers, national television shows, local television stations and radio;[37] (3) coverage in magazines such as AARP's Modern Maturity with a distribution of over 30 million recipients; (4) publications made available for free on Checkbook's website; (5) pre-existing contracts with government agencies to provide free online access to employees (such as 700,000 federal employees in 2006-2007); and (6) distribution through public libraries.  Id.  Moreover, Checkbook clarified that it had a history of achieving this broad public distribution of material, including its 2002 distribution of hospital rankings, which were made public to millions of individuals through these same mechanisms, as well as numerous examples of studies that Checkbook has posted on its web site for free public access, including "How to Choose and When to Change a Physician," "Why Board Certification Matters," "How to Get Good Care in a Hospital," and "Keeping an Eye on Medicare's Impact on Choice of Physicians."  Id.

Checkbook's litany of broad public distribution capabilities is comparable to the public distribution plan described in Rossotti, in which the D.C. Circuit confirmed that a generalized information distribution plan involving newsletters, web access, radio coverage and TV productions would satisfy the third factor in the fee waiver analysis requiring broad dissemination.  326 F.3d at 1314.  The court in Rossotti did not require an exacting level of specificity in the distribution plan.[38]  Id.  As is the case with Checkbook, a showing that the requester has an established history of working with multiple distribution mechanisms to release publicly valuable information about agency activities is sufficient.

---

[37]   Checkbook has established relationships with major media outlets, including a regular appearance three-times per month on the Washington, DC FOX morning news program.  See Krug. Dec. Ex. 5 at 3.

[38]   The court in Rossotti even recognized that the requester need not explicitly state that it would be distributing the requested records through the distribution channels mentioned, characterizing such picayune detail as "pointless specificity."  326 F.3d at 1314.

Furthermore, in its letter denying the fee waiver appeal CMS inappropriately criticized Checkbook's distribution plan because it did not explain how Checkbook would release the "vast amount of information" contained in the FOIA request to the public.  Krug. Second Dec. Ex. 1 at 3.  Checkbook has clarified that although it has requested a large volume of records from the NCH database, it intends to analyze the records in order to conduct studies of the quality and efficiency delivered by Medicare participating physicians and inform the public about the results of such studies.  To the extent that the raw records requested from CMS will be distributed by Checkbook, they will at least be tabulated to display meaningful summary information about the Medicare program (such as the total number of procedures performed by specific Medicare physicians).  Checkbook's expertise in analyzing health data and developing meaningful reports that inform the public about the quality and efficiency of health programs will allow Checkbook to deliver this critical information to the public in a meaningful format.  CMS' criticism that Checkbook has not shown how it will distribute the voluminous Medicare data completely misses the mark.

### 3.   <u>The contribution to public understanding will be significant.</u>

CMS erroneously claimed that Checkbook failed to show how its public release of information would be significant.  Krug. Second Dec. Ex. 1 at 3.  CMS' analysis is flawed because it by focuses entirely on one example of Checkbook's public distribution plan, a sample press release that Checkbook included as an exhibit to its appeal, and disregarded the multitude of other distribution sources that Checkbook plans to utilize.  CMS explained "you haven't shown how releasing a press release of a few pages in length will be a significant contribution to public understanding."  <u>Id</u>.  To the contrary, a press release highlighting the results of Checkbook's Medicare studies, along with appearances on national TV and radio shows to discuss the findings, publication of the full reports on Checkbook's website with free public

access, and coverage of the reports in major newspapers (all of which Checkbook described in its

public distribution plan), will enable Checkbook to distribute significant findings to a broad

public audience.

Moreover, CMS leveled erroneous and unsupported criticism against the quality study

that Checkbook proposed regarding the volume of procedures performed by specific Medicare

physicians.  Id.  CMS stated "[w]hile we do not dispute that the number of times a specific

procedure is performed may contribute to a physician's expertise and skill, this quantitative data

within a limited context cannot be equated as an overall quality analysis."  Id.  CMS' criticism is

problematic on several levels.  First, it is difficult to understand how CMS can concede that

Checkbook's proposed quality study can be probative of a Medicare physician's expertise and

skill, and yet not be deemed an "overall quality analysis."  CMS seems to assert that there is

some requirement that in order to be "significant" under the fourth factor of the fee waiver test,

the proposed analysis must answer all questions about the entire Medicare program rather than

specific components.  Such a broad interpretation is not supported in the language of the FOIA,

or applicable HHS regulations.  The requested records with physician identifying information

have never been publicly released by CMS, leaving the public without any way to assess critical

Medicare services.  Under any standard, a quality study that quantifies the level of skill,

expertise, and efficiency of physicians whom Medicare is paying to provide medical services for

actual beneficiaries would provide a "significant" contribution to the public understanding of the

Medicare program and the services provided therein.

Furthermore, in its fee waiver appeal, Checkbook described the "volume of procedures"

analysis as just one example of the kinds of studies that it will be performing once it gains access

to the requested data.  Krug. Dec. Ex. 5 at 4.  Checkbook explained, "[t]he requested records will

allow [Checkbook] to highlight this <u>and other</u> important quality indicators within the Medicare program.  Furthermore, release of the records will focus public attention on whether the Medicare program is adequately assessing issues of quality within the program."  <u>Id</u>. (emphasis added).  As a practical matter, Checkbook will not be able to determine definitively all of the quality and efficiency studies that it will be able to perform until it receives the requested records from CMS.  However, the record in this case is clear that (1) Checkbook is an established research entity with significant experience analyzing health data to develop reports that assess quality in health care programs;[39] (2) the studies that Checkbook has proposed already will be probative of quality and efficiency in the Medicare program;[40] and (3) there is a large public demand for access to the requested Medicare records so that quality and efficiency studies of the type proposed by Checkbook may be performed.[41]  These facts confirm that the benefit that Checkbook will provide to the public will be "significant."

Similarly, CMS asserted in its letter denying the fee waiver appeal that the study proposed by Checkbook "in and of itself, [will not] shed light upon whether the Medicare program is adequately assessing quality of care issues."  Krug. Second Dec. Ex. 1 at 3.  This assertion by CMS suffers a similar infirmity.  First, Checkbook did not allege that it would be performing only a single analysis that would reveal whether Medicare was adequately assessing quality of care issues.  Rather, Checkbook indicated in its administrative appeal that it would be performing a variety of analyses, and offered but one example.  Krug. Dec. Ex. 5 at 4.  Second, even if Checkbook performed only one quality analysis using the requested data, if that study

---

[39]  As a testimony to the Center's reputation in this field, even CMS recognized that the Center is an approved vendor to administer hospital surveys on behalf of CMS.  <u>See</u> Krug. Second Dec. Ex. 1 at 4.

[40]  <u>See</u>, <u>e.g.</u>, Krug. Second Dec. ¶11 & Ex. 5 (regarding the GAOs assessment that studies similar to those proposed by the Center will be probative of efficiency in the Medicare program).

[41]  <u>See</u> Krug. Dec. Ex. 5 at 4, citing to Robert Pear, <u>Employers Push White House to Disclose Medicare Data</u>, N.Y. Times, April 11, 2006, at A1.

either showed that there was a useful quality analysis that CMS was not yet performing itself, or even if the study showed that one particular quality analysis was not fruitful in terms of assessing Medicare quality, then those would be useful and worthwhile conclusions of significant public importance that would provide insight into whether the agency responsible for administering the massive Medicare program was adequately assessing quality-of-care issues. CMS' assertion to the contrary is simply shortsighted, and incorrect.

> **B.      The public interest in obtaining the requested records outweighs any commercial interest of Checkbook.**

Finally, CMS asserted in its letter denying the fee waiver appeal that Checkbook's commercial interest in the requested records outweighs any public interest in receiving the information, and yet again, CMS has missed the mark. In its denial of Plaintiff's fee waiver appeal, CMS chronicled the multiple ways that Checkbook historically has charged fees for its services, including subscription fees for its publications and fees for its survey and reporting services. Krug. Second Dec. Ex. 1 at 4. To be sure, Checkbook is a not-for-profit entity that does from time to time charge fees to fund its operations -- in part because Checkbook does not accept advertising, a major source of support for many magazines and websites. Yet CMS failed to explain how gaining access to the requested records would further Checkbook's commercial interest, which is the appropriate inquiry. See 45 C.F.R. § 5.45(c) (explaining how the agency must inquire whether the disclosure of the requested information will further the requester's commercial interest). Because Checkbook has charged fees for various services in the past, CMS assumed that Checkbook would be charging fees for access to the Medicare quality studies derived from the requested data, and noted that Checkbook "does not inform us as to how much your organization intends to charge the public for access to the data elements that you are requesting . . . ." Krug. Second Dec. Ex. 1 at 4. In its inquiry, CMS glossed over Checkbook's

explanation of how it intended to distribute its findings from its Medicare quality and efficiency studies, including through public release of the study findings on Checkbook's free public web site, just as Checkbook has done with other important health care reports.  Id.  CMS' assumption that Checkbook will be charging for access to the quality studies performed with the requested data is not supported in the record, and cannot serve as the basis for denying Plaintiff's fee waiver on commercial interest grounds.  To the contrary, Checkbook explained in its appeal that it has historically provided free access to many of its important health related reports as part of its information distribution activities, and indicated that it would use those same methods to provide public access to the Medicare reports that it will create if allowed access to the requested information.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Cross-Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment, and order Defendants to produce all of the requested Medicare claims records for Washington DC, Illinois, Maryland, Virginia and Washington without assessing fees for the search, review and duplication costs associated with the request.

Respectfully submitted,


 /s/ Stephen Albrecht
Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'*
*CHECKBOOK, Center for the Study of Services*


May 18, 2007

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

_____

CONSUMERS' CHECKBOOK, CENTER FOR     :
THE STUDY OF SERVICES                              :
                                                                    :
                          Plaintiff,                          :
                                                                    :    Case No: 06-02201 (EGS)
            vs.                                                   :
                                                                    :
UNITED STATES DEPARTMENT OF HEALTH :
AND HUMAN SERVICES, et. al.                    :
                                                                    :
                          Defendants.                       :
                                                                    :
_____


## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to LCvR 7(h), Plaintiff Consumers' CHECKBOOK, Center for the Study of Services ("Checkbook") respectfully submits this statement of material facts as to which there is no genuine dispute necessary to be litigated.

1.   Checkbook is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services, including services provided to consumers through government programs, and publishing *Consumers' CHECKBOOK* magazine and other reports that educate consumers about such services.  Checkbook places a particular focus on studying health services and programs, and annually publishes several reports including the *Guide to Top Doctors*, *Consumers' Guide to Hospitals*, and the *Guide to Health Plans for Federal Employees* (now in its 27th annual print edition).  <u>See</u> Second Declaration of Robert Krughoff ("Krug. Second Dec.") ¶¶ 1-2.

2.    Checkbook distributes many of its studies and publications to the general public on its web site (www.checkbook.org) free of charge.  See Krug. Second Dec. ¶ 3.

3.    On or about March 27, 2006, Checkbook submitted to the Centers for Medicare and Medicaid Services  ("CMS") a written request for records pursuant to the Freedom of Information Act (the "request").  The request asked CMS to provide certain Medicare claim records compiled and maintained electronically by CMS, and divided among five states (DC, IL, MD, WA and VA) for calendar year 2004.  The request also sought a fee waiver for the cost of the production.  See Declaration of Robert Krughoff ("Krug. Dec.") ¶ 2 & Ex. 1.

4.    The request specifically noted that CMS had previously denied similar requests on the basis of FOIA Exemption 6, personal privacy, and requested that CMS contact Checkbook to discuss this issue if Exemption 6 would be relevant to Checkbook's request.  See Krug. Dec. Ex. 1.

5.    Checkbook sought the information at issue in electronic form because it wished to perform computerized analysis of the data in order to conduct studies of the quality and efficiency of medical services provided by physicians in the Medicare program and publish such studies to allow the public to scrutinize the operations of the Medicare program.  See Krug. Second Dec. ¶¶ 22-25.

6.    By letter dated June 26, 2006, CMS denied the request stating that the agency did not maintain records responsive to the request, and that "under FOIA, we are not required either to create records or to furnish information in a particular form or format when a record in such form or format is not readily reproducible employing reasonable efforts.  5 U.S.C. § 552(a)(3)(B)." See Krug. Dec. ¶ 3 & Ex. 2 (emphasis in original).

7.  By letter dated July 25, 2006, Checkbook filed an administrative appeal challenging CMS's denial of the request, arguing that the statutory provision relied upon by CMS to deny the request did not provide a sound legal basis for completely denying the request.  See Krug. Dec. ¶ 4 & Ex. 3.

8.  CMS never responded to the appeal.  See Krug. Dec. ¶ 4

9.  On December 26, 2006, Checkbook initiated the instant lawsuit seeking to enjoin CMS from withholding the requested records.  See Krug. Dec. ¶ 5.

10. By letter dated January 29, 2007, CMS revised its decision not to comply with the request, but did not agree to release the requested records.  CMS denied Checkbook's requested fee waiver, and noted that Checkbook could appeal the fee waiver denial within 30 days.  CMS also for the first time provided an estimate of the fees required to produce the records, totaling $3,944.70 for each of the five sets of state-specific records requested.  The letter asked Checkbook to agree to pay the fees so CMS could complete the processing of the request, or alternatively to amend or narrow the request to reduce costs.  CMS clarified that it had not determined whether the records would be released, and would do so only after the records were processed.  See Krug. Dec. ¶ 6 & Ex. 4.

11. On February 28, 2007, Checkbook sent a letter to the Deputy Administrator of CMS appealing the denial of the fee waiver.  See Krug. Dec. ¶ 7 & Ex. 5.

12. On March 2, 2007, CMS acknowledged receipt of the fee waiver appeal and stated that it would process the appeal as expeditiously as possible.  See Krug. Dec. ¶ 8 & Ex. 6.

13. On March 8, 2007, Checkbook, through counsel, sent a letter to CMS agreeing to (a) on a preliminary basis limit the request to records from Washington, DC, and (b) pay the record processing fees in the event that Checkbook does not prevail in its fee waiver appeal either at the

administrative level or before a court of competent jurisdiction.  Checkbook also explained that it was aware that Exemption 6 had been relied upon by CMS to deny similar requests in the past, and requested that if CMS had already determined or could determine that Exemption 6 applied to the current request, that it inform Checkbook of that determination immediately so as to avoid incurring unnecessary processing fees.  <u>See</u> Krug. Dec. ¶ 9 & Ex. 7.

14. On March 16, 2007, CMS responded to Checkbook's fee waiver appeal, denying the appeal, but also acknowledging Checkbook's agreement to pay for the cost of producing a preliminary set of records, and agreeing to produce those records "in full, and without redaction" in three to four weeks.  <u>See</u> Krug. Second Dec. ¶ 5 & Ex. 1.

15. On March 20, 2007, Defendants filed a Reply In Support of Defendants' Motion for Summary Judgment, arguing, among other things, that the Court should grant summary judgment to Defendants because Defendants had agreed to release the requested records in full. <u>See</u> Krug. Second Dec. ¶ 6.

16. On April 4, 2007, Checkbook amended its complaint to add a claim for a fee waiver and seeking an order requiring CMS to produce all of the requested records from five states.  <u>See</u> Krug. Second Dec. ¶ 7.

17. On April 26, 2007, Checkbook, through counsel, wrote to CMS to inform the agency that its promised deadline for production of the requested records had been exceeded by over two weeks.  <u>See</u> Krug. Second Dec. ¶ 8 & Ex. 2.

18. On April 30, 2007, CMS filed a Supplement To Defendants' Motion For Summary Judgment, revoking its promise to produce the requested records, and instead, for the first time, invoking Exemption 6 under the FOIA as a basis for withholding the portions of the requested

records that contain information identifying particular physicians who provide Medicaer services under the government Medicare program. <u>See</u> Krug. Second Dec. ¶ 9.

19. Physicians who voluntarily agree to provide medical services to Medicare beneficiaries under the Medicare program perform a commercial service, and are reimbursed according to a fee schedule that is available to the public. <u>See</u> 42 U.S.C. § 1395l; Duzor Declaration ¶ 14 (referencing the public web site containing the fee schedule).

20. Concern about lack of quality in physician services provided in the Medicare program, lack of efficiency in the program, and CMS' unwillingness to share Medicare data that would allow the public to further scrutinize the Medicare program has been a topic of debate and criticism in the general public, in the private sector, and before Congress in recent years. <u>See</u>, <u>e.g.</u>, Pl. Mem. at 5-8; Krug. Second Dec. ¶¶ 10-12.

21. Government publications, including U.S. Government Accountability Office, GAO-07-307, MEDICARE Focus on Physician Practice Patterns Can Lead to Greater Program Efficiency (2007), have reported that Medicare claims data is a useful tool in profiling Medicare physicians and identifying inefficient practice patterns within the Medicare program. <u>See</u> Krug. Second Dec. ¶ 11 & Ex. 5.

22. A strong public interest will be served by the disclosure of the requested Medicare claims records sought by Checkbook because this information will assist the public in better understanding the operations of CMS and the Medicare program, specifically by allowing public scrutiny of the quality and efficiency of physician services in the program, and by allowing the public to perform an independent check on the quality and efficiency initiatives that are allegedly already underway at CMS. <u>See</u> Krug. Second Dec. ¶¶ 13-25.

23. Checkbook has a history of working with media outlets and posting information on its own web site to distribute important consumer information broadly to the general public. <u>See</u> Krug. Dec. Ex. 5 at 3; Krug. Second Dec. ¶ 3.

Respectfully submitted,

    /s/ Stephen Albrecht
Patrick Carome (D.C. Bar No. 385676)
Stephen Albrecht (D.C. Bar No. 481871)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff Consumers'*
*CHECKBOOK, Center for the Study of Services*

May 18, 2007

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES | : |
| | : |
| | : |
| Plaintiff, | : |
| | :   Case No: 06-02201 (EGS) |
| vs. | : |
| | : |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et. al. | : |
| | : |
| Defendants. | : |
| | : |

---

## SECOND DECLARATION OF ROBERT KRUGHOFF

I, Robert Krughoff, hereby declare as follows:

1. I am the President of Consumers' CHECKBOOK, Center for the Study of Services ("Checkbook"). Checkbook is a non-profit 501(c)(3) organization dedicated to conducting and supporting studies of consumer services, including services provided to consumers through government programs, and publishing (in print and online) *Consumers' CHECKBOOK* magazine and other reports that educate consumers about such services.

2. Checkbook places a particular focus on studying health services and programs, and publishes several reports including the *Guide to Top Doctors*, *Consumers' Guide to Hospitals*, and the *Guide to Health Plans for Federal Employees* (now in its 27th annual print edition). None of Checkbook's publications nor websites carries any advertising, a major source of income for many magazines and websites.

3.   Although some of Checkbook's publications are sold on a subscription or fee basis, Checkbook also distributes many of its publications on its website (www.checkbook.org) free of charge.  Examples of health related reports distributed without charge include "How to Choose and When to Change a Physician," "Why Board Certification Matters," "How to Get Good Care in a Hospital," and "Keeping an Eye on Medicare's Impact on Choice of Physicians."   These articles are available at http://www.checkbook.org/cgi-bin/download/med.cfm?area=WDC.

4.   Checkbook works with health care organizations, government agencies, and others to collect, analyze, and disseminate survey information about health plans and physicians. Checkbook has administered several large-scale surveys of patient experience with individual doctors for groups such as the Massachusetts Health Quality Partners and the Pacific Business Group on Health.  Checkbook has also conducted more than 350 provider satisfaction surveys covering over 340,000 physicians.  For the federal government, Checkbook has been responsible for data analysis involving quality measures used by the Federal Employees Health Benefits ("FEHB") program, managed by the U.S. Office of Personnel Management ("OPM"), and is currently administering a mail survey of the members of all of the Medicare Prescription Drug Plans and Medicare Advantage plans (surveying approximately 700,000 beneficiaries) under a contract with CMS.

**Recent Chronology of Checkbook's FOIA Request for Medicare Records**

5.   On March 16, 2007, CMS responded to Checkbook's fee waiver appeal, denying the appeal, but also acknowledging Checkbook's agreement to pay for the cost of producing a preliminary set of records, and agreeing to produce those records "in full, and without redaction" in three to four weeks.  See Exhibit 1.

6.  On March 20, 2007, Defendants filed a Reply In Support of Defendants' Motion for Summary Judgment, arguing, among other things, that the Court should grant summary judgment to Defendants because Defendants had agreed to release the requested records in full.

7.  On April 4, 2007, Checkbook amended its complaint to add a claim for a fee waiver and seeking an order requiring CMS to produce all of the requested records from five states.

8.  On April 26, 2007, Checkbook, through counsel, wrote to CMS to inform the agency that its promised deadline for production of the requested records had been exceeded by over two weeks.  See Exhibit 2.

9.  On April 30, 2007, CMS filed a Supplement To Defendants' Motion For Summary Judgment, revoking its promise to produce the requested records, and instead, for the first time, invoking Exemption 6 under the FOIA as a basis for withholding the physician identifying information from the requested records.

**Public Interest and Concern About Quality and Efficiency in the Medicare Program**

10. As president of a consumer studies organization that has researched health services for over 30 years, I am aware of a growing interest in tracking and improving quality and efficiency in government health programs including Medicare.  CMS, the Congress, and private organizations have produced studies and instituted programs dealing with quality and efficiency in Medicare, but public concern remains high, and the demand for further scrutiny in the Medicare program persists.

11. Several government organizations have published recent reports or directives acknowledging the need for continued scrutiny of quality and efficiency of physician services in Medicare and other health programs, including the profiling of physicians to assess the services they provide.  For Example:

- On August 22, 2006, President Bush signed an Executive Order entitled "Promoting Quality and Efficient Health Care in Federal Government Administered or Sponsored Health Care Programs." The Order requires all federal health programs take steps to promote health care quality and increase transparency of pricing for health services. See Exec. Order No. 13,410, 71 Fed. Reg. 51,089 (Aug. 28, 2006) (attached as Exhibit 3).

- In December 2006, the Congress passed and the President signed the Tax Relief and Health Care Act of 2006 (P.L. 109-432), which authorized CMS to establish a Physician Quality Reporting Initiative ("PQRI"). The PQRI provides financial incentives for Medicare physicians to report certain quality measures on the services they provide to Medicare beneficiaries. A summary of the PQRI program is available on the CMS web site at http://www.cms.hhs.gov/pf/printpage.asp?ref=http://www.cms.hhs.gov/PQRI/01_Overvi ew.asp (attached as Exhibit 4).

- In April 2007, the U.S. Government Accountability Office ("GAO") conducted an assessment of program efficiency under the Medicare program, and looked specifically at the potential benefits to be gained from profiling physicians. The GAO concluded that physician profiling could be a useful approach to identifying physicians with inefficient practice patterns and bringing greater efficiency to the care provided under the Medicare program. See U.S. Government Accountability Office, GAO-07-307, MEDICARE Focus on Physician Practice Patterns Can Lead to Greater Program Efficiency (2007) (attached as Exhibit 5).

12. Private sector organizations have also joined the call for greater scrutiny of health care programs, specifically involving the use of Medicare claims data to analyze the quality and efficiency of services provided by Medicare participating physicians. For example:

- In April of 2006, the New York Times reported that the Business Roundtable requested that CMS release the claims data in the Medicare database in order to study the quality and effectiveness of services conducted by Medicare physicians. See Robert Pear, Employers Push White House to Disclose Medicare Data, N.Y. Times, April 11, 2006 at A1 (attached as Exhibit 6).

- In June 2006, the Consumer-Purchaser Disclosure Project, an organization that includes labor and consumer organizations such as Consumers Union (publisher of Consumer Reports), the National Partnership for Women and Families, the Center for Medical Consumers, and the Service Employees International Union, sent a letter to the Administrator of CMS advocating that CMS "make available physician-identifiable Medicare claims data (fully protecting patient privacy), to allow for better quality and efficiency performance reporting." See Letter from Consumer-Purchaser Disclosure Project to Mark McClellan, MD, PhD, Administrator, CMS (June 12, 2006) at 2 (attached as Exhibit 7).

- In July 2006, G. Richard Wagoner Jr., Chairman and Chief Executive Officer of General Motors Corporation, testified before the Senate Special Committee on Aging, arguing that CMS should release the data in the Medicare claims database to "enhance quality and efficiency in the delivery of Medicare services as well as health care services overall." See From Medicaid to Retiree Benefits: How Seniors Impact America's Health Care Costs: Hearing Before the Special Committee on Aging, 109th Cong. (2006)(statement of G. Richard Wagoner Jr.) (attached as Exhibit 8).

**The Use of Medicare Claims Data to Profile Medicare Physicians and Assess Quality and Efficiency in the Medicare Program**

13. The Medicare physician identifying claims data records requested by Checkbook include, among other things, the procedures performed for the Medicare beneficiaries, the year of the service, the diagnosis codes for the patients treated, and the unique UPIN number that identifies each physician.

14. Health services research in the public and private sectors has shown that the volume of certain procedures performed by physicians can affect the quality of services provided. For example, a recent study using Medicare claims data concluded that "patients can often improve their chances of survival substantially, even at high-volume hospitals, by selecting surgeons who perform the operations frequently." See Birkmeyer, J., et al., Surgeon Volume and Operative Mortality in the United States, 349 New Eng. J. Med. 2117 (2003) (attached as Exhibit 9). As an illustration, the Birkmeyer article reports that surgeons who do fewer than 101 coronary artery bypass graft procedures per year have 1.35 times as high a mortality rate as surgeons who do more than 162 procedures per year. Yet physician-level procedure-volume data that I reviewed from the Center for Medical Consumers in New York State (the only state for which such data are readily available) indicated that nearly 30 percent of such procedures in that state were done by physicians who did fewer than 101 procedures per year, and only about 40 percent were done by physicians who did more than 162 per year. Similarly, the Birkmeyer article reports that

- 5 -

physicians who do fewer than 18 carotid endarterectomies per year have 1.64 times as high a mortality rate as physicians who do more than 40 of these procedures per year. Yet the New York State data indicated that 28 percent of these surgeries were done by physicians who did fewer than 18 of these procedures per year and only about 42 percent were done by physicians who did more than 40 per year. The New York state data is available at www.medicalconsumers.org.

15. Consumer guidance issued by the Agency for Health Care Quality and Research ("AHRQ"), a division of HHS, in its publication, *Your Guide to Choosing Quality Health Care: Choosing a Doctor*, states: "Research shows that doctors who have a lot of experience with a condition tend to have better success with it." (The report is available at http://www.ahrq.gov/consumer/qnt/qntdr.htm ) In its publication, *Be Informed: Questions to Ask Your Doctor Before You Have Surgery*, AHRQ states: "One way to reduce the risks of surgery is to choose a surgeon who has been thoroughly trained to do the procedure and has plenty of experience doing it." (The report is available at http://www.ahrq.gov/consumer/surgery/surgery.htm.)

16. The physician-identified Medicare claims data requested by Checkbook will allow Checkbook to profile Medicare participating physicians to show the volume of Medicare procedures performed annually by each physician. Therefore, these physician profiles will help inform the public about an important indicator of the quality of services that are available from Medicare physicians participating in the Medicare program and the extent to which major procedures are being performed by physicians with less-than-optimum levels of experience.

17. Analysis of the data will also show, when compared with publicly available information on physician board certification, disciplinary actions, patient survey results, clinical quality

profiles published by health plans, and other sources of physician quality information the extent to which physicians performing significant volumes of procedures score favorably on such independent measures of quality. I have seen, for example, with even a cursory examination of the list of participating Medicare providers at www.cms.gov in comparison to listings of physicians on state medical disciplinary board web sites, that many physicians who are eligible to be paid by Medicare to care for beneficiaries have a history of serious quality of care deficiencies. Determining the volume of Medicare procedures that these doctors have been allowed to perform on Medicare patients will reveal important information about the quality of services available in the Medicare program, and whether CMS is taking adequate steps to promote quality.

18. In addition, analysis of the physician-identified Medicare claims data may show that CMS and Medicare are less effective than they could be in reducing the number of beneficiaries who get unnecessary (and sometimes dangerous) procedures.

19. Furthermore, it can be expected that the analysis of the requested records will show that CMS and Medicare are less effective than they could be in assuring that beneficiaries and other Americans get the diagnostic and treatment procedures they need. For example, a recent study of health care services for adults in the U.S. found that study participants received only 54.9 percent of recommended care, and that greater access to information on physician performance would be a key strategy in closing this gap. See McGlynn, E. et al., The Quality of Health Care Delivered to Adults in the United States, 348 New Eng. J. Med. 2635 (2003) (attached as Exhibit 10). The Medicare records requested by Checkbook would help the public to assess which physicians are, and which are not, providing all services required to reach the standards of

recommended care.  This analysis would also allow the public to advocate for targeted quality improvements for Medicare physicians that are failing to meet the standards.

20. A recent study of physician practice patterns in the Medicare program revealed that on average, Medicare physicians provided services that met established quality standards 69.5% of the time in 1998-1999 and 73.45 of the time in 2000-2001.  Jencks, S., et al., Change in the Quality of Care Delivered to Medicare Beneficiaries, 1998-1999 to 2000-2001, 289 JAMA 305 (2003) (attached as Exhibit 11).

21. With the category of data Checkbook has requested, it can be expected that Checkbook and others will be able to help the public scrutinize the extent to which CMS is meeting its responsibilities to make quality health care services available to Medicare beneficiaries, and to improve the quality of care delivered by Medicare physicians.

**The Use of Medicare Claims Data to Scrutinize Agency Performance**

22. Physician-identified Medicare claims records will be a powerful tool to assist the public to scrutinize the performance of the Medicare program in a number of ways.  With the data Checkbook has requested, it will be possible to create counts of the annual volume of procedures of various kinds billed to Medicare by each participating physician (e.g. the volume of coronary artery bypass graft procedures, carotid endarterectomies, or total knee replacements).  These volume counts of Medicare procedures will be a useful tool in and of themselves to track the experience level of Medicare physicians.

23. In order to further improve upon its volume counts, Checkbook expects to supplement these counts with counts of the same procedures paid for by other sources.  Checkbook expects to get this additional count information from private health plans and employer self-insured plans that are willing to cooperate with Checkbook to create a more complete volume picture for each

profiled physician.  Checkbook expects to post this information on the internet, and to work with

health plans and other informational websites to distribute this information widely for the public

to use in assessing the quality and experience of Medicare providers.

24. With the Medicare physician volume counts described above, the public will be able to

scrutinize the Medicare program in various ways.  The following are a few examples of the many

possible uses:

- For procedures for which there is a documented, or likely, relationship between volume
  and outcome, information on volume by physician by procedure/service will enable the
  public to scrutinize whether Medicare is allowing and paying some physicians to perform
  procedures/services for which they have less than the optimal level of experience.

- For procedures for which there is evidence that over-utilization is common (and
  sometimes harmful), information on volume by physician by procedure/service will
  enable the public to see the extent to which Medicare is allowing and paying physicians
  to perform numbers of procedures out of proportion to their patient load.

- Information on volume by physician by procedure/service will enable the public to see
  the extent to which Medicare is allowing and paying for physicians who are less-than-
  optimally trained (as indicated by board certification and other indicators) to perform
  those procedures or services.  This can be done by matching the identities of the
  physicians on which there is volume information from Medicare with information for
  these same physicians in databases maintained by medical specialty boards and others
  indicating which physicians are board certified and have other credentials.

- To the extent that other non-Medicare sources such as private health plans, community
  coalitions, state governments, disciplinary boards and others are involved in profiling
  physicians and rating them for quality, the volume counts for Medicare procedures can be
  used to determine whether physicians that are rated poor by other measures are being
  allowed to perform high volumes of procedures for Medicare beneficiaries.

- Once Medicare physicians are profiled by volume of procedures, Checkbook or others
  will be able to target surveys and studies to those physicians to find out from the
  physicians themselves the effects Medicare is having, or could have, on the quality or
  their practices--through incentives, training, regulation, and other means.

- Physician-identified Medicare claims data, by enhancing users' ability to identify
  physicians who perform well and badly on outcome measures and quality and efficiency
  profiles, will in turn enhance the public's ability to scrutinize the extent to which the
  Medicare program is helping beneficiaries get care from high-quality, efficient physicians
  and avoid low-quality, inefficient physicians.  This includes enhancing the public's

ability to assess whether value-based purchasing, pay-for-performance, physician-recognition, managed care, and other types of Medicare programs are creating incentives that lead to better care or worse care.

- When Checkbook or others use the Medicare claims data to profile physicians and publicize the profile results to allow Medicare beneficiaries to select quality physicians and allow CMS to provide training to physicians that are not meeting quality standards, it will be possible to determine whether these types of profile-based uses have desirable effects on beneficiaries' provider choices and on care quality and efficiency. If good effects result, this will be evidence that the Medicare program should do more profiling and use and distribute such profiles widely.

- Providing beneficiaries with information on physician volume by service/procedure will arm these beneficiaries to serve as watchdogs for the government – for instance, by spotting physicians who might be fraudulently billing Medicare for procedures that the beneficiaries know are not actually being performed.

**Public Scrutiny of Agency Performance Requires that Individual Physicians Be Identified**

25. In its Supplemental Brief, CMS reversed its prior decision to release all of the data requested by Checkbook, and instead asserted that the data elements that identify the physicians who performed the medical procedures in the claims records could not be disclosed due to personal privacy concerns. To allow the important types of public scrutiny of the Medicare program discussed above, it is essential that the claims data requested by Checkbook include physician identifiers. Such identification is essential for several reasons, including but not limited to the following:

- Medicare beneficiaries will only be able to scrutinize the services provided by their own physicians if the physician identities are released.

- For Medicare volume information about individual physicians to be matched with other quality assessments performed by independent groups, or with public information about board certifications or disciplinary histories, the physician identities must be known.

- To enable Medicare claims data to be pooled with claims data from private health plans and self-insured programs in order to develop even more robust volume profiling, the physician identities must be disclosed.

- 10 -

- To be able to identify physicians with high volume in important procedures or specialties so that these physicians can be surveyed and studied as to the favorable and unfavorable effects the Medicare program's current mode of operation has on their performance, the physician identities must be disclosed.

- To enable the public to monitor Medicare physician billing habits, and spot instances where Medicare physicians may be charging the program for unnecessary services, or services that may not have actually been performed, the physician identities must be disclosed.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this 18 day of May, 2007.

Robert Krughoff

- 11 -

# EXHIBIT 1



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

**RE: Appeal Case Number C07FOI0907A**

MAR 1 6 2007

*Deputy Administrator*
Baltimore, MD  21244-1850

Mr. Robert Krughoff
President, CHECKBOOK/CSS
1625 K Street, 8th Floor
Washington, D.C. 20006

Dear Mr. Krughoff:

This is in response to your February 28, 2007 letter appealing the decision of Michael S. Marquis, Director, Freedom of Information Group (FIG), Centers for Medicare & Medicaid Services (CMS), to deny your request for a waiver of fees for processing your March 27, 2006 Freedom of Information Act (FOIA) request. Your request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. Before rendering my appeal decision, I note that I have been advised that contingent upon the court's final decision on the fee waiver issue in the litigation that is pending over this FOIA request, you are willing to pay the FOIA processing fees for CMS to produce the requested 29 fields of data listed on Attachment A of your request only for those records for which the Line NCH Provider State Code is Washington, D.C. Based upon your agreement to pay, we have initiated production of the requested data. It will be released to you in full, and without redaction. The estimated computer time to generate the data will be approximately three to four weeks. My appeal ruling follows.

**Background:** Your original FOIA request sought a subset of 29 specific data elements from a CMS database containing physician Medicare claims records, for the 2004 calendar year, for the localities of Washington, D.C., Illinois, Maryland, Washington, or Virginia. The request also sought a fee waiver. Specifically, your fee waiver request provided that CHECKBOOK/CSS is a non-profit organization that conducts and supports studies of consumer services and publishes reports that educate consumers about such services. Your request also stated that you believed your analysis of the requested data and publication of the findings would contribute significantly to the public's scrutiny of the operation and performance of CMS and the Medicare program. Your request asserted that the commercial interests of CHECKBOOK/CSS are not primary to the FOIA request.

Mr. Marquis' January 29, 2007 letter explained the reasons for the denial. The denial noted that the fee waiver request lacked specificity regarding publication of the requested data and disseminating the data in such a way to provide benefit to a broad public audience. In addition, the denial reviewed the services provided by CHECKBOOK/CSS, as described on the web sites www.checkbook.org and www.cssresearch.org, and noted that CHECKBOOK/CSS charges fees for survey and research services, to individual consumers, governments, and commercial entities. The denial pointed out that Checkbook Magazine, a publication which evaluates various services used by consumers, sells its service rating information by subscription in the metropolitan areas where it is published, at subscription rates ranging from $30.00 to $34.00. The denial also showed that CHECKBOOK/CSS also sells access to health publications such as the Guide to Health Plans for Federal Employees and the Guide to Top Doctors. Additionally, the denial explained that CHECKBOOK/CSS actively markets itself as an expert in conducting studies, surveys, data collection and analysis, as evidenced by

**PAGE II.** – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A

its web site at http://www.cssresearch.org/exp.cfm. In support of his decision concerning the commercial interests of your organization, Mr. Marquis provided an example of CHECKBOOK/CSS' description of itself as an approved vendor to administer Hospital Consumer Assessment of Health Plans (HCAHPS) hospital surveys, for which it charges an annual fee of $2,900. Based on the foregoing, Mr. Marquis found that the commercial interests of CHECKBOOK/CSS were primary to the FOIA request.

You appealed the fee waiver denial on February 28, 2007, arguing that your organization met the Department's public interest criteria for a fee waiver and that the public interest in obtaining the requested records outweighs any commercial interest of your organization.

**Analysis of Public Interest**: It is the policy of this Department to waive or reduce fees if disclosure of the information meets both the following tests: (1) it is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) it is not primarily in the commercial interest of the requester.

In analyzing the public interest, we consider the following factors:

(1) How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government?

(2) Would disclosure of the records reveal meaningful information about government operations or activities? Can one learn from these records anything about such operations that is not already public knowledge?

(3) Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons?

(4) Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?

With respect to the first two above public interest factors, we do not dispute that the requested records pertains to operations or activities of the Federal Government and that the disclosure of the records would reveal meaningful information about government operations or activities.

With regard to the third public interest factor, we question whether the disclosure will advance the understanding of the general public as distinguished from a narrow segment of interested persons. Your appeal included an attachment of a press release as an example of how your organization releases the results of its quality studies through press releases. This sample press release, in the first two and a half pages, generally explains your organization's 360-page Consumers' Guide to Hospitals (the Guide) and then explains that if consumers want the Guide, they can pay $19.95 or subscribe for two years of online access to the same information in the Guide for $19.95. This press release shows that if the public wants access to the full Guide, they have to pay for it, a circumstance which may well limit access to the information.

**PAGE III.** – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A

Your appeal does not specify how the general public's understanding will be advanced in light of the fact that your organization charges for some of the information that it obtains, and it is not clear to us how much your organization intends to charge for the requested records. Your appeal states that your organization often makes free content available on its website. Your appeal, however, does not adequately explain how CHECKBOOK/CSS intends to convey the requested data to the general public. Your amended FOIA request is for 29 data elements about all Medicare physicians in the District of Columbia for the 2004 calendar year. This is a large amount of information, and it is not clear from your appeal how news articles, press releases, or media reports will convey this vast amount of information to the general public.

With respect to the fourth public interest factor, using the sample press release as an example (Exhibit B of your appeal), you haven't shown how releasing a press release of a few pages in length will be a significant contribution to public understanding, in light of the fact that you are requesting 29 data elements for Medicare physicians for the 2004 calendar year. As we noted in our review of the first and second public interest factors, the data you have requested would allow the public to see the volume and types of procedures performed by individual physicians within Washington, D.C. during the one-year period of 2004, specifically for claims submitted to Medicare. While we do not dispute that the number of times a specific procedure is performed may contribute to a physician's expertise and skill, this quantitative data within a limited context cannot be equated as an overall quality analysis. Nor does this information, in and of itself, shed light upon whether the Medicare program is adequately assessing quality of care issues.

**Analysis of Commercial Interest**: Even though you did not meet the third and fourth factors of the public interest test, we also considered whether your organization's commercial interest is the primary interest. In determining whether the commercial interest is the primary interest of the requester, HHS considers the following factors:

(1) Would the disclosure further a commercial interest of the requester, or of someone on whose behalf the requester is acting? "Commercial interests" include interests relating to business, trade, and profit. Not only profit-making corporations have commercial interests—so do nonprofit corporations, individuals, unions, and other associations. The interest of a representative of the news media in using the information for news dissemination purposes will not be considered a commercial interest.

(2) If disclosure would further a commercial interest of the requester, would that effect outweigh the advancement of the public interest defined in paragraph (b) of this section [45 C.F.R. § 5.45]? Which effect is primary?

**PAGE IV. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

Within your appeal, you did not challenge the initial denial's assertion that your organization markets itself as an expert in conducting studies, surveys, data collection and analysis. As was also pointed out in the initial denial, your organization has exhibited a pattern of charging consumers and others for certain information that it obtains. As we previously stated, Exhibit B of your appeal confirms that consumers must pay $19.95 to gain access to the Consumers Guide to Hospitals. In regard to a supporting argument raised on the fourth page of your appeal, in which you stated that CHECKBOOK/CSS has contracted with government agencies to provide federal employees with free access to the Consumers Checkbook Guide to Health Plans, your organization charges the subscribing agencies for this access. The Department of Health and Human Services paid $12,000 to your organization during 2006 for this access. To reiterate a prior example of CHECKBOOK/CSS' commercial activities, your organization is an approved vendor to administer the HCAHPS hospital survey and charges an annual fee of $2,900 to each facility for those services. In addition to those examples of fee-for-service activities, we also note that CHECKBOOK/CSS charges $24.95 for its Guide to Top Doctors, as stated on the website at http://www.checkbook.org/doctors/pageone.cfm, and as also stated in a recent subscription renewal letter to a CHECKBOOK subscriber. That subscription renewal letter stated the following: "You will enjoy *free* subscriber-only online access to our nationwide *Top Doctors* Ratings to help you find the best health care providers for yourself, your friends, and your family, both locally and nationwide (thousand of consumers pay $24.95 for online access to those ratings alone)".

In addition, your organization's website at http://www.checkbook.org/about.cfm explains that the organization is supported entirely by subscription payments and donations from individual consumers who subscribe to its magazines, and by fees for your survey and information services and books. Even though your website acknowledges that your organization is supported by subscription payments and donations from individual consumers who subscribe to your organization's magazine and by fees for your services and books, your appeal makes a conclusory statement that your commercial interest is "de minimus," and it does not inform us as to how much your organization intends to charge the public for access to the data elements that you are requesting from CMS so we can weigh the commercial interest against the public interest

**Conclusion:** It is the responsibility of the FOIA requester to demonstrate and substantiate his eligibility for a fee waiver. As a FOIA requester, you have not met this burden, in that you have not satisfactorily established that your organization's commercial interest was not primary, nor have you demonstrated how you would disseminate the requested data to edify and inform a broad segment of the population.

Based upon my careful consideration of your appeal arguments discussed above, I find it both reasonable and warranted that CHECKBOOK/CSS should compensate this agency for the costs of producing the requested data. Therefore, I am upholding the denial of your fee waiver request. Your FOIA request has been placed in the "commercial" fee category; FOIA requesters in this category are charged for search, review, and duplication costs.

**PAGE V. – CHECKBOOK/CSS / FOIA APPEAL C07FOI0907A**

This letter constitutes the final decision of the Department of Health and Human Services in the matter. If you disagree with this decision, the law at 5 U.S.C. § 552(a)(4)(B) provides for judicial review in the District of Columbia District Court, or in a U.S. district court where you reside or have your principal place of business, or where the agency records are situated.

Sincerely yours,

Herb B. Kuhn
Acting Deputy Administrator

cc: Mr. Stephen M. Albrecht, Esq.

# EXHIBIT 2

WILMERHALE

Stephen M. Albrecht

+1 202 663 6714 (t)
+1 202 663 6363 (f)
stephen.albrecht@wilmerhale.com

April 26, 2007

**By Facsimile and First Class Mail**

Herb B. Kuhn
Acting Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

Re: C06FOI1318 - C07FOI0907A

Dear Mr. Kuhn:

We write in response to your letter to our client, Robert Krughoff, President, Consumers'
CHECKBOOK/CSS ("CSS"), dated March 16, 2007.  We represent CSS with regards to the
above referenced Freedom of Information Act request submitted to the Centers for Medicare and
Medicaid Services ("CMS") on March 27, 2006.  This request seeks certain physician claims
records from five states for calendar year 2004.

Due to the significant expense estimated by CMS to produce the requested records for each state
(approximately $3,944.70 per state), CSS sent a letter to Mr. Marquis, CMS Freedom of
Information Group Director, on March 8, 2007, agreeing on a provisional basis to pay for and
accept production of just the requested records from Washington, DC.  CSS clarified that its
agreement to pay for and accept only the DC records in an initial production was made without
prejudice to its right to seek all of the remaining requested records at a later date.  (Please note
that CSS is continuing to seek and demand production of, and a fee waiver for, all of the
remaining requested records; those issues are currently pending before the District Court for the
District of Columbia.)

In your March 16, 2007 letter, you acknowledged CSS' agreement to pay for the DC records,
and stated that you had initiated production of the records, which would be released to CSS "in
full, and without redaction."  You estimated the production time to be approximately three to
four weeks.

It has now been over seven weeks since CSS agreed to pay for the DC records, and over six
weeks since you allegedly initiated the production process.  The record of delay on the part of
CMS in this case has been extraordinary. CSS filed its original request almost 13 months ago.
After CSS filed an administrative appeal (which went unanswered) and a complaint in the

WILMERHALE

Herb B. Kuhn
April 26, 2007
Page 2

District Court for the District of Columbia seeking to compel production (which is still pending), CMS continues to improperly withhold the requested records.

We ask that CMS end its practice of delay and immediately produce the requested Washington, DC records to CSS "in full, and without redaction" as promised.

Sincerely,

Stephen M. Albrecht

cc:    Robert Krughoff, CHECKBOOK/CSS
       Michael Marquis, Director, Freedom of Information Group
       Andrea McBarnette, Assistant United States Attorney

# EXHIBIT 3



Monday,
August 28, 2006

Part IV

# The President

Executive Order 13410—Promoting
Quality and Efficient Health Care in
Federal Government Administered or
Sponsored Health Care Programs
Notice of August 24, 2006—Intention To
Enter Into a Free Trade Agreement With
Colombia

Federal Register

Vol. 71, No. 166

Monday, August 28, 2006

# Presidential Documents

---

Title 3—

**The President**

Executive Order 13410 of August 22, 2006

**Promoting Quality and Efficient Health Care in Federal Government Administered or Sponsored Health Care Programs**

By the authority vested in me as President by the Constitution and the laws of the United States, and in order to promote federally led efforts to implement more transparent and high-quality health care, it is hereby ordered as follows:

**Section 1.** *Purpose.* It is the purpose of this order to ensure that health care programs administered or sponsored by the Federal Government promote quality and efficient delivery of health care through the use of health information technology, transparency regarding health care quality and price, and better incentives for program beneficiaries, enrollees, and providers. It is the further purpose of this order to make relevant information available to these beneficiaries, enrollees, and providers in a readily useable manner and in collaboration with similar initiatives in the private sector and non-Federal public sector. Consistent with the purpose of improving the quality and efficiency of health care, the actions and steps taken by Federal Government agencies should not incur additional costs for the Federal Government.

**Sec. 2.** *Definitions.* For purposes of this order:

(a) "Agency" means an agency of the Federal Government that administers or sponsors a Federal health care program.

(b) "Federal health care program" means the Federal Employees Health Benefit Program, the Medicare program, programs operated directly by the Indian Health Service, the TRICARE program for the Department of Defense and other uniformed services, and the health care program operated by the Department of Veterans Affairs. For purposes of this order, "Federal health care program" does not include State operated or funded federally subsidized programs such as Medicaid, the State Children's Health Insurance Program, or services provided to Department of Veterans' Affairs beneficiaries under 38 U.S.C. 1703.

(c) "Interoperability" means the ability to communicate and exchange data accurately, effectively, securely, and consistently with different information technology systems, software applications, and networks in various settings, and exchange data such that clinical or operational purpose and meaning of the data are preserved and unaltered.

(d) "Recognized interoperability standards" means interoperability standards recognized by the Secretary of Health and Human Services (the "Secretary"), in accordance with guidance developed by the Secretary, as existing on the date of the implementation, acquisition, or upgrade of health information technology systems under subsections (1) or (2) of section 3(a) of this order.

**Sec. 3.** *Directives for Agencies.* Agencies shall perform the following functions:

(a) Health Information Technology.

(1) For Federal Agencies. As each agency implements, acquires, or upgrades health information technology systems used for the direct exchange of health information between agencies and with non-Federal entities, it shall utilize, where available, health information technology systems and products that meet recognized interoperability standards.

(2) For Contracting Purposes. Each agency shall require in contracts or agreements with health care providers, health plans, or health insurance issuers that as each provider, plan, or issuer implements, acquires, or upgrades health information technology systems, it shall utilize, where available, health information technology systems and products that meet recognized interoperability standards.

(b) Transparency of Quality Measurements.

(1) In General. Each agency shall implement programs measuring the quality of services supplied by health care providers to the beneficiaries or enrollees of a Federal health care program. Such programs shall be based upon standards established by multi-stakeholder entities identified by the Secretary or by another agency subject to this order. Each agency shall develop its quality measurements in collaboration with similar initiatives in the private and non-Federal public sectors.

(2) Facilitation. An agency satisfies the requirements of this subsection if it participates in the aggregation of claims and other appropriate data for the purposes of quality measurement. Such aggregation shall be based upon standards established by multi-stakeholder entities identified by the Secretary or by another agency subject to this order.

(c) Transparency of Pricing Information. Each agency shall make available (or provide for the availability) to the beneficiaries or enrollees of a Federal health care program (and, at the option of the agency, to the public) the prices that it, its health insurance issuers, or its health insurance plans pay for procedures to providers in the health care program with which the agency, issuer, or plan contracts. Each agency shall also, in collaboration with multi-stakeholder groups such as those described in subsection (b)(1), participate in the development of information regarding the overall costs of services for common episodes of care and the treatment of common chronic diseases.

(d) Promoting Quality and Efficiency of Care. Each agency shall develop and identify, for beneficiaries, enrollees, and providers, approaches that encourage and facilitate the provision and receipt of high-quality and efficient health care. Such approaches may include pay-for-performance models of reimbursement consistent with current law. An agency will satisfy the requirements of this subsection if it makes available to beneficiaries or enrollees consumer-directed health care insurance products.

Sec. 4. *Implementation Date.* Agencies shall comply with the requirements of this order by January 1, 2007.

Sec. 5. *Administration and Judicial Review.*

(a) This order does not assume or rely upon additional Federal resources or spending to promote quality and efficient health care. Further, the actions directed by this order shall be carried out subject to the availability of appropriations and to the maximum extent permitted by law.

(b) This order shall be implemented in new contracts or new contract cycles as they may be renewed from time to time. Renegotiation outside of the normal contract cycle processes should be avoided.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity against the United

States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*August 22, 2006.*

[FR Doc. 06–7220
Filed 8–25–06; 8:45 am]
Billing code 3195–01–P

# EXHIBIT 4

# Centers for Medicare & Medicaid Services

Print This Page

Return to Previous Page

## Overview

On December 20, 2006 the President signed the Tax Relief and Health Care Act of 2006 (TRHCA). Section 101 under Title I authorizes the establishment of a physician quality reporting system by CMS. CMS has titled the statutory program the Physician Quality Reporting Initiative (PQRI).

PQRI establishes a financial incentive for eligible professionals to participate in a voluntary quality reporting program. Eligible professionals who successfully report a designated set of quality measures on claims for dates of service from July 1 to December 31, 2007, may earn a bonus payment, subject to a cap, of 1.5% of total allowed charges for covered Medicare physician fee schedule services.

### 2007 PQRI- Testing Opportunity for the Physician Quality Reporting Initiative

CMS has posted information on how to test your billing system and practice readiness for PQRI quality data code reporting. Go to the Reporting page of this section for more information.

**Measures Specifications Released -** CMS has posted detailed specifications for the 74 measures included in the 2007 PQRI. Go to the Measures/Codes page of this section for more information.

### Downloads
There are no Downloads
### Related Links Inside CMS
Overview FAQs
All PQRI FAQs
### Related Links Outside CMS
There are no Related Links Outside CMS.

Return to Previous Page

# EXHIBIT 5

**United States Government Accountability Office**

# GAO

## Report to Congressional Committees

April 2007

# MEDICARE

# Focus on Physician Practice Patterns Can Lead to Greater Program Efficiency



**Accountability ★ Integrity ★ Reliability**

GAO-07-307

April 2007



**GAO**
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-07-307, a report to
congressional committees

# MEDICARE

# Focus on Physician Practice Patterns Can Lead to Greater Program Efficiency

## Why GAO Did This Study

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) directed GAO to study the compensation of physicians in traditional fee-for service (FFS) Medicare. GAO explored linking physician compensation to efficiency—defined as providing and ordering a level of services that is sufficient to meet a patient's health care needs but not excessive, given the patient's health status. In this report, GAO (1) estimates the prevalence in Medicare of physicians who are likely to practice inefficiently, (2) examines physician-focused strategies used by health care purchasers to encourage efficiency, and (3) examines the potential for CMS to profile physicians for efficiency and use the results. To do this, GAO developed a methodology using 2003 Medicare claims data to compare generalist physicians' Medicare practices with those of their peers in 12 metropolitan areas. GAO also examined 10 health care purchasers that profile physicians for efficiency.

## What GAO Recommends

Given the contribution of physicians to Medicare spending in total, GAO recommends that CMS develop a system that identifies individual physicians with inefficient practice patterns and, seeking legislative changes as necessary, uses the results to improve the efficiency of care financed by Medicare.

www.gao.gov/cgi-bin/getrpt?GAO-07-307.

To view the full product, including the scope and methodology, click on the link above. For more information, contact A. Bruce Steinwald at (202) 512-7101 or steinwalda@gao.gov.

## What GAO Found

Based on 2003 Medicare claims data, GAO's analysis found outlier generalist physicians—physicians who treat a disproportionate share of overly expensive patients—in all 12 metropolitan areas studied. Outlier generalists and other generalists saw similar numbers of Medicare patients and their respective patients averaged the same number of office visits. However, after taking health status and location into account, GAO found that Medicare patients who saw an outlier generalist—compared with those who saw other generalists—were more likely to have been hospitalized, more likely to have been hospitalized multiple times, and more likely to have used home health services. By contrast, they were less likely to have been admitted to a skilled nursing facility.

Certain public and private health care purchasers routinely evaluate physicians in their networks using measures of efficiency and other factors. The 10 health care purchasers in our study profiled physicians—that is, compared physicians' performance to an efficiency standard to identify those who practiced inefficiently. To measure efficiency, the purchasers we spoke with generally compared actual spending for physicians' patients to the expected spending for those same patients, given their clinical and demographic characteristics. Most of the 10 purchasers also evaluated physicians on quality. To encourage efficiency, all 10 purchasers linked their physician evaluation results to a range of incentives—from steering patients toward the most efficient providers to excluding physicians from the purchaser's provider network because of inefficient practice patterns.

CMS has tools available to evaluate physicians' practices for efficiency but would likely need additional authorities to use results in ways similar to other purchasers. CMS has a comprehensive repository of Medicare claims data to compute reliable efficiency measures for most physicians serving Medicare patients and has substantial experience using methods that adjust for differences in patients' health status. However, CMS may not currently have the flexibility that other purchasers have to link physician profiling results to a range of incentives encouraging efficiency. Implementation of other strategies to encourage efficiency would likely require legislation.

CMS said that our recommendation was timely and that our focus on the need for risk adjustment in measuring physician resource use was particularly helpful. However, CMS only discussed using profiling results for educating physicians. GAO believes that the optimal profiling effort would include financial or other incentives to encourage efficiency and would measure the effort's impact on Medicare. GAO concurs with CMS that this effort would require adequate funding.

# Contents

| | | |
|---|---|---:|
| **Letter** | | 1 |
| | Results in Brief | 5 |
| | Background | 7 |
| | Physicians Who Treated a Disproportionate Share of Overly Expensive Patients Were Found in Each of 12 Areas Studied | 10 |
| | Health Care Purchasers Used Physician Profiling Results to Encourage Efficient Medical Practice | 13 |
| | CMS Has Tools Available to Profile Physicians for Efficiency, but May Need Some Additional Authorities to Use Results in Ways Similar to Other Purchasers | 17 |
| | Conclusions | 21 |
| | Recommendation for Executive Action | 22 |
| | Agency and Professional Association Comments and Our Evaluation | 22 |
| **Appendix I** | **Methodology for Identifying Physicians with a Disproportionate Share of Overly Expensive Beneficiaries** | 26 |
| **Appendix II** | **Health Care Purchaser Program Characteristics** | 34 |
| **Appendix III** | **Distribution of Physicians by Their Proportion of Overly Expensive Beneficiaries by Metropolitan Area** | 37 |
| **Appendix IV** | **Comments from the Centers for Medicare & Medicaid Services** | 44 |
| **Appendix V** | **GAO Contact and Staff Acknowledgments** | 47 |

## Tables

Table 1: Percentage of Outlier Physicians in 12 Metropolitan Areas, 2003                                                    12

Table 2: Proportion of Overly Expensive Beneficiaries and Outlier Threshold Value by CBSA                                    33

Table 3: Characteristics of Health Care Purchasers' Physician Profiling Programs                                            35

## Figures

Figure 1: Average Medicare Expenditures, by Quintile, for Beneficiaries of Nearly Average Health Status                     11

Figure 2: Distribution of Total Per-Beneficiary Medicare Expenditures for Survivors for Risk Categories 1-10               28

Figure 3: Distribution of Total Per-Beneficiary Medicare Expenditures for Survivors for Risk Categories 11-31             29

Figure 4: Actual and Simulated Distribution of Generalists by their Medicare Practice's Proportion of Overly Expensive Beneficiaries in a Hypothetical Metropolitan Area    32

Figure 5: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Albuquerque, N.Mex.                                37

Figure 6: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Baton Rouge, La.                                   38

Figure 7: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Cape Coral, Fla.                                   38

Figure 8: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Columbus, Ohio                                    39

Figure 9: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Des Moines, Iowa                                   39

Figure 10: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Miami, Fla.                                      40

Figure 11: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries— Phoenix, Ariz.                                   40

Figure 12: Percentage of Generalist Physicians by Their Medicare
Practice's Proportion of Overly Expensive Beneficiaries—
Pittsburgh, Pa.                                                    41
Figure 13: Percentage of Generalist Physicians by Their Medicare
Practice's Proportion of Overly Expensive Beneficiaries—
Portland, Maine                                                   41
Figure 14: Percentage of Generalist Physicians by Their Medicare
Practice's Proportion of Overly Expensive Beneficiaries—
Riverside, Calif.                                                 42
Figure 15: Percentage of Generalist Physicians by Their Medicare
Practice's Proportion of Overly Expensive Beneficiaries—
Sacramento, Calif.                                                42
Figure 16: Percentage of Generalist Physicians by Their Medicare
Practice's Proportion of Overly Expensive Beneficiaries—
Springfield, Mass.                                                43

**Abbreviations**

| | |
|---|---|
| ACP | American College of Physicians |
| AMA | American Medical Association |
| BIPA | Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 |
| CMS | Centers for Medicare & Medicaid Services |
| FFS | fee-for-service |
| MMA | Medicare Prescription Drug, Improvement, and Modernization Act of 2003 |
| MedPAC | Medicare Payment Advisory Commission |
| SGR | sustainable growth rate |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

**G A O**
Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC 20548**

April 30, 2007

Congressional Committees

In recent years, we and others have reported that the Medicare program is unsustainable in its present form.[1] Because of rising health care costs and the aging of baby boomers into eligibility for Medicare, future program spending is projected to encumber an escalating share of the government's resources.[2] In their 2006 annual report, the Medicare Trustees found that Part B assets now are substantially below appropriate levels and that Medicare's Hospital Insurance Trust Fund—which funds the Medicare Part A program—will be exhausted in 2018.[3] They concluded that Medicare's financial challenges call for timely and effective action, and that reforms must be prompt to allow time for health care providers, beneficiaries, and taxpayers to adjust their expectations. Similarly, in 2006 testimony, the Comptroller General noted that dramatic health care reform would require a long transition period, arguing for acting sooner rather than later.[4]

---

[1]GAO, *Suggested Areas for Oversight for the 110th Congress*, GAO-07-235R (Washington D.C.: Nov. 17, 2006); GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: Feb. 2005); Congressional Budget Office, *The Long-Term Budget Outlook* (Washington D.C.: Dec. 2005); *The Wall Street Journal*, "Greenspan Expresses Concerns On Derivatives, Medicare Costs," May 19, 2006, p. A7; *USA Today*, "Bernanke: Savings situation getting dire," October 5, 2006, http://www.usatoday.com/money/economy/fed/2006-10-04-bernanke-retirement-programs_x.htm (accessed Dec. 13, 2006).

[2]GAO, *21st Century: Addressing Long-Term Fiscal Challenges Must Include a Re-examination of Mandatory Spending*, GAO-06-456T (Washington, D.C.: Feb. 15, 2006).

[3]See Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, *2006 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds* (Washington D.C.: May 1, 2006). Medicare Part A pays for inpatient hospital stays, skilled nursing facility care, hospice care, and some home health care. Part B finances physician, outpatient hospital, home health care, and other services.

[4]GAO-06-456T.

Experts agree that physicians play a central role in the generation of health care expenditures in total.[5] Their services are estimated to account for 20 percent of total health care expenditures, whereas their influence is estimated to account for up to 90 percent of this spending.[6] For example, physicians refer patients to other physicians; they admit patients to hospitals, skilled nursing facilities, and hospices; and they order services delivered by other health care providers, such as imaging studies, laboratory tests, and home health services.

Based on the centrality of the physician's role with respect to the consumption of health care services, some public and private health care purchasers have initiated programs to identify "efficient" physicians and encourage patients to obtain care from these physicians. (For the purposes of this report, efficiency means providing and ordering a level of services that is sufficient to meet a patient's health care needs but not excessive, given the patient's health status.) These purchasers identify efficient physicians by examining data obtained from medical claims to measure an individual's performance relative to a benchmark, a method known as profiling. Physician profiling activities occur in Medicare today, but they focus largely on improper billing practices rather than on efficient care delivery. Some policymakers have suggested using a profiling approach in Medicare to pay physicians based on their meeting quality and efficiency performance standards.[7] As a practical matter, such an approach would be carried out by the Centers for Medicare & Medicaid Services (CMS), the agency responsible for administering the Medicare program.

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) required us to study aspects of physician compensation, pertaining only to physicians serving beneficiaries in traditional fee-for-

---

[5]GAO, *Comptroller General's Forum on Health Care: Unsustainable Trends Necessitate Comprehensive and Fundamental Reforms to Control Spending and Improve Value,* GAO-04-793SP (Washington D.C.: May 1, 2004); Laura A. Dummit, *Medicare Physician Payments and Spending,* National Health Policy Forum, Issue Brief Number 815 (Washington D.C.: Oct. 9, 2006).

[6]John M. Eisenberg, *Doctors' Decisions and the Cost of Medical Care: The Reasons for Doctors' Practice Patterns and Ways to Change Them,* Health Administration Press Perspectives (Ann Arbor, Mich.: 1986); Gail R. Wilensky and Louis F. Rossiter, "The Relative Importance of Physician-induced Demand in the Demand for Medical Care," *Milbank Memorial Fund Quarterly: Health and Society,* 61(2): 252-277, spring 1983.

[7]*See* H.R. 3617, 109th Cong. §2 (2005).

service (FFS) Medicare.[8] As discussed with the committees of jurisdiction, this report explores key concepts involved in linking assessments of individual physicians' performance—particularly measures of efficiency—to their compensation. Specifically, this report (1) estimates the prevalence in Medicare of physicians who are likely to practice medicine inefficiently, (2) examines physician-focused strategies used by public and private sector health care purchasers to encourage efficient medical care, and (3) examines the potential for CMS to profile physicians in traditional FFS Medicare for efficiency and use the results in ways that are similar to other purchasers that encourage efficiency.

To estimate the prevalence in Medicare of physicians likely to practice medicine inefficiently, we developed a profiling methodology using claims data for beneficiaries in the traditional FFS program. We considered the experience of other purchasers that conduct such analyses and used an approach that was feasible and practical for our purposes. We focused our analysis on generalists—physicians who described their specialty as general practice, internal medicine, or family practice—in 12 metropolitan areas.[10] We selected areas that were diverse geographically and in terms of Medicare spending per beneficiary. Using 2003 Medicare claims data, we examined the degree to which a generalist physician treated a large proportion of Medicare patients for whom Medicare spending was

---

[8]Pub. L. No. 108-173, § 953, 117 Stat. 2066, 2428. With respect to physician compensation, the MMA included the requirement under which the current study was done as well as several other requirements, which directed us to study the following: the system for annually adjusting physicians' fees and alternatives to this system (Pub. L. No. 108-173, § 953, 117 Stat. 2066, 2427-28), access to physician services by beneficiaries in Medicare's FFS program (Pub. L. No. 108-173, § 604, 117 Stat. 2066, 2301-02), and adjustments in physician fees for area differences in physicians' costs of operating a private medical practice (Pub. L. No. 108-173, § 413(c), 117 Stat. 2066, 2277-78). In response, we issued three reports: *Medicare Physician Payments: Concerns about Spending Target System Prompt Interest in Considering Reforms*, GAO-05-85 (Washington D.C.: Oct. 8, 2004); *Medicare Physician Services: Use of Services Increasing Nationwide and Relatively Few Beneficiaries Report Major Access Problems*, GAO-06-704 (Washington D.C.: July 21, 2006); and *Medicare Physician Fees: Geographic Adjustment Indices Are Valid in Design, but Data and Methods Need Refinement*, GAO-05-119 (Washington D.C.: Mar. 1, 2005).

[9]In 2005, most Medicare beneficiaries (88 percent) were in traditional Medicare FFS. The rest were enrollees in Medicare Advantage plans, which include managed care plans, private FFS plans, and Medical Savings Account/High Deductible plans.

[10]These metropolitan areas included Albuquerque, N.M.; Baton Rouge, La.; Des Moines, Iowa; Phoenix, Ariz.; Miami, Fla.; Springfield, Mass.; Cape Coral, Fla.; Riverside, Calif.; Pittsburgh, Pa.; Columbus, Ohio; Sacramento, Calif.; and Portland, Maine.

unusually high, given their health status.[11] To identify such patients, we assigned health status scores to all beneficiaries in the 12 areas, using a risk adjustment method similar to the one CMS uses to adjust payments for Medicare enrollees in managed care plans.[12] We grouped these patients into 31 cohorts by health status to remove differences in spending associated with differences in health status. We then identified within each cohort the top 20 percent of beneficiaries ranked by spending for all Medicare services and referred to these beneficiaries as "overly expensive" compared with others of similar health status. We linked these overly expensive patients to the physicians they saw and computed the percentage they represented of each physician's Medicare practice. We determined whether a generalist physician had a Medicare practice that, relative to the physician's peers in the same metropolitan area, included a percentage of overly expensive patients that was higher than would occur by chance if these patients were randomly distributed across the area's generalist physicians.[13] We identified these physicians as "outliers" relative to the practice patterns prevailing in their area and concluded that they were likely to practice medicine inefficiently.[14] Our results are not statistically generalizable beyond the 12 areas we studied.

We ensured the reliability of the claims data used in this report by performing appropriate electronic data checks and by interviewing agency officials who were knowledgeable about the data. The encounter and cost information in the claims data we used are generally considered to be reliable, as they are used by the Medicare program as a record of payments to health care providers and are closely monitored by both CMS and Medicare's fiscal intermediaries and carriers—contractors that process, review, and pay claims for Medicare-covered services. In addition, we examined the claims data files for obvious errors, missing values, and values outside of expected ranges. We also interviewed experts at CMS

---

[11]We excluded generalist physicians from our study whose practices did not include a sufficient number of Medicare patients to ensure the statistical reliability of our analysis.

[12]To account for differences in health status, CMS uses a risk adjustment tool that assigns Medicare enrollees a health status score based on their diagnoses and demographic characteristics.

[13]We defined "higher" by setting a threshold percentage of overly expensive patients for each area that would be exceeded by no more than 1 percent of generalist physicians if overly expensive patients were randomly distributed across all generalist physicians.

[14]See appendix I for further discussion of our methodology.

who regularly use the claims data for evaluation and analysis. We found the claims data were sufficiently reliable for the purpose of our analyses.

To examine physician-focused strategies used by public and private health care purchasers to encourage efficient medical care, we interviewed representatives of 10 health care purchasers,[15] including 5 commercial health plans, 1 provider network, 1 trust fund jointly managed by employers and a union, and 3 government agencies—2 in U.S. states and 1 in a Canadian province.[16] On the basis of discussions with industry experts, we selected these plans because their physician profiling programs explicitly assess efficiency—unlike many such programs that assess quality only. To examine the potential for profiling in Medicare and using the results to encourage efficiency, we reviewed CMS program guidelines and memoranda, interviewed CMS officials, and analyzed how certain components of physician-focused payment strategies would fit with structural features of the Medicare program.

We conducted our work from September 2005 through April 2007 in accordance with generally accepted government auditing standards.

## Results in Brief

In each of the 12 metropolitan areas studied, we found generalist physicians who, relative to their peers in the same area, treated a disproportionate share of overly expensive Medicare patients. To identify such patients while accounting for differences in health status, we grouped beneficiaries into 31 health status cohorts and designated, for each cohort, the top 20 percent of beneficiaries, ranked by Medicare spending, as "overly expensive." We linked these patients to the physicians who saw them and identified the physicians whose Medicare practice included a percentage of overly expensive patients that was higher than would occur by chance for their area. We concluded that these physicians were likely to practice medicine inefficiently.

---

[15]In this report we use the term purchaser to mean health plans as well as agencies that manage care purchased from health plans; one of the entities we interviewed is a provider network that contracts with several insurance companies to provide care to their enrollees.

[16]Aetna, BlueCross BlueShield of Texas, Health Insurance BC (British Columbia, Canada), Greater Rochester Independent Practice Association, HealthPartners, Massachusetts Group Insurance Commission, Minnesota Advantage Health Plan, PacifiCare Health Systems, UnitedHealthcare, and the Hotel Employees and Restaurant Employees International Union Welfare Fund.

Certain public and private health care purchasers routinely evaluate physicians in their networks using measures of efficiency and other factors. The 10 health care purchasers in our study profiled physicians—that is, compared physicians' performance to an efficiency standard to identify those who practiced inefficiently. To measure efficiency, the purchasers we spoke with generally compared actual spending for physicians' patients to the expected spending for those same patients, given their clinical and demographic characteristics. Most of the 10 we spoke with also evaluated physicians on quality. To encourage efficiency, all 10 purchasers linked their physician evaluation results to a range of incentives—from steering patients toward the most efficient providers to excluding physicians from the purchaser's provider network because of inefficient practice patterns.

CMS has tools to profile physicians for efficiency but would likely need additional authorities to use results in ways similar to other purchasers. CMS has a comprehensive repository of Medicare claims data to compute reliable efficiency measures for most physicians serving Medicare patients and has substantial experience using methods that adjust for differences in patients' health status. However, CMS may not currently have the flexibility that other purchasers have to link physician profiling results to a range of incentives encouraging efficiency. Although CMS has extensive experience in Medicare with physician education efforts, the implementation of other strategies to encourage efficiency, for example, tying fee updates of individual physicians to meeting efficiency standards, would likely require legislation providing additional authority to the agency.

In our view, physician profiling offers a promising, targeted approach that could be one of an array of measures collectively aimed at realigning the imbalance between Medicare's outlays and revenues. Given the contribution of physicians to Medicare spending in total, we are recommending that CMS develop a profiling system that identifies individual physicians with inefficient practice patterns and, seeking legislative changes as necessary, uses the results to improve the efficiency of care financed by Medicare.

CMS said our recommendation was timely and characterized our focus on the need for risk adjustment in measuring physician resource use as particularly helpful. The agency also noted that nationwide dissemination of reports of physician resource use would generate significant recurring costs. While our report notes that CMS is familiar with key methodological tools needed to conduct such an effort, we agree that any such

undertaking would need to be adequately funded. The agency was silent on a strategy for using profiling results beyond physician education. We believe that the optimal profiling effort would include financial or other incentives to curb individual physicians' inefficient practices and would measure the effort's impact on Medicare spending. Both the American Medical Association (AMA) and the American College of Physicians (ACP) said that quality standards should be the primary focus of a physician profiling system.

## Background

Since 1992, physicians in Medicare have been paid under a national fee schedule in conjunction with a system of spending targets. Under the design of the fee schedule and target system, annual adjustments (updates) to physician fees depend, in part, on whether actual spending has fallen below or exceeded the target. Fees are permitted to increase at least as fast as the costs of providing physician services as long as the growth in volume and intensity of physician services remains below a specified rate—currently, a little more than 2 percent a year. If spending associated with volume and intensity grows faster than the specified rate, the target system reduces fee increases or causes fees to fall. The target system in place today, called the sustainable growth rate (SGR) system, was implemented in 1998. This system acts as a blunt instrument in that all physicians are subject to the consequences of excess spending—that is, downward fee adjustments—that may stem from the excessive use of resources by some physicians relative to their peers.

Medicare spending on Part B physician services has grown rapidly in recent years. From 2000 through 2005, program spending for Part B FFS physician services grew at an average annual rate of 9.8 percent, outpacing average annual Medicare aggregate spending growth of 8.7 percent for this period. Since 2002, actual Medicare spending on physician services has exceeded SGR targets, and the SGR system has called for fee cuts to offset the excess spending. However, the cuts were overridden by administrative action or the Congress five times during this period. In a 2004 report on the SGR system,[17] we found that possible options to modify or eliminate the system would increase the growth in cumulative spending over a 10-year period, usually by double-digit percentages. The difficulty of stabilizing physician fees in the face of the need to maintain fiscal

---

[17]GAO-05-85.

discipline has spurred congressional interest in other ways to restrain spending growth.

As concern about the long-term fiscal sustainability of Medicare has grown, so has the recognition that some of the spending for services provided and ordered by physicians may not be warranted. For example, the wide geographic variation in Medicare spending for physician services—unrelated to beneficiary health status or outcomes—provides evidence that health needs alone do not determine spending. Furthermore, several studies have shown that in some instances growth in the number of services provided may lead to medical harm.[18] Payments under the Medicare program, however, generally do not foster individual physician responsibility for quality, medical efficacy, or efficiency. In recognition of this, the Institute of Medicine has recently recommended that Medicare payment policies should be reformed to include a system for paying health care providers differentially based on how well they meet performance standards for quality or efficiency or both.[19] In April 2005, CMS initiated a demonstration mandated by the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA) to test this approach.[20] Under the Physician Group Practice demonstration, 10 large physician group practices, each comprising at least 200 physicians, are eligible for bonus payments if they meet quality targets and succeed in keeping the total expenditures of their Medicare population below annual targets.[21]

Several studies have found that Medicare and other purchasers could realize substantial savings if a portion of patients switched from less efficient to more efficient physicians. The estimates vary according to

---

[18]Elliott S. Fisher and H. Gilbert Welch, "Avoiding the Unintended Consequences of Growth in Medical Care: How Might More Be Worse?" *Journal of the American Medical Association*, vol. 281, no. 5 (1999): 446-453; E.S. Fisher, et al., "The Implications of Regional Variations in Medicare Spending. Part 1: The Content, Quality, and Accessibility of Care," *Annals of Internal Medicine*, vol. 138, no. 4 (2003): 273-287; E.S. Fisher, et al., "The Implications of Regional Variations in Medicare Spending. Part 2: Health Outcomes and Satisfaction with Care," *Annals of Internal Medicine*, vol. 138, no. 4 (2003): 288-298; and Joseph P. Newhouse, *Free for All? Lessons from the RAND Health Insurance Experiment* (Cambridge, Mass.: Harvard University Press, 1993).

[19]Institute of Medicine, *Rewarding Provider Performance: Aligning Incentives in Medicare (Pathways to Quality Health Care Series) – Summary* (Washington D.C.: 2007).

[20]Pub. L. No. 106-554, app. F, § 412(a), 114 Stat. 2763, 2763A–509-515.

[21]We are currently conducting a study of the demonstration, as required by BIPA (Pub. L. No. 106-554, app. F, § 412(b), 114 Stat. 2763, 2763A–515).

assumptions about the proportion of beneficiaries who would change physicians.[22] In 2003, the Consumer-Purchaser Disclosure Project, a partnership of consumer, labor, and purchaser organizations, asked actuaries and health researchers to estimate the potential savings to Medicare if a small proportion of beneficiaries started using more efficient physicians. The Project reported that Medicare could save between 2 and 4 percent of total costs if 1 out of 10 beneficiaries moved to more efficient physicians. This conclusion is based on information received from one actuarial firm and two academic researchers. One researcher concluded, based on his simulations, that if 5 to 10 percent of Medicare enrollees switched to the most efficient physicians, savings would be 1 to 3 percent of program costs—which would amount to about $5 billion to $14 billion in 2007.

The Congress has also recently expressed interest in approaches to constrain the growth of physician spending. The Deficit Reduction Act of 2005 required the Medicare Payment Advisory Commission (MedPAC) to study options for controlling the volume of physicians' services under Medicare. One approach for applying volume controls that the Congress directed MedPAC to consider is a payment system that takes into account physician outliers.[23]

---

[22]See Consumer-Purchaser Disclosure Project, *More Efficient Physicians: A Path to Significant Savings in Health Care* (Washington D.C.: July 2003).

[23]Medicare Payment Advisory Commission, *Report to the Congress: Assessing Alternatives to the Sustainable Growth Rate System* (Washington, D.C.: Mar. 2007).

## Physicians Who Treated a Disproportionate Share of Overly Expensive Patients Were Found in Each of 12 Areas Studied

In each of the 12 metropolitan areas studied, we found physicians who treated a disproportionate share of overly expensive patients. Using 2003 Medicare claims data, we identified overly expensive beneficiaries in the 12 areas and computed the percentage they represented in each generalist physician's Medicare FFS practice. We then identified outlier generalist physicians as those with practices that, relative to their peers, had a percentage of overly expensive patients that was unlikely to have occurred by chance. We concluded that such physicians are likely to practice an inefficient style of medicine. The proportion of generalist physicians found to be outliers varied across the 12 areas. In two areas, they accounted for more than 10 percent of the areas' generalist physician population.[24]

## In Identifying Overly Expensive Beneficiaries, We Found Significant Variation in Medicare Spending on Patients with Similar Health Status

We classified beneficiaries as overly expensive if their total Medicare expenditures—for services provided by all health providers, not just physicians—ranked in the top fifth of their health status cohort for 2003 claims.[25] We developed 31 health status cohorts of beneficiaries based on the diagnoses appearing on their Medicare claims and other factors.[26]

Within each health status cohort, we observed large differences in total Medicare spending across beneficiaries. For example, in one cohort of beneficiaries whose health status was about average, overly expensive beneficiaries—the top fifth ranked by expenditures—had average total expenditures of $24,574, as compared with the cohort's bottom fifth, averaging $1,155.[27] (See fig. 1.) This variation may reflect differences in the number and type of services provided and ordered by these patients' physicians as well as factors not under the physicians' direct control, such as a patient's response to and compliance with treatment protocols. Overly expensive beneficiaries accounted for nearly one-half of total Medicare expenditures even though they represented only 20 percent of beneficiaries in our sample.

---

[24]The population of generalist physicians studied excluded those who had small Medicare practices (see app. I).

[25]Expenditures identified were for services from inpatient hospital, outpatient, skilled nursing facility, physician, hospice, durable medical equipment, and home health providers.

[26]For decedents, we also took into account the number of months they were enrolled in Medicare FFS during 2003. For more detail on the development of the cohorts, see appendix I.

[27]See figures 2 and 3 in appendix I for a depiction of beneficiary expenditures at the 20th, 50th, and 80th percentile for each health status cohort.

**Figure 1: Average Medicare Expenditures, by Quintile, for Beneficiaries of Nearly Average Health Status**



Average Medicare expenditures (dollars in thousands)

Expenditure quintile

Source: GAO analysis of 2003 Medicare claims and enrollment data.

Note: Beneficiaries who died during 2003 are excluded in this figure.

## Outlier Physicians Were Present in Every Metropolitan Area

Based on 2003 Medicare claims data, our analysis found outlier generalist physicians in all 12 metropolitan areas we studied. Our methodology assumed that, if overly expensive beneficiaries were distributed randomly across generalists, no more than 1 percent of generalists in any area would be designated as outliers. Across all areas, the actual percentage of outlier generalists ranged from 2 percent to over 20 percent.

To identify outlier generalist physicians, we compared the percentage of overly expensive beneficiaries in each physician's Medicare practice to a threshold value—the percentage of overly expensive beneficiaries in a physician's Medicare practice that would be expected to occur less than 1

time out of 100 by chance.[28] We classified those who exceeded the threshold value for their metropolitan area as outliers. That is, all physicians had some overly expensive patients in their Medicare practice, but outlier physicians had a much higher percentage of such patients.

The Miami area had the highest percentage—almost 21 percent—of outlier generalists, followed by the Baton Rouge area at about 11 percent. (See table 1.) Across the other areas, the percentage of outliers ranged from 2 percent to about 6 percent.

**Table 1: Percentage of Outlier Physicians in 12 Metropolitan Areas, 2003**

| Metropolitan area | Percentage of outlier physicians |
|---|---|
| Miami, Fla. | 20.9 |
| Baton Rouge, La. | 11.2 |
| Cape Coral, Fla. | 6.3 |
| Portland, Maine | 5.8 |
| Riverside, Calif. | 5.8 |
| Phoenix, Ariz. | 5.2 |
| Sacramento, Calif. | 5.2 |
| Des Moines, Iowa | 4.8 |
| Columbus, Ohio | 4.6 |
| Pittsburgh, Pa. | 3.8 |
| Springfield, Mass. | 2.9 |
| Albuquerque, N. Mex. | 2.0 |

Source: GAO analysis of 2003 CMS claims and enrollment data.

Note: Outlier percentages greater than 1 percent indicate that an area has an excessive number of outlier physicians.

In 2003, outlier generalists' Medicare practices were similar to those of other generalists, but the beneficiaries they treated tended to experience higher utilization of certain services. Outlier generalists and other

---

[28]In determining the threshold value, we assumed that if all generalists practiced at a similar level of efficiency, overly expensive beneficiaries would be randomly distributed across all generalists, within a geographic area. Under this assumption, in an area such as Phoenix, Ariz., where 19 percent of the beneficiaries were overly expensive, one would expect that the percentage of overly expensive patients in generalist physicians' practices would cluster around 19 percent. However, no more than 1 percent of generalists would have practices in which more than 29 percent of the patients were overly expensive. See appendix I for further detail on our methodology for calculating threshold values.

generalists saw similar average numbers of Medicare patients (219 compared with 235) and their patients averaged the same number of office visits (3.7 compared with 3.5). However, after taking into account beneficiary health status and geographic location, we found that beneficiaries who saw an outlier generalist, compared with those who saw other generalists, were 15 percent more likely to have been hospitalized, 57 percent more likely to have been hospitalized multiple times, and 51 percent more likely to have used home health services. By contrast, they were 10 percent less likely to have been admitted to a skilled nursing facility.[29]

## Health Care Purchasers Used Physician Profiling Results to Encourage Efficient Medical Practice

Consistent with the premise that physicians play a central role in the generation of health care expenditures, some health care purchasers use physician profiling to promote efficiency. The 10 health care purchasers in our study profiled physicians—that is, compared physicians' performance to an efficiency standard to identify those who practiced inefficiently. To measure efficiency, the purchasers we spoke with generally compared actual spending for physicians' patients to the expected spending for those same patients, given their clinical and demographic characteristics. Most of the 10 we spoke with also evaluated physicians on quality. The purchasers linked their efficiency profiling results and other measures to a range of physician-focused strategies to encourage the efficient provision of care.

## Health Care Purchasers in Our Study Profiled Physicians across Several Dimensions to Evaluate Physician Performance

The 10 health care purchasers we examined used two basic profiling approaches to identify physicians whose medical practices were inefficient.[30] One approach focused on the costs associated with treating a specific episode of an illness—for example, a stroke or heart attack—and assessing the physician's performance based on the resources used during that episode. The other approach focused on costs, within a specific time period, associated with the patients in a physician's practice. Both approaches shared common features. That is, both used information from medical claims data to measure resource use and account for differences

---

[29]These findings were derived from logistic regressions in which health status, geographic area, and beneficiary contact with an outlier generalist were the explanatory variables used to predict whether a beneficiary was hospitalized, used home health services, or was admitted to a skilled nursing facility.

[30]See appendix II for the names and characteristics of these health care purchasers.

in patients' health status. In addition, both approaches assessed physicians (or physician groups) based on the costs associated with services that they may not have provided directly, such as costs associated with a hospitalization or services provided by a different physician.

Although the method used by purchasers to estimate expected spending for patients varied, all used patient demographics and diagnoses. The programs generally computed efficiency measures as the ratio of actual to expected spending for patients of similar health status. Ratios greater than 1.0 (indicating that actual equals expected spending) suggest relative inefficiency while ratios below 1.0 suggest efficiency, although purchasers were free to set their own threshold. For example, one purchaser scrutinized physicians with scores above 1.2 for inefficient delivery of care. Some purchasers also took account of additional information before making a final judgment. For example, two purchasers told us that they reexamined the results for physicians who exceeded the threshold for inefficiency to see if there were factors, such as erroneous data, that made an otherwise efficient provider appear inefficient.

While our focus was on purchasers who profile for efficiency, purchasers in our study included quality measures as part of their profiling programs. For example, most purchasers evaluated physicians on one or more quality measures, such as whether patients with congestive heart failure were prescribed beta blockers. Some purchasers included factors related to patient access in their evaluations of physicians, such as whether the physician was in a specialty that was underrepresented within the network or within a particular geographic area covered by the network.

Purchasers varied with respect to the types of physicians profiled for efficiency. All of the purchasers we interviewed profiled specialists and all but one also profiled primary care physicians. Several purchasers said they would only profile physicians who treated a minimum number of cases; for example, one did not profile psychiatrists because it felt the volume of data was not sufficient to do statistical profiling. Typically such analyses require a minimum sample size to be valid. Purchasers differed on the inclusion of physician groups and individual practitioners. Four of the purchasers profiled physician group practices exclusively, three profiled individual physicians exclusively, and the remaining three profiled both.

To perform their profiling analyses, eight of the purchasers used episode-grouping models, which group claims into clinically distinct episodes of care—such as stroke—adjusted for case severity or patient health status. This approach can assign one physician primary responsibility for the

episode even if the patient sees multiple physicians. Two purchasers used a population-based model, which aggregated patient claims data to classify a patient's health status score for patients in the population to estimate expected expenditures for the patients a physician treats.

## Health Care Purchasers Linked Physician Profiling Results to Range of Incentives Encouraging Efficiency

The health care purchasers we examined directly tied the results of their profiling methods to incentives that encourage physicians to practice efficiently. In some cases, purchasers implemented these incentives directly, while in other cases, incentives were implemented at the discretion of their clients.[31] We found that the incentives varied widely in design, application, and severity of consequences—from steering patients toward the most efficient providers to excluding a physician from the purchaser's provider network because of inefficient practice patterns. The following were commonly reported incentives:

- *Physician education*: Some health care purchasers told us that they shared their profiling results with physicians to encourage more efficient care delivery or to foster acceptance of the purchaser's physician evaluation methods. For example, one purchaser's profiling report compared a physician's utilization patterns to a benchmark measure derived from the practice patterns of the physician's peer group, such as cardiologists compared with other cardiologists in the network or primary care physicians compared with other primary care physicians in the network. No purchaser employed education as the sole method of motivating physicians to change their practice patterns.

- *Publicly designating physicians based on efficiency or quality*: Some purchasers encouraged enrollees to get their care from certain physicians by designating in their physician directories those physicians who met quality or quality and efficiency standards. Other purchasers offered financial incentives to their enrollees to encourage them to patronize such physicians. The incentives may generate higher patient volume for the designated physicians, thereby achieving savings for the purchaser or their clients.

- *Using tiered arrangements to promote efficiency*: Several purchasers used profiling results to group physicians in tiers—essentially groups of physicians ranked by their level of efficiency. Enrollees selecting physicians in the higher tiers compared with those in lower tiers will

---

[31]Clients can be employers or organizations that contract with the purchasers.

obtain financial advantages—such as lower deductibles or copayments. From the purchaser's point of view, tiering has the advantage of affording enrollees freedom of choice within the purchaser's network, while making it advantageous for them to seek care from the network's most efficient physicians. Several reported that a portion of their enrollees or employers of enrollees responded to the incentives offered by the tiered arrangements to switch to more efficient physicians.

- *Bonuses and penalties*: Two of the purchasers in our study used bonuses or financial penalties to encourage efficient medical practices. They awarded bonuses to physicians based on their efficiency and quality scores. To finance bonuses, one purchaser withholds 10 percent of each physician's total reimbursement amount and with those funds pays bonuses to only those physicians who have high quality and efficiency scores. The amount withheld from physicians who did not meet standards serves as an implicit financial penalty.

- *Network exclusion*: One purchaser terminated its contractual relationship with physicians in its network when it determined that the physicians were practicing inefficiently. In an effort to control costs, the purchaser stated that it excluded about 3 percent of the physicians in its network in 2003. Although the purchaser has not ruled out similar actions in the future, it had not excluded additional physicians for reasons of inefficiency at the time of our interview.

## Physician Profiling Suggests Potential for Savings

Evidence from our interviews with the health care purchasers in our study suggests that physician profiling programs may have the potential to generate savings for health care purchasers or their clients. Three of the 10 purchasers provided us with estimates of savings attributable to their physician-focused efficiency efforts. One placed more efficient physicians in a special network and reported that premiums for this network were 3 to 7 percent lower than premiums for the network that includes the rest of its physicians. Another reported that growth in spending fell from 12 percent to about 1 percent in the first year after it restructured its network as part of its efficiency program. By examining the factors that contributed to the reduction, an actuarial firm hired by the purchaser estimated that about three-quarters of the reduction in expenditure growth was most likely a result of the efficiency program. The third purchaser reported a "sentinel" effect—the effect of being scrutinized—resulting from its physician profiling efforts. This purchaser estimated that the sentinel effect associated with its physician efficiency program reduced spending by as much as 1 percent. Three other purchasers suggested their

programs might have achieved savings for themselves or their clients but did not provide us with their savings estimates, while four said they had not yet attempted to measure savings at the time of our interviews.

# CMS Has Tools Available to Profile Physicians for Efficiency, but May Need Some Additional Authorities to Use Results in Ways Similar to Other Purchasers

Medicare's data-rich environment is conducive to conducting profiling analyses designed to identify physicians whose medical practices are inefficient compared with their peers. CMS has a comprehensive repository of Medicare claims data and experience using key methodological tools. However, CMS may not have legislative authority to implement some of the incentives used by other health care purchasers to encourage efficiency.

## Medicare's Data-Rich Environment Is Conducive to Profiling for Efficiency

Fundamental to profiling physicians for efficiency is the ability to make statistical comparisons that enable health care purchasers to identify physicians practicing outside of established norms. CMS has the resources to make statistically valid comparisons, including comprehensive medical claims information, tools to adjust for differences in patient health status, and sufficient numbers of physicians in most areas to construct adequate sample sizes. As with the development of any new system, however, CMS would need to make choices about its design and implementation.

Among the resources available to CMS are the following:

- *Comprehensive source of medical claims information*: CMS maintains a centralized repository (database) of all Medicare claims that provides a comprehensive source of information on patients' Medicare-covered medical encounters. The data are in a uniform format, as Medicare claim forms are standardized. In addition, the data are relatively recent: CMS states that 90 percent of clean claims are paid within 30 days and new information is added to the central database weekly. Using claims from the central database, each of which includes the beneficiary's unique identification number, CMS can identify and link patients to the various types of services they received—including, for example, hospital, home health, and physician services—and to the physicians who treated them.

- *Data samples large enough to ensure meaningful comparisons across physicians*: The feasibility of using efficiency measures to compare physicians' performance depends on two factors—the availability of enough data on each physician to compute a reliable efficiency measure and numbers of physicians large enough to provide meaningful comparisons. In 2005, Medicare's 33.6 million FFS enrollees were served by about 618,000 physicians. These figures suggest that CMS has enough clinical and expenditure data to compute reliable efficiency measures for most physicians billing Medicare.

- *Methods to account for differences in patient health status*: Because sicker patients are expected to use more health care resources than healthier patients, patients' health status needs to be taken into account to make meaningful comparisons among physicians. The 10 health care purchasers we examined accounted for differences in patients' health status through various risk adjustment methods. Medicare has significant experience with risk adjustment. Specifically, CMS has used increasingly sophisticated risk adjustment methodologies over the past decade to set payment rates for beneficiaries enrolled in managed care plans.[32]

To conduct profiling analyses, CMS would likely make methodological decisions similar to those made by the health care purchasers we interviewed. For example, the health care purchasers we spoke with made choices about, among other things, whether to profile individual physicians or group practices; which risk adjustment tool was best suited for the purchaser's physician and enrollee population; whether to measure costs associated with episodes of care or the costs, within a specific time period, associated with the patients in a physicians' practice; and what criteria to use to define inefficient practices.

CMS would also likely want to take steps similar to those of other purchasers to supplement its efficiency assessments with additional information before using the results to do more than share information with physicians. For example, some purchasers in our study reviewed their profiling results for physicians who did not meet the efficiency standard to validate the accuracy of their assessments. Such validation of profiling results would be appropriate if CMS were to institute financial

---

[32]Our estimate of the prevalence of physicians likely to practice inefficiently, discussed earlier in this report, relied on a risk adjustment methodology similar to that CMS uses to adjust Medicare payments to health plans in Medicare Advantage.

incentives for physicians to improve the efficiency of the care they provide and order for Medicare beneficiaries.

## To Use Profiling Results in Medicare in Ways Similar to Other Purchasers Would Likely Require Additional Authorities

Some of the actions health care purchasers take as a result of their physician profiling may not be readily adaptable to Medicare, given the program's structural underpinnings, but they may be instructive in suggesting future directions for Medicare. Although Medicare has extensive experience with physician education efforts, the implementation of other strategies to encourage efficiency would likely require legislation providing authority to the Secretary of Health and Human Services.

Educational outreach to physicians has been a long-standing and widespread activity in Medicare as a means to change physician behavior based on profiling efforts to identify improper billing practices and potential fraud. Outreach includes letters sent to physicians alerting them to billing practices that are inappropriate.[33] In some cases, physicians are given comparative information on how the physician varies from other physicians in the same specialty or locality with respect to use of a certain service. A physician education effort based on efficiency profiling results would therefore not be a foreign concept in Medicare. For example, CMS could provide physicians a report that compares their practice's efficiency with that of their peers. This would enable physicians to see whether their practice style is outside the norm. In its March 2005 report to the Congress,[34] MedPAC recommended that CMS measure resource use by physicians and share the results with them on a confidential basis. MedPAC suggested that such an approach would enable CMS to gain experience in examining resource use measures and identifying ways to refine them while affording physicians the opportunity to change inefficient practices.[35]

---

[33]Other forms of physician education include face-to-face meetings, telephone conferences, seminars, and workshops.

[34]MedPAC, 2005.

[35]In several testimonies before the Congress in the last half of 2005, CMS officials said that they were taking steps to implement this recommendation. See Value-Based Purchasing for Physicians Under Medicare: Hearing Before the House Subcommittee on Health, Committee on Ways and Means, 109th Cong. (2005) (statement of Mark B. McClellan, MD, Ph.D., Administrator of CMS).

Another application of profiling results used by the purchasers we spoke with entailed sharing comparative information with enrollees. CMS has considerable experience comparing certain providers on quality measures and posting the results to a Web site. Currently, Medicare Web sites posting comparative information exist for hospitals, nursing homes, home health care agencies, dialysis facilities, and managed care plans. In its March 2005 report to the Congress, MedPAC noted that CMS could share results of physician performance measurement with beneficiaries once the agency gained sufficient experience with its physician measurement tools.

Several structural features of the Medicare program would appear to pose challenges to the use of other strategies designed to encourage efficiency. These features include a beneficiary's freedom to choose any licensed physician permitted to be paid by Medicare; the lack of authority to exclude physicians from participating in Medicare unless they engage in unlawful, abusive, or unprofessional practices; and a physician payment system that does not take into account the efficiency of the care provided. Under these provisions, CMS would not likely be able—in the absence of additional legislative authority—to designate preferred providers,[36] assign physicians to tiers associated with varying beneficiary copayments, tie fee updates of individual physicians to meeting performance standards,[37] or exclude physicians who do not meet practice efficiency and quality criteria.

Regardless of the use made of physician profiling results, the involvement of, and acceptance by, the physician community and other stakeholders of any actions taken is critical. Several purchasers described how they had worked to get physician buy-in. They explained their methods to physicians and shared data with them to increase physicians' familiarity with and confidence in the purchasers' profiling. CMS has several avenues for obtaining the input of the physician community. Among them is the federal rule-making process, which generally provides a comment period for all parties affected by prospective policy changes. In addition, CMS forms federal advisory committees—including ones composed of physicians and other health care practitioners—that regularly provide it

---

[36]Preferred providers refers to those providers who meet a purchaser's utilization, price, and quality standards. Patients who choose providers who are not preferred are assessed higher copayments.

[37]Medicare fee updates are annual adjustments made to physicians' fees.

with advice and recommendations concerning regulatory and other policy decisions.

## Conclusions

The health care spending levels predicted to overwhelm the Medicare program call for action to be taken promptly. To address this looming problem, no single action or reform is likely to suffice, and policymakers are seeking solutions among an array of reform proposals. Our findings suggest that physician profiling is one promising, targeted approach toward curbing excessive spending both for physician services and for the services that physicians order.

Our profiling of generalist physicians in 12 metropolitan areas found indications of inefficient physician practices occurring in areas with low spending per beneficiary as well as in areas with high spending. To ensure that our estimates were fair, we adjusted them to account for the fact that some physicians have sicker patients than others; in addition, our efficiency standards were based on actual practices by local physicians rather than on a single measure applied to all physicians, regardless of geographic area. Notably, two areas—Miami and Baton Rouge—had particularly large proportions of outlier physicians compared with the other areas.

Some health care purchasers seek to curb inefficient practices through physician education and other measures directed at physicians' income—such as discouraging patients from obtaining care from physicians whom the purchaser, through profiling, ranks as inefficient. If similar approaches were adopted in Medicare—that is, profiling physicians for efficiency and strategically applying the results—the experience of other purchasers suggests that reductions in spending growth could be achieved. The adoption of a profiling system could require the modification of certain basic Medicare principles. For example, if CMS had the authority to rank-order physicians based on efficiency and tier beneficiary copayments accordingly, beneficiaries could retain the freedom to choose among providers but would be steered, through financial incentives, toward those identified as most efficient. CMS would likely find it desirable to base the tiers on both quality and efficiency. It would also be important to develop an evaluation component to measure the profiling system's impact on program spending and physician behavior.

In addition, a physician profiling system in Medicare could work in ways that would be complementary to the SGR system. That is, if Medicare instituted a physician profiling system that resulted in gains in efficiency,

over time the rate of growth in volume and intensity of physician services could decline and the SGR targets would be less likely to be exceeded. At the same time, under a profiling system that focused on total program expenditures, Medicare could experience a drop in unnecessary utilization of other services, such as hospitalizations and home health care. Although savings from physician profiling alone would clearly not be sufficient to correct Medicare's long-term fiscal imbalance, it could be an important part of a package of reforms aimed at future program sustainability.

## Recommendation for Executive Action

Given the contribution of physicians to Medicare spending in total, we recommend that the Administrator of CMS develop a profiling system that identifies individual physicians with inefficient practice patterns and, seeking legislative changes as necessary, use the results to improve the efficiency of care financed by Medicare. The profiling system should include the following elements:

- total Medicare expenditures as the basis for measuring efficiency,

- adjustments for differences in patients' health status,

- empirically based standards that set the parameters of efficiency,

- a physician education program that explains to physicians how the profiling system works and how their efficiency measures compare with those of their peers,

- financial or other incentives for individual physicians to improve the efficiency of the care they provide, and

- methods for measuring the impact of physician profiling on program spending and physician behavior.

## Agency and Professional Association Comments and Our Evaluation

We obtained written comments on a draft of this report from CMS (see app. IV). We obtained oral comments from representatives of the American College of Physicians (ACP) and the American Medical Association (AMA).

## CMS Comments

CMS stated that our recommendation was very timely and that it fits into efforts the agency is pursuing to improve the quality and efficiency of care paid for by Medicare. CMS also found our focus on the need for risk adjustment in measuring physician resource use to be particularly helpful. CMS noted that its current measurement efforts involve evaluation of "episode grouper" technology, which examines claims data for a given episode of care, and called it a promising approach. We do not disagree, but we also believe that approaches involving the measurement of total patient expenditures are equally promising.

CMS said that the agency would incur significant recurring costs to develop reports on physician resource use, disseminate them to physicians nationwide, and evaluate the impact of the program. While our report notes that CMS is familiar with key methodological tools needed to conduct such an effort, we agree that any such undertaking would need to be adequately funded. CMS was silent on a strategy for using profiling results beyond physician education. We believe that the optimal profiling effort would include financial or other incentives to curb individual physicians' inefficient practices and would measure the effort's impact on Medicare spending.

## Professional Association Comments

AMA and ACP raised three principal concerns about physician profiling: the relative importance of quality and efficiency, the adequacy of risk adjustment methods, and the ways profiling results would be used. Both said that quality standards should be the primary focus of a physician profiling system. AMA said including incentives that promote the provision of high-quality care might increase costs initially but could reduce costs in the long term. Although we agree that quality is an important measure of physician performance, given growing concern about Medicare's fiscal sustainability, we believe that a focus on the efficient delivery of care is essential.

With regard to the use of risk adjustment methods in assessing physician efficiency, both AMA and ACP said that this technique has significant shortcomings. For example, AMA said that diagnostic information included in the claims data used in risk adjustment may not adequately capture differences in patient health status. AMA also said that these data lack information on other factors that affect health status and spending, such as differences in patient compliance with medical advice. ACP echoed this concern. We believe that these claims data limitations are not of sufficient importance to preclude their use for profiling physicians treating Medicare patients. As our report notes, risk adjustment methods

using claims information are now used by many private payers in measuring physician resource use. Moreover, Medicare currently uses one such risk adjustment method to set payment rates for managed care plans.

Finally, both AMA and ACP expressed reservations about linking the results of profiling to physician reimbursement. The AMA stated that it was acceptable to use profiling results for the purpose of physician education, but an exclusive focus on costs was not. Although all of the purchasers we interviewed included physician education in their profiling programs, none of them relied on it as the sole means for encouraging physicians to practice efficiently. Similarly, we believe that, to restrain the growth in Medicare expenditures, a physician profiling system would need financial or other incentives to motivate physicians to practice medicine efficiently.

We are sending a copy of this report to the Administrator of CMS. We will also provide copies to others on request. In addition, this report is available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have questions about this report, please contact me at (202) 512-7101 or steinwalda@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix IV.

A. Bruce Steinwald
Director, Health Care

*List of Committees*

The Honorable Max Baucus
Chairman
The Honorable Charles E. Grassley
Ranking Member
Committee on Finance
United States Senate

The Honorable John D. Dingell
Chairman
The Honorable Joe L. Barton
Ranking Member
Committee on Energy and Commerce
House of Representatives

The Honorable Charles B. Rangel
Chairman
The Honorable Jim McCrery
Ranking Member
Committee on Ways and Means
House of Representatives

The Honorable Frank J. Pallone, Jr.
Chairman
The Honorable Nathan Deal
Ranking Member
Subcommittee on Health
Committee on Energy and Commerce
House of Representatives

The Honorable Pete Stark
Chairman
The Honorable Dave Camp
Ranking Member
Subcommittee on Health
Committee on Ways and Means
House of Representatives

GAO-07-307  Physician Efficiency in Medicare

# Appendix I: Methodology for Identifying Physicians with a Disproportionate Share of Overly Expensive Beneficiaries

We developed a methodology to identify physicians whose practices were composed of a disproportionate number of overly expensive beneficiaries—that is, beneficiaries whose costs rank them in the top 20 percent when compared to the costs of other beneficiaries with similar health status. We focused our analysis on generalists—physicians who described their specialty as general practice, internal medicine, or family practice—in the following 12 metropolitan areas: Albuquerque, N.M.; Baton Rouge, La.; Des Moines, Iowa; Phoenix, Ariz.; Miami, Fla.; Springfield, Mass.; Cape Coral, Fla.; Riverside, Calif.; Pittsburgh, Pa.; Columbus, Ohio; Sacramento, Calif.; and Portland, Maine.[1] We selected these metropolitan areas to obtain a sample of physicians that was geographically diverse and represented a range in average Medicare spending per beneficiary. We assigned physicians to a particular metropolitan area based on where the plurality of their Medicare expenditures was generated. Our results are not statistically generalizable.

To conduct our analysis, we obtained 2003 Centers for Medicare & Medicaid Services (CMS) data from the following sources: (1) the Standard Analytic Files, a repository of Medicare claims information that include data on physician/supplier, durable medical equipment, skilled nursing, home health, hospice, and hospital inpatient and outpatient services and (2) the Denominator File, a database that contains enrollment and entitlement status information for all Medicare beneficiaries enrolled and/or entitled in a given year. To assess beneficiary health status, we used commercially available software developed by DxCG, Inc. This software uses beneficiary characteristics—age, sex, and Medicaid status—and diagnosis codes included on medical claims to assign each beneficiary a single health "risk score"—a summary measure of the beneficiary's current health status corresponding to the beneficiary's expected health care costs relative to the costs of the average Medicare beneficiary.[2] We analyzed the

---

[1]These areas were based on the following Core-Based Statistical Areas (an umbrella term for micropolitan and metropolitan statistical areas): Albuquerque, N.M.; Baton Rouge, La.; Des Moines, Iowa; Phoenix-Mesa-Scottsdale, Ariz.; Miami-Fort Lauderdale-Miami Beach, Fla.; Springfield, Mass.; Cape Coral-Fort Myers, Fla.; Riverside-San Bernardino-Ontario, Calif.; Pittsburgh, Pa.; Columbus, Ohio; Sacramento–Arden-Arcade–Roseville, Calif.; and Portland-South Portland-Biddeford, Maine.

[2]For example, a beneficiary with a risk score of .5 is expected to have one-half the health care costs of the average Medicare beneficiary, whereas a beneficiary with a score of 2 is expected to have costs that are twice the national average. CMS uses such measures to prospectively set payment rates for managed care plans, known as Medicare Advantage.

Medicare practices of 7,105 physicians who provided services to 1,283,943 beneficiaries.

## Method for Identifying Overly Expensive Beneficiaries

Because our method for identifying overly expensive beneficiaries requires comparable information on total beneficiary costs, we developed a slightly different methodology for two groups of beneficiaries—survivors (beneficiaries who did not die in 2003) and decedents (beneficiaries who died in 2003). Decedents typically have annualized costs that are much higher than survivors[3] but usually have less than 12 months of Medicare enrollment in their last year of life. We included survivors in our analysis if they had (1) 12 months of Medicare fee-for-service (FFS) enrollment in 2003 and (2) were not covered by other health insurance for which Medicare was determined to be a secondary payer.[4] Decedents were included if they were continuously enrolled in Medicare FFS as of January 2003 and met the second criterion. Beneficiaries included in our analysis had at least one office visit with a generalist physician in one of the selected metropolitan areas.

Using DxCG software, we examined the diagnosis codes on survivors' 2003 hospital inpatient, outpatient, and physician claims and generated a separate health risk score for each beneficiary. The risk scores reflect the level of a beneficiary's relative health status, and in our analysis, ranged from .01 (very healthy) to 30.84 (extremely ill). Next, using their risk scores, we assigned survivors into 1 of 31 discrete risk categories. The categories were ordered in terms of health status from very healthy (category 1) to extremely ill (category 31). Finally, we calculated each survivor's total 2003 Medicare costs from all types of providers (hospital inpatient, outpatient, physician, durable medical equipment, skilled nursing facility, home health, and hospice). We included costs from all Medicare claims submitted on survivors' behalf, including claims from locations outside the selected metropolitan areas. Within each risk category, we ranked survivors by their total costs. Survivors who ranked in the top 20 percent of their assigned risk category were designated as

---

[3]GAO, *Medicare+Choice: Payments Exceed Cost of Fee-for-Service Benefits, Adding Billions to Spending*, GAO/HEHS-00-161 (Washington D.C.: Aug. 23, 2000).

[4]We excluded beneficiaries for whom Medicare was a secondary payer because we were not able to determine their total costs. Such persons, though eligible for Medicare, may have some of their health care costs covered by employer-sponsored or other private insurance. We also excluded beneficiaries who had End Stage Renal Disease.

Appendix I: Methodology for Identifying
Physicians with a Disproportionate Share of
Overly Expensive Beneficiaries

overly expensive.[5] Figure 2 and figure 3 show the range of costs in the 31 risk categories for survivors in our sample.

**Figure 2: Distribution of Total Per-Beneficiary Medicare Expenditures for Survivors for Risk Categories 1-10**



Medicare expenditures (dollars in thousands)

Risk category

⊤ 80th percentile
● Median
⊥ 20th percentile

Source: GAO analysis of 2003 Medicare claims.

[5]Our objective was to group together beneficiaries with generally similar health statuses. To assess whether our method of assigning beneficiaries to risk categories achieved this objective, we ranked beneficiaries within each risk category by their risk score and divided them into two equal-sized groups. Despite having slightly lower risk scores, beneficiaries who were placed in the bottom half group were on average about 1 percent more likely to be classified as overly expensive than beneficiaries in the top half group. Consequently, across all risk categories, beneficiaries had roughly the same chance of being classified as overly expensive based on their 2003 expenditures.

Appendix I: Methodology for Identifying
Physicians with a Disproportionate Share of
Overly Expensive Beneficiaries

**Figure 3: Distribution of Total Per-Beneficiary Medicare Expenditures for Survivors for Risk Categories 11-31**



Source: GAO analysis of 2003 Medicare claims.

The methodology we used to identify decedents who were overly expensive was identical to that used for survivors, with one exception. Before ranking decedents by their total costs, we further divided them within each risk category by the number of months they were enrolled in Medicare FFS during 2003. This was necessary because decedents varied in the number of months they incurred health care costs. For example, decedents who died in October had up to 10 months to incur costs while those who died in January had 1 month or less to incur costs.

The proportion of overly expensive beneficiaries varied across the areas we examined. We identified overly expensive beneficiaries within health status cohorts that spanned all 12 of the metropolitan areas. As a consequence, it was possible that some areas would have proportionately more overly expensive beneficiaries than others. For example, the Miami Fort Lauderdale-Miami Beach, Fla., Core-Based Statistical Area (CBSA) had the highest proportion of overly expensive beneficiaries, .28, and the

Des Moines, Iowa, CBSA had the lowest proportion with .13. The remaining areas had proportions that ranged from .13 to .21.

## Method for Identifying Outlier Physicians

For each generalist physician, we determined the proportion of his or her Medicare patients that were overly expensive. Physicians' proportions of overly expensive beneficiaries varied substantially both across and within metropolitan areas. For example, in Miami, where the overall proportion of overly expensive patients was .28, individual physicians' proportions ranged from .08 to .98. Similarly, in Sacramento, the overall proportion was .16, with individual physicians' proportions ranging from .05 to .60. To ensure that our estimate of each physician's proportion of overly expensive beneficiaries was statistically reliable, we excluded physicians with small Medicare practices.[6]

We classified generalists as outliers if their practice was composed of such a high proportion of overly expensive beneficiaries that the proportion would only be expected to occur by chance no more than 1 time out of 100. In order to determine this proportion (threshold value) we conducted separate Monte Carlo simulations for each area.[7]

In each simulation, which we repeated 200 times for each metropolitan area, we randomly classified each of a generalist's patients into one of two categories—overly expensive or other. The probability of a beneficiary being randomly assigned to the overly expensive category was equal to the proportion of physician-patient pairings in the metropolitan area in which the patient was an overly expensive beneficiary.[8] We then determined the

---

[6]Because the composition of a physician's practice may change during the year—a physician may acquire new patients while other patients may die or leave—the proportion of overly expensive patients associated with a particular physician can be treated as a sample statistic. To ensure reliability of this statistic, we limited our analysis to physicians who treated a substantial number of patients. We established a minimum practice size for physicians included in our analysis so that we would be 95 percent confident that our estimate of the true proportion of a physician's practice comprised of overly expensive patients was accurate within 10 percent. See William G. Cochran, *Sampling Techniques* (New York: John Wiley and Sons, 1977), 75-76. Because the precision of our estimate is a function of the overall proportion of overly expensive patients within a metropolitan area, the minimum sampling size varied across metropolitan areas.

[7]Monte Carlo simulation is a statistical technique by which a quantity is calculated repeatedly, using randomly selected "what-if" scenarios for each calculation.

[8]In the simulations, only the beneficiary's status, in terms of being overly expensive, was randomized. The numbers of patients in each generalist's practice, and the number of generalists each patient saw, remained the same in each simulation.

percentage of generalists for each proportion of overly expensive patients.[9] The results generated by each of the 200 simulations were averaged to determine an expected percentage of generalists at each proportion of overly expensive beneficiaries. We defined the outlier threshold value as the point in the expected distribution where only 1 percent of physicians would have a proportion of overly expensive beneficiaries that large or larger.

To illustrate our method, we present in figure 4 the actual and expected distributions of generalists in a hypothetical metropolitan area. The dotted line represents the distribution of generalists by their proportion of overly expensive beneficiaries that would be expected if such patients were randomly distributed among generalists. The solid line shows the actual distribution of generalists by their proportion of overly expensive patients. The vertical line (outlier threshold value) denotes the 99th percentile of the expected distribution—.25. That is, by chance, only 1 percent of generalists would be expected to have a proportion of overly expensive beneficiaries greater than .25. As shown by the area under the solid line and to the right of the vertical line, about 11 percent of generalists in this hypothetical example had actual proportions of overly expensive beneficiaries that exceeded .25—these generalists would be classified as outliers in our analysis.

---

[9]In determining the distribution of generalists, the proportion of overly expensive beneficiaries was rounded to one-half percent intervals.

Appendix I: Methodology for Identifying
Physicians with a Disproportionate Share of
Overly Expensive Beneficiaries

**Figure 4: Actual and Simulated Distribution of Generalists by their Medicare Practice's Proportion of Overly Expensive Beneficiaries in a Hypothetical Metropolitan Area**



Source: GAO analysis.

Table 2 shows that the proportion of overly expensive beneficiaries and the outlier threshold value varied across metropolitan areas. In general, areas that had higher proportions of overly expensive beneficiaries also had higher outlier threshold values. (See table 2.)

Appendix I: Methodology for Identifying
Physicians with a Disproportionate Share of
Overly Expensive Beneficiaries

**Table 2: Proportion of Overly Expensive Beneficiaries and Outlier Threshold Value by CBSA**

| CBSA | Proportion of overly expensive beneficiaries[a] | Outlier threshold value |
|------|---|---|
| Miami-Fort Lauderdale-Miami Beach, Fla. | 0.28 | 0.43 |
| Riverside-San Bernardino-Ontario, Calif. | 0.21 | 0.31 |
| Cape Coral-Fort Myers, Fla. | 0.23 | 0.30 |
| Phoenix-Mesa-Scottsdale, Ariz. | 0.19 | 0.29 |
| Baton Rouge, La. | 0.19 | 0.28 |
| Pittsburgh, Pa. | 0.16 | 0.26 |
| Sacramento–Arden-Arcade–Roseville, Calif. | 0.16 | 0.25 |
| Columbus, Ohio | 0.16 | 0.25 |
| Springfield, Mass. | 0.17 | 0.25 |
| Albuquerque, N.Mex. | 0.13 | 0.22 |
| Portland, Maine | 0.13 | 0.22 |
| Des Moines, Iowa | 0.13 | 0.21 |

Source: GAO analysis of 2003 Medicare claims data.

[a]The figures presented in this column reflect the proportion of beneficiaries in each metropolitan area who were classified as overly expensive. By contrast, the outlier threshold values are based on the proportion of physician-beneficiary relationships in a metropolitan area that involved an overly expensive beneficiary. Because some beneficiaries saw more than one generalist in 2003, the proportion of overly expensive beneficiaries in an area may differ slightly from the proportion of doctor-patient relationships involving overly expensive beneficiaries. For example, in the Phoenix-Mesa-Scottsdale, Ariz., CBSA, where 19 percent of beneficiaries were overly expensive, 20 percent of physician-beneficiary relationships involved an overly expensive beneficiary. Overly expensive beneficiaries in that CBSA saw slightly more generalists than other beneficiaries and accounted for a proportionately larger share of all doctor-patient relationships than their share of the overall beneficiary population.

# Appendix II: Health Care Purchaser Program Characteristics

In 2005 and 2006 we interviewed representatives of 10 health care purchasers who had implemented a physician profiling program. We also conducted some follow-up contacts to ensure the data were current. We had at least one purchaser from each major geographic area of the country as well as one Canadian province. These purchasers represented a mix of traditional health insurance plans and organizations that arrange care for select groups of patients. Five were commercial health plans, three were government agencies, one was a provider network that contracts with several insurance companies to provide care to their enrollees, and one was a trust-fund jointly managed by employers and a union.

Table 2 presents the basic characteristics of each purchaser's profiling program and includes, among other things, (1) the approximate number of covered lives and physicians profiled; (2) the year the purchaser began profiling physicians; (3) whether the purchaser profiled individual or group practices or both; (4) whether the purchaser also used quality measures, such as adherence to clinical practice guidelines, to evaluate physicians; and (5) the unit of resource use employed to measure efficiency. The purchasers with the classification of "Episode" used an episodic grouper, which links claims into an episode of care that may span multiple encounters and multiple providers. By adjusting for the severity of like illnesses, episode groupers allow purchasers to measure payments to a particular physician or physician group relative to their peers. The purchasers with the classification "Patient" used a person-based method of categorizing illness severity. This method allows the purchaser to compare actual expenditures relative to an estimate of what was expected to have been spent given the level of "sickness" of the patients in a particular practice.

Appendix II: Health Care Purchaser Program
Characteristics

**Table 3: Characteristics of Health Care Purchasers' Physician Profiling Programs**

| Purchaser name | Approximate number of covered lives affected[a] | Approximate number of physicians profiled | Locations | Year physician profiling began | Type of practice profiled | Quality measures used | Unit of resource use employed to measure efficiency |
|---|---|---|---|---|---|---|---|
| Aetna | 500,000[b] | 15,000 | Multistate[c] | 2004 | Group | Yes | Episode |
| BlueCross BlueShield of Texas | 60,000 | 26,000 | Texas | 2004 | Group and individual | Yes | Episode |
| Greater Rochester Independent Practice Association | 120,000 | 640 | New York | 1996 | Individual | Yes | Episode |
| Health Insurance BC (British Columbia, Canada) | 4,100,000 | 8,000 | British Columbia | 1997 | Individual | No | Patient |
| HealthPartners | 650,000 | 27,000 | Minnesota | 1989[d] | Group | Yes | Episode |
| Hotel Employees and Restaurant Employees International Union Welfare Fund | 130,000 | 2,000 | Nevada | 2000 | Group and individual | Yes | Episode |
| Massachusetts Group Insurance Commission | 268,000 | 19,000 | Massachusetts | 2004 | Individual | Yes | Episode |
| Minnesota Advantage Health Plan | 115,000 | [e] | Minnesota | 2002 | Group[f] | No | Patient |
| PacifiCare Health Systems[g] | 1,500,000[h] | 14,000 | California | 1993[i] | Group | Yes | Episode |
| UnitedHealthcare | 10,600,000 | 80,000 | Multistate[j] | 2005 | Group and individual | Yes | Episode |

Source: Health care purchasers.

[a]This column describes the total number of patients or plan members who are potentially affected by the profiling program. In some cases, their exposure may be limited to having access to purchaser evaluations of the profiled physicians.

[b]This figure refers to the number of Aetna enrollees in plans that included the Aexcel network.

[c]In 2006, Aetna's Aexcel network was available in Dallas, Tex.; Jacksonville, Fla.; Seattle, Wash.; Atlanta, Ga.; Connecticut; Houston, Tex.; Los Angeles, Calif.; metropolitan Washington, D.C.; metropolitan New York, N.Y.; Northern New Jersey; Arizona; Austin, Tex.; Chicago, Ill.; Cleveland, Ohio; Columbus, Ohio; Maine; Northern California; Orlando, Fla.; San Antonio, Tex.; South Florida; and Tampa, Fla.

[d]HealthPartners began profiling at this time for more limited purposes, such as negotiating fee schedules, rather than trying to influence physician and patient behavior.

[e]Minnesota Advantage Health Plan had about 50 provider groups at the time of our interview, each of which may have included physicians and institutional providers together.

Appendix II: Health Care Purchaser Program
Characteristics

<sup>i</sup>Minnesota Advantage combined individual practitioners into a single entity for the purposes of profiling.

<sup>g</sup>When we began our study, PacifiCare Health Systems and UnitedHealthcare were separate organizations with their own physician profiling programs. Although PacifiCare Health Systems merged with UnitedHealth Group, of which UnitedHealthcare is a part, in December 2005, as of December 2006, the profiling programs continued to be separate.

<sup>h</sup>This figure represents the number of PacifiCare Health Systems enrollees who have access to some profiling data. A smaller number of enrollees in select areas have reduced copayments if they patronize physicians rated as higher quality, lower cost providers.

<sup>i</sup>PacifiCare Health Systems began profiling in 1993; in later years the effort was enhanced to include, among other measures, indicators of quality, patient safety, and patient satisfaction.

<sup>j</sup>UnitedHealthcare profiled physicians in their provider networks in Iowa, Illinois, Indiana, Kansas, Kentucky, Michigan, Ohio, Wisconsin, North Carolina, Washington, Florida, Georgia, Louisiana, Tennessee, Arizona, Colorado, Texas, Nebraska, Mississippi, and Utah.

# Appendix III: Distribution of Physicians by Their Proportion of Overly Expensive Beneficiaries by Metropolitan Area

This appendix displays the distribution of generalist physicians by the proportion of overly expensive beneficiaries in their Medicare practice for each of the 12 metropolitan areas in our study. The vertical line in each chart represents the outlier threshold value for that area. If the proportion of overly expensive beneficiaries in a physician's practice exceeded this value, then the physician was designated an outlier physician.

**Figure 5: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Albuquerque, N.Mex.**



Source: GAO analysis of 2003 Medicare claims data.

Appendix III: Distribution of Physicians by
Their Proportion of Overly Expensive
Beneficiaries by Metropolitan Area

**Figure 6: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Baton Rouge, La.**



Source: GAO analysis of 2003 Medicare claims data.

**Figure 7: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Cape Coral, Fla.**



Source: GAO analysis of 2003 Medicare claims data.

GAO-07-307  Physician Efficiency in Medicare

**Figure 8: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Columbus, Ohio**



Source: GAO analysis of 2003 Medicare claims data.

**Figure 9: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Des Moines, Iowa**



Source: GAO analysis of 2003 Medicare claims data.

Appendix III: Distribution of Physicians by
Their Proportion of Overly Expensive
Beneficiaries by Metropolitan Area

**Figure 10: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Miami, Fla.**



Source: GAO analysis of 2003 Medicare claims data.

**Figure 11: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Phoenix, Ariz.**



Source: GAO analysis of 2003 Medicare claims data.

Appendix III: Distribution of Physicians by
Their Proportion of Overly Expensive
Beneficiaries by Metropolitan Area

**Figure 12: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Pittsburgh, Pa.**



Source: GAO analysis of 2003 Medicare claims data.

**Figure 13: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Portland, Maine**



Source: GAO analysis of 2003 Medicare claims data.

GAO-07-307  Physician Efficiency in Medicare

Appendix III: Distribution of Physicians by
Their Proportion of Overly Expensive
Beneficiaries by Metropolitan Area

**Figure 14: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Riverside, Calif.**



Source: GAO analysis of 2003 Medicare claims data.

**Figure 15: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Sacramento, Calif.**



Source: GAO analysis of 2003 Medicare claims data.

Appendix III: Distribution of Physicians by
Their Proportion of Overly Expensive
Beneficiaries by Metropolitan Area

**Figure 16: Percentage of Generalist Physicians by Their Medicare Practice's Proportion of Overly Expensive Beneficiaries—Springfield, Mass.**



Source: GAO analysis of 2003 Medicare claims data.

# Appendix IV: Comments from the Centers for Medicare & Medicaid Services



DEPARTMENT OF HEALTH & HUMAN SERVICES                 Centers for Medicare & Medicaid Services

MAR 2 9 2007                 Administrator
                             Washington, DC 20201

TO:        A. Bruce Steinwald
           Director, Health Care

FROM:      Leslie V. Norwalk, Esq.
           Acting Administrator

SUBJECT:   Government Accountability Office's Draft Report: "MEDICARE: Focus on
           Physician Practice Patterns Can Lead to Greater Program Efficiency"
           (GAO-07-307)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to respond to
the Government Accountability Office's draft report entitled, "Medicare: Focus on Physician
Practice Patterns Can Lead to Greater Program Efficiency." This report studied the prevalence
of physicians in Medicare who are likely to practice inefficiently, the existence of physician-
focused strategies used by health care purchasers to encourage efficiency and the potential for
Medicare to profile physicians for efficiency. We agree that, given the role of physicians in
driving total Medicare spending, there is opportunity to increase the efficiency of the Medicare
program by measuring and reporting on physician resource use. In addition, we found the
attention in the report to the need for adequate risk adjustment for physician resource use reports
to be particularly helpful.

The CMS is in the process of transforming from a passive payer to an active purchaser of health
care services. To maximize the value of the Medicare dollar, we are studying and implementing
value-based purchasing initiatives for various Medicare payment systems, including physicians'
services. Value-based purchasing links assessment of performance, through the use of measures,
to financial and other incentives, such as public reporting. A comprehensive set of performance
measures includes not only measures of clinical effectiveness and patient-centeredness, but also
measures of resource use. Thus, value-based purchasing recognizes the importance of measuring
and encouraging both the provision of high quality care and the avoidance of unnecessary
resource use in the provision of care.

## GAO Recommendation

The GAO recommends that CMS develop a system that identifies individual physicians with
inefficient practice patterns and to seek legislative changes as necessary, to improve the
efficiency of care financed by Medicare.

Page 2 – A. Bruce Steinwald, Director

CMS Response

This is a very timely recommendation and fits into the broader work that CMS is pursuing with
regard to maximizing the value of the services for which Medicare pays. Specifically, CMS is
investigating measuring individual physician resource use with the goal of improving the quality
and efficiency of care paid for by Medicare. We believe that measuring resource use needs to
maintain quality in the provision of care to Medicare beneficiaries and encourage physicians
focus on efficiency. Consequently, our goals are to develop and implement measures of
physician resource use that are linked to our physician quality measures.

A goal of resource use measurement is to provide information that is meaningful, actionable, and
fair to physicians in order to reduce inefficient practice patterns. We have tested various
approaches to reporting of resource use with physician focus groups and have learned that
physicians understand their practices from a patient-by-patient perspective, not from an
aggregate statistics perspective. Disseminating high-level outlier reports on total annual
Medicare expenditures would likely not provide adequate detail to make the reports meaningful
or actionable by physicians. We have also learned that detailed data for a specific procedure or
service out of context limits the meaningfulness of the report and the ability of physicians to act
on the information. The physician focus groups also emphasized that adequate risk adjustment is
essential to creating a fair measurement tool that can be used to compare actual to expected
resource use. They were skeptical that current risk adjustment methodologies can adequately
account for the complex variables among patient populations.

Our current efforts to measure physician resource use involve evaluation of episode grouper
software products currently on the market. In so doing, we are coordinating our episode grouper
evaluation closely with similar work being conducted by Medicare Payment Advisory
Commission, the Ambulatory Care Quality Alliance, National Committee for Quality Assurance,
National Quality Forum, and Agency for Healthcare Research and Quality, among others.
Episode grouper software uses data from multiple claims streams to capture all of the services
and procedures associated with an episode of care. Those resources can then be assigned to
individual physicians, and the data can be used to develop comparative reports. We are
evaluating the extent to which these episode groupers can handle Medicare data, and the risk
adjustment capabilities of those products. We believe that episode grouper technology holds
promise for the measurement of physician resource use.

An issue in the routine, nationwide dissemination of reports of physician resource use is the
potential return on investment for the Medicare program. There would be a significant and
recurring cost to designing the measurement tool, analyzing the data, populating the reports,
disseminating the reports, educating physicians on the use of the information, and evaluating the
impact of providing the information on physician behavior. These factors would need to be
considered.

Page 3 - A. Bruce Steinwald

In summary, we applaud GAO's focus on physician efficiency and the need for robust risk
adjustment in resource use reporting.  We are also committed to developing meaningful,
actionable, and fair measurement tools for physician resource use that, along with quality
measures, would provide a comprehensive assessment of physician performance.  We look
forward to working with GAO as we move forward on these initiatives.

# Appendix V: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | A. Bruce Steinwald, (202) 512-7101 or steinwalda@gao.gov |
| **Acknowledgments** | In addition to the contact above, James Cosgrove and Phyllis Thorburn, Assistant Directors, and Todd Anderson, Hannah Fein, Gregory Giusto, Richard Lipinski, and Eric Wedum made key contributions to this report. |

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |

Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone: Voice:	(202) 512-6000
TDD:	(202) 512-2537
Fax:	(202) 512-6061

**To Report Fraud, Waste, and Abuse in Federal Programs**

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

**Congressional Relations**

Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, D.C. 20548

**Public Affairs**

Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, D.C. 20548



# EXHIBIT 6

Case 1:06-cv-02201-EGS     Document 16-8     Filed 05/18/2007     Page 2 of 49

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY



April 11, 2006

# Employers Push White House to Disclose Medicare Data

By **ROBERT PEAR**

WASHINGTON, April 10 — The White House is clashing with the nation's largest employers over their request for huge amounts of government data on the cost and quality of health care provided by doctors around the country.

President Bush has repeatedly urged private insurers to disclose such data, saying it will help consumers choose doctors and hospitals. But Medicare, the nation's largest insurer, has turned down a request for its data from the Business Roundtable, whose member companies provide coverage to more than 25 million people.

Employers want to use the data to compare and rate doctors and to rein in soaring health costs — the very purpose advocated by the president. The data would show, for example, which doctors performed the most knee operations with the fewest complications. Employers said they could then compare the average cost per case for different doctors. And they could steer patients — workers, and retirees and their dependents — to doctors who achieved the best results and offered the best value.

"The Medicare data would be a gold mine of information," said Maria M. Ghazal, director of public policy at the Business Roundtable. Medicare handles more than a billion claims a year.

Administration officials said they shared the employers' goals, but were constrained by court rulings that limited the disclosure of data showing Medicare payments to individual doctors, identified by name. Employers disagree, saying those court rulings are no longer relevant.

Touring the country in recent weeks, Mr. Bush has said the best way to control health costs is to "empower consumers" with information. "You can't make good health care decisions unless there's transparency in the marketplace," he said on Wednesday in Connecticut.

The White House has said that doctors, hospitals and insurance companies should "make information about prices and quality readily available to all Americans."

That sentiment gets passionate support from the Business Roundtable, which represents chief executives from 160 of the nation's largest companies, including Citigroup, Exxon Mobil and General Electric. Health benefits are a major expense for these companies.

"The Centers for Medicare and Medicaid Services should release 100 percent of the Medicare claims database," said Robert W. Lane, chairman of Deere & Company, the world's largest maker of farm equipment and a member of the Business Roundtable. "This is essential to measuring cost efficiency and compliance with clinical guidelines."

At a recent White House meeting, Mr. Bush asked business executives to support his campaign for the disclosure of data on health costs and quality. In response, they asked why Medicare had not released its data.

Last year, before Mr. Bush started talking about "transparency in the marketplace," the Business Roundtable asked for access to the full Medicare claims database.

Michael O. Leavitt, the secretary of health and human services, said the volume of doctor claims was so large that "we cannot produce a single file larger than 5 percent of the total."

Moreover, federal officials said, the data could be released only for bona fide research projects and even then the claim files would not identify doctors by name. So they could not be used to produce profiles of doctors, or report cards.

Geralyn M. Barosso, a technical specialist at Medicare's Research Data Assistance Center, said, "Medicare data has not been released for the purpose of profiling individual physicians."

Federal officials said they were still bound by a 1979 ruling in which a federal district judge blocked the disclosure of information about Medicare payments to individual doctors. Such disclosure was "prohibited by the Privacy Act" because it would "constitute a clearly unwarranted invasion of personal privacy," the court said.

The law protects the privacy interests of doctors as well as patients, the court said.

Christina Pearson, a spokeswoman for the Department of Health and Human Services, said the administration was reviewing that decision.

Peter V. Lee, chief executive of the Pacific Business Group on Health, a coalition of employers, said he had repeatedly urged the Bush administration to make available the full Medicare claims database, stripped of information that could identify patients.

"To measure performance accurately, you need big numbers," Mr. Lee said. "The best source of big numbers is Medicare. One employer may have 12 patients seen by a particular doctor. Medicare may have 100 patients treated by the same doctor. If you combine the information, you get a much better picture of the doctor's performance."

Consumer groups and labor unions also want the Medicare data. "We have a shared interest," said Debra L. Ness,

president of the National Partnership for Women and Families. "Medicare and private health plans could save billions of dollars if just one in 10 beneficiaries moved from less efficient to more efficient physicians."

Medicare has Web sites to help consumers compare hospitals, nursing homes, home health agencies and kidney dialysis centers. But it has no site comparing doctors.

Employers say the 1979 court case is no longer relevant because Medicare has changed the way it pays doctors, and most doctors now practice in professional corporations, which are not protected by the Privacy Act.

"Times have changed," Mr. Lee said. "The administration should take a hard look at that case and its outdated interpretation of the privacy law."

Researchers have found immense variation in the amount and cost of care provided by different doctors to Medicare patients with the same disease and the same severity of illness. Patients who receive more care — more office visits, hospitalizations and operations — do not necessarily fare better.

Dr. John E. Wennberg of Dartmouth Medical School, who has studied such variations for more than 30 years, said the Business Roundtable was making "a splendid effort" to compare health care providers. But Dr. Wennberg said: "I would caution against simplistic efforts to measure efficiency. It's very difficult to get reliable data on cost and quality at the individual physician level."

Conclusions are more likely to be valid when researchers compare groups of 25 or more doctors, Dr. Wennberg said, and it is also essential to know how frequently doctors admit patients to hospitals.

Even among surgeons performing similar procedures on the same kinds of patients at the same hospital, costs often vary widely.

Dr. Bruce L. Hall, assistant professor of surgery at Washington University in St. Louis, suggested one reason: Doctors treating the sickest patients seem to develop "costly practice habits," which show up even when they are caring for healthier patients.

Copyright 2006 The New York Times Company

# EXHIBIT 7

Consumer-Purchaser
DISCLOSURE
PROJECT    Improving Health Care Quality through Public Reporting of Performance

June 12, 2006

Mark McClellan, MD, PhD
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
200 Independence Ave., NW
Washington, DC 20201

File Code: CMS-1488-P (Changes to the Hospital Inpatient Prospective Payment System and
Fiscal Year 2007 Rates)

RE:    Comments on Medicare Hospital Reporting and Payment Policies:
- Hospital Quality Data;
- Value-Based Purchasing; and
- Health Care Information Transparency Initiative

Dear Dr. McClellan:

Thank you for the opportunity to comment of the proposed changes to the Hospital Inpatient
Prospective Payment System and Fiscal Year 2007 Rates.  We applaud your efforts to promote
and foster increased transparency and we believe that Medicare should lead the way to
promoting a market that recognizes and rewards high-quality, efficient, equitable, and patient-
centered care.  Some overarching comments introduce responses to specific questions on three
sections of the proposed rules that address hospital quality data, value-based purchasing, and
the health care information transparency initiative.

**OVERARCHING COMMENTS**

**The Federal Government must support the development and endorsement of a robust set
of hospital (and other provider) performance measures**: Medicare should evaluate the
performance of each health care provider that bills Medicare, using nationally-endorsed,
scientifically-valid, risk-adjusted, and regularly-updated measures that address:
- Clinical quality (safe, timely, and effective care);
- Efficiency (prices and resource use over time);
- Equity (gender, race, ethnicity); and
- Patient-centeredness.
There is currently a huge need for more nationally endorsed standardized measures in these
areas.

Recommended Actions
    o  HHS or CMS should provide substantial and ongoing funding to support
       development of consumer-relevant measures that fill existing gaps (especially
       efficiency, patient-centered/continuum of care, and equity).  Developing measures is
       a public good that requires significant financing from the public sector.  Because of

C/O National Partnership for Women & Families
1875 Connecticut Avenue, NW Suite 650
Washington, DC 20009
202.986.2600  •  202.986.2539 (fax)  •  healthcaredisclosure.org

the lack of well-specified and endorsed measures that meet consumers' and purchasers' needs, the federal government should specifically support the rapid development of measures that are:

- Reasonably scientifically acceptable. Consumers and purchasers want measures to be scientifically sound and evidence-based, but do not want the pursuit of perfection to delay the availability of good and useful information.
- Feasible to implement. Rapid reporting necessitates measures are constructed and specified so that the data needed are currently available or can be collected with limited reporting burden.
- Relevant to consumers and purchasers. The needs of consumers and purchasers for important and actionable information must drive the development of measures.
- Reflect the continuum of care/care coordination from a patient's perspective. Measures should address the extent to which comprehensive, patient-centered care is delivered, often by multiple providers and across multiple settings.

o HHS or CMS should provide core ongoing operating support for the National Quality Forum (NQF) to ensure an ongoing, independent consensus process reviews, endorses, and updates measures to enable the availability of comparative information and the reduction of provider reporting burden.

**CMS should ensure that measures are reported publicly to foster improvement, accountability and consumers' ability to make better informed decisions.** Medicare should provide the public with the information on the aspects of provider performance described above. Doing so, will allow: 1) consumers to make informed decisions about their health care; 2) insurers and purchasers to make value-based contracting decisions and use differential payments as incentives; and 3) providers' improvement efforts to be supported with better information.

<u>Recommended Actions</u>
o CMS should immediately make available physician-identifiable Medicare claims data (fully protecting patient privacy), to allow for better quality and efficiency performance reporting.
o CMS should continue to allow private-sector organizations to have full access to provider performance information from the CMS Compare websites.
o CMS should require that hospital claims data submissions be augmented with clinical data elements to enable a better understanding of patient acuity and more robust quality reporting.

**CMS should implement financial incentives that are sensitive to the provision of high-quality, efficient, equitable, and patient-centered care:** Medicare should phase in a system that differentially pays providers based on nationally standardized measures.

<u>Recommended Actions</u>
o Continue to rapidly expand the number and type of measures that hospitals must report to obtain annual payment update.
o Medicare payments must be sensitive to provider performance and create financial incentives to more efficiently provide higher quality care.
o Incentives should take into account performance on quality, efficiency, equity, and patient experience.
o Provider incentives should be budget-neutral and, in the near-term, based on a combination of improvement and meeting thresholds.

What follow are specific comments on the three sections that address hospital quality data, value-based purchasing, and the health care information transparency initiative.

## SECTION: HOSPITAL QUALITY DATA

### *Reporting of Hospital Quality Data for Annual Hospital Payment Update*
**Fiscal Year 2007**: We support CMS' recommendation to reduce the FY 2007 annual hospital payment update by 2% for any hospital that does not submit data on 21 measures (8 heart attack, 4 heart failure, 7 pneumonia, 2 surgical infection prevention) for patients discharged starting January 1, 2006 through December 31, 2006.

**Fiscal Year 2008**: CMS <u>must</u> do far more than merely "explore the feasibility of adopting additional measures for FY 2008 update, including HCAHPS." There should be a **substantial** expansion of measures for hospitals to obtain the FY 2008 annual update. We strongly urge that CMS adopt the measures identified in the Institute of Medicine's *Performance Measurement: Accelerating Improvement*, i.e., Hospital-CAHPS and three structural measures (computerized provider order entry, intensive care staffing with intensivists, and evidence-based hospital referral) as well as consider and adopt as many additional NQF-endorsed measures as can be feasibly collected, for example:

<u>Outcomes</u>
o   30-day heart failure mortality
o   30-day heart attack mortality
o   Failure to rescue

<u>Complications</u>
o   Urinary catheter-associated infection rate
o   Central line-associated blood stream infection rate
o   Ventilator associated pneumonia rate

<u>Clinical</u>
o   Surgery patients with recommended venous thromboembolism prophylaxis ordered
o   Surgery patients who received appropriate venous thromboembolism prophylaxis within 24 hour prior to surgery to 24 hours after surgery.

### *Procedures for Validating Hospital Compare Data (pages 337-343):* As CMS continues to work to ensure the accuracy of the information posted on the Hospital Compare website, the methodology adopted should be fully transparent to allow all stakeholders to clearly assess hospital-level reliability. CMS should also engage representatives from the research, provider, and consumer communities to obtain input on the different potential methodologies and their impact on data validity, accuracy, and completeness.

### Electronic Medical Records (p. 343)
Health information technology (HIT) – which includes software applications for care management (EMR, EHR, practice management systems, registries) – has the potential to dramatically improve the quality and efficiency of health care, however implementation has been slow. In addition, if appropriately implemented, HIT can and should serve as the platform for the collection of information to supply future performance measurement, reporting and payment systems. The Secretary should ensure that the data necessary for quality measurement are captured by using conditions of participation that require hospitals to implement HIT/software applications that:

o   Comply with interoperability standards;
o   Adequately protect privacy and confidentiality of patient data;
o   Enable standardized quality, performance, and efficiency measurement as a routine by-product of their use; and

  o Are designed to enable the merger of their data with others in both the public and private sectors for the purpose of facilitating the production of standardized quality, performance, and efficiency information.

[NOTE: Adapted from AQA Data Sharing and Aggregation Subgroup on HIT: www.ambulatoryqualityalliance.org/files/PrinciplesforHITandMeasAgg-May06.doc]

Further, the Secretary should tie the annual hospital payment update to the reporting of hospitals' progress toward CPOE implementation (see previous comments under Hospital Quality Data for Annual Payment Update).

Until HIT becomes wide-spread the Secretary can enable much more robust hospital performance reporting by requiring hospitals to report the following data elements on both paper and electronic claims:

  o A unique physician identifier for each coded procedure;
  o Capture the referring/ordering physician for each coded procedure;
  o Vital signs (heart rate, blood pressure, temperature, and respiratory rate) recorded at presentation;
  o Key lab values (BUN, hematocrit, platelets, WBC, sodium, potassium, and creatinine) if obtained at the time of admission, excluding hospitalizations for psychiatric, obstetrical and newborn services;
  o Do Not Resuscitate order present (including date and time), if recorded during first 24 hours of patient presenting; and
  o Time of day of admission, discharge, and each procedure.

**SECTION: VALUE-BASED PURCHASING**

*Plan for Implementing Hospital Value-Based Purchasing Beginning with FY 2009*
As CMS works to develop a plan to implement hospital value-based purchasing beginning in FY 2009, the following issues must be addressed: (a) the ongoing development, selection, and modification process for hospital quality and efficiency measures; (b) the reporting, collection, and validation of data; (c) the structure of payment adjustments; and (d) the disclosure of hospital performance information.

**Measure development and refinement (p.350-353)**
As noted in our overarching comments, the development of consumer relevant measures is critical and the Secretary should provide substantial funding to support development of consumer-relevant measures that fill existing gaps (especially efficiency, patient-centered/continuum of care, and equity). Developing measures is a public good that requires significant financing from the public sector. Because of the lack of well-specified and endorsed measures that meet consumers' and purchasers' needs, the federal government should specifically support the rapid development of measures that are:

- o Reasonably scientifically acceptable. Consumers and purchasers want measures to be scientifically sound and evidence based, but do not want the pursuit of perfection to delay the availability of good and useful information.
- o Feasible to implement. Rapid reporting necessitates measures are constructed and specified so that the data needed are currently available or can be collected with limited reporting burden.
- o Relevant to consumers and purchasers. The needs of consumers and purchasers for important and actionable information must drive the development of measures.
- o Reflect the continuum of care/care coordination from a patient's perspective. Measures should address the extent to which comprehensive, patient-centered care is delivered, often by multiple providers and across multiple settings.

HHS or CMS should provide core operating support for the NQF to ensure ongoing, independent consensus process for the review, endorsement, and updating of measures so as to enable the availability of comparative information and the reduction of provider reporting burden.

**Incentive Methodology (p. 357-367)**
*Incentive Structure:* Incentives should initially be based on a combination of improvement and meeting performance thresholds based on standard measures adhering to the Consumer-Purchaser Disclosure Project's *Guidelines for Measurement of Provider Performance (http://healthcaredisclosure.org/docs/files/Guidelines.pdf)*. Current experience indicates that shifting over time to basing incentives on attaining specific performance-based thresholds allows hospitals (including those serving disenfranchised populations or unique communities) an opportunity to meet targeted performance levels and focus their efforts on those that would yield the most improvement. Because of the evidence that performance dramatically varies within hospitals, incentives should be available and calculated both at the service-line level (e.g., for specific clinical areas) and hospital-wide (e.g., for H-CAHPS).

Many private sector incentive programs, operated by health plans and other organizations, such as The Leapfrog Group's "Leapfrog Hospital Rewards Program", reward both *top performers* and *performance improvers*. The goal is to provide incentives for hospitals to improve continuously and to sustain that improvement once it is achieved. As Medicare moves to institutionalize performance-based payment, it should consider how to use baseline thresholds of performance and the potential of relative comparisons to help all hospitals make improvements appropriate to their current level of performance.

**Level of Incentive**: The share of payment tied to performance should be substantial. Clearly what constitutes "substantial" will differ from one type of provider to another (i.e., the same percentage may not be appropriate for both hospitals and physicians). Initially, we believe that the performance incentive for hospitals should be on the same order of magnitude as the level of incentive that rewards public reporting for the FY07 annual market basket update, which is 2% of total Medicare payments. The overall proportion of CMS payments to hospitals that are directly linked to performance should grow significantly over time and could eventually reach a level so that 10% or more of total Medicare payments is sensitive to performance. CMS should set and revise the appropriate level using the information that continues to develop from its implementation of performance-based payments for all hospitals, its demonstration projects, and from private-sector efforts.

**Source of Incentive**: Performance incentives should be budget neutral. Providing additional funding to finance performance incentives is an unrealistic option given the current economic and cost pressures faced by CMS. One central way to ensure budget-neutrality is to measure and report comparative information and base hospital incentives on efficiency as one of a number of different performance domains.

**Development of Composite Scores:** The development of composite scores is critical to help consumers integrate complex information into their decision making. Below, we outline additional work that needs to be done around the development and display of composites (see Public Reporting section), but consumer testing should be a key factor in CMS's assessment of alternative methodologies, i.e., "appropriate care measures" versus the "opportunity model." [Note: It is our understanding that in initial testing done by Mathematica for CMS in July, 2005, consumers preferred composites based on the appropriate care measure.]

**Public Reporting (p. 362)**
CMS should further stimulate public reporting to increase the transparency and meaningfulness of health care performance information by taking the following actions:
- o Continue to allow private-sector organizations to have full access to provider performance information from the CMS Compare websites.
- o Support further research and consumer testing around the development and display of measure composites, including how different tiers of composite scores could be constructed. ( E.g., a total, overall score combining clinical quality, patient experience, and efficiency; a score on each of those three respective domains, and a composite by service line, such as diabetes, cardiac care, etc.)
- o While improving the utility of the CMS Compare websites through using composites and presentation of providers that shows their differential performance, CMS should maintain the ability for consumers to "drill down" to a granular level of performance detail.

Beyond these suggested actions, we would call your attention to the Principles for Public Reporting of Health Care Information that were developed and endorsed by the members of the AQA (formerly the Ambulatory Care Quality Alliance) as an additional useful reference. These Principles can be found at:
http://www.ambulatoryqualityalliance.org/files/ConsumerPrinciplesMay06.doc

**Hospital Acquired Infections (p. 363)**
Given the tremendous toll – both human and financial – caused by hospital-acquired infections, the Secretary should do more than meet the statutory minimum of identifying "at least two conditions that are (a) high cost or high volume or both, (b) result in the assignment of a case to a DRG that has a higher payment when present as a secondary diagnosis, and (c) could reasonably have been prevented through the application of evidence-based guidelines." The Secretary should work with those states that currently collect the "Present on Admission" identifier (e.g., California and Pennsylvania) to determine all those conditions that meet the above criteria and implement policies by which hospitals would have payments adjusted for any care that could have reasonably been prevented in the hospital had evidence-based care been provided.

With the requirement for hospitals to submit the secondary diagnoses that are present on admission for discharges after October 1, 2007, we anticipate much more robust hospital outcomes reporting due to the increased ability to differentiate co-morbidities from complications.

**Promoting Effective Use of HIT (p. 364)**
Health information technology (HIT) – which includes software applications for care management (EMR, EHR, practice management systems, registries) – has the potential to dramatically improve the quality and efficiency of health care, however implementation has been slow. In addition, if appropriately implemented, HIT can and should serve as the platform for the collection of information to supply future performance measurement, reporting and payment systems. The Secretary can spur HIT adoption and ensure that the data necessary for quality measures are captured by using conditions of participation that require hospitals to implement HIT/software applications that:
- o Comply with interoperability standards;
- o Adequately protect privacy and confidentiality of patient data;
- o Enable standardized quality, performance, and efficiency measurement as a routine by-product of their use; and
- o Are designed to enable the merger of their data with others in both the public and private sectors for the purpose of facilitating the production of standardized quality, performance, and efficiency information.

[NOTE: Adapted from AQA Data Sharing and Aggregation Subgroup on HIT: www.ambulatoryqualityalliance.org/files/PrinciplesforHITandMeasAgg-May06.doc]

Further, the Secretary should tie the annually hospital payment update to the reporting of hospitals' progress toward CPOE implementation (see previous comments under Hospital Quality Data for Annual Payment Update).

Until HIT becomes wide-spread the Secretary can enable much more robust hospital performance reporting by requiring hospitals to report the following data elements on both paper and electronic claims:
- o A unique physician identifier for each coded procedure;
- o Capture the referring/ordering physician for each coded procedure;
- o Vital signs (heart rate, blood pressure, temperature, and respiratory rate) recorded at presentation;
- o Key lab values (BUN, hematocrit, platelets, WBC, sodium, potassium, and creatinine) if obtained at the time of admission, excluding hospitalizations for psychiatric, obstetrical and newborn services;
- o Do Not Resuscitate order present (including date and time), if recorded during first 24 hours of patient presenting; and
- o Time of day of admission, discharge, and each procedure.

**SECTION: HEALTH CARE INFORMATION TRANSPARENCY INITIATIVE**

As the Department builds upon its current transparency efforts, we would encourage the Secretary to increase both the scope and breadth of consumer-friendly cost and quality information by employing the following strategies. The critical need to directly link, wherever possible, consumers' cost information with quality information reinforces the importance of the federal government supporting the development and endorsement of a robust set of hospital (and other provider) performance measures (see "Overarching Comments").

Actions the federal government should take to increase the breadth and scope of performance information available to the public include:
- o Making available physician-identifiable Medicare claims data (fully protecting patient privacy), to allow for better quality and efficiency performance reporting.
- o Continue to allow private-sector organizations to have full access to provider performance information from the CMS Compare websites.
- o Release the risk-adjusted DRG rates for every hospital (and rates for physicians), by region in easily accessible formats.
- o Develop BOTH total costs of episodes AND total estimated beneficiary out-of-pocket costs for episodes of care (with estimates for beneficiaries with and without Medigap supplemental coverage). This release should include contextual and background information that makes clear the relevance of Medicare costs to beneficiaries to their circumstance (e.g., having Medigap plan) or to commercially insured individuals.
- o Price information should be presented in a manner that reflects the following principles:
  - **Linked directly to Quality measures** (outcomes, patient experience, compliance with evidence-based medicine). Whenever possible price information should be directly linked to quality information to facilitate total value consideration by the consumer. When it cannot be, there should be context and background (including that price does not correlate to quality, i.e., more expensive does not mean better and less expensive does not mean worse).
  - **Understandable**: Information should be "transmissible", that is, it can be communicated from one consumer to another and must recognize that different consumer audiences will have different information seeking and comprehension skills.
  - **Actionable**: Information should include relevant comparisons of providers based on quality and cost; link to a consumer being able to select a particular option; and should provide context and background on how to not just compare price of providers/treatments selected, but information on potentially relevant alternatives.
  - **Accessible**: Should be available on-line with no barriers and designed for ease of use.
  - **Relevant to consumers' circumstances** (health and coverage status): Information should be useful in the context of an individual's or family's particular health coverage and health status (including potentially a discrete condition OR considering a combination of conditions).
  - **Predictive (accurate)**: Information should predict likely expense accurately and/or have clear explanation of the reason for range of cost variation.

CMS/HHS should consider using the following mechanisms to further enhance transparency of quality and cost information by:

- o Establishing conditions of participation for hospitals that require posting of prices and/or policies regarding discounts and other payment options for uninsured patients. For insured individuals, health plans will likely be the primary vehicle for information that is specific to their condition or coverage, but CMS should play a

central role in ensuring that the uninsured have access to information relevant to their circumstances, though true transparency and informed consumer decision-making will require actionable tools.

o   The Administration through its various contracting mechanisms with health plans (via OPM or Medicare), should ensure they are providing tools for enrollees to make informed choices, considering both quality and costs.

o   Requiring hospitals to augment claims form with additional clinical data elements. Accurately assessing provider performance would be greatly enhanced if the severity of the patient's condition could be captured from administrative claims data. The public reporting of quality and cost information would benefit greatly from claims data with richer detail.  Adding the following data elements to the inpatient paper and electronic claim form would enable much more robust hospital outcomes reporting:
    ▪   A unique physician identifier for each coded procedure;
    ▪   Capture the referring/ordering physician for each coded procedure;
    ▪   Vital signs (heart rate, blood pressure, temperature, and respiratory rate) recorded at presentation;
    ▪   Key lab values (BUN, hematocrit, platelets, WBC, sodium, potassium, and creatinine) if obtained at the time of admission, excluding hospitalizations for psychiatric, obstetrical and newborn services;
    ▪   Do Not Resuscitate order present (including date and time), if recorded during first 24 hours of patient presenting; and
    ▪   Time of day of admission, discharge, and each procedure.

Again, thank you for the opportunity to comment.

Sincerely,


Peter V. Lee
Disclosure Project Co-Chair
Chief Executive Officer
Pacific Business Group on Health

Debra L. Ness
Disclosure Project Co-Chair
President
National Partnership for Women & Families

Consumer-Purchaser
# DISCLOSURE
## PROJECT    Improving Health Care Quality through Public Reporting of Performance

June 22, 2006

Michael O. Leavitt                          Mark McClellan, MD, PhD
Secretary                                   Administrator
U.S. Department of Health and Human Services   Centers for Medicare & Medicaid Services
200 Independence Avenue, S.W.                200 Independence Avenue, S.W.
Washington, D.C. 20201                       Washington, D.C. 20201

RE:    Endorsement of Need to Expand Measurement, Public Reporting and Value Payment
       Support for Disclosure Project's June 12, 2006 Comments on Hospital Quality
       Reporting and Value-based Purchasing and Health Care Information
       Transparency Initiative (CMS-1488-P: Changes to the Hospital Inpatient
       Prospective Payment System)

Dear Secretary Leavitt and Dr. McClellan:

The undersigned organizations sincerely welcome and thank you for the significant strides that
you have made to provide consumers with comparative quality and cost information. In
particular, your leadership and focus on improving the quality and efficiency of the health care
system has recognized that Medicare must play a central role to achieve increased
transparency and a reimbursement system that is sensitive to performance. We strongly agree.

As participants in the Consumer-Purchaser Disclosure Project we also thank you for the recent
opportunity to provide comments on strategies that Medicare can employ to further enhance
accountability, reward better performance and improve consumers' ability to make informed
decisions. We believe that Medicare can and should continue to support the development of a
new generation of consumer-relevant performance measures, report comparative information,
and implement performance-sensitive payments. Specific comments and recommendations to
advance our shared goal of improving health care performance and transparency were
submitted by the Consumer-Purchaser Disclosure Project on June 12, 2006. We join in support
of these comments and believe they will help inform your continuing efforts to make Medicare
an even more active partner in this vital agenda.

We recognize that much work remains to be done to transform our health care system to one
that both measures and rewards proven performance, but, along with you, we are committed to
that goal. We hope you will not hesitate to call on our organizations or the Disclosure Project's
Co-chairs – Peter Lee at the Pacific Business Group on Health and Debra Ness at the National
Partnership for Women & Families– if we can be of any further assistance. Thank you again for
your leadership in this important work.

Attachment:    List of Endorsing Organizations
               June 12, 2006 Comments on S-1488-P

**Endorsement of Need to Expand Measurement, Public Reporting and Value Payment**

Support for Disclosure Project's June 12, 2006 Comments on Hospital Quality Reporting and
Value-based Purchasing and Health Care Information Transparency Initiative
(CMS-1488-P: Changes to the Hospital Inpatient Prospective Payment System)

June 22, 2006

American Benefits Council
Center for Medical Consumers
Center for the Study of Services/Consumers' CHECKBOOK
Consumers Union
Employer Health Care Alliance Cooperative
General Electric
Health Policy Corporation of Iowa
HR Policy Association
Midwest Business Group on Health
Motorola
National Business Coalition on Health
National Partnership for Women & Families
National Small Business Association
New Jersey Health Care Quality Institute
Pacific Business Group on Health
Service Employees International Union

# EXHIBIT 8

Written Testimony Before the

Special Committee on Aging

United States Senate

Presented by

**Mr. G. Richard Wagoner, Jr.**
**Chairman and Chief Executive Officer**
**General Motors Corporation**


**July 13, 2006**


**"From Medicaid to Retiree Benefits:**
**How Seniors Impact America's Health Care Costs"**

Thank you Chairman Smith, Senator Kohl, and Members of the Committee for the opportunity to testify about the innovations GM is supporting in the private marketplace to manage health care costs for our employees, retirees, and their families. My name is Rick Wagoner, and I am the Chairman and CEO of General Motors Corporation. General Motors leads several programs to improve the delivery and efficiency of health care services for our employees and retirees. Today, I would like to highlight a few of those efforts, and also discuss some ways that we can work to improve the cost and quality of private and public health care services. I have also provided a more detailed description of our key initiatives within this material. I am interested in listening to the health care challenges faced by Arizona Governor Napolitano and her state, and the initiatives she has undertaken to address them. Corporate America and our state governments can learn a lot from each other on this important topic.

## I.    BACKGROUND

General Motors is the largest private purchaser of health care in the United States, paying the health care costs of 1.1 million employees, retirees and dependents. Of those 1.1 million, approximately 530,000 are age 60 and over, representing over 1% of the U.S. population over 60. In 2005, General Motors spent $5.3 billion for health care. That's more than we spend on steel. $1.9 billion of that cost was spent on prescription drugs, and represents a 335% increase in prescription drug costs over the past 12 years.

GM is not alone in facing huge health cost pressures. In a Business Roundtable survey of its CEO members, 58 percent cited health care as their companies' most meaningful cost pressure.

2

As you know, the U.S. spends more on health care as a percentage of GDP than any other industrialized country, and health care costs continue to rise. However, despite all that we spend, basic quality indicators show that the U.S. does not have the best health outcomes. Of 16 key health indicators, the U.S. is second to last among 13 industrialized nations. For example, in 2002, the U.S. had 6.8 deaths per live birth, compared to Japan which had 3 deaths per live birth and France which had 4.1 deaths per live birth.

Another statistic of concern is medical errors. Back in 1999, the Institute of Medicine cited that 98,000 people die per year due to medical errors in hospitals alone. For GM, this translates to 488 GM workers, retirees, and their families who may die each year because of a preventable medical error. This is more than one per day! While there has been progress since the IOM report and the enactment of the Patient Safety and Quality Improvement Act of 2005, the results are still insufficient. Quite simply, we need greater value for our health care dollar. We need a high quality health care system that is productive, efficient and error-free.

For years, GM has attempted to balance the demands of global competition with our efforts to offer quality health care. We have made improving the delivery and affordability of the health care system for our employees and retirees one of our top priorities. We want to work <u>with</u> our employees and all the stakeholders within our communities to improve the health care that is delivered.

To do this, we at GM continuously examine the costs and quality of health care. We believe there is NO single solution or a one size fits all approach to reducing the costs and improving the quality and outcomes of the care delivered. Instead we recognize the complexities of the health care system and the diverse population of GM, and that to

achieve positive change, numerous and varied approaches must be taken that require the collaboration of stakeholders on many levels.

In our analysis, we found that our employees and retirees need 1) Better information on effective treatments; 2) Better tools to identify effective and efficient health care providers and to achieve provider accountability; and 3) Community and employment-based education and outreach to prevent disease and better manage chronic illnesses. To address these needs and to find innovative ways to create a better health care delivery system for all, GM is leading over 30 initiatives throughout communities across the country.

Today, I am pleased to highlight a few of these initiatives and discuss what GM and our workers and retirees have learned and what we are bringing to our communities to make health care delivery safer, more effective, and affordable. It is our hope that Congress and other stakeholders will work with us to improve the quality of health care for all Americans.

## I. GETTING EMPLOYEES HEALTHY; WELLNESS AND DISEASE PREVENTION

The most important key to keeping health costs down, and to keeping your beneficiaries out of hospitals, is to keep them healthy or improve their health status. As such, we have in place a number of programs and educational tools to help our employees, retirees, and their families stay healthier and manage their diseases better.

Let me first talk about fitness. We are encouraging our employees to get in the best possible shape by educating them on how to stay fit and giving them the tools to manage their health risks. Currently 20 percent of GM's population exercises less than

4

20 minutes per week.  In order to help change that, GM has built in-house fitness centers in many of our facilities to make it easy to exercise before or after work.  As an alternative for those who don't want to exercise so close to the workplace, we offer a discount fitness network called "GlobalFit" that offers memberships to clubs nationwide at substantial savings.

**Lifesteps**

GM's flagship wellness program is called Lifesteps.  Back in 1996, GM, along with the UAW, launched LifeSteps, a comprehensive health and wellness program for our 1.1 million employees, retirees and dependents.  This program is designed to help individuals identify controllable health risks, develop plans to reduce those risks, and modify lifestyles.  It offers personal health risk appraisals, health fairs and screenings, wellness support programs and health-related news and publications. Today, more than 75 percent of GM employees and a very substantial number of retirees have participated in LifeSteps.  It has led to more than one million health risk appraisals and the reduction of more than 185,000 specific health risks.  The Lifesteps program also has published more articles than any other employer-sponsored wellness program in America.  In 2004, the U.S. Department of Health and Human Services awarded the GM-UAW Lifesteps program the "Innovation in Prevention Award."

One of the rewarding outcomes is that when our employees participate in LifeSteps as active employees, we have seen that they are more likely to participate in these programs as Medicare eligible retirees.  We have also determined that as our employees retire and move into Medicare, they exceed the National Guidelines for Preventive Services in nearly every category.  This indicates that we are providing

Medicare a more health-aware and, likely, healthier member. This benefits the Medicare program and taxpayers that support it.

**Cancer Efforts**

In the field of treatment and prevention, a particular concern is cancer. For pre-65 year old beneficiaries, cancer-related costs make up 8.1% of total health care expenditures. Costs per beneficiary with cancer averages $16,246 a year, which is five times higher than the annual medical costs incurred by those without cancer. Full costs over the entire treatment period are roughly $83,084, and indirect costs include absenteeism, lower work productivity, and reduced performance. The cancer survival rate is now over 60 percent, but is still the second leading cause of death in the United States.

For the last 27 years, GM has been on the front lines in the efforts to eradicate cancer. Through the GM Cancer Research Foundation, we annually honor and award those who conduct research on cures, and donate millions of dollars to cancer research. Within the GM family, over 100,000 people a year are screened or treated for cancer through our Lifesteps program.

**Diabetes and the Worksite / Diabetes Disease Management Pilot Program**

Another condition of concern to GM is diabetes. Diabetes is the fifth leading cause of death by disease in the U.S. and also contributes to higher rates of morbidity as people with diabetes are at higher risk for heart disease, blindness, kidney failure, extremity amputations, and other chronic conditions. Consequently, it is an

6

extraordinarily expensive disease.  In the U.S., expenditures attributable to diabetes in 2002 were estimated at $132 billion – one out of four Medicare dollars.

As a result, GM instituted the "Worksite Diabetes Disease Management Pilot Program."  The project is free to employees, confidential, and voluntary.  We offer in-plant screening, testing, and free follow-up.  The program also seeks to make the workplace diabetic friendly by offering healthier entrees in the cafeteria, making the workplace smoke-free, and providing convenient, private, and sanitary places for insulin injections.  The project also links together the myriad of wellness and health promotion programs.

## Greater Flint Health Coalition Heart Failure Taskforce

A key aspect of prevention is proper management across all health care settings. For this, GM instituted the "Greater Flint Health Coalition Heart Failure Taskforce." This program, which covers almost 200,000 General Motors employees, retirees, and their families, was implemented with the Greater Flint Health Coalition in Flint, Michigan (overseen by the University of Michigan and sponsored by the American College of Cardiology).  The goal is to increase adherence of physicians to the American College of Cardiology/American Heart Association Guidelines for Evaluation and Management of Chronic Heart Failure.  Evidence shows this leads to lower death risks, lower readmission rates and better quality of care for patients.

Early results have shown significant improvement in the use of appropriate medications, documentation of vaccines, discharge instructions and compliance.  Of 2,500 heart failure patients, those treated at the eight participating hospitals had a lower mortality and readmission rate than those treated at six hospitals that did not participate. Thirty day readmission rates fell 22% at the eight participating hospitals, compared to a

slight increase at non-participating hospitals. Thirty day mortality rates fell 27% at participating hospitals compared to a slight increase among non-participating providers.

## II.    GIVING CONSUMERS BETTER INFORMATION

In addition to our preventive and disease management programs, another way in which GM is attempting to improve health care is by providing our employees and retirees with a broad range of tools to become better health care consumers. It's troubling that consumers know more about a potential vehicle purchase than they do about the doctors they see, the hospital they may visit, or the prescription drugs they may take.

### Education Tools

Patients want and need to become better consumers. GM has an extensive education campaign for all our employees, retirees, and their families to help them better understand the health care delivery system and become better informed health care consumers. For example, in 2001, GM began a comprehensive education campaign to inform employees and retirees about the high quality effectiveness of generic drugs. Since the program began, we have been able to obtain over 90% generic substitution. Each percentage increase in generic use saves $4 million per year.

We also offer all our employees and retirees a "Health Care 101" publication online and in print that educates them and others about major health care issues facing the health care system. Also, throughout the year we publish information on various health care topics via the web and newsletters to help our employees, retirees, and their families make better and more efficient choices.

### Dayton Consumer Information Transparency Project

Another way GM is helping our employees and retirees become better consumers is by providing them with pricing and quality information about providers and plans in their communities.  This August, GM is launching a program called the "Dayton Consumer Information Transparency Project."  The project will give patients consumer shopping tools, provider level cost and quality information, and member out-of-pocket cost information.  The goal is to educate patients to make informed and effective health care choices, and to create competition among providers based on cost of service and quality.  The project will allow more than 70,000 people to make the best health care decisions possible, whether it's for cancer-related or cold treatments.

## Empowering Consumers through Health Care Spending Accounts

Starting in 2006, GM began offering salaried workers and early retirees a choice of two high-deductible health plans with Health Savings Accounts, in addition to the traditional health insurance plan options.  These plans give GM employees and early retirees greater control over their health care dollars, flexibility to choose their own providers, and allow them to save for current and future health care costs on a tax-free basis.  In the first year, 4,150 active employees selected high deductible health plans, 2,120 non-Medicare retirees selected high deductible health plans, and 2,810 Medicare retirees selected high deductible health plans.

## Health Information Technology

Another critical tool to help patients become better health care consumers is health information technology.  Having a health care system that is electronically based and streamlined will help make health care information readily accessible to consumers and providers, and improve the overall safety and quality of care while reducing inefficiencies and administrative waste.

9

Currently we have several projects that will help move health care to a technology-based system. Two of these are the Southeast Michigan Electronic Prescribing Initiative, or SEMI, and the Southeast Michigan Health Information Exchange.

## Southeast Michigan E- Prescribing Initiative

The Southeast Michigan Electronic Prescribing Initiative is a collaborative effort with Ford, DaimlerChrysler, and Medco Health, and is supported by the UAW and Michigan government. It is designed to increase the adoption of health information technology by providing incentives to physicians to adopt e-prescribing tools in the ambulatory setting. Physicians are given hand-held devices to look up formularies and other prescription drug information, write prescriptions, and send them directly to the pharmacy for filling. These devices help give important safety and coverage information when a physician is making prescribing decisions. They help improve patient safety, reduce costs, and increase generic drug usage. As you can imagine, it is drastically reducing errors associated with pharmacists reading physicians' handwriting.

Launched in February 2005, SEMI covers approximately 208,000 GM employees, retirees, and family members in Southeast Michigan, and 860 physicians have enrolled in the program. Participating physicians wrote almost 600,000 prescriptions, of which 110,000 were changed or cancelled due to drug-to-drug interaction alerts. 72,000 prescriptions were changed or cancelled due to formulary alerts, and over 7,000 prescriptions were changed or cancelled due to drug or allergy warnings. Under this initiative, generic drug use has increased by over 7%.

## Southeast Michigan Health Information Exchange

10

A second IT initiative in which GM is taking a leadership role is the Southeast Michigan Health Information Exchange.  GM is active in regional health care information organizations in all our large communities.

The Southeast Michigan Health Information Exchange is a collaborative effort by GM, other employers, hospitals, and Michigan state officials.  It will implement an electronic regional health care information organization that will affect all 4.8 million residents in the Southeast Michigan area, including the 208,000 GM employees, retirees, and family members I just mentioned.  While the exchange is still in the early stages of development, we are encouraged that so many stakeholders have come together in a fairly short time in what is a large and complex market.

## III. CREATING AN IMPROVED AND EFFICIENT HEALTH CARE SYSTEM

As I mentioned earlier, it takes collaboration by all stakeholders to achieve positive change and develop a quality, efficient health care system.  To make health care more affordable and accountable, reduce waste in the system and improve care, the health care industry, government, employers and consumers must come together.  While there are numerous collaborative efforts that GM supports, I would like to highlight two that are showing great success and promise.

### Save Lives Save Dollars

In Michigan, GM is working with local health care providers, businesses, unions, hospitals and the Greater Detroit Health Care Council on a program called "Save Lives Save Dollars."  The program is aimed at improving the cost and quality of care and

giving consumers better information about their health care providers and medical facilities. The goal is to make hospitals, physicians and other providers more financially accountable for their performance and give consumers price and quality information on physicians, helping to drive our health care system to achieve higher levels of performance and greater efficiency.

The intention of the "save lives" side of the program is to achieve 100% adherence to selected clinical guidelines. The "save dollars" component is differential reimbursement through paying hospitals based on 100% adherence to the established guidelines. When care and outcomes are improved, we expect to spend fewer dollars. This is something we know from manufacturing – as you improve quality, you lower costs.

When launched later this summer, the program will include a web site that the public can access for reports on the performance data of hospitals in the region, helping beneficiaries in Southeast Michigan become better-informed health care consumers. Differential pay for performance for hospitals begins in July 2006, and will continue to roll out for other health care providers over the next year and a half.

### GM Production System (Lean, Go Fast, and Value Stream Mapping)

Another example of how GM has worked with others to help the health care system become more efficient and productive is the implementation of the GM Production System at various health plans, hospitals, and physician groups. GM has found that approximately 80% of a process, regardless of the industry, is comprised of waste and non-value added activities. Since 1994, GM has held workshops in over 400 hospital systems and other health care organizations to help those in the health care industry learn how to be more efficient, and identify and eliminate waste. The goal is to

drive health care system improvements in the areas of quality, operational effectiveness, capacity utilization, patient safety and customer satisfaction.

For example, at the HMHP Hospital System in Youngstown, Ohio, nine workshops were completed with a total of 60,000 lives impacted through enhanced levels of care and operational efficiencies. In another example, at the Genesys Health Systems in Flint, Michigan, attendees improved their coding and billing process time from 330 minutes to 97 minutes, and the process itself dropped from 17 to 6 steps. Average results in other settings have yielded a 60% productivity increase, a 46% inventory reduction and a 51% lead line reduction.

## **Community Based Hospital Negotiations**

GM also works with insurers to identify hospitals that are restricting competition in the marketplace. We offer support to insurers to assist in the negotiations by leveraging resources to collect and analyze data and evaluate information. The goal is to enable carriers and hospitals to cooperatively deliver high quality, cost effective health care to community residents. In Dayton, Ohio for example, GM worked with the Tri-River Health Care Coalitions, IUE/CWA and other labor unions, the Dayton Chamber of Commerce, Local Health Departments and local universities. More than 300,000 individuals benefited, including 36,000 GM employees, and GM alone saved nearly $2 million in reduced costs. Overall, it is estimated that the community will save $90 million in one year alone.

## **Leapfrog Regional Rollout**

GM was also one of the founders of the Leapfrog Group, dedicated to using employer purchasing power to create great leaps in patient safety and health care quality.

In each of our communities, GM is working with the Leapfrog Group, coalitions, and local hospitals to publish vital patient safety data from hospitals on the Leapfrog website.

This initiative, located in Indiana, is aimed at reducing the number of patients harmed or killed by preventable medical errors. The hospitals are measured on four criteria: computerized physician order entry, Intensive Care Unit physician staffing, evidence-based hospital referral, and the Leapfrog safe practice score. If all U.S. hospitals were to follow Leapfrog's practice guidelines, it is estimated that 65,000 lives and approximately $41.5 billion would be saved.

## IV.    PUBLIC POLICY NEEDS TO BE ALIGNED WITH THESE CHANGES

GM is investing considerable resources to find innovative ways to improve the quality and costs of health care services and to ensure that our GM families are getting value-based health care. However, GM also believes that this is just a beginning, and that much more can be done with the support and engagement of Congress and other public and private-sector stakeholders to make health care more affordable, accessible, and accountable on a comprehensive, national basis. We believe there are several key public and private initiatives that deserve attention:

- A vigorous and robust competitive prescription drug market in which everyone has access to affordable pharmaceuticals, including generic biopharmaceutical drugs.

- Policies that give consumers and physicians information on the relative effectiveness of different drugs and treatments so that they can compare and distinguish treatment options. Armed with this information, physicians and

consumers can ensure that only the most effective drugs and treatments are provided, and help reduce inappropriate, ineffective, and costly care.

- Implementation of National Health IT legislation. S.1472, the Health Care Wired Act, sponsored by Senators Enzi and Kennedy, should be enacted into law this year.

- Release of the complete Medicare Claims Database. I have joined my colleagues at the Business Roundtable asking that the Federal government disclose all Medicare data on the cost and quality of physicians and hospitals across the country. By getting price and quality information about physicians, hospitals, and other providers available to the public, consumers can make better choices about the health care they receive. This is increasingly important as consumers spend more of their own money on health care. This information will enhance quality and efficiency in the delivery of Medicare services as well as health care services overall.

- Finally, a stronger focus on high-cost cases. Just one percent of the population with chronic and serious illnesses accounts for about 30% of total health care expenditures. These cases pose a significant burden on both private and public payers. We need a better public/private effort to address these high-cost cases to improve their care and reduce overall costs, and to create a more competitive health care market.

## CLOSING

In conclusion, GM is proud of the positive efforts we have been making in our communities for our employees, retirees, and their families. However, we must all do

15

more to reduce costs and get greater value for the money we are spending.  As we move forward, we are committed to working with all public and private stakeholders to develop solutions that improve the health care marketplace.

I appreciate the opportunity to share GM's experiences with the Special Committee on Aging.  As you evaluate private and public initiatives, please consider GM a resource and a willing partner.

**General Motors Corporation**
**Health Care Initiatives**

General Motors Corporation provides health care for more than 1.1 million workers, retirees and family members at a cost in 2005 of $5.3 billion. GM has a comprehensive strategy to improve quality and manage costs which includes providing leadership in many community-based initiatives and a long-established wellness approach toward curbing health care costs among its employees by encouraging the use of smoking cessation, fitness programs, and generic prescription drugs, which are less expensive than name brands but equally safe and effective. Notwithstanding those efforts, GM continues to incur unsustainable health care costs. The following provides a brief summary of GM's ongoing efforts to continue providing high quality health care in the face of ever-increasing costs.

| Program | Description |
|---------|-------------|
| *LifeSteps* | GM's flagship wellness program is designed to promote wellness, safety, and quality of life by providing health services that prevent and control illness. The program covers all GM employees, spouses and dependents. Jointly funded by the UAW from 1994-2004, the program is now fully funded by GM. The estimated medical savings for the intensive program is estimated to be $97 per participant over a four year period. It is estimated that if all active employees were to participate in the program, there is a potential of $40 million in savings due to decreased disability and absence. Since the inception of the program, over 800,000 (78% of population) individuals have been touched by LifeSteps. Over 356,000 individuals have actively participated in some trackable segment of the program and have completed over 1,000,000 health risk appraisals (HRA). The HRA has identified 815,000 risks and over time participants have reported a gross reduction of 185,000 risks. The Lifesteps program has published more articles than any other employer-sponsored wellness program in America. In 2004, Department of HHS awarded the GM-UAW Lifesteps program the Innovation in Prevention Award. |
| *Greater Flint Heart Failure Task Force Initiative* | The Greater Flint Health Coalition Heart Failure Task Force focuses on implementing best practices guidelines in heart failure care. The goal is to increase adherence of physician practices to the American College of Cardiology/American Heart Association Guidelines for Evaluation and Management of Chronic Heart Failure, lower the readmission rates for heart failure patients, and lower the risk of death. The project was implemented in eight participating hospitals (Genesee, Lapeer, Saginaw, Bay, Midland and Ingham counties) and covers almost 200,000 General Motors' employees, retirees or dependents. Preliminary results showed a significant improvement in the use of standardized orders, discharge documents and critical pathways' compliance. In the aggregate, the eight hospitals experienced significant advancements in the use of beta blockers and aldosterone inhibitors. Also increased was documentation of discharge instructions and smoking cessation counseling. Results include a 30 day reduction in the readmission rate of 22%, and reduction in mortality rate of 27%. |
| *Community Based Hospital Negotiations* | GM works closely with insurers to identify hospitals that are seeking high levels of reimbursement and restricting competition in the marketplace. GM offers support to insurers to assist in the negotiations by leveraging resources to collect and analyze data and evaluate information. The goal is to enable carriers and hospitals to cooperatively deliver high quality, cost effective health care to community residents. In Dayton, Ohio, GM worked with the Tri-River Health Care Coalitions IUE/CWA and other labor unions, the Dayton Chamber of Commerce, Local Health Departments and local universities. More than 300,000 individuals, including 36,000 GM employees, benefited and GM alone saved nearly $2 million in wasted costs. Overall, it is estimated that the community will save $90 million in one year. |

| | |
|---|---|
| *The Dayton Consumer Information Transparency Project* | In August 2006, GM is launching a program called the "Dayton Consumer Information Transparency Project." The project will give patients consumer shopping tools, featuring easy to understand information such as services and procedures of interest to members, provider level allowed cost and quality information, and member out-of-pocket cost information. The goal is to educate consumers to make informed and effective health care choices and to create competition among providers based on cost, service, and quality. The Program will be available to more than 70,000 people in the Dayton market. |
| *GM/AHRQ Collaborative to Reduce Avoidable Hospitalizations* | Recently, AHRQ and HHS approached GM in an effort to connect large employers with the AHRQ Quality Indicators (QIs). The AHRQ QIs were developed to utilize hospital discharge data and incorporate severity adjustment methods to create indicators of quality of community care. Indicators include prevention of hospital admissions, preventive care, inpatient performance and patient safety. The pilot initiative will be conducted through the Greater Flint Health Coalition in Flint, Michigan and will impact over 90,000 GM employees, retirees or dependents. This initiative offers an opportunity to identify areas for improving health care quality and reduce avoidable hospital admissions and procedures. |
| *Leapfrog Regional Rollout* | GM is one of the founders of the Leapfrog Group, dedicated to using employer purchasing power to create great leaps in patient safety and health care quality. In each of our large communities, GM is working with the Leapfrog Group, coalitions, and local hospitals to publish vital patient safety data from hospitals on the Leapfrog website. This initiative, located in Indiana, is aimed at reducing the number of patients harmed or killed by preventable medical errors. The hospitals are surveyed on four categories: computerized physician order entry; ICU physician staffing; evidence based hospital referral; and the Leapfrog safe practice score. The program could potentially impact all 86,000 GM participants in Indiana and is supported by 154 business organizations. If all U.S. hospitals followed Leapfrog's practice guidelines, it is estimated that 65,000 lives and approximately $41.5 billion would be saved. |
| *On-line Physician-Patient Communication (OPPC)* | Implemented April 1, 2006, the OPPC is a two year pilot to provide online patient/physician communication, which is HIPPA-ready and internet secure. The project enables physicians to communicate online with their established patients for non-urgent conditions and provides a clinically structured communication process that supports medical office workflow. The project covers all GM salaried employees and early retirees in central Indiana with PPO coverage. Reimbursement for e-visits would be $25 less $5 member co-pay, or approximately one-half of a normal office visit. If an e-visit substitutes for an office visit and office visits do not increase as a result of the greater convenience for patients or providers, the cost of office visits could be cut in half. Also, availability of e-visits may act to reduce emergency room visits, saving many times the cost of the visit. In a study conducted by Stanford on two years of claims, e-visit technology decreased total health care costs by $3.69 per member per month. The study found no increase in pharmaceutical spending. |
| *Quality Health First* | The purpose of the Quality Health First initiative is to develop and implement a community-wide pay for performance system to reward physicians for achieving measurable improvements in quality of care. The program is being coordinated by the Employers Forum of Indianapolis and the Indiana Health Information Exchange. The goal of the program is to improve the quality and efficiency of care. Quality will be measured across different payers and populations, using evidence-based standards. Comparative reports and actionable information will be provided that will allow providers to improve care processes and outcomes. Provider efforts to improve quality and efficiency will be supported by constructing a multi-payer pay for performance system to reward providers for continuously improving quality of care. |

| | |
|---|---|
| | The program will impact approximately 540,000 lives, including approximately 40,000 GM participants in the greater Indianapolis area. Program quality reporting will begin at the end of 2006 and will continue to be rolled out in 2007. |
| *Implementation of GM Production System (Lean, Go Fast and Value Stream Mapping) at Health Care Initiatives* | Since 1994, GM has held workshops in over 400 hospital systems and other health care organizations to help those in the health care industry to be more efficient, and identify and eliminate waste and non-value added efforts. The goal is to drive health care system improvements in the areas of quality, operational effectiveness, capacity utilization, patient safety, and customer satisfaction. In Ohio, a total of nine workshops were completed in the Warren/Youngstown and Dayton areas with a total of 60,000 people impacted through improved level of care and operational improvement. Institutions such as Johns Hopkins Medicine, Mayo Clinic and Cleveland Clinic have embraced GM's processes. Examples of results include reported 60% productivity increases, 46% inventory reduction, and 51% lead time reduction. |
| *Health Savings Accounts* | Starting in 2006, GM began offering all salaried workers and early retirees a choice of two high-deductible health plans with Health Savings Accounts, in addition to the traditional health insurance plan options. In the first year, approximately 10% of the active salaried population and 3% of the salaried retirees enrolled in high deductible health plans (4,150 active employees, 2,120 non-Medicare retirees, and 2,810 Medicare). |
| *HMO Value-based Purchasing* | GM's HMO purchasing strategy includes evaluation of quality and cost tied to differentiated pricing for salaried employees and retirees. Those electing higher performing health plans (higher quality, lower price) experience the lowest monthly contribution, thereby steering GM's population into better health plans. This strategy results in rewards for the health plans delivering the best value and provides an incentive for health plans to improve. The elements included in the quality evaluation are HEDIS/CAHPS (NCQA's clinical quality and satisfaction metrics) and the National Business Coalition on Health's eValue8 RFI. This strategy is supported by a large number of coalitions and employers across the country and helps to drive change and quality improvement in the health care market place. Results include significant performance improvement in key health plans and significant migration in to better performing plans. |
| *Worksite Diabetes Disease Management* | Diabetes is the fifth leading cause of death by disease in the U.S. and an extraordinarily expensive disease. In the U.S., expenditures attributable to diabetes in 2002 were estimated at $132 billion – one out of four Medicare dollars. As a result, GM instituted a worksite diabetes disease management pilot program. The project is free to employees, confidential, and voluntary. GM offers in-plant screening, testing, and free follow-up. The program also seeks to make the workplace diabetic friendly by offering healthier meals in the cafeteria, making the workplace smoke-free, and providing convenient, private, and sanitary places for insulin injections. The project also links together the myriad of wellness and health promotion programs. Of the 560 diabetics in the GM population, 237 are active program participants. |
| *Generic Initiative* | In 2001, GM began a comprehensive educational campaign to inform the community about the high quality and cost effectiveness of generics. This emphasis continues today with GM working with other insurance carriers and our PBM to educate retail pharmacists, physicians, and enrollees. At the beginning of the project, GM looked at the top 10 states with a goal to increase the use of generics. Approximately 750,000 GM covered dependents benefit from the ongoing initiative. GM has seen a significant increase in generic use as a result of this and other programs. Since the program began, GM has been able to obtain over 90% generic substitution, of which each percentage increase in generic use saves $4 million per year. |

| | |
|---|---|
| *Southeast Michigan Health Information Exchange* | The Southeast Michigan Health Information Exchange is a collaborative effort by GM, other employers, hospitals, physicians, insurers and Michigan state officials. It will implement an electronic regional health information organization (RHIO) that will affect all 4.8 million residents in the Southeast Michigan area, including 208,000 GM lives. The primary purpose of a RHIO is the secure electronic facilitation of clinical and administrative data across multiple stakeholder sites to improve the quality and cost effectiveness of the health care delivery system. Covisint, a subsidiary of Compuware, has brought together stakeholders from the employer, physician, carrier, and health system perspectives to discuss functionality and value propositions. Participants are currently working toward the creation of a more community-based decision-making structure in order to develop a business plan, funding structure, and operational plan. |
| *Southeast Michigan Prescribing Initiative (SEMI)* | SEMI is designed to increase the adoption of health information technology by providing incentives to physicians to adopt e-prescribing tools in the ambulatory setting. E-prescribing tools include decision support at the point of prescribing, which drives improved quality and cost effectiveness. Quality is enhanced through the identification of potential drug-drug interactions and appropriate dosing. Cost is reduced through the increased use of generic and preferred brand drugs. In addition to impacting cost and quality through decision support, the administration and safety of prescribing is enhanced via electronic submission of prescriptions to the pharmacy. This addresses safety issues such as illegible handwriting and streamlines the administrative process for physician office staff and patients. Launched in February 2005, SEMI covers approximately 208,000 GM people and 860 physicians have enrolled in the program. Participating physicians wrote almost 600,000 prescriptions, of which 190,000 prescriptions were changed or cancelled due to alerts for drug to drug interactions, formulary alerts, drug or allergy warnings, and errors. Under this initiative, generic use has increased by over 7%, which alone will save $3.1 million in annual pharmacy costs. Other business partners in SEMI include Ford Motor Company, DaimlerChrysler Corporation, BCBSM, Health Alliance Plan, Medco, RxHub, Surescripts, and several point-of-care technology vendors. |
| *Save Lives Save Dollars (SLSD)* | The SLSD program is aimed at improving the cost and quality of care and giving consumers better information about their health care providers and medical facilities. The goal is to make hospitals, physicians and other providers more financially accountable for their performance and give consumers price and quality information on physicians, helping to drive our health care system to achieve higher levels of performance and greater efficiency. The intention of the "save lives" side of the program is to achieve 100% adherence to selected clinical guidelines. The "save dollars" component is differential reimbursement through paying hospitals based on adherence to 100% of the established guidelines. Differential pay-for-performance for hospitals begins in July 2006, and will continue to roll out for other providers over the next year and one half. When launched later this summer (2006), the program will include a web site that the public can access for reports on the performance data of hospitals in the region, helping beneficiaries in Southeast Michigan become better-informed health care consumers. GM is working with local health care providers, businesses, unions, hospitals, and the Greater Detroit Area Health Council to implement SLSD. |

# EXHIBIT 9

The NEW ENGLAND JOURNAL of MEDICINE

---
SPECIAL ARTICLE
---

# Surgeon Volume and Operative Mortality in the United States

John D. Birkmeyer, M.D., Therese A. Stukel, Ph.D., Andrea E. Siewers, M.P.H.,
Philip P. Goodney, M.D., David E. Wennberg, M.D., M.P.H.,
and F. Lee Lucas, Ph.D.

---
ABSTRACT
---

**BACKGROUND**

Although the relation between hospital volume and surgical mortality is well established, for most procedures, the relative importance of the experience of the operating surgeon is uncertain.

**METHODS**

Using information from the national Medicare claims data base for 1998 through 1999, we examined mortality among all 474,108 patients who underwent one of eight cardiovascular procedures or cancer resections. Using nested regression models, we examined the relations between operative mortality and surgeon volume and hospital volume (each in terms of total procedures performed per year), with adjustment for characteristics of the patients and other characteristics of the providers.

**RESULTS**

Surgeon volume was inversely related to operative mortality for all eight procedures (P=0.003 for lung resection, P<0.001 for all other procedures). The adjusted odds ratio for operative death (for patients with a low-volume surgeon vs. those with a high-volume surgeon) varied widely according to the procedure — from 1.24 for lung resection to 3.61 for pancreatic resection. Surgeon volume accounted for a large proportion of the apparent effect of the hospital volume, to an extent that varied according to the procedure: it accounted for 100 percent of the effect for aortic-valve replacement, 57 percent for elective repair of an abdominal aortic aneurysm, 55 percent for pancreatic resection, 49 percent for coronary-artery bypass grafting, 46 percent for esophagectomy, 39 percent for cystectomy, and 24 percent for lung resection. For most procedures, the mortality rate was higher among patients of low-volume surgeons than among those of high-volume surgeons, regardless of the surgical volume of the hospital in which they practiced.

**CONCLUSIONS**

For many procedures, the observed associations between hospital volume and operative mortality are largely mediated by surgeon volume. Patients can often improve their chances of survival substantially, even at high-volume hospitals, by selecting surgeons who perform the operations frequently.

From the Department of Surgery, Dartmouth–Hitchcock Medical Center, Lebanon, N.H. (J.D.B., P.P.G.); the Veterans Affairs Outcomes Group, Veterans Affairs Medical Center, White River Junction, Vt. (J.D.B., P.P.G.); the Institute for Clinical Evaluative Sciences, Toronto (T.A.S.); and the Center for Outcomes Research and Evaluation, Maine Medical Center, Portland (A.E.S., D.E.W., F.L.L.). Address reprint requests to Dr. Birkmeyer at the Section of General Surgery, Dartmouth–Hitchcock Medical Center, Lebanon, NH 03756, or at john.birkmeyer@hitchcock.org.

N Engl J Med 2003;349:2117-27.
*Copyright © 2003 Massachusetts Medical Society.*

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

For many surgical procedures, patients at hospitals where a high number of such procedures are performed (high-volume hospitals) have lower mortality rates than those at hospitals that are less experienced with the procedures.[1-4] In one recent study of the national population of Medicare recipients, we found strong relations between hospital volume and operative mortality associated with 14 high-risk cancer resections and cardiovascular procedures.[5] Despite the considerable body of research in this area, little is known about the mechanisms underlying the observed associations between volume and outcome. Because they tend to be much larger facilities, high-volume hospitals have a broader range of specialist and technology-based services, better-staffed intensive care units, and other resources that are not available at smaller centers. By virtue of these resources, high-volume hospitals may be better equipped to deliver the complex perioperative care required by patients who are undergoing high-risk surgery.

On the other hand, the outcome of a surgical procedure may depend as much on how well the operation itself is performed as on the resources available at the hospital. If so, another explanation for the observed relation between the hospital volume and the outcome may be that high-volume hospitals tend to have surgeons who are more experienced with specific procedures. Numerous studies have explored the associations between surgeon volume (the number of procedures performed by the surgeon) and mortality for some procedures.[1,6-12] However, relatively few of these analyses have simultaneously accounted for hospital volume and other potential confounding characteristics of the hospital that may be strongly correlated with surgeon volume. Moreover, few have been large enough to characterize the relative influence of these two measures of volume with sufficient precision.

To address these issues, we undertook a comprehensive evaluation of the operative risk associated with eight different cardiovascular procedures and cancer resections using data from the national population of Medicare recipients. We had two primary aims: to assess the association between surgeon volume and operative mortality for various procedures and to achieve a better understanding of the extent to which the observed effects of hospital volume can be explained by the experience of the operating surgeon.

## METHODS

### PATIENTS AND DATA BASES

We obtained 100 percent of the national analytic files from the Center for Medicare and Medicaid Services for 1998 and 1999. The Medicare Provider Analysis and Review (MEDPAR) and inpatient files, which contain hospital-discharge abstracts for the fee-for-service, acute care hospitalizations of all Medicare recipients, were used to create our main data sets for analysis; the Medicare denominator file was used to determine the vital status of the patients. The institutional review board of Dartmouth Medical School approved the study protocol.

As in our previous work,[5,13,14] we used the appropriate procedure codes from the *International Classification of Diseases, Ninth Revision* (ICD-9), to identify all patients between 65 and 99 years of age who underwent 1 of 14 cardiovascular procedures or cancer resections. To simplify the presentation of our results, however, we present here the analyses for only four cardiovascular procedures and four cancer resections. These procedures, which were selected prospectively, included two that are frequently the focus of debate concerning the regionalization of health care services (coronary-artery bypass grafting and carotid endarterectomy). Six other procedures (aortic-valve replacement, elective repair of an abdominal aortic aneurysm, pancreatic resection, esophagectomy, lung resection, and cystectomy) for which we have previously found a relatively strong association between hospital volume and operative mortality were selected to represent diverse surgical subspecialties.

In examining the data related to the cancer resections, we excluded from the analysis of outcomes (but not from the tallies of volume) patients who did not have an accompanying diagnosis code for cancer. This restriction was intended to exclude small subgroups of patients who had a much higher level of risk at base line (e.g., patients who underwent pancreatic resection because of infection) and thus to minimize confounding. Similarly, patients who underwent repair of an abdominal aortic aneurysm were excluded if they had diagnosis or procedure codes suggesting the rupture of an aneurysm, the presence of a thoracoabdominal aneurysm, or both. We excluded from the analysis of the cohort that underwent coronary-artery bypass grafting patients who had a valve replaced simultaneously.

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

SURGEON VOLUME AND OPERATIVE MORTALITY IN THE UNITED STATES

### IDENTIFICATION OF SURGEONS

For all procedures, we identified the operating surgeon with the use of the unique provider identification number listed in the "primary operator" field of the inpatient file. Previous work has suggested the reliability of this approach in identifying operating surgeons.[15] Records containing invalid provider identification numbers (6 percent) were excluded from further analysis. For some procedures, the number of unique, valid identification numbers exceeded the number of surgeons in the relevant specialties in the United States. This problem was most apparent in the analysis of the two cardiac procedures, for which cardiologists were often identified in the primary-operator field. For this reason, we used information from the 1998 Medicare provider files to restrict our analysis to physicians who had designated themselves as surgeons. For coronary-artery bypass grafting and valve-replacement procedures, we included only self-designated cardiothoracic surgeons. Because the specialists who perform the other procedures are more diverse, we included any self-designated surgeon. These restrictions removed a large proportion of potentially eligible surgeons from our analysis (ranging from 6 percent for cystectomy to 72 percent for coronary-artery bypass grafting). However, because the physicians who were excluded tended to be associated with relatively few patients (most often only one each), the restrictions resulted in the exclusion of a relatively low proportion of patients from our analysis of outcomes (ranging from 4 percent for cystectomy to 13 percent for coronary-artery bypass grafting).

### STATISTICAL ANALYSIS

Our primary analyses focused on the relations between surgeon volume and hospital volume (the main variables measuring exposure) and operative mortality, defined as death before hospital discharge or within 30 days after the index procedure. Because, for some procedures, a large proportion of operative deaths before discharge occurred more than 30 days after surgery, 30-day mortality alone would not adequately reflect the true operative mortality.

To characterize volume, we first determined the average number of procedures that each hospital and each surgeon performed on Medicare patients during each of the two years. To make our estimates of volume more easily interpretable, we then estimated the total (all-payer) volumes, using data from the 1997 Nationwide Inpatient Sample. As in our previous research,[5] we determined the proportion of patients undergoing each procedure who were covered by Medicare — which ranged from 49 percent for esophagectomy to 75 percent for carotid endarterectomy — and divided each provider's observed Medicare volume (the total number of each type of procedure performed on Medicare patients) by these procedure-specific proportions. Although volume was evaluated as a continuous (log-transformed) variable in the assessment of statistical significance, we also created categorical variables for volume by ranking providers in order of increasing estimated total volume and selecting cutoff points that most closely sorted patients into three evenly sized groups with low, medium, and high volume. In sensitivity analyses, we recategorized hospital volume as a binary variable according to the criteria established by the Leapfrog Group for four procedures: coronary-artery bypass grafting (450 or more procedures per year vs. fewer than 450), repair of abdominal aortic aneurysm (50 or more per year vs. fewer than 50), esophagectomy (13 or more per year vs. fewer than 13), and pancreatic resection (11 or more per year vs. fewer than 11).

We used multiple logistic-regression analyses to examine the relation between surgeon volume and operative mortality, with adjustment for characteristics of the patients.[16] We used the patient as the unit of analysis, with volume measured at the level of the surgeon and at the level of the hospital. All models were analyzed separately for each procedure. Separate models were used to investigate the relation between operative mortality and surgeon volume, with and without consideration of hospital volume, and the relation between operative mortality and hospital volume, with and without consideration of surgeon volume. To establish the general form of the relation, we first modeled the relations between operative mortality and the logarithms of surgeon volume and hospital volume considered separately. We then fitted the models to the three volume strata. We adjusted for the effect of clustering of patients within surgeons and clustering of surgeons within hospitals by using binary mixed-effects models incorporating the two levels of nesting.[17] Surgeons who operated in more than one hospital were assumed to be in different clusters and contributed a random effect for each hospital in which they worked. We used the statistical software package MLwiN (Centre for Multilevel Modeling) to perform all modeling.[18]

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

We adjusted the analyses for characteristics of both the patients and the hospitals. The characteristics of the patients for which we adjusted included age group (in five-year intervals), sex, race (black or nonblack), year of procedure (1998 or 1999), whether the procedure was performed electively or not, and the mean income from Social Security in the ZIP Code of the patient's residence. Coexisting conditions were identified by their appropriate ICD-9 codes, with the exclusion of conditions that were likely to reflect either the primary indication for surgery or postoperative complications.[5] We explored three alternative approaches to the incorporation of data on coexisting conditions into our models for risk adjustment, including the use of Charlson scores with published weights,[19] the use of Charlson scores with weights derived empirical-ly for each procedure, and adjustment for all pertinent coexisting conditions as individual variables. Because all three approaches yielded virtually identical results, we report only those from the models derived according to the first approach. We used 1998 and 1999 files from the American Hospital Association to ascertain the characteristics of the hospitals specific to the year in which the event occurred. The characteristics of the hospitals for which we adjusted included the type of ownership (not-for-profit, for-profit, or government), location (urban or nonurban), and teaching status (as defined by Taylor et al.[20]).

We computed adjusted mortality rates on the basis of the average values of the characteristics of the patients and the hospitals by back-transforming predicted mortality from the logistic-regression

| Table 1. Characteristics of the Patients, According to Surgeon Volume. | | | |
|---|---|---|---|
| Characteristic | Low-Volume Surgeons | Medium-Volume Surgeons | High-Volume Surgeons |
| | | *percentage of patients* | |
| **Cardiovascular procedures** | | | |
| Carotid endarterectomy | | | |
| Age >75 yr | 49.4 | 50.1 | 50.4 |
| Female sex | 43.6 | 43.1 | 44.4 |
| Black race | 3.8 | 2.6 | 2.3 |
| Charlson score ≥3 | 10.7 | 10.2 | 9.9 |
| Nonelective admission | 32.2 | 27.4 | 26.3 |
| Coronary-artery bypass grafting | | | |
| Age >75 yr | 39.4 | 39.3 | 40.3 |
| Female sex | 35.0 | 35.4 | 34.9 |
| Black race | 4.6 | 3.7 | 2.9 |
| Charlson score ≥3 | 10.0 | 9.5 | 9.7 |
| Nonelective admission | 57.0 | 58.5 | 55.4 |
| Aortic-valve replacement | | | |
| Age >75 yr | 53.7 | 54.5 | 55.5 |
| Female sex | 43.8 | 43.4 | 44.3 |
| Black race | 4.7 | 2.8 | 2.0 |
| Charlson score ≥3 | 9.4 | 8.7 | 10.2 |
| Nonelective admission | 43.1 | 38.9 | 36.4 |
| Elective repair of an abdominal aortic aneurysm | | | |
| Age >75 yr | 46.3 | 45.4 | 47.0 |
| Female sex | 23.3 | 23.8 | 23.0 |
| Black race | 3.7 | 2.6 | 2.2 |
| Charlson score ≥3 | 9.3 | 9.9 | 10.2 |
| Nonelective admission | 26.5 | 23.9 | 22.5 |

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

SURGEON VOLUME AND OPERATIVE MORTALITY IN THE UNITED STATES

models. To assess the relative contribution of surgeon volume to the observed associations between hospital volume and outcome, we used models that estimated the relation between the operative mortality and hospital volume, first excluding and then including a variable for surgeon volume. The relative attenuation of the odds ratio was computed as $[OR_H - OR_{HS}] \div [OR_H - 1]$, where $OR_H$ is the odds ratio for operative death with a given hospital volume without consideration of surgeon volume and $OR_{HS}$ is the odds ratio for operative death with a given hospital volume after adjustment for surgeon volume; both odds ratios were adjusted for patient characteristics and other characteristics of the hospital. A P value of less than 5 percent was considered to indicate statistical significance, and all tests were two-sided.

## RESULTS

A total of 474,108 Medicare patients underwent one of the eight cardiac procedures or cancer resections during 1998 or 1999. Overall, approximately 25 percent of the surgeons who were included in the study operated at more than one hospital. Patients were much more likely to undergo surgery performed by a low-volume surgeon if they went to a low-volume hospital (range, 51 percent for carotid endarterectomy to 70 percent for pancreatic resection) than if they went to a high-volume hospital (range, 6 percent for pancreatic resection to 21 percent for carotid endarterectomy). The numbers of Medicare patients treated by low-volume, medium-volume, and high-volume surgeons in different hospital-volume strata are given in Supplemen-

| Table 1. (Continued.) | | | |
|---|---|---|---|
| Characteristic | Low-Volume Surgeons | Medium-Volume Surgeons | High-Volume Surgeons |
| | | *percentage of patients* | |
| **Cancer resections** | | | |
| Resection for lung cancer | | | |
| Age >75 yr | 35.6 | 35.3 | 35.7 |
| Female sex | 42.6 | 43.2 | 43.5 |
| Black race | 5.9 | 4.5 | 4.1 |
| Charlson score ≥3 | 32.2 | 36.7 | 38.1 |
| Nonelective admission | 20.8 | 16.6 | 11.1 |
| Cystectomy of the bladder | | | |
| Age >75 yr | 44.3 | 47.0 | 43.8 |
| Female sex | 22.1 | 19.8 | 19.7 |
| Black race | 4.7 | 3.4 | 2.3 |
| Charlson score ≥3 | 34.2 | 34.1 | 41.4 |
| Nonelective admission | 20.4 | 19.4 | 15.6 |
| Esophagectomy | | | |
| Age >75 yr | 31.2 | 31.6 | 31.0 |
| Female sex | 24.4 | 25.1 | 21.5 |
| Black race | 8.7 | 6.8 | 4.3 |
| Charlson score ≥3 | 42.2 | 41.8 | 42.4 |
| Nonelective admission | 24.7 | 14.9 | 15.5 |
| Pancreatic resection | | | |
| Age >75 yr | 41.6 | 38.6 | 39.2 |
| Female sex | 49.1 | 51.9 | 48.8 |
| Black race | 8.0 | 7.2 | 4.2 |
| Charlson score ≥3 | 52.4 | 53.8 | 64.9 |
| Nonelective admission | 40.0 | 37.6 | 18.3 |

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

tary Appendix 1 (available with the full text of this article at www.nejm.org).

There were negligible differences in age and sex between the patients who received care from low-volume surgeons and those who received care from high-volume surgeons; for some procedures, the prevalence of coexisting conditions varied to a small degree according to surgeon volume (Table 1). Patients receiving care from low-volume surgeons were more likely to be black and to be admitted to the hospital nonelectively. Overall, however, there were no clinically important differences in predicted mortality rates according to surgeon volume.

When surgeon volume was assessed as a con-



Figure 1. Adjusted Operative Mortality among Medicare Patients in 1998 and 1999, According to Surgeon-Volume Stratum, for Four Cardiovascular Procedures (Panel A) and Four Cancer Resections (Panel B).

Operative mortality was defined as the rate of death before hospital discharge or within 30 days after the index procedure. Surgeon volume was determined on the basis of the total number of procedures performed in both Medicare and non-Medicare patients. P<0.001 for all procedures except resection for lung cancer; P=0.003 for lung resection; P values reflect associations between operative mortality and volume assessed as a continuous variable.

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

SURGEON VOLUME AND OPERATIVE MORTALITY IN THE UNITED STATES

tinuous variable, it was inversely related to operative mortality for all eight procedures (P=0.003 for lung resection, P<0.001 for all other procedures). The strength of the inverse association between surgeon volume and outcome varied markedly according to the procedure in terms of both the absolute operative mortality rate (Fig. 1) and the adjusted odds ratio for operative death (Table 2). The adjusted odds ratios for operative death among patients of low-volume surgeons as compared with patients of high-volume surgeons ranged from 1.24 for lung resection to 3.61 for pancreatic resection. Adjusting for hospital volume attenuated the strength of the associations between surgeon volume and outcome, but the effect of surgeon volume remained statistically significant for seven of the eight procedures.

When hospital volume was assessed as a continuous variable, it was inversely related to operative mortality for seven of the eight procedures (P=0.20 for carotid endarterectomy, P<0.001 for all the other procedures). After adjustment for surgeon volume, however, higher hospital volume remained a significant predictor of decreased mortality for only four procedures (repair of an abdominal aor-

tic aneurysm, cystectomy, lung resection, and pancreatic resection). In fact, after adjustment for surgeon volume, high hospital volume was associated with increased mortality among patients undergoing carotid endarterectomy. For many procedures, surgeon volume accounted for a large proportion of the apparent differences in operative mortality between high-volume hospitals and low-volume hospitals. Among patients undergoing elective repair of an abdominal aortic aneurysm, for example, the adjusted odds ratio for death with surgery performed in a low-volume hospital as compared with that performed in a high-volume hospital decreased from 1.40 to 1.17 after adjustment for surgeon volume. Thus, surgeon volume accounted for 57 percent of the apparent difference in mortality between low-volume and high-volume hospitals ([1.40−1.17]÷[1.40−1.00]). The proportion of the apparent effect of hospital volume that was actually attributable to surgeon volume varied according to the procedure: it was 100 percent for aortic-valve replacement, 54 percent for pancreatic resection, 49 percent for coronary-artery bypass grafting, 46 percent for esophagectomy, 39 percent for cystectomy, and 24 percent for lung resection.

| Table 2. Adjusted Odds Ratio for Operative Death, According to Surgeon Volume and Hospital Volume.* | | | | | | |
|---|---|---|---|---|---|---|
| Procedure | Odds of Operative Death with Low Volume as Compared with High Volume | | | | | |
| | Surgeon Volume | Surgeon Volume, Adjusted for Hospital Volume | Proportion of Effect of Surgeon Volume Attributable to Hospital Volume | Hospital Volume | Hospital Volume, Adjusted for Surgeon Volume | Proportion of Effect of Hospital Volume Attributable to Surgeon Volume |
| | adjusted odds ratio (95% CI) | | % | adjusted odds ratio (95% CI) | | % |
| **Cardiovascular procedures** | | | | | | |
| Carotid endarterectomy | 1.64 (1.47–1.84) | 1.70 (1.51–1.91) | 0 | 1.04 (0.92–1.17) | 0.89 (0.79–1.01) | —† |
| Aortic-valve replacement | 1.44 (1.29–1.59) | 1.45 (1.30–1.63) | 0 | 1.13 (1.00–1.28) | 0.97 (0.86–1.10) | 100 |
| Coronary-artery bypass grafting | 1.36 (1.28–1.45) | 1.33 (1.25–1.42) | 8 | 1.26 (1.15–1.37) | 1.13 (1.03–1.24) | 49 |
| Elective repair of an abdominal aortic aneurysm | 1.65 (1.46–1.86) | 1.55 (1.36–1.77) | 15 | 1.40 (1.23–1.59) | 1.17 (1.02–1.35) | 57 |
| **Cancer resections** | | | | | | |
| Resection for lung cancer | 1.24 (1.08–1.44) | 1.16 (0.99–1.36) | 34 | 1.29 (1.11–1.51) | 1.22 (1.04–1.44) | 24 |
| Cystectomy of the bladder | 1.83 (1.37–2.45) | 1.45 (1.03–2.04) | 46 | 2.06 (1.50–2.83) | 1.65 (1.14–2.39) | 39 |
| Esophagectomy | 2.30 (1.54–3.42) | 1.80 (1.13–2.87) | 38 | 2.23 (1.47–3.39) | 1.67 (1.02–2.73) | 46 |
| Pancreatic resection | 3.61 (2.44–5.33) | 2.31 (1.43–3.72) | 50 | 3.95 (2.55–6.11) | 2.34 (1.38–3.99) | 54 |

* Because of rounding, the values given for the proportion of the effect of surgeon volume attributable to hospital volume and the proportion of the effect of hospital volume attributable to surgeon volume may not match the values that can be calculated with the formula given in the text. CI denotes confidence interval.
† There was no statistically significant effect of hospital volume.

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

Figure 2 shows the relative effects of hospital volume and surgeon volume in terms of adjusted mortality rates. For carotid endarterectomy and aortic-valve replacement, the mortality rates decreased with increasing surgeon volume but did not change substantially with increasing hospital volume. Conversely, for lung resection, the adjusted mortality rates were strongly inversely related to hospital volume, but were less strongly related to surgeon volume. For the remaining five procedures, operative mortality decreased to relatively similar degrees with increasing hospital volume and increasing surgeon volume. Even within the high-volume–hospital stratum, the patients who received their care from low-volume surgeons had considerably higher mortality rates with several procedures than the patients who received care from high-volume surgeons.

We performed similar sensitivity analyses using the hospital-volume criteria that were established by the Leapfrog Group for four of the procedures (Table 3). High-volume hospitals (those with volumes at or above the Leapfrog cutoffs) had lower overall mortality rates than low-volume hospitals, largely because patients at high-volume hospitals were much more likely to be treated by high-volume surgeons than by low-volume surgeons. For coronary-artery bypass grafting, elective repair of an abdominal aortic aneurysm, and esophagectomy, the operative mortality among the patients treated by low-volume surgeons at high-volume hospitals was higher than the overall operative mortality at low-volume hospitals. For pancreatic resection, patients at high-volume hospitals had lower mortality rates than those at low-volume hospitals, regardless of the surgeon volume.

## DISCUSSION

By virtue of the large size and generalizability of the national Medicare data base, we were able to examine with precision the associations between surgeon volume and operative mortality for a wide range of cardiovascular procedures and cancer resections. For all eight procedures we studied, the patients treated by high-volume surgeons had lower operative mortality rates than those treated by low-volume surgeons. Surgeon volume accounted for a relatively large proportion of the apparent effect of hospital volume, to a degree that varied according to the procedure. For some procedures, the association between hospital volume and out-

come disappeared almost entirely after surgeon volume had been taken into account.

It is not surprising that the relative importance of surgeon volume and hospital volume varies according to the procedure. In the case of carotid endarterectomy, for example, technical skill and the use of specific intraoperative processes (e.g., intraarterial shunt insertion and patch angioplasty)[21] — processes used at the discretion of the operating surgeon — are important determinants of the risk of operative stroke or death. In contrast, other hospital-based services are relatively less important. Most patients undergoing carotid endarterectomy do not require intensive postoperative management, and the length of stay is typically just overnight. For these reasons, the preeminent role of surgeon volume in the outcome of this procedure has strong intuitive validity. In the case of lung resection, in contrast, patients rarely die because of direct technical complications of the procedure itself (e.g., bleeding or leakage from a bronchial stump); they die from cardiac events, pneumonia, and respiratory failure. Hospital-based services (e.g., intensive care, pain management, respiratory care, and nursing care) are very important, and the average length of stay is relatively long. Thus, it is not surprising that hospital volume was more important than surgeon volume in determining the outcome of this procedure. Of course, these two procedures represent the extremes. As suggested by our analysis, factors related to both surgeon volume and hospital volume seem to be important for most high-risk procedures.

Our study has several important limitations. First, because we used Medicare data, our study was restricted to patients 65 years of age or older. However, the elderly constitute the majority of patients undergoing the cardiovascular procedures and cancer resections that we examined in this study. Second, although our study was large, some of our subgroup analyses were based on relatively

---

**Figure 2 (facing page). Adjusted Operative Mortality among Medicare Patients in 1998 and 1999, According to Hospital-Volume Stratum and Surgeon-Volume Stratum for Four Cardiovascular Procedures (Panel A) and Four Cancer Resections (Panel B).**

Because of small samples (<20), mortality rates among patients treated by high-volume surgeons in low-volume hospitals are not shown for esophagectomy and pancreatic resection. Mortality rates were adjusted for characteristics of the patients.

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

SURGEON VOLUME AND OPERATIVE MORTALITY IN THE UNITED STATES



Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

**Table 3. Adjusted Operative Mortality Rates among Medicare Patients in 1998 and 1999, According to Total Hospital Volume, Relative to the Leapfrog Group Volume Criteria and Surgeon Volume.***

| Procedure | Cutoff | Hospital Volume <Cutoff | | | Hospital Volume ≥Cutoff | | |
|---|---|---|---|---|---|---|---|
| | | Low-Volume Surgeons | High-Volume Surgeons | Overall Hospital Mean | Low-Volume Surgeons | High-Volume Surgeons | Overall Hospital Mean |
| | *no./yr* | | | *percent* | | | |
| Coronary-artery bypass grafting | 450 | | | | | | |
| Proportion of patients | | 47.3 | 20.1 | | 19.3 | 46.8 | |
| Mortality | | 5.4 | 4.6 | 5.0 | 5.4 | 3.7 | 4.2 |
| Elective repair of an abdominal aortic aneurysm | 50 | | | | | | |
| Proportion of patients | | 45.3 | 18.1 | | 17.8 | 52.5 | |
| Mortality | | 6.4 | 4.3 | 5.4 | 5.8 | 3.6 | 4.3 |
| Esophagectomy | 13 | | | | | | |
| Proportion of patients | | 36.0 | 14.4 | | 9.2 | 70.0 | |
| Mortality | | 19.2 | 11.1 | 15.3 | 17.5 | 8.1 | 9.5 |
| Pancreatic resection | 11 | | | | | | |
| Proportion of patients | | 50.5 | 9.4 | | 6.9 | 80.5 | |
| Mortality | | 15.7 | 6.9 | 11.9 | 6.1 | 3.7 | 4.5 |

* Operative mortality was defined as the rate of death before hospital discharge or within 30 days after the index procedure; total hospital volume included procedures in both Medicare and non-Medicare patients.

small numbers of patients. In particular, the number of patients who underwent procedures performed by low-volume surgeons at high-volume hospitals or by high-volume surgeons at low-volume hospitals was relatively low. Thus, estimates of mortality in these subgroups are relatively imprecise. Third, because of errors in the coding and assignment of unique provider identification numbers, we may have incorrectly identified the operating surgeon for some procedures. Such errors, if largely random, would tend to bias our results toward the null hypothesis (no effect of surgeon volume on outcome). However, to reduce any potential bias against low-volume surgeons, we excluded physicians who were not self-designated as surgeons.

Finally, many would question our ability to perform adequate risk adjustment with the use of administrative data.[22,23] Whether risk adjustment is important in studies of surgical volume and outcome is uncertain. Some have noted that analyses based on clinical studies are less likely to report statistically significant associations between volume and outcome than those (the majority) that are based on administrative data.[4] However, clinical studies also tend to be substantially smaller and often lack sufficient statistical power to detect clinically meaningful differences in operative mortality

rates. Moreover, there is little evidence from clinical studies that there are important, volume-related differences in case mix (i.e., that low-volume providers care for "sicker" patients). Although we cannot rule out confounding by unmeasured characteristics of the patients in our study, there is no reason to believe that such confounding would affect our analyses of hospital volume and surgeon volume disproportionately. Thus, we do not believe that limitations related to risk adjustment threaten our main conclusions about the relative importance of hospital volume and surgeon volume.

Our findings have direct implications for ongoing initiatives for volume-based referral. Leading the most visible of these initiatives, the Leapfrog Group, a coalition of more than 140 large public and private purchasers, has established "evidence-based hospital referral" standards for several surgical procedures.[24] Although the Leapfrog Group has recently incorporated data on outcomes and selected process measures into its 2003 standards for some procedures, criteria based on minimal hospital volume remain in place for coronary-artery bypass grafting, percutaneous coronary interventions, elective repair of an abdominal aortic aneurysm, esophagectomy, and pancreatic resection. Our analysis confirms that hospitals that exceed the volume criteria set by Leapfrog have lower mortali-

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

SURGEON VOLUME AND OPERATIVE MORTALITY IN THE UNITED STATES

ty rates, on average, than those that do not. However, our findings also suggest that high-volume hospitals have better outcomes in large part because patients at these hospitals are more likely to be treated by high-volume surgeons and that standards based on surgeon volume as well as hospital volume would be more useful in directing patients to the providers who are likely to achieve the best outcomes. Increasing surgeons' volumes would require that administrators and leaders in the field of surgery actively manage the way in which selected operations are distributed within their hospitals — that is, by restricting them to a smaller number of surgeons. Although such efforts would no doubt encounter resistance, they may be more practical and less controversial than policies focusing exclusively on redistributing patients among hospitals.

We should also look for opportunities to improve the quality of surgical care delivered by low-volume surgeons. Determining whether this goal is realistic will require a better understanding of the mechanisms underlying the observed associations between volume and outcome. The key mechanism could simply be "practice" — clinical judgment and technical skill that are achieved only by surgeons who perform a specific procedure with sufficient frequency. Before jumping to this conclusion, however, we must better understand which specific processes of care are most important to the success of various operations and the extent to which they can be exported to other surgeons or hospitals.

Supported by a grant (R01 HS10141-01) from the Agency for Healthcare Research and Quality.

Dr. Birkmeyer reports serving as a paid consultant for the Leapfrog Group and as the chair of its advisory panel on evidence-based hospital referral.

The views expressed in this article are those of the authors and do not necessarily represent those of the Center for Medicare and Medicaid Services or the U.S. government.

## REFERENCES

1. Hannan EL, Radzyner M, Rubin D, Dougherty J, Brennan MF. The influence of hospital and surgeon volume on in-hospital mortality for colectomy, gastrectomy, and lung lobectomy in patients with cancer. Surgery 2002;131:6-15.
2. Begg CB, Cramer LD, Hoskins WJ, Brennan MF. Impact of hospital volume on operative mortality for major cancer surgery. JAMA 1998;280:1747-51.
3. Dudley RA, Johansen KL, Brand R, Rennie DJ, Milstein A. Selective referral to high-volume hospitals: estimating potentially avoidable deaths. JAMA 2000;283:1159-66.
4. Halm EA, Lee C, Chassin MR. Is volume related to outcome in health care? A systematic review and methodologic critique of the literature. Ann Intern Med 2002;137:511-20.
5. Birkmeyer JD, Siewers AE, Finlayson EVA, et al. Hospital volume and surgical mortality in the United States. N Engl J Med 2002;346:1128-37.
6. Schrag D, Panageas KS, Riedel E, et al. Hospital and surgeon procedure volume as predictors of outcome following rectal cancer resection. Ann Surg 2002;236:583-92.
7. Begg CB, Riedel ER, Bach PB, et al. Variations in morbidity after radical prostatectomy. N Engl J Med 2002;346:1138-44.
8. Hillner BE, Smith TJ, Desch CE. Hospital and physician volume or specialization and outcomes in cancer treatment: importance in quality of cancer care. J Clin Oncol 2000;18:2327-40.
9. Sosa JA, Bowman HM, Gordon TA, et al. Importance of hospital volume in the overall management of pancreatic cancer. Ann Surg 1998;228:429-38.
10. Hannan EL, Popp AJ, Tranmer B, Feustel P, Waldman J, Shah D. Relationship between provider volume and mortality for carotid endarterectomies in New York State. Stroke 1998;29:2292-7.
11. Hannan EL, Siu AL, Kumar D, Kilburn H Jr, Chassin MR. The decline in coronary artery bypass graft surgery mortality in New York State: the role of surgeon volume. JAMA 1995;273:209-13.
12. Harmon JW, Tang DG, Gordon TA, et al. Hospital volume can serve as a surrogate for surgeon volume for achieving excellent outcomes in colorectal resection. Ann Surg 1999;230:404-11.
13. Finlayson EVA, Birkmeyer JD. Operative mortality with elective surgery in older adults. Eff Clin Pract 2001;4:172-7. [Erratum, Eff Clin Pract 2001;4:235.]
14. Goodney PP, Siewers AE, Stukel TA, Lucas FL, Wennberg DE, Birkmeyer JD. Is surgery getting safer? National trends in operative mortality. J Am Coll Surg 2002;195:219-27.
15. Miller ME, Welch WP, Welch HG. The impact of practicing in multiple hospitals on physician profiles. Med Care 1996;34:455-62.
16. McCullagh P, Nelder JA. Generalized linear models. New York: Chapman & Hall, 1989.
17. Breslow NE, Clayton DG. Approximate inference in generalized linear mixed models. J Am Stat Assoc 1993;88:9-25.
18. Goldstein H, Rasbash J, Plewis I, et al. A user's guide to MLwiN. London: Institute of Education, 1998.
19. Charlson ME, Pompei P, Ales KL, MacKenzie CR. A new method of classifying prognostic comorbidity in longitudinal studies: development and validation. J Chronic Dis 1987;40:373-83.
20. Taylor DH Jr, Whellan DJ, Sloan FA. Effects of admission to a teaching hospital on the cost and quality of care for Medicare beneficiaries. N Engl J Med 1999;340:293-9.
21. Hannan EL, Popp AJ, Feustel P, et al. Association of surgical specialty and processes of care with patient outcomes for carotid endarterectomy. Stroke 2001;32:2890-7.
22. Iezzoni LI, Foley SM, Daley J, Hughes J, Fisher ES, Heeren T. Comorbidities, complications, and coding bias: does the number of diagnosis codes matter in predicting in-hospital mortality? JAMA 1992;267:2197-203.
23. Fisher ES, Whaley FS, Krushat WM, et al. The accuracy of Medicare's hospital claims data: progress has been made, but problems remain. Am J Public Health 1992;82:243-8.
24. Patient safety: evidence-based hospital referral fact sheet. Washington, D.C.: Leapfrog Group, 2003. (Accessed October 30, 2003, at http://www.Leapfroggroup.org.)
*Copyright © 2003 Massachusetts Medical Society.*

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 8, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

# EXHIBIT 10

The NEW ENGLAND JOURNAL of MEDICINE

SPECIAL ARTICLE

# The Quality of Health Care Delivered to Adults in the United States

Elizabeth A. McGlynn, Ph.D., Steven M. Asch, M.D., M.P.H., John Adams, Ph.D., Joan Keesey, B.A., Jennifer Hicks, M.P.H., Ph.D., Alison DeCristofaro, M.P.H., and Eve A. Kerr, M.D., M.P.H.

## ABSTRACT

**BACKGROUND**

We have little systematic information about the extent to which standard processes involved in health care — a key element of quality — are delivered in the United States.

**METHODS**

We telephoned a random sample of adults living in 12 metropolitan areas in the United States and asked them about selected health care experiences. We also received written consent to copy their medical records for the most recent two-year period and used this information to evaluate performance on 439 indicators of quality of care for 30 acute and chronic conditions as well as preventive care. We then constructed aggregate scores.

**RESULTS**

Participants received 54.9 percent (95 percent confidence interval, 54.3 to 55.5) of recommended care. We found little difference among the proportion of recommended preventive care provided (54.9 percent), the proportion of recommended acute care provided (53.5 percent), and the proportion of recommended care provided for chronic conditions (56.1 percent). Among different medical functions, adherence to the processes involved in care ranged from 52.2 percent for screening to 58.5 percent for follow-up care. Quality varied substantially according to the particular medical condition, ranging from 78.7 percent of recommended care (95 percent confidence interval, 73.3 to 84.2) for senile cataract to 10.5 percent of recommended care (95 percent confidence interval, 6.8 to 14.6) for alcohol dependence.

**CONCLUSIONS**

The deficits we have identified in adherence to recommended processes for basic care pose serious threats to the health of the American public. Strategies to reduce these deficits in care are warranted.

From RAND, Santa Monica, Calif. (E.A.M., S.M.A., J.A., J.K., J.H., A.D.); the Veterans Affairs (VA) Greater Los Angeles Health Care System, Los Angeles (S.M.A.); the Department of Medicine, University of California Los Angeles, Los Angeles (S.M.A.); the VA Center for Practice Management and Outcomes Research, VA Ann Arbor Health Care System, Ann Arbor, Mich. (E.A.K.); and the Department of Medicine, University of Michigan, Ann Arbor (E.A.K.). Address reprint requests to Dr. McGlynn at RAND, 1700 Main St., P.O. Box 2138, Santa Monica, CA 90407, or at beth_mcglynn@rand.org.

N Engl J Med 2003;348:2635-45.
*Copyright © 2003 Massachusetts Medical Society.*

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

THE DEGREE TO WHICH HEALTH CARE in the United States is consistent with basic quality standards is largely unknown.[1,2] Although previous studies have documented serious quality deficits, they provide a limited perspective on the issue.[3-5] Most have assessed a single condition,[6,7] a small number of indicators of quality,[8,9] persons with a single type of insurance coverage,[10] or persons receiving care in a small geographic area.[11,12] The few national studies have been limited to specific segments of the population, such as Medicare beneficiaries[13-15] or enrollees in managed-care plans[16]; have focused on a limited set of topics, such as preventive care,[17] diabetes,[18] or human immunodeficiency virus[19]; or have assessed health outcomes without a link to specific processes involved in care.[20] As a result, we have no comprehensive view of the level of quality of care given to the average person in the United States. This information gap contributes to a persistent belief that quality is not a serious national problem.[1]

In this article, we report results from the Community Quality Index (CQI) study, a collateral study of the Community Tracking Study (CTS).[21] The CTS, conducted by the Center for Studying Health System Change (CSHSC), monitors changes in health care markets in the United States. The CTS obtains self-reported information from a random sample of the U.S. population on their insurance coverage, patterns of utilization of health care services, and health status. The CSHSC has reported on trends in health care costs,[22] factors affecting the choice of employer-sponsored or public insurance,[23] and changes in the structure of managed-care plans.[24] However, the CTS lacks detailed information about the implications of these variations in health care markets for the quality of health care. By collaborating with the CSHSC, we were able to assess the extent to which the recommended processes of medical care — one critical dimension of quality — are delivered to a representative sample of the U.S. population for a broad spectrum of conditions.

## METHODS

### RECRUITMENT OF PARTICIPANTS

In 12 metropolitan areas (Boston; Cleveland; Greenville, S.C.; Indianapolis; Lansing, Mich.; Little Rock, Ark.; Miami; Newark, N.J.; Orange County, Calif.; Phoenix, Ariz.; Seattle; and Syracuse, N.Y.), using random-digit-dial telephone surveys, the CTS deliberately recruited enough participants to assess how structural characteristics in each market (e.g., the penetration of managed care) affect patterns of access to and utilization of health care services. Between October 1998 and August 2000, we recontacted by telephone households that had participated in the CTS interviews. Participants were asked to complete a telephone interview regarding their health history and to provide a listing of all individual or institutional health care providers whom they had seen during the previous two years. Participants who orally agreed to provide access to their medical records were sent written consent forms to sign and return to RAND. Photocopies of the medical records of participants providing written consent were sent to RAND for central abstracting.

### RESPONSE RATES

Because of the complex, multistage nature of the study design, several calculations of the response rate are provided. Among the 20,028 adults in the initial sample, 2091 (10 percent) were deemed ineligible, primarily because they had left the area. Among the 17,937 eligible adults, 13,275 (74 percent) participated in the telephone interview regarding their health history, including 863 (7 percent) who had had no visits to a health care provider during the previous two years. Among the 12,412 participants who had had visits, 10,404 (84 percent) agreed orally to provide access to their medical records. We obtained written consent from 7528 (61 percent of those with visits to a provider). Participants reported having seen between 1 and 17 providers (mean, 2.6) during the study period. We obtained at least one record for 6712 (89 percent) of those who returned their consent forms. Overall, we received 84 percent of the records for which we had consent forms; we received all expected records for 4612 of the 6712 participants with consent forms and records (69 percent) and all but one record for 1547 of these participants (23 percent). Sensitivity analyses revealed few differences in results related to the completeness of records, so all participants for whom we obtained at least one record were included in the results we report (37 percent of the sample of eligible adults).

### DEVELOPMENT OF INDICATORS OF QUALITY

The indicators of quality used in the study were derived from RAND's Quality Assessment Tools system.[25] RAND staff members selected acute and chronic conditions that represented the leading causes of illness, death, and utilization of health

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

THE QUALITY OF HEALTH CARE DELIVERED TO ADULTS IN THE UNITED STATES

care in each age group, as well as preventive care related to these causes. For each condition, staff physicians reviewed established national guidelines and the medical literature and proposed indicators of quality for all phases of care or medical functions (screening, diagnosis, treatment, and follow-up). We developed indicators to assess potential problems with the overuse and underuse of key processes. We primarily chose measures of processes as indicators, because they represent the activities that clinicians control most directly, because they do not generally require risk adjustment beyond the specification of eligibility, and because they are consistent with the structure of national guidelines.[5,26]

Four nine-member, multispecialty expert panels were convened to assess the validity of the indicators proposed by the staff, using the RAND–UCLA modified Delphi method.[27] The members of the panels, nominated by the appropriate specialty societies, were diverse with respect to geography, practice setting, and sex. Indicators were rated on a 9-point scale (with 1 denoting not valid and 9 very valid). Only indicators with a median validity score of 7 or higher were included in the Quality Assessment Tools system. This method of selecting indicators is reliable[28] and has been shown to have content, construct, and predictive validity in other applications.[29-32]

The criteria for the selection of conditions, reviews of the literature, the process followed by the panels, and the final indicators have been published elsewhere.[33-36] (Further information on all the quality indicators used in this study is available at http://www.rand.org/health/mcglynn_appa.pdf or from the National Auxiliary Publications Service.*) Table 1 provides a brief description and classifications for a sample of the indicators we used. The classifications enabled us to examine quality from the perspective of what is being done (type of care), why it is being done (function), how it is being delivered (mode), and the nature of the quality problem (underuse or overuse). Results are based on 439 indicators for 30 conditions and preventive care.

### HEALTH HISTORY INTERVIEW
We obtained selective information directly from respondents to augment information in their medical records. The health history took an average of 13 minutes to complete. The data obtained in this in-

terview were used to refine the analysis of a respondent's eligibility for inclusion in the analysis or to augment the scoring for 22 of the 439 indicators. For example, we used reports of symptoms from participants with asthma to classify those with moderate-to-severe disease. We augmented scores for influenza or pneumococcal immunizations and screening for cancer on the basis of self-reports.

### ABSTRACTING OF CHARTS
We developed computer-assisted abstraction software on a Visual Basic platform (version 6.0, Microsoft). The software allowed the manual abstraction of charts to be tailored to the specific record being reviewed and provided interactive checks of the quality of the data (for consistency and range), calculations (e.g., the determination of the presence of high blood pressure), and classifications (e.g., the determination of drug class) during abstraction.

Data for the study were abstracted by 20 trained registered nurses who had successfully abstracted a complex standard chart after a two-week training program. Charts were abstracted separately for each health care provider of each participant (i.e., at the dyad level). The average time required to abstract a chart for a participant–provider dyad was 50 minutes.

To assess interrater reliability, we re-abstracted charts from a randomly selected 4 percent sample of participants. Average reliability, with the use of the kappa statistic, ranged from substantial to almost perfect[37] at three levels: the presence or absence of a given condition ($\kappa=0.83$), the participant's eligibility for the process represented by a given indicator ($\kappa=0.76$), and scoring of a given indicator ($\kappa=0.80$).

### STATISTICAL ANALYSIS
We specified the combination of variables necessary to determine whether each participant was or was not eligible for the process specified by each indicator and whether each participant did or did not receive each process or some proportion of it. Each indicator was scored at one of three levels — that of the individual participant, that of the participant–provider dyad, or that of the episode — depending on the nature of the process being evaluated. The level at which an indicator was scored affected the number of times a participant was eligible for the specified process; the resulting number served as the denominator in the calculation of the aggregate score. For participant-level indicators, we gave

*See NAPS document no. 05610 for 50 pages of supplementary material. To order, contact NAPS, c/o Microfiche Publications, 248 Hempstead Tpke., West Hempstead, NY 11552.

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

**Table 1. Selected Quality-of-Care Indicators and Classifications Used in the Community Quality Index Study.***

| Condition† | Description of Selected Indicator | Classification for Aggregate Scores | | | |
|---|---|---|---|---|---|
| | | Type of Care | Function | Mode | Problem with Quality |
| **Alcohol dependence (5 indicators)** | | | | | |
| Indicator 2 | Assessment of alcohol dependence among regular or binge drinkers | For chronic condition | Diagnosis | History | Underuse |
| Indicator 4 | Treatment referral for persons given a diagnosis of alcohol dependence | For chronic condition | Treatment | Encounter or other intervention | Underuse |
| **Asthma (25 indicators)** | | | | | |
| Indicator 4 | Long-acting agents for patients with frequent use of short-acting beta-agonists | For chronic condition | Treatment | Medication | Underuse |
| Indicator 6 | Inhaled corticosteroids for patients receiving long-term systemic corticosteroid therapy | For chronic condition | Treatment | Medication | Underuse |
| **Breast cancer (9 indicators)** | | | | | |
| Indicator 1 | Appropriate follow-up of palpable mass | For chronic condition | Diagnosis | Laboratory testing or radiography | Underuse |
| Indicator 5 | Choice of surgical treatments for stage I or II cancer | For chronic condition | Treatment | Surgery | Underuse |
| **Cerebrovascular disease (10 indicators)** | | | | | |
| Indicator 4 | Antiplatelet therapy for noncardiac stroke or transient ischemic attack | For chronic condition | Treatment | Medication | Underuse |
| Indicator 5 | Carotid imaging for patients with symptomatic cardiovascular disease or transient ischemic attack | For chronic condition | Diagnosis | Laboratory testing or radiography | Underuse |
| **Colorectal cancer (12 indicators)** | | | | | |
| Indicator 1 | Screening for high-risk patients starting at 40 yr of age | Preventive | Screening | Laboratory testing or radiography | Underuse |
| Indicator 7 | Appropriate surgical treatment | For chronic condition | Treatment | Surgery | Underuse |
| **Congestive heart failure (36 indicators)** | | | | | |
| Indicator 1 | Ejection fraction assessed before medical therapy | For chronic condition | Diagnosis | Laboratory testing or radiography | Underuse |
| Indicator 32 | ACE inhibitors for patients with congestive heart failure and an ejection fraction <40% | For chronic condition | Treatment | Medication | Underuse |
| **Coronary artery disease (37 indicators)** | | | | | |
| Indicator 3 | Counseling on smoking cessation | For chronic condition | Treatment | Counseling or education | Underuse |
| Indicator 11 | Avoidance of nifedipine for patients with an acute myocardial infarction | For chronic condition | Treatment | Medication | Overuse |
| **Diabetes (13 indicators)** | | | | | |
| Indicator 9 | Diet and exercise counseling | For chronic condition | Treatment | Counseling or education | Underuse |
| Indicator 12 | ACE inhibitors for patients with proteinuria | For chronic condition | Treatment | Medication | Underuse |

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

THE QUALITY OF HEALTH CARE DELIVERED TO ADULTS IN THE UNITED STATES

**Table 1. (Continued.)**

| Condition | Description of Selected Indicator | Classification for Aggregate Scores | | | |
|---|---|---|---|---|---|
| | | Type of Care | Function | Mode | Problem with Quality |
| **Headache (21 indicators)** | | | | | |
| Indicator 11 | CT or MRI for patients with new-onset headache and an abnormal neurologic examination | Acute | Diagnosis | Laboratory testing or radiography | Underuse |
| Indicator 15 | Use of appropriate first-line agents for patients with acute migraine | Acute | Treatment | Medication | Overuse |
| **Hip fracture (9 indicators)** | | | | | |
| Indicator 6 | Prophylactic antibiotics given on day of hip-repair surgery | Acute | Treatment | Medication | Underuse |
| Indicator 7 | Prophylactic antithrombotic drugs given on admission for patients with hip fracture | Acute | Treatment | Medication | Underuse |
| **Hyperlipidemia (7 indicators)** | | | | | |
| Indicator 4 | Treatment of high LDL cholesterol levels in patients with coronary artery disease | For chronic condition | Treatment | Medication | Underuse |
| **Hypertension (27 indicators)** | | | | | |
| Indicator 16 | Lifestyle modification for patients with mild hypertension | For chronic condition | Treatment | Counseling or education | Underuse |
| Indicator 18 | Pharmacotherapy for uncontrolled mild hypertension | For chronic condition | Treatment | Medication | Underuse |
| Indicator 27 | Change in treatment when blood pressure is persistently uncontrolled | For chronic condition | Follow-up | Medication | Underuse |
| **Acute low back pain (6 indicators)** | | | | | |
| Indicator 1 | Rule out cancer, fracture, infection, cauda equina syndrome, and neurologic causes | Acute | Diagnosis | History | Underuse |
| Indicator 6 | Avoidance of prolonged bed rest | Acute | Treatment | Other | Overuse |
| **Preventive care (38 indicators)** | | | | | |
| Indicator 1 | Screening for problem drinking | Preventive | Screening | History | Underuse |
| Indicator 2 | Mammographic screening for breast cancer | Preventive | Screening | Laboratory testing or radiography | Underuse |
| Indicator 3 | Screening for colorectal cancer in persons at average risk | Preventive | Screening | Laboratory testing or radiography | Underuse |
| Indicator 8 | Influenza vaccine for persons ≥65 yr of age | Preventive | Treatment | Immunization | Underuse |
| Indicator 21 | HIV testing for those at risk | Preventive | Screening | Laboratory testing or radiography | Underuse |
| Indicator 25 | Screening for cervical cancer | Preventive | Screening | Laboratory testing or radiography | Underuse |
| Indicator 29 | Smoking status documented | Preventive | Screening | History | Underuse |
| Indicator 31 | Annual advice for smokers to quit smoking | Preventive | Treatment | Counseling or education | Underuse |

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

| Table 1. (Continued.) | | | | | |
| --- | --- | --- | --- | --- | --- |
| Condition | Description of Selected Indicator | Classification for Aggregate Scores | | | |
| | | Type of Care | Function | Mode | Problem with Quality |
| Sexually transmitted diseases (26 indicators) | | | | | |
| Indicator 9 | Chlamydia screening for high-risk women | Preventive | Screening | Laboratory testing or radiography | Underuse |
| Indicator 24 | HIV screening in patients with sexually transmitted diseases | Acute | Screening | Laboratory testing or radiography | Underuse |

\* ACE denotes angiotensin-converting enzyme, CT computed tomography, MRI magnetic resonance imaging, LDL low-density lipoprotein, and HIV human immunodeficiency virus.
† The number of indicators given in parentheses after each condition is the total number of indicators of quality of care for that condition; the indicators listed below each condition are examples.

the participant a score of "pass" if at least one of his or her health care providers had delivered the indicated care (e.g., influenza vaccination). For indicators scored at the level of the participant–provider dyad (e.g., smoking status noted in the chart), we scored every dyad separately, so the number of times the participant was counted in the denominator depended on the number of providers who saw the participant and could have performed the specified process. For indicators scored at the episode level (e.g., follow-up after hospitalization for an exacerbation of asthma), we scored every event rendering the participant eligible for the specified process and involving any of the participant's providers, so the number of eligibility events depended on the number of episodes that occurred.

In order to produce aggregate scores, we divided all instances in which recommended care was delivered by the number of times participants were eligible for indicators in the category. For example, Table 1 presents information about seven of the indicators for acute care; the number of times participants were eligible for these indicators would constitute the denominator for the acute care score. The results are expressed as proportions, theoretically ranging in value from 0 to 100 percent. We used the bootstrap method to estimate standard errors directly for all the aggregate scores.[38]

Because everyone in the initial sample for the CQI study had participated in the CTS, we had a rich set of variables for assessing nonresponse. We used logistic-regression analysis to estimate the relations between individual characteristics (age, sex, race, educational level, income, self-reported level of use of physicians and hospitals, insurance status, and

health status) and participation in the study. In general, participants tended to be older than nonparticipants (P<0.001) and were more likely than nonparticipants to be female (P<0.001) and white (P<0.001), with higher levels of education (P<0.001) and income (P<0.001). They were also more likely to have used health care services (P<0.001) and to be in other than excellent health (P=0.03). We used the coefficients from the regression equation to adjust the scores for nonresponse, and we weighted the data for the participants to be representative of the population from which they were drawn.

## RESULTS

### CHARACTERISTICS OF THE PARTICIPANTS

Table 2 summarizes the characteristics of the participants; these characteristics differ from population averages but parallel the profile of persons receiving medical care. For example, the average age of patients in the National Ambulatory Medical Care Survey[39] is 44.7 years. Women have higher rates of visits than men (319.9 vs. 234.9 visits per 100 persons per year), and whites have higher rates of visits than blacks (293.2 vs. 210.7 visits per 100 persons per year).[39] Participants were well educated. Forty-three percent had one or more of the chronic conditions we assessed, and 34 percent had one or more of the acute conditions. Preventive care was assessed for all participants; in addition, participants' care was assessed for 1.5 chronic or acute conditions, on average, for a total of 2.5 (range, 1 to 13). Participants were included in the overall denominator an average of 16 times (range, 2 to 304).

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

THE QUALITY OF HEALTH CARE DELIVERED TO ADULTS IN THE UNITED STATES

## ANALYSIS OF CARE DELIVERED

Tables 3, 4, and 5 show the number of indicators included in the aggregate score, the number of persons eligible for one or more processes within the category, the number of times participants in the sample were eligible for indicators, and the weighted mean proportion (and 95 percent confidence interval) of recommended processes that were delivered.

Overall, participants received 54.9 percent of recommended care (95 percent confidence interval, 54.3 to 55.5) (Table 3). This level of performance was similar in the areas of preventive care, acute care, and care for chronic conditions. The level of performance according to the particular medical function ranged from 52.2 percent (95 percent confidence interval, 51.3 to 53.2) for screening to 58.5 percent (95 percent confidence interval, 56.6 to 60.4) for follow-up care.

"Mode" refers to the mechanism of care delivery required for the provision of the indicated process. Analysis of performance in terms of mode may identify areas in which system-wide interventions could offer solutions to problems of quality, such as improved methods for ordering, processing, and communicating laboratory results. We found greater variation among modes than among functions in adherence to the processes we studied (Table 4). Care requiring an encounter or other intervention (e.g., the annual visit recommended for patients with hypertension) had the highest rates of adherence (73.4 percent [95 percent confidence interval, 71.5 to 75.3]), and processes involving counseling or education (e.g., advising smokers with chronic obstructive pulmonary disease to quit smoking) had the lowest rates of adherence (18.3 percent [95 percent confidence interval, 16.7 to 20.0]). All pairwise differences were statistically significant at $P<0.001$ except those between the prescribing of medication and care requiring an encounter or other intervention ($P=0.02$), physical examination and immunization ($P=0.001$), surgery and immunization ($P=0.004$), and surgery and physical examination ($P=0.05$). The difference between surgery and laboratory testing or radiography was not significant ($P=0.39$).

## PROBLEMS WITH QUALITY OF CARE

We also classified indicators according to the problem with quality that was deemed most likely to occur, and we found greater problems with underuse (46.3 percent of participants did not receive recom-

| Table 2. Characteristics of the 6712 Participants.* | |
|---|---|
| Characteristic | Value |
| Age (yr) | |
|   Mean | 45.5±0.2 |
|   Range | 18–97 |
| Female sex (%) | 59.6±0.006 |
| Nonwhite race (%) | 18.6±0.005 |
| Education (yr) | 13.7±0.03 |
| ≥1 Chronic conditions (%) | 44.7±0.006 |
| ≥1 Acute conditions (%) | 36.3±0.006 |
| No. of conditions and preventive care for which participants were eligible | |
|   Mean | 2.5±0.02 |
|   Range | 1–13 |
| No. of times participants eligible for indicators† | |
|   Mean | 15.8±0.17 |
|   Range | 2–304 |

\* Plus–minus values are means or percentages ±SE.
† The number of times a participant is eligible for an indicator is a function of the level at which the indicator is scored (participant, participant–provider dyad, or episode), the number of participants eligible for the specified process, and the number of indicators in the aggregate-score category.

mended care [95 percent confidence interval, 45.8 to 46.8]) than with overuse (11.3 percent of participants received care that was not recommended and was potentially harmful [95 percent confidence interval, 10.2 to 12.4]).

## VARIATIONS IN QUALITY

Table 5 shows substantial variability in the quality-of-care scores for the 25 conditions for which at least 100 persons were eligible for analysis. Persons with senile cataracts received 78.7 percent of the recommended care (95 percent confidence interval, 73.3 to 84.2); persons with alcohol dependence received 10.5 percent of the recommended care (95 percent confidence interval, 6.8 to 14.6). The aggregate scores for individual conditions were generally not sensitive to the presence or absence of any single indicator of quality.

## DISCUSSION

Overall, participants received about half of the recommended processes involved in care. These defi-

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

| Variable | No. of Indicators | No. of Participants Eligible | Total No. of Times Indicator Eligibility Was Met | Percentage of Recommended Care Received (95% CI)* |
|---|---|---|---|---|
| Overall care | 439 | 6712 | 98,649 | 54.9 (54.3–55.5) |
| Type of care | | | | |
| Preventive | 38 | 6711 | 55,268 | 54.9 (54.2–55.6) |
| Acute | 153 | 2318 | 19,815 | 53.5 (52.0–55.0) |
| Chronic | 248 | 3387 | 23,566 | 56.1 (55.0–57.3) |
| Function | | | | |
| Screening | 41 | 6711 | 39,486 | 52.2 (51.3–53.2) |
| Diagnosis | 178 | 6217 | 29,679 | 55.7 (54.5–56.8) |
| Treatment | 173 | 6707 | 23,019 | 57.5 (56.5–58.4) |
| Follow-up | 47 | 2413 | 6,465 | 58.5 (56.6–60.4) |

Table 3. Adherence to Quality Indicators, Overall and According to Type of Care and Function.

* CI denotes confidence interval.

| Mode | No. of Indicators | No. of Participants Eligible | Total No. of Times Indicator Eligibility Was Met | Percentage of Recommended Care Received (95% CI)* |
|---|---|---|---|---|
| Encounter or other intervention | 30 | 2843 | 4,329 | 73.4 (71.5–75.3) |
| Medication | 95 | 2964 | 8,389 | 68.6 (67.0–70.3) |
| Immunization | 8 | 6700 | 9,748 | 65.7 (64.3–67.0) |
| Physical examination | 67 | 6217 | 19,428 | 62.9 (61.8–64.0) |
| Laboratory testing or radiography | 131 | 5352 | 18,605 | 61.7 (60.4–63.0) |
| Surgery | 21 | 244 | 312 | 56.9 (51.3–62.5) |
| History | 64 | 6711 | 36,032 | 43.4 (42.4–44.3) |
| Counseling or education | 23 | 2838 | 3,806 | 18.3 (16.7–20.0) |

Table 4. Adherence to Quality Indicators, According to Mode.

* CI denotes confidence interval. All pairwise differences were statistically significant at P<0.001 except those between medication and encounter or other intervention (P=0.02), physical examination and immunization (P=0.001), surgery and immunization (P=0.004), and surgery and physical examination (P=0.05). The difference between surgery and laboratory testing or radiography was not significant (P=0.39).

cits in care have important implications for the health of the American public. For example, only 24 percent of participants in our study who had diabetes received three or more glycosylated hemoglobin tests over a two-year period. This finding parallels the finding by Saaddine and colleagues that 29 percent of adults with diabetes who participated in the nationally representative Behavioral Risk Factor Surveillance System reported having their blood sugar tested during the previous year.[18] This routine monitoring is essential to the assessment of the effectiveness of treatment, to ensuring appropriate responses to poor glycemic control, and to the identification of complications of the disease at an early stage so that serious consequences may be prevented. In the United Kingdom Prospective Diabetes Study, tight blood glucose control and biannual monitoring decreased the risk of microvascular complications by 25 percent.[40]

In our study, persons with hypertension received 64.7 percent of the recommended care (95 percent confidence interval, 62.6 to 66.7). We have previously demonstrated a link between blood-pressure control and adherence to process-related measures of quality of care for hypertension.[41] Persons whose blood pressure is persistently above normal are at increased risk for heart disease, stroke, and death.[42] Poor blood-pressure control contributes to more than 68,000 preventable deaths annually.[43]

Overall, 68.0 percent (95 percent confidence interval, 64.2 to 71.8) of the recommended care for coronary artery disease was received, but only 45 percent of persons presenting with a myocardial infarction received beta-blockers, which reduce the risk of death by 13 percent during the first week of treatment and by 23 percent over the long term.[44] Only 61 percent of participants with a myocardial infarction who were appropriate candidates for aspirin therapy received aspirin, which has been shown in randomized trials to reduce the risk of death from vascular causes by 15 percent, to reduce the risk of nonfatal myocardial infarction by 30 percent, and to reduce the risk of nonfatal stroke by 40 percent.[45]

Deficits in processes involved in primary and secondary preventive care are also associated with preventable deaths. Among elderly participants, only 64 percent had received or been offered a pneumococcal vaccine; nearly 10,000 deaths from pneumonia could be prevented annually by appropriate

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

THE QUALITY OF HEALTH CARE DELIVERED TO ADULTS IN THE UNITED STATES

vaccinations.[43] About 38 percent of participants had been screened for colorectal cancer; annual fecal occult-blood tests could prevent about 9600 deaths annually.[43]

Nonresponse bias is a potential limitation of the study. Because the sample we analyzed included 37 percent of the eligible subjects, the results are likely to be biased, but the direction of that bias is not clear. For example, because our participants were more likely to use the health care system than were eligible persons who did not participate in the study, our results may be biased toward an underestimation of deficits in quality related to underuse.

The study relied primarily on the review of medical records to score indicators, which may lead some to conclude that we have identified problems with documentation rather than quality. This issue has been examined in studies that compared process-based quality scores using standardized patients, vignettes, and abstraction of medical records[46] and studies that compared standardized patients with audiotapes of encounters.[47] Overall, the process scores among the four conditions studied were 5 percentage points lower with the use of medical records than with the use of vignettes and 10 percentage points lower with the use of medical records than with the use of standardized patients. About two thirds of the disagreement between data from standardized patients and data from audiotapes was attributable to reports by standardized patients that they received care processes that were not confirmed by audiotape. A related study reported a false positive rate of 6.4 percent in medical-record documentation, with the highest false positive rates found for physical examination and elements of the diagnostic process.[48] Thus, our scores might have been as much as 10 percentage points higher if we had used a different method of obtaining data. We used the interview about the participant's health history to partially offset this effect. For example, among elderly participants, only 15 percent had a note in any chart indicating that an influenza vaccination had been received, but 85 percent reported having received one. In general, the inclusion of self-reported data improved scores.

Our results indicate that, on average, Americans receive about half of recommended medical care processes. Although this point estimate of the size of the quality problem may continue to be debated, the gap between what we know works and what is

| Condition | No. of Indicators | No. of Participants Eligible | Total No. of Times Indicator Eligibility Was Met | Percentage of Recommended Care Received (95% CI) |
|---|---|---|---|---|
| Senile cataract | 10 | 159 | 602 | 78.7 (73.3–84.2) |
| Breast cancer | 9 | 192 | 202 | 75.7 (69.9–81.4) |
| Prenatal care | 39 | 134 | 2920 | 73.0 (69.5–76.6) |
| Low back pain | 6 | 489 | 3391 | 68.5 (66.4–70.5) |
| Coronary artery disease | 37 | 410 | 2083 | 68.0 (64.2–71.8) |
| Hypertension | 27 | 1973 | 6643 | 64.7 (62.6–66.7) |
| Congestive heart failure | 36 | 104 | 1438 | 63.9 (55.4–72.4) |
| Cerebrovascular disease | 10 | 101 | 210 | 59.1 (49.7–68.4) |
| Chronic obstructive pulmonary disease | 20 | 169 | 1340 | 58.0 (51.7–64.4) |
| Depression | 14 | 770 | 3011 | 57.7 (55.2–60.2) |
| Orthopedic conditions | 10 | 302 | 590 | 57.2 (50.8–63.7) |
| Osteoarthritis | 3 | 598 | 648 | 57.3 (53.9–60.7) |
| Colorectal cancer | 12 | 231 | 329 | 53.9 (47.5–60.4) |
| Asthma | 25 | 260 | 2332 | 53.5 (50.0–57.0) |
| Benign prostatic hyperplasia | 5 | 138 | 147 | 53.0 (43.6–62.5) |
| Hyperlipidemia | 7 | 519 | 643 | 48.6 (44.1–53.2) |
| Diabetes mellitus | 13 | 488 | 2952 | 45.4 (42.7–48.3) |
| Headache | 21 | 712 | 8125 | 45.2 (43.1–47.2) |
| Urinary tract infection | 13 | 459 | 1216 | 40.7 (37.3–44.1) |
| Community-acquired pneumonia | 5 | 144 | 291 | 39.0 (32.1–45.8) |
| Sexually transmitted diseases or vaginitis | 26 | 410 | 2146 | 36.7 (33.8–39.6) |
| Dyspepsia and peptic ulcer disease | 8 | 278 | 287 | 32.7 (26.4–39.1) |
| Atrial fibrillation | 10 | 100 | 407 | 24.7 (18.4–30.9) |
| Hip fracture | 9 | 110 | 167 | 22.8 (6.2–39.5) |
| Alcohol dependence | 5 | 280 | 1036 | 10.5 (6.8–14.6) |

Table 5. Adherence to Quality Indicators, According to Condition.*

* Condition-specific scores are not reported for management of pain due to cancer and its palliation, management of symptoms of menopause, hysterectomy, prostate cancer, and cesarean section, because fewer than 100 people were eligible for analysis of these categories. CI denotes confidence interval.

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

actually done is substantial enough to warrant attention. These deficits, which pose serious threats to the health and well-being of the U.S. public, persist despite initiatives by both the federal government and private health care delivery systems to improve care.

What can we do to break through this impasse? Given the complexity and diversity of the health care system, there will be no simple solution. A key component of any solution, however, is the routine availability of information on performance at all levels. Making such information available will require a major overhaul of our current health information systems, with a focus on automating the entry and retrieval of key data for clinical decision making and for the measurement and reporting of quality.[49]

Establishing a national base line for performance makes it possible to assess the effect of policy changes and to evaluate large-scale national, regional, state, or local efforts to improve quality.

Supported by the Robert Wood Johnson Foundation and by career development awards (to Drs. Asch and Kerr) from the Veterans Affairs Health Services Research and Development program.

We are indebted to Maureen Michael, James Knickman, and Robert Hughes at the Robert Wood Johnson Foundation for their support; to Paul Ginsburg at the Center for Studying Health System Change for his support of this collaboration; to Richard Strauss at Mathematica Policy Research for developing systems for passing the initial sample from the Community Tracking Study household survey to RAND for this study; to RAND's Survey Research Group (Josephine Levy and Laural Hill) and the telephone interviewers for recruiting participants; to Peggy Wallace, Karen Ricci, and Belle Griffin for their assistance in the design of the data-collection tool, for hiring and training the nurse abstractors, and for overseeing the data-collection process; to Liisa Hiatt for serving as the project manager; and to Vector Research for developing the data-collection software.

## REFERENCES

**1.** McGlynn EA, Brook RH. Keeping quality on the policy agenda. Health Aff (Millwood) 2001;20(3):82-90.
**2.** Institute of Medicine. Crossing the quality chasm: a new health system for the 21st century. Washington, D.C.: National Academy Press, 2001.
**3.** Schuster MA, McGlynn EA, Brook RH. How good is the quality of health care in the United States? Milbank Q 1998;76:517-63.
**4.** Miller RH, Luft HS. Managed care plan performance since 1980: a literature analysis. JAMA 1994;271:1512-9.
**5.** Jencks SM, Cuerdon T, Burwen DR, et al. Quality of medical care delivered to Medicare beneficiaries: a profile at state and national levels. JAMA 2000;284:1670-6.
**6.** Ellerbeck EF, Jencks SF, Radford MJ, et al. Quality of care for Medicare patients with acute myocardial infarction: a four-state pilot study from the Cooperative Cardiovascular Project. JAMA 1995;273:1509-14.
**7.** Murata PJ, McGlynn EA, Siu AL, et al. Quality measures for prenatal care: a comparison of care in six health care plans. Arch Fam Med 1994;3:41-9.
**8.** Krumholz HM, Radford MJ, Ellerbeck EF, et al. Aspirin in the treatment of acute myocardial infarction in elderly Medicare beneficiaries: patterns of use and outcomes. Circulation 1995;92:2841-7.
**9.** Brechner RJ, Cowie CC, Howie LJ, Herman WH, Will JC, Harris MI. Ophthalmic examination among adults with diagnosed diabetes mellitus. JAMA 1993;270:1714-8.
**10.** Starfield B, Powe NR, Weiner JR, et al. Costs vs quality in different types of primary care settings. JAMA 1994;272:1903-8.
**11.** Payne SM, Donahue C, Rappo P, et al. Variations in pediatric pneumonia and bronchitis/asthma admission rates: is appropriateness a factor? Arch Pediatr Adolesc Med 1995;149:162-9.
**12.** Udvarhelyi IS, Jennison K, Phillips RS,

Epstein AM. Comparison of the quality of ambulatory care for fee-for-service and prepaid patients. Ann Intern Med 1991;115: 394-400.
**13.** Jencks SF, Huff ED, Cuerdon T. Change in the quality of care delivered to Medicare beneficiaries, 1998-1999 to 2000-2001. JAMA 2003;289:305-12.
**14.** Asch SM, Sloss EM, Hogan C, Brook RH, Kravitz RL. Measuring underuse of necessary care among elderly Medicare beneficiaries using inpatient and outpatient claims. JAMA 2000;284:2325-33.
**15.** Kahn KL, Keeler EB, Sherwood MJ, et al. Comparing outcomes of care before and after implementation of the DRG-based prospective payment system. JAMA 1990;264: 1984-8.
**16.** The state of health care quality, 2002. Washington, D.C.: National Committee for Quality Assurance. (Accessed May 30, 2003, at http://www.ncqa.org/sohc2002/.)
**17.** Nelson DE, Bland S, Powell-Griner E, et al. State trends in health risk factors and receipt of clinical preventive services among US adults during the 1990s. JAMA 2002; 287:2659-67.
**18.** Saaddine JB, Engelgau MM, Beckles GL, Gregg EW, Thompson TJ, Narayan KM. A diabetes report card for the United States: quality of care in the 1990s. Ann Intern Med 2002;136:565-74.
**19.** Asch SM, Gifford AL, Bozzette SA, et al. Underuse of primary Mycobacterium avium complex and Pneumocystis carinii prophylaxis in the United States. J Acquir Immune Defic Syndr 2001;28:340-4.
**20.** Hyman DJ, Pavlik VN. Characteristics of patients with uncontrolled hypertension in the United States. N Engl J Med 2001;345: 479-86. [Erratum, N Engl J Med 2002;346: 544.]
**21.** Kemper PD, Blumenthal D, Corrigan JM, et al. The design of the Community Tracking

Study: a longitudinal study of health system change and its effects on people. Inquiry 1996;33:195-206.
**22.** Strunk BC, Ginsburg PB, Gabel JR. Tracking health care costs: hospital care surpasses drugs as the key cost driver. Bethesda, Md.: Health Affairs, September 2001. (Accessed May 30, 2003, at http://www. healthaffairs.org/1110_web_exclusives. php.)
**23.** Cunningham PJ. Declining employer-sponsored coverage: the role of public programs and implications for access to care. Med Care Res Rev 2002;59:79-98.
**24.** Draper DA, Hurley RE, Lesser CS, Strunk BC. The changing face of managed care. Health Aff (Millwood) 2002;21(1):11-23.
**25.** McGlynn EA, Kerr EA, Asch SM. New approach to assessing the clinical quality of care for women: the QA Tool system. Womens Health Issues 1999;9:184-92.
**26.** McGlynn EA. Choosing and evaluating clinical performance measures. Jt Comm J Qual Improv 1998;24:470-9.
**27.** Brook RH. The RAND/UCLA appropriateness method. In: McCormick KA, Moore SR, Siegel RA, eds. Clinical practice guideline development: methodology perspectives. Rockville, Md.: Agency for Health Care Policy and Research, November 1994:59-70. (AHCPR publication no. 95-0009).
**28.** Shekelle PG, Kahan JP, Bernstein SJ, Leape LL, Kamberg CJ, Park RE. The reproducibility of a method to identify the overuse and underuse of medical procedures. N Engl J Med 1998;338:1888-95.
**29.** Shekelle PG, Chassin MR, Park RE. Assessing the predictive validity of the RAND/ UCLA appropriateness method criteria for performing carotid endarterectomy. Int J Technol Assess Health Care 1998;14:707-27.
**30.** Kravitz RL, Park RE, Kahan JP. Measuring the clinical consistency of panelists' appropriateness ratings: the case of coronary

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

THE QUALITY OF HEALTH CARE DELIVERED TO ADULTS IN THE UNITED STATES

artery bypass surgery. Health Policy 1997; 42:135-43.

**31.** Selby JV, Fireman BH, Lundstrom RJ, et al. Variation among hospitals in coronary-angiography practices and outcomes after myocardial infarction in a large health maintenance organization. N Engl J Med 1996; 335:1888-96.

**32.** Hemingway H, Crook AM, Feder G, et al. Underuse of coronary revascularization procedures in patients considered appropriate candidates for revascularization. N Engl J Med 2001;344:645-54.

**33.** McGlynn EA, Kerr EA, Damberg CL, Asch SM, eds. Quality of care for women: a review of selected clinical conditions and quality indicators. Santa Monica, Calif.: RAND, 2000.

**34.** Kerr EA, Asch SM, Hamilton EG, McGlynn EA, eds. Quality of care for cardiopulmonary conditions: a review of the literature and quality indicators. Santa Monica, Calif.: RAND, 2000.

**35.** Idem. Quality of care for general medical conditions: a review of the literature and quality indicators. Santa Monica, Calif.: RAND, 2000.

**36.** Asch SM, Kerr EA, Hamilton EG, Reifel JL, McGlynn EA, eds. Quality of care for oncologic conditions and HIV: a review of the literature and quality indicators. Santa Monica, Calif.: RAND, 2000.

**37.** Landis RJ, Koch GG. The measurement of observer agreement for categorical data. Biometrics 1977;33:159-74.

**38.** Efron B, Tibshirani R. An introduction to the bootstrap. New York: Chapman & Hall, 1993.

**39.** Cherry DK, Burt CW, Woodwell DA. National ambulatory medical care survey: 1999 summary. Advance data from vital and health statistics. No. 322. Hyattsville, Md.: National Center for Health Statistics, July 2001. (DHHS publication no. (PHS) 2001-1250 01-0383.)

**40.** UK Prospective Diabetes Study (UKPDS) Group. Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with type 2 diabetes (UKPDS 33). Lancet 1998;352:837-53. [Erratum, Lancet 1999;354:602.]

**41.** Asch SM, Kerr EA, Lapuerta P, Law A, McGlynn EA. A new approach for measuring quality of care for women with hypertension. Arch Intern Med 2001;161:1329-35.

**42.** Collins R, Peto R, MacMahon S, et al. Blood pressure, stroke, and coronary heart disease. 2. Short-term reductions in blood pressure: overview of randomised drug trials in their epidemiological context. Lancet 1990;335:827-38.

**43.** Woolf SH. The need for perspective in evidence-based medicine. JAMA 1999;282: 2358-65.

**44.** Hennekens CH, Albert CM, Godfried SL, Gaziano JM, Buring JE. Adjunctive drug therapy of acute myocardial infarction — evidence from clinical trials. N Engl J Med 1996;335:1660-7.

**45.** Antman EM, Lau J, Kupelnick B, Mosteller F, Chalmers TC. A comparison of results of meta-analyses of randomized control trials and recommendations of clinical experts: treatments for myocardial infarction. JAMA 1992;268:240-8.

**46.** Peabody JW, Luck J, Glassman P, Dresselhaus TR, Lee M. Comparison of vignettes, standardized patients, and chart abstraction: a prospective validation study of 3 methods for measuring quality. JAMA 2000;283:1715-22.

**47.** Luck J, Peabody JW. Using standardised patients to measure physicians' practice: validation study using audio recordings. BMJ 2002;325:679.

**48.** Dresselhaus TR, Luck J, Peabody JW. The ethical problem of false positives: a prospective evaluation of physician reporting in the medical record. J Med Ethics 2002;28: 291-4.

**49.** Berwick DM, James B, Coye MJ. Connections between quality measurement and reporting. Med Care 2003;41:Suppl:I-30–I-38.

*Copyright © 2003 Massachusetts Medical Society.*

---

**PERSONAL ARCHIVES IN THE *JOURNAL* ONLINE**

Individual subscribers can store articles and searches using a new feature on the Journal's Web site (www.nejm.org) called "Personal Archive." Each article and search result links to this feature. Users can create personal folders and move articles into them for convenient retrieval later.

---

Downloaded from www.nejm.org by MR GARY W. CLELAND JR on May 15, 2007 .
Copyright © 2003 Massachusetts Medical Society. All rights reserved.

# EXHIBIT 11

▨ ORIGINAL CONTRIBUTION

# Change in the Quality of Care Delivered to Medicare Beneficiaries, 1998-1999 to 2000-2001

Stephen F. Jencks, MD, MPH

Edwin D. Huff, PhD

Timothy Cuerdon, PhD

HEALTH CARE IN THE UNITED States can be improved substantially, and even people with apparently good access to care receive care that falls far short of what it could be. In the area of public health and prevention, *Healthy People 2010*[1] showed wide gaps between public health performance and actual achievements on many quality indicators, including some delivered by the fee-for-service health care system. Two years ago, a report from the Institute of Medicine showed serious problems of harm to patients from medical errors[2]; last year another Institute of Medicine report, *Crossing the Quality Chasm*,[3] identified major system problems as the principal source of many errors. In 2000, Congress instructed the Agency for Health Care Research and Quality to prepare an annual report on quality of health care in the United States, and the first of these reports is scheduled to be made public next year.

In 2000, the Health Care Financing Administration (now the Centers for Medicare & Medicaid Services) reported on 24 indicators of the quality of care delivered to Medicare beneficiaries (primarily in fee-for-service) in 1998-1999.[4] These indicators measure delivery of services that evi-

**Context** Despite widespread concern regarding the quality and safety of health care, and a Medicare Quality Improvement Organization (QIO) program intended to improve that care in the United States, there is only limited information on whether quality is improving.

**Objective** To track national and state-level changes in performance on 22 quality indicators for care of Medicare beneficiaries.

**Design, Patients, and Setting** National observational cross-sectional studies of national and state-level fee-for-service data for Medicare beneficiaries during 1998-1999 (baseline) and 2000-2001 (follow-up).

**Main Outcome Measures** Twenty-two QIO quality indicators abstracted from statewide random samples of medical records for inpatient fee-for-service care and from Medicare beneficiary surveys or Medicare claims for outpatient care. *Absolute improvement* is defined as the change in performance from baseline to follow-up (measured in percentage points for all indicators except those measured in minutes); *relative improvement* is defined as the absolute improvement divided by the difference between the baseline performance and perfect performance (100%).

**Results** The median state's performance improved from baseline to follow-up on 20 of the 22 indicators. In the median state, the percentage of patients receiving appropriate care on the median indicator increased from 69.5% to 73.4%, a 12.8% relative improvement. The average relative improvement was 19.9% for outpatient indicators combined and 11.9% for inpatient indicators combined ($P<.001$). For all but one indicator, absolute improvement was greater in states in which performance was low at baseline than those in which it was high at baseline (median $r=-0.43$; range: 0.12 to −0.93). When states were ranked on each indicator, the state's average rank was highly stable over time ($r=0.93$ for 1998-1999 vs 2000-2001).

**Conclusions** Care for Medicare fee-for-service plan beneficiaries improved substantially between 1998-1999 and 2000-2001, but a much larger opportunity remains for further improvement. Relative rankings among states changed little. The improved care is consistent with QIO activities over this period, but these cross-sectional data do not provide conclusive information about the degree to which the improvement can be attributed to the QIOs' quality improvement efforts.

*JAMA. 2003;289:305-312*                                   www.jama.com

dence shows to be effective in preventing or treating breast cancer, diabetes, myocardial infarction, heart failure, pneumonia, and stroke.[4] This report provides follow-up data on care given in 2000-2001 and makes comparisons with the 1998-1999 baseline data.

**Author Affiliations:** Office of Clinical Standards and Quality, Centers for Medicare & Medicaid Services, Baltimore, Md (Dr Jencks); Division of Clinical Standards and Quality, Centers for Medicare & Medicaid Services, John F. Kennedy Building, Boston, Mass (Dr Huff); Health and Behavioral Science Research Branch, National Institute of Mental Health, Bethesda, Md (Dr Cuerdon). Corresponding Author: Stephen F. Jencks, MD, MPH, Centers for Medicare & Medicaid Services, 7500 Security Blvd, Mail Stop S3-02-01, Baltimore, MD 21244 (e-mail: sjencks@cms.hhs.gov).

**For editorial comment see p 354.**

©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

QUALITY OF MEDICARE HEALTH CARE DELIVERY

## METHODS

The tracking system used for the 1998-1999 data that was first reported in 2000 is used again for the 2000-2001 data in this report. This system is used in evaluation of the Medicare Quality Improvement Organizations (QIOs) and is independent of them.

TABLE 1 summarizes the clinical topics, quality indicators, sampling frame, and data sources that were used for the baseline article and are used again herein. The quality indicators and their rationale have been described in the 2000 report.[4] The Medicare Quality Improvement Organization program tracks 24 quality indicators through contracted data abstraction centers, surveys, and analysis of claims data. Two of these (time to thrombolysis and time to angioplasty) are shown in TABLE 2 but are not analyzed herein (they were not in the 2000 report) because the number of cases observed in most states was quite small.

We followed the same fee-for-service sampling strategy and data collection procedures as were first reported for the baseline data with 2 exceptions. Information on influenza

**Table 1.** Quality Indicators for Care of Medicare Fee-for-Service Beneficiaries

| Topic | Indicator | Short Name | Sampling Frame for Denominator | Data Source |
|---|---|---|---|---|
| **Inpatient setting** | | | | |
| Acute myocardial infarction | Administration of aspirin within 24 h of admission | Aspirin 24 h | All Medicare patients with principal discharge diagnosis of acute myocardial infarction and no contraindications | Systematic random sample of up to 750 inpatient records per state |
| | Aspirin prescribed at discharge 24 h | Aspirin disch | | |
| | Administration of β-blocker within 24 h of admission | BB 24 h | | |
| | β-Blocker prescribed at discharge | BB disch | | |
| | ACE inhibitor prescribed at discharge for patients with left ventricular ejection fraction <0.40 | ACEI in AMI | | |
| | Smoking cessation counseling given during hospitalization | Smoking | | |
| | Time to angioplasty, min | PTCA, min | | |
| | Time to thrombolytic therapy, min | Thrombolytic, min | | |
| Heart failure | Evaluation of ejection fraction | LVEF | All Medicare patients with principal discharge diagnosis of heart failure | Systematic random sample of up to 800 inpatient records per state |
| | ACE inhibitor prescribed at discharge for patients with left ventricular ejection fraction <0.40 | ACEI in HF | | |
| Stroke | Warfarin prescribed for patients with atrial fibrillation | Afibrillation | All Medicare patients with any discharge diagnosis of atrial fibrillation | Systematic random sample of up to 750 inpatient records per state |
| | Antithrombotic prescribed at discharge for patients with acute stroke or transient ischemic attack | Antithrombotic | All Medicare patients with principal discharge diagnosis of stroke (nifedipine and antithrombotic) or transient ischemic attack (antithrombotic) | Systematic random sample of up to 750 inpatient records per state |
| | Avoidance of sublingual nifedipine for patients with acute stroke | Nifedipine | | |
| Pneumonia | Antibiotic within 8 h of arrival at hospital | Antibiotic time | All Medicare patients with a discharge diagnosis of pneumonia | Systematic random sample of up to 750 inpatient records per state |
| | Antibiotic consistent with current recommendations | Antibiotic Rx | | |
| | Blood culture drawn (if done) before antibiotic given | Blood culture | | |
| | Patient screened for or given influenza vaccine | Flu screen | | |
| | Patient screened for or given pneumococcal vaccine | Pneu screen | | |
| **Any setting** | | | | |
| Pneumonia | Influenza immunization every year | Flu immun | All noninstitutionalized persons aged ≥65 y (includes managed care) | Behavioral Risk Factor Surveillance System for 1998-1999; similar CMS survey for 2000-2001 |
| | Pneumococcal immunization at least once ever | Pneu immun | | |
| Breast cancer | Mammogram at least every 2 y | Mammography | All female Medicare beneficiaries aged 52-69 y | All Medicare claims |
| Diabetes | Hemoglobin $A_{1c}$ at least every y | $HbA_{1c}$ | All Medicare patients with 2 ambulatory diagnoses or 1 inpatient diagnosis of diabetes | All Medicare claims |
| | Eye exam at least every 2 y | Eye exam | | |
| | Lipid profile at least every 2 y | Lipid profile | | |

Abbreviations: BB, β-blocker; ACE, angiotensin-converting enzyme; PTCA, percutaneous coronary intervention; CMS, Centers for Medicare & Medicaid Services.

©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

QUALITY OF MEDICARE HEALTH CARE DELIVERY

**Table 2.** Quality Indicator Averages (Absolute Change From Baseline) by State, 2000-2001*

| State | Average State Ranks | | Acute Myocardial Infarction | | | | | | | | Congestive Heart Failure | | Stroke | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1998-1999 | 2000-2001 | Aspirin 24 h | Aspirin Disch | BB 24 h | BB Disch | ACEI in AMI | Smoking | Thrombolysis, min | PTCA, min | LVEF | ACEI in HF | Atrial fibrillation | Antithrombotic | Nifedipine |
| Alabama | 46 | 42 | 80 (2) | 87 (1) | 58 (3) | 78 (18) | 69 (6) | 38 (4) | 35 (−18) | 100 (1) | 69 (4) | 70 (8) | 53 (3) | 84 (4) | 100 (4) |
| Alaska | 22 | 33 | 82 (−5) | 86 (−10) | 78 (−1) | 67 (−6) | 100 (18) | 61 (24) | 57 (3) | 90 (−13) | 70 (19) | 58 (−33) | 52 (−1) | 84 (−2) | 97 (4) |
| Arizona | 25 | 29 | 84 (−3) | 84 (−2) | 65 (2) | 84 (16) | 69 (1) | 32 (−21) | 55 (−3) | 103 (−4) | 81 (11) | 61 (−4) | 55 (−2) | 89 (7) | 99 (8) |
| Arkansas | 50 | 48 | 78 (3) | 84 (6) | 50 (−5) | 57 (−6) | 69 (12) | 39 (15) | 37 (−5) | 109 (15) | 60 (8) | 43 (−22) | 51 (0) | 80 (3) | 100 (8) |
| California | 39 | 44 | 87 (2) | 86 (2) | 66 (6) | 66 (−2) | 70 (4) | 31 (−10) | 77 (41) | 146 (39) | 66 (4) | 70 (5) | 52 (6) | 77 (2) | 96 (9) |
| Colorado | 9 | 7 | 92 (6) | 93 (3) | 75 (10) | 92 (16) | 82 (8) | 53 (6) | 51 (13) | 121 (42) | 69 (4) | 65 (−7) | 65 (8) | 85 (1) | 100 (6) |
| Connecticut | 6 | 9 | 89 (−3) | 86 (−5) | 78 (10) | 83 (8) | 80 (6) | 39 (−2) | 39 (2) | 101 (−7) | 79 (2) | 69 (−4) | 84 (7) | 90 (0) | 100 (2) |
| Delaware | 12 | 14 | 88 (2) | 96 (10) | 69 (7) | 84 (12) | 82 (10) | 33 (−37) | 28 (−22) | 67 | 77 (3) | 78 (5) | 55 (5) | 89 (3) | 99 (1) |
| District of Columbia | 31 | 37 | 87 (−10) | 91 (8) | 69 (−5) | 85 (−7) | 78 (5) | 39 (12) | | 177 (127) | 75 (4) | 72 (−4) | 55 (1) | 82 (3) | 99 (0) |
| Florida | 40 | 41 | 80 (3) | 79 (1) | 65 (4) | 79 (10) | 60 (−10) | 33 (3) | 45 (9) | 55 (−36) | 76 (6) | 70 (4) | 61 (5) | 80 (1) | 97 (6) |
| Georgia | 48 | 47 | 73 (−6) | 84 (3) | 58 (−4) | 74 (6) | 71 (3) | 38 (4) | 38 (4) | 110 (6) | 68 (5) | 64 (−3) | 51 (1) | 80 (1) | 100 (5) |
| Hawaii | 23 | 16 | 90 (6) | 83 (2) | 62 (6) | 84 (33) | 79 (4) | 50 (14) | 79 (35) | 96 (21) | 82 (7) | 74 (3) | 47 (2) | 90 (1) | 100 (3) |
| Idaho | 19 | 22 | 90 (3) | 87 (2) | 66 (−4) | 84 (11) | 78 (19) | 44 (−12) | 30 (−8) | 107 (−32) | 58 (9) | 73 (−15) | 56 (−1) | 83 (3) | 99 (1) |
| Illinois | 47 | 46 | 83 (7) | 80 (4) | 67 (0) | 75 (20) | 73 (−1) | 35 (6) | 51 (30) | 110 (−51) | 67 (2) | 68 (7) | 57 (2) | 83 (3) | 99 (7) |
| Indiana | 29 | 27 | 83 (−1) | 89 (2) | 69 (8) | 83 (12) | 79 (12) | 55 (2) | 35 (2) | 165 (45) | 71 (6) | 60 (−5) | 62 (7) | 84 (3) | 98 (5) |
| Iowa | 8 | 6 | 85 (1) | 88 (2) | 78 (14) | 89 (10) | 77 (2) | 41 (4) | 51 (8) | 104 (−29) | 66 (13) | 70 (−1) | 60 (3) | 83 (−1) | 100 (1) |
| Kansas | 34 | 30 | 84 (5) | 84 (0) | 68 (14) | 74 (15) | 67 (9) | 51 (8) | 49 (4) | 134 (49) | 59 (1) | 60 (−10) | 53 (2) | 86 (10) | 97 (8) |
| Kentucky | 37 | 40 | 85 (5) | 81 (−2) | 65 (2) | 80 (7) | 66 (−4) | 52 (16) | 32 (2) | 71 (−48) | 63 (1) | 52 (−10) | 54 (3) | 84 (1) | 100 (9) |
| Louisiana | 49 | 51 | 85 (4) | 81 (2) | 65 (7) | 71 (−2) | 65 (1) | 25 (−15) | 44 (11) | 105 (11) | 66 (6) | 58 (12) | 49 (7) | 74 (−1) | 100 (6) |
| Maine | 3 | 3 | 89 (4) | 91 (4) | 82 (1) | 91 (7) | 82 (14) | 49 (−12) | 38 (13) | | 73 (6) | 71 (−1) | 60 (−1) | 89 (2) | 99 (1) |
| Maryland | 24 | 25 | 85 (−1) | 87 (3) | 71 (2) | 77 (1) | 79 (0) | 27 (−13) | 30 (−24) | 83 (−86) | 75 (2) | 61 (−4) | 55 (2) | 84 (3) | 99 (1) |
| Massachusetts | 4 | 15 | 87 (0) | 86 (−2) | 82 (6) | 88 (−4) | 72 (−7) | 45 (1) | 45 (4) | 135 | 80 (4) | 65 (3) | 66 (2) | 91 (5) | 99 (3) |
| Michigan | 28 | 26 | 85 (1) | 90 (4) | 70 (3) | 93 (20) | 82 (8) | 43 (1) | 49 (11) | 110 (−29) | 70 (1) | 68 (6) | 57 (6) | 86 (7) | 99 (3) |
| Minnesota | 7 | 10 | 88 (−2) | 83 (−6) | 80 (4) | 87 (3) | 69 (−11) | 51 (13) | 42 (2) | 117 (21) | 64 (3) | 69 (−1) | 62 (3) | 89 (1) | 100 (3) |
| Missouri | 35 | 28 | 81 (5) | 88 (10) | 67 (8) | 78 (7) | 74 (0) | 54 (16) | 80 (36) | 124 (−255) | 73 (7) | 71 (12) | 58 (6) | 83 (−1) | 99 (7) |
| Montana | 17 | 13 | 88 (2) | 89 (−1) | 70 (17) | 71 (−1) | 71 (13) | 46 (−17) | 44 (−3) | 87 (0) | 58 (11) | 77 (7) | 62 (3) | 86 (1) | 99 (3) |
| Mississippi | 51 | 50 | 80 (0) | 84 (7) | 60 (16) | 66 (19) | 66 (5) | 43 (9) | 38 (1) | 141 (−51) | 61 (2) | 55 (−6) | 54 (7) | 80 (6) | 100 (2) |
| Nebraska | 27 | 12 | 85 (1) | 89 (4) | 74 (8) | 74 (−9) | 81 (13) | 51 (14) | 41 (2) | 107 (−311) | 74 (3) | 69 (−7) | 67 (9) | 90 (6) | 95 (7) |
| Nevada | 36 | 35 | 88 (6) | 84 (9) | 59 (1) | 69 (−1) | 73 (−4) | 45 (1) | 45 (5) | 178 (70) | 82 (0) | 62 (−13) | 56 (14) | 81 (3) | 96 (9) |
| New Hampshire | 1 | 1 | 92 (4) | 93 (2) | 86 (11) | 89 (−1) | 87 (6) | 36 (−13) | 35 (−14) | 260 (159) | 82 (1) | 77 (2) | 70 (8) | 86 (1) | 100 (1) |
| New Jersey | 41 | 43 | 76 (−1) | 65 (−10) | 61 (−4) | 68 (−1) | 64 (4) | 31 (−7) | 47 (3) | 128 (10) | 72 (6) | 59 (6) | 55 (0) | 73 (0) | 99 (3) |
| New Mexico | 32 | 36 | 89 (4) | 89 (2) | 65 (12) | 74 (12) | 67 (−10) | 53 (3) | 43 (6) | 94 (−46) | 58 (3) | 70 (−14) | 58 (1) | 77 (−1) | 97 (6) |
| New York | 30 | 24 | 84 (1) | 84 (3) | 81 (14) | 85 (12) | 76 (1) | 36 (−13) | 44 (−6) | 100 (6) | 81 (5) | 76 (−8) | 62 (7) | 84 (2) | 100 (2) |
| North Carolina | 18 | 23 | 84 (3) | 92 (5) | 69 (4) | 81 (2) | 76 (−1) | 47 (13) | 58 (27) | 95 (−29) | 74 (15) | 65 (3) | 53 (−7) | 87 (0) | 98 (1) |
| North Dakota | 5 | 4 | 92 (7) | 92 (5) | 75 (6) | 84 (−3) | 65 (−16) | 43 (13) | 103 (60) | 73 (−122) | 45 (5) | 68 (−10) | 64 (−1) | 90 (4) | 100 (5) |
| Ohio | 33 | 38 | 83 (−5) | 83 (−3) | 72 (10) | 79 (6) | 64 (−7) | 25 (−2) | 42 (−11) | 82 (10) | 75 (5) | 57 (−7) | 62 (10) | 84 (4) | 98 (6) |
| Oklahoma | 44 | 45 | 83 (8) | 82 (5) | 57 (12) | 76 (13) | 76 (6) | 39 (14) | 46 (8) | 59 (−25) | 59 (7) | 56 (−10) | 50 (−2) | 76 (4) | 100 (9) |
| Oregon | 20 | 11 | 87 (1) | 87 (3) | 79 (10) | 80 (3) | 78 (8) | 45 (−8) | 38 (−2) | 77 (−25) | 70 (11) | 76 (7) | 56 (−1) | 82 (4) | 100 (6) |
| Pennsylvania | 16 | 31 | 85 (3) | 85 (4) | 68 (−3) | 79 (9) | 63 (−21) | 26 (−15) | 50 (11) | 103 (−88) | 77 (3) | 61 (−12) | 63 (2) | 86 (1) | 99 (0) |
| Puerto Rico | 52 | 52 | 70 (4) | 69 (10) | 53 (20) | 67 (14) | 65 (6) | 33 (3) | 78 (12) | 230 | 56 (12) | 61 (2) | 39 (8) | 76 (3) | 98 (0) |
| Rhode Island | 15 | 17 | 88 (6) | 88 (1) | 81 (6) | 95 (16) | 84 (1) | 31 (5) | 38 (−2) | 106 (−158) | 79 (2) | 74 (−6) | 65 (5) | 86 (−2) | 98 (4) |
| South Carolina | 38 | 32 | 83 (5) | 85 (5) | 70 (12) | 76 (9) | 79 (20) | 34 (5) | 45 (−10) | 78 (−481) | 73 (6) | 60 (−6) | 59 (7) | 90 (7) | 100 (1) |
| South Dakota | 26 | 20 | 89 (8) | 92 (4) | 70 (1) | 82 (11) | 75 (8) | 52 (15) | 57 (163) | 153 (−117) | 61 (10) | 56 (−1) | 64 (9) | 90 (6) | 97 (7) |
| Tennessee | 42 | 39 | 78 (−5) | 84 (0) | 63 (7) | 75 (9) | 71 (4) | 39 (−5) | 41 (15) | 170 (64) | 67 (6) | 66 (15) | 46 (−15) | 81 (5) | 100 (6) |
| Texas | 45 | 49 | 83 (5) | 75 (−9) | 65 (14) | 72 (14) | 64 (1) | 37 (8) | 54 (16) | 111 (26) | 65 (1) | 58 (−4) | 48 (4) | 80 (8) | 98 (8) |
| Utah | 14 | 5 | 87 (3) | 93 (3) | 75 (17) | 88 (20) | 78 (−1) | 61 (10) | 30 (−20) | 89 (−64) | 71 (14) | 73 (−6) | 65 (8) | 88 (2) | 98 (7) |
| Vermont | 2 | 2 | 92 (6) | 90 (1) | 82 (4) | 86 (7) | 70 (−2) | 56 (−3) | 49 (−1) | 230 (45) | 81 (10) | 81 (4) | 66 (8) | 88 (2) | 99 (1) |
| Virginia | 21 | 18 | 89 (4) | 90 (6) | 67 (2) | 88 (11) | 78 (11) | 53 (10) | 51 (6) | 141 (−23) | 80 (3) | 73 (−1) | 56 (−4) | 88 (−2) | 98 (0) |
| Washington | 13 | 19 | 92 (6) | 87 (−1) | 71 (4) | 78 (12) | 71 (−5) | 49 (9) | 50 (40) | 98 (−23) | 69 (6) | 69 (9) | 59 (9) | 83 (−1) | 100 (6) |
| West Virginia | 43 | 34 | 85 (1) | 86 (1) | 65 (13) | 62 (−3) | 65 (1) | 51 (8) | 40 (−21) | 122 (−15) | 58 (−4) | 53 (−5) | 56 (11) | 87 (1) | 100 (7) |
| Wisconsin | 11 | 8 | 86 (1) | 87 (−1) | 74 (3) | 79 (−6) | 75 (10) | 58 (16) | 49 (16) | 108 (−104) | 72 (5) | 72 (−3) | 65 (5) | 86 (2) | 100 (6) |
| Wyoming | 10 | 21 | 95 (4) | 91 (−1) | 71 (1) | 62 (0) | 89 (−1) | 44 (−22) | 33 (−3) | 116 (−41) | 42 (8) | 82 (3) | 65 (7) | 82 (2) | 98 (−2) |
| Median | | | 85 (3) | 86 (2) | 69 (6) | 79 (7) | 74 (4) | 43 (3) | 45 (4) | 107 (−19) | 70 (4) | 68 (−4) | 57 (3) | 84 (2) | 99 (4) |

(continued)

©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

QUALITY OF MEDICARE HEALTH CARE DELIVERY

**Table 2.** Quality Indicator Averages (Absolute Change From Baseline) by State, 2000-2001* (cont)

| State | Pneumonia | | | | | Immunizations | | Breast Cancer | Diabetes | | |
| | Antibiotic Time | Antibiotic Rx | Blood Culture | Flu Screen | Pneu Screen | Flu Immun | Pneu Imm | Mammography | HgbA₁c | Eye Exam | Lipid Profile |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 87 (0) | 84 (7) | 74 (−5) | 26 (13) | 30 (20) | 65 (1) | 54 (0) | 60 (4) | 70 (12) | 64 (1) | 65 (18) |
| Alaska | 91 (4) | 83 (8) | 89 (−5) | 30 (6) | 27 (9) | 67 (7) | 66 (22) | 55 (3) | 71 (2) | 57 (1) | 69 (13) |
| Arizona | 86 (4) | 90 (12) | 80 (−8) | 37 (10) | 40 (18) | 69 (−2) | 68 (15) | 60 (3) | 71 (4) | 64 (−1) | 72 (16) |
| Arkansas | 87 (−1) | 83 (6) | 83 (1) | 12 (6) | 8 (4) | 74 (6) | 63 (12) | 55 (5) | 69 (12) | 70 (3) | 64 (21) |
| California | 88 (4) | 83 (16) | 82 (−5) | 12 (2) | 12 (6) | 73 (1) | 66 (9) | 56 (3) | 73 (8) | 70 (7) | 77 (16) |
| Colorado | 88 (2) | 85 (1) | 82 (−3) | 30 (10) | 31 (12) | 78 (3) | 69 (6) | 60 (5) | 84 (7) | 69 (2) | 74 (23) |
| Connecticut | 90 (5) | 84 (9) | 83 (−2) | 35 (12) | 27 (9) | 72 (8) | 66 (17) | 63 (3) | 80 (7) | 77 (0) | 76 (14) |
| Delaware | 87 (5) | 89 (8) | 79 (−8) | 22 (9) | 19 (8) | 72 (4) | 69 (3) | 64 (0) | 80 (10) | 76 (1) | 82 (26) |
| District of Columbia | 82 (5) | 82 (10) | 65 (−2) | 27 (5) | 25 (9) | 61 (5) | 48 (13) | 52 (1) | 65 (5) | 69 (0) | 68 (16) |
| Florida | 80 (4) | 84 (10) | 79 (−5) | 14 (8) | 18 (15) | 66 (3) | 61 (8) | 65 (3) | 79 (10) | 75 (0) | 83 (14) |
| Georgia | 83 (0) | 84 (7) | 81 (1) | 14 (3) | 17 (9) | 71 (14) | 63 (13) | 57 (5) | 74 (11) | 63 (1) | 67 (15) |
| Hawaii | 89 (−1) | 80 (1) | 87 (2) | 23 (12) | 22 (11) | 78 (4) | 75 (19) | 60 (5) | 82 (9) | 72 (4) | 82 (11) |
| Idaho | 89 (0) | 88 (10) | 84 (0) | 24 (12) | 29 (19) | 72 (3) | 59 (4) | 60 (5) | 82 (5) | 69 (1) | 75 (16) |
| Illinois | 86 (1) | 85 (8) | 77 (−1) | 21 (8) | 17 (8) | 69 (1) | 59 (11) | 58 (4) | 74 (11) | 66 (3) | 69 (20) |
| Indiana | 84 (3) | 84 (5) | 83 (5) | 36 (8) | 37 (11) | 73 (7) | 61 (10) | 60 (6) | 77 (10) | 65 (1) | 73 (15) |
| Iowa | 90 (3) | 88 (10) | 90 (4) | 33 (12) | 31 (12) | 78 (8) | 69 (8) | 60 (5) | 85 (7) | 78 (1) | 74 (14) |
| Kansas | 89 (0) | 85 (8) | 82 (−4) | 30 (11) | 24 (13) | 72 (5) | 67 (12) | 64 (6) | 83 (8) | 77 (2) | 70 (20) |
| Kentucky | 85 (2) | 85 (5) | 82 (1) | 22 (6) | 25 (11) | 66 (−2) | 59 (18) | 56 (5) | 75 (12) | 65 (3) | 71 (17) |
| Louisiana | 84 (3) | 81 (9) | 79 (−3) | 7 (−1) | 7 (3) | 65 (4) | 59 (18) | 55 (6) | 69 (12) | 63 (1) | 71 (17) |
| Maine | 90 (1) | 82 (4) | 84 (−2) | 39 (0) | 28 (9) | 76 (2) | 65 (7) | 71 (6) | 86 (5) | 79 (2) | 79 (17) |
| Maryland | 83 (3) | 88 (6) | 77 (−4) | 31 (17) | 28 (18) | 72 (6) | 67 (13) | 61 (3) | 77 (7) | 69 (1) | 79 (17) |
| Massachusetts | 88 (2) | 85 (4) | 75 (−10) | 19 (6) | 16 (7) | 79 (9) | 71 (14) | 66 (2) | 83 (6) | 76 (0) | 69 (13) |
| Michigan | 82 (−2) | 84 (13) | 76 (−4) | 29 (10) | 28 (14) | 72 (0) | 63 (6) | 67 (3) | 78 (6) | 66 (1) | 70 (15) |
| Minnesota | 88 (1) | 86 (11) | 81 (−4) | 33 (−3) | 26 (4) | 78 (14) | 68 (16) | 60 (7) | 87 (5) | 79 (4) | 76 (17) |
| Missouri | 83 (−2) | 85 (6) | 79 (−1) | 14 (3) | 11 (5) | 70 (7) | 60 (10) | 52 (5) | 65 (14) | 65 (4) | 59 (20) |
| Montana | 84 (0) | 84 (4) | 79 (2) | 28 (12) | 25 (10) | 77 (9) | 64 (11) | 59 (5) | 78 (6) | 68 (1) | 71 (14) |
| Mississippi | 93 (0) | 88 (9) | 89 (1) | 30 (15) | 24 (13) | 74 (1) | 68 (7) | 65 (6) | 81 (11) | 74 (2) | 74 (24) |
| Nebraska | 91 (5) | 87 (5) | 83 (2) | 28 (13) | 33 (21) | 79 (10) | 70 (15) | 63 (7) | 77 (6) | 77 (1) | 69 (15) |
| Nevada | 82 (−4) | 87 (7) | 72 (−4) | 32 (11) | 46 (35) | 62 (−1) | 65 (3) | 56 (6) | 78 (8) | 65 (1) | 77 (15) |
| New Hampshire | 90 (1) | 83 (8) | 87 (−2) | 32 (−5) | 23 (4) | 76 (11) | 66 (6) | 68 (5) | 87 (5) | 78 (2) | 77 (17) |
| New Jersey | 85 (6) | 85 (11) | 82 (3) | 35 (23) | 33 (25) | 68 (3) | 60 (6) | 54 (4) | 73 (11) | 72 (0) | 79 (14) |
| New Mexico | 87 (0) | 85 (15) | 83 (−3) | 26 (2) | 24 (6) | 72 (3) | 64 (11) | 56 (5) | 71 (6) | 63 (0) | 66 (16) |
| New York | 81 (1) | 83 (13) | 77 (−1) | 37 (23) | 32 (20) | 70 (6) | 64 (14) | 58 (2) | 76 (11) | 73 (2) | 76 (20) |
| North Carolina | 83 (−1) | 85 (4) | 84 (5) | 20 (1) | 19 (7) | 72 (9) | 70 (11) | 62 (6) | 81 (11) | 72 (2) | 75 (21) |
| North Dakota | 90 (−1) | 86 (1) | 83 (6) | 33 (6) | 30 (11) | 78 (10) | 68 (13) | 71 (6) | 87 (6) | 80 (3) | 80 (16) |
| Ohio | 83 (2) | 82 (10) | 80 (−2) | 30 (7) | 20 (7) | 69 (0) | 63 (8) | 61 (5) | 78 (13) | 69 (2) | 75 (23) |
| Oklahoma | 86 (3) | 83 (3) | 83 (−3) | 27 (11) | 33 (19) | 78 (6) | 69 (15) | 55 (6) | 72 (9) | 61 (0) | 68 (14) |
| Oregon | 92 (2) | 85 (7) | 89 (1) | 33 (19) | 20 (7) | 77 (12) | 67 (11) | 64 (5) | 85 (6) | 73 (2) | 74 (22) |
| Pennsylvania | 86 (1) | 79 (0) | 87 (−1) | 22 (10) | 17 (8) | 74 (11) | 66 (13) | 60 (4) | 80 (10) | 71 (1) | 78 (18) |
| Puerto Rico | 47 (5) | 69 (15) | 63 (−2) | 37 (30) | 37 (32) | 40 (−1) | 31 (9) | 52 (6) | 55 (15) | 53 (0) | 64 (22) |
| Rhode Island | 89 (8) | 92 (8) | 76 (−5) | 22 (12) | 23 (16) | 73 (−3) | 62 (5) | 62 (4) | 80 (10) | 79 (1) | 76 (21) |
| South Carolina | 81 (1) | 84 (5) | 83 (−3) | 15 (7) | 17 (11) | 76 (6) | 66 (10) | 61 (5) | 77 (10) | 68 (3) | 72 (16) |
| South Dakota | 90 (−1) | 85 (0) | 86 (1) | 22 (8) | 22 (8) | 78 (4) | 56 (6) | 65 (8) | 80 (0) | 71 (1) | 69 (13) |
| Tennessee | 87 (8) | 84 (5) | 79 (0) | 24 (14) | 24 (16) | 74 (9) | 68 (14) | 58 (6) | 78 (12) | 62 (1) | 71 (23) |
| Texas | 82 (2) | 84 (5) | 81 (−3) | 17 (5) | 17 (9) | 69 (−1) | 62 (6) | 56 (5) | 75 (6) | 65 (−1) | 77 (14) |
| Utah | 90 (1) | 86 (1) | 84 (2) | 52 (33) | 49 (32) | 74 (−1) | 64 (3) | 60 (6) | 85 (5) | 62 (0) | 77 (22) |
| Vermont | 88 (−1) | 81 (0) | 87 (−2) | 33 (0) | 17 (0) | 77 (4) | 69 (12) | 68 (5) | 87 (4) | 76 (1) | 75 (19) |
| Virginia | 87 (2) | 88 (4) | 84 (2) | 21 (11) | 26 (17) | 74 (6) | 63 (9) | 60 (5) | 80 (9) | 70 (1) | 74 (16) |
| Washington | 91 (3) | 80 (7) | 83 (−4) | 24 (2) | 24 (8) | 72 (4) | 67 (11) | 64 (5) | 86 (5) | 74 (2) | 78 (18) |
| West Virginia | 86 (2) | 81 (1) | 80 (−2) | 35 (27) | 29 (23) | 70 (7) | 64 (10) | 61 (6) | 77 (15) | 65 (3) | 75 (23) |
| Wisconsin | 88 (1) | 88 (10) | 88 (6) | 29 (6) | 25 (8) | 77 (12) | 68 (14) | 67 (7) | 86 (6) | 79 (3) | 76 (18) |
| Wyoming | 90 (−2) | 86 (−1) | 87 (−1) | 18 (5) | 20 (11) | 74 (1) | 69 (7) | 62 (7) | 76 (13) | 71 (3) | 59 (18) |
| Median | 87 (2) | 85 (7) | 82 (−2) | 27 (9) | 24 (11) | 72 (5) | 65 (10) | 60 (5) | 78 (8) | 70 (1) | 74 (17) |

*For an explanation of abbreviations, see Table 1. For details of indicators, see Table 1. Values are percentage of patients receiving appropriate care except for Thrombolysis and PTCA, which are reported in minutes. A blank indicates that there were no cases in the sample that met the selection criteria. Typeface indicates number of cases on which value is based: italic, 1-30 cases; regular, 31-100 cases; bold, 101-200 cases; bold italic, 301 or more cases.

                ©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

and pneumococcal vaccination rates came from a specially contracted survey using the influenza and pneumococcal vaccination items from the Behavioral Risk Factor Surveillance System (BRFSS) and designed to emulate the BRFSS sampling strategy as closely as possible. This was done because appropriately timed data from the regularly scheduled BRFSS were not available.[5] We also substituted the 1999 BRFSS data for the earlier 1997 BRFSS data in our baseline rates because these later data represent state rates during the 1998-1999 baseline period better than the 1997 data. In addition, we made minor corrections in the claims processing algorithms used to construct the diabetes indicators for the 1998-1999 period. These changes resulted in small, nonmaterial, changes in the baseline rates first reported in the 2000 report. The corrected baseline rates for the immunization and diabetes indicators are used to make comparisons with the follow-up performance from the 2000-2001 period.

Reliability was calculated as the percentage agreement on all abstraction data elements between 2 blinded, independent abstractors at different abstraction centers. Each abstraction center also performed internal reliability assessments on a monthly random sample of 30 cases taken from abstracts completed during the previous month.[6]

*Absolute improvement* is defined as the change in performance from baseline to follow-up (measured in percentage points for all indicators except those measured in minutes); *relative improvement* is defined as the absolute improvement divided by the difference between the baseline performance and perfect performance (100%); relative improvement can also be called the decrease in the error or failure rate. The definition of relative improvement differs from the usual method of using the baseline rate as the denominator. We used this definition because dividing by the baseline rate exaggerates small changes for poorly performing states while minimizing changes in states that already perform well.

Performance was calculated at the state level for each of the quality indicators. For the 22 quality indicators discussed herein, results were calculated as the percentage of patients who had no contraindications and who received the indicated treatment. We direct our attention both to variation among states (including the District of Columbia and Puerto Rico) and to national trends. Therefore, we calculated for each indicator both performance of the median state and the national average (weighted by the number of aged Medicare beneficiaries in each state). We calculated the SD of each indicator rate across the set of states. To summarize the overall changes we observed on each indicator, we calculated the absolute and relative improvement on the indicator in the median state. To summarize the overall changes that we observed within each state, we calculated a median amount of absolute and relative improvement across the set of indicators in the state. Finally, we characterized the median absolute and relative national improvement as the median of these state medians.

We also calculated the rank of each state on each quality indicator based on performance rates during the 2000-2001 follow-up period and the rank on each quality indicator based on the amount of relative improvement observed. We then calculated the average rank for each state across the 22 quality indicators and arrayed the states according to their average rank, again based on their performance rates during the 2000-2001 follow-up period. We ranked states in a similar way on the amount of relative improvement. The changes in data described above and changes in our algorithm for breaking ties on ranking resulted in slight changes of ranking for 1998-1999 from those reported in the earlier article.

We tested the equality of the relative improvement for the inpatient indicators (the first 16 indicators in Table 1) and outpatient indicators (the last 6 indicators in Table 1) using a *t* test without assumption of equal variances and

treating each indicator rate in each state as an observation.

## RESULTS

The reliability of data elements used to construct quality indicators based on medical record abstraction ranged from 80% to 95% with a median interrater reliability of 90%.

Table 2 shows the 2000-2001 performance and change from baseline for each indicator in each state. Across the 1144 pairs of baseline vs re-measurement comparisons (ie, 52 states and territories × 22 indicators), absolute increases in performance occurred in 81% (925/1144) of the observations ($\chi_1^2 = 240.8$; $P<.001$). For all 22 indicators, state performance at baseline predicted performance at follow-up, generally quite powerfully (median $r=0.74$; range: 0.29-0.98). A state's average rank on the 22 indicators was highly stable over time ($r=0.93$ for 1998-1999 vs 2000-2001). For all but one indicator, absolute improvement was greater when performance was low at baseline than when it was high at baseline (median $r=-0.43$; range: 0.12 to −0.93); a similar pattern occurred for state performance as measured by performance on the median indicator in the state ($r$, −0.30) and for indicator performance as measured by the median state's performance ($r$, −0.43).

TABLE 3 shows summary statistics for each indicator for the country as a whole. The performance of the median state as well as the weighted national average improved on 20 of the 22 indicators (all but use of angiotensin-converting enzyme inhibitors in heart failure and performance of blood culture prior to starting antibiotics in pneumonia). Performance in the median state on the median indicator was 69.5% appropriate care in 1998-1999 and 73.4% in 2000-2001; the median absolute improvement was 3.9%, and the median relative improvement was 12.8%. The average relative improvement was 19.9% for outpatient indicators combined and 11.9% for inpatient indicators combined ($P<.001$).

©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

QUALITY OF MEDICARE HEALTH CARE DELIVERY

**Table 3.** National Summary of Quality Indicators and Changes, 1998-1999 to 2000-2001*

| | Inpatient Setting | | | | | | | | | | | | | | | | | | | Any Setting | | | | | |
| | Acute Myocardial Infarction | | | | | | | | Congestive Heart Failure | | Stroke | | | Pneumonia | | | | | Adult Immunization | | Breast Cancer | Diabetes | | |
| Variables | Aspirin 24 h | Aspirin Disch | BB 24 h | BB Disch | ACEI in AMI | Smoking | Thrombolysis, min | PTCA, min | LVEF | ACEI in HF | Afibrillation | Antithrombotic | Nifedipine | Antibiotic Time | Antibiotic Rx | Blood Culture | Flu Screen | Pneu Screen | Flu Immun | Pneu Imm | Mammography | HbA1c | Eye Exam | Lipid Profile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Median state rate | | | | | | | | | | | | | | | | | | | | | | | | |
| 1998-1999 | 84 | 85 | 64 | 72 | 71 | 40 | .41 | 120 | 65 | 69 | 55 | 83 | 95 | 85 | 79 | 82 | 14 | 11 | 67 | 55 | 55 | 70 | 68 | 74 |
| 2001-2000 | 85 | 86 | 69 | 79 | 74 | 43 | 45 | 107 | 70 | 68 | 57 | 84 | 99 | 87 | 85 | 82 | 27 | 24 | 72 | 65 | 60 | 78 | 70 | 60 |
| Weighted average 2000-2001 | 84 | 84 | 68 | 78 | 71 | 38 | 50 | 114 | 71 | 66 | 57 | 83 | 99 | 85 | 84 | 81 | 24 | 23 | 71 | 64 | 77 | 70 | 74 | 16 |
| Improvement | | | | | | | | | | | | | | | | | | | | | | | | |
| Median | 3 | 2 | 6 | 7 | 4 | 3 | 4 | -19 | 5 | -4 | 3 | 2 | 4 | 2 | 7 | -2 | 9 | 11 | 5 | 10 | 5 | 8 | 1 | 16 |
| Weighted | 2 | 1 | 6 | 7 | 0 | 0 | 9 | -17 | 8 | -2 | 4 | 3 | 5 | 2 | 8 | -2 | 9 | 12 | 5 | 10 | 4 | 9 | 1 | 17 |
| Median relative† | 15 | 14 | 17 | 28 | 10 | 5 | NA | NA | 14 | -10 | 7 | 12 | 77 | 10 | 32 | -9 | 10 | 12 | 16 | 22 | 11 | 29 | 4 | 38 |
| Weighted average relative | 10 | 6 | 17 | 23 | 1 | 0 | NA | NA | 22 | -6 | 8 | 13 | 78 | 12 | 34 | -9 | 11 | 13 | 14 | 22 | 10 | 28 | 3 | 40 |
| SD | | | | | | | | | | | | | | | | | | | | | | | | |
| 1998-1999 | 5.0 | 5.7 | 9.1 | 10.2 | 7.7 | 11.6 | 9.7 | 93.0 | 10.0 | 8.4 | 6.3 | 4.7 | 3.5 | 7.6 | 5.4 | 5.1 | 8.2 | 5.2 | 5.9 | 7.0 | 4.6 | 8.4 | 5.9 | 6.5 |
| 2000-2001 | 4.9 | 5.6 | 7.9 | 8.7 | 7.7 | 9.6 | 17.8 | 41.4 | 9.2 | 8.2 | 6.5 | 4.4 | 1.3 | 6.3 | 3.4 | 5.3 | 8.5 | 8.4 | 6.3 | 6.6 | 4.7 | 6.6 | 6.1 | 5.3 |
| Correlation of 1998-1999 with 2000-2001 | .73 | .71 | .74 | .54 | .41 | .31 | .29 | -.07 | .90 | .41 | .71 | .83 | .58 | .94 | .64 | .76 | .56 | .48 | .75 | .77 | .96 | .94 | .98 | .84 |
| Correlation of improvement with baseline | -.39 | -.41 | -.52 | -.60 | -.53 | -.68 | -.27 | -.93 | -.41 | -.56 | -.35 | -.39 | -.93 | -.60 | -.79 | -.26 | -.44 | -.16 | -.27 | -.42 | -.07 | -.71 | .12 | -.58 |

*See Table 1 for explanation of abbreviations.
†Relative improvement is calculated as improvement/(100 − baseline improvement).

**Figure 1.** State Ranking on Provision of Appropriate Care, 2000-2001



Quartile Rank
1
2
3
4

States are ranked according to their average performance across indicators in 2000-2001.

FIGURE 1 shows the national pattern of performance in 2000-2001 (follow-up). As in the previous report on 1998-1999, better performance is concentrated in northern states and less populous states. FIGURE 2 shows the pattern of relative improvement. Geographic trends are similar but less marked than for follow-up performance.

## COMMENT

We believe this is the first national study to show improvement in quality of care over time for multiple conditions in inpatient and outpatient settings. However, these quality indicators give a somewhat unbalanced picture of Medicare services. They overrepresent inpatient and preventive services, underrepresent ambulatory care, and represent very few

interventional procedures. This study is also generally limited to care delivered in fee-for-service Medicare. Nationally, about 85% of Medicare beneficiaries are cared for under fee-for-service care and about 15% under managed care, but in Arizona, California, Florida, and Pennsylvania more than 25% of beneficiaries are enrolled in managed care. Comparing Health Employer Data and Information Set (HEDIS) data from managed care with this fee-for-service Medicare data presents technical problems that we have not yet solved for these measures, but HEDIS data for managed care demonstrate similar trends.[7] Furthermore, because of technical challenges such as risk adjustment, we focused on measuring processes of care critical to outcomes rather than on measuring outcomes themselves.

Growing national alarm over unrealized opportunities to improve care has been accompanied by a significant improvement in care, although far more remains to be done than has been accomplished. The improvement reported herein is consistent with the goals of the Medicare QIO program, which has performance-based con-

©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

tracts with QIOs to achieve precisely these kinds of improvement.[8] The QIO program has created the performance measurement system that tracks progress on these topics and has dramatically heightened national awareness of the opportunity for improvement. However, these cross-sectional data do not provide conclusive information about the degree to which the improvement can be attributed to the QIOs' quality improvement efforts. There is evidence that QIO interventions can cause improvement,[9] but the effort during the period of this study was national, with no control group, and the strong emphasis on partnerships for improvement makes isolating the contribution of the QIO program almost impossible. Indeed, using a clinical model to conduct research that will prove linkages between interventions (such as fail-safe systems) and improved quality faces many of the same difficulties as using a clinical research model to study many aspects of patient safety.[10] Nor does current evidence allow us to estimate how much of the improvement reported herein may be attributed to heightened awareness of specific clinical treatments and how much may be attributed to changes in health care systems.

Ten years ago, Rogers et al[11] and Kahn et al[12] reported an improvement in quality of inpatient care for Medicare beneficiaries with 5 conditions during the mid 1980s. Our study suggests that this trend continues and is broader. However, despite this evidence, a wide gap remains between the care that could be delivered and the care that is delivered to Medicare beneficiaries. In part the explanation for this discrepancy is that the diffusion of standards of care is relatively slow, that new standards are developed continually, and that the performance gap is very wide compared with progress. The greatest improvements in inpatient care were (1) prescription of β-blockers for patients with acute myocardial infarction at discharge, (2) delivering antibiotics within 8 hours of reaching the hospital for patients with pneumonia, and (3) avoid-



**Figure 2.** Median Relative Improvement in the Provision of Appropriate Care

Quartile Rank (Range)
- 1 (17.1% to 22.4%)
- 2 (12.3% to 16.9%)
- 3 (10.7% to 12.0%)
- 4 (5.6% to 9.8%)

Relative improvement is calculated as improvement/(100 − baseline improvement).

ing the administration of sublingual nifedipine to patients with acute stroke. Yet, in 2000-2001, 21% of patients with myocardial infarction and without contraindication to β-blockers were still discharged without a prescription and 13% of patients with pneumonia still waited more than 8 hours for antibiotics. By contrast, the number of patients receiving sublingual nifedipine dropped by 77% to about 1%, and the measure has been dropped from QIO contracts because so little opportunity for improvement remains. Growing evidence suggests that improvement and adoption of best practices is limited or promoted by the systems within which care is delivered and that we cannot close those gaps unless we change the systems.[3] Although it is risky to generalize from these few examples, it seems intuitive that changing the system to prevent doing something risky would be easier than changing it to do something of potential benefit both reliably and promptly.

Centers for Medicare & Medicaid Services is dropping stroke from the QIO contracts because there seems to be little further systemic improvement to be achieved on use of sublingual nifedipine and because clinically valid abstraction of eligibility for warfarin use in patients with atrial fibrillation is very difficult.

Centers for Medicare & Medicaid Services will be adding 3 indicators related to patient safety in the inpatient setting: use of appropriate antibiotics for prophylaxis against surgical infection, appropriate timing of the administration of those antibiotics, and appropriate discontinuation after surgery.[13,14] Centers for Medicare & Medicaid Services and the Joint Commission on Accreditation of Healthcare Organizations have modified their performance indicators to make them virtually identical for areas that both organizations cover. Quality Improvement Organizations will also extend their work to improving performance on quality indicators for both nursing homes and home health agencies. The National Quality Forum endorsed a group of indicators for hospitals in 2002[15] and is scheduled to endorse additional hospital measures, as well as nursing home measures, in 2003. Quality Improvement Organizations will also be working to help hospitals collect their own data, with the hope that those hospitals will soon decide to publish their performance data.[16] The health care system still urgently needs systems that will help it to keep up with change and needs partnerships among those who support quality improvement to move it forward more rapidly.[17]

The findings of this study are encouraging in showing that improvement is possible and is taking place. They should not lead to complacency:

©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

QUALITY OF MEDICARE HEALTH CARE DELIVERY

there is still a very long way to go, and medicine is changing at least as fast as our progress in implementing what was the standard of care just a few years ago.

**Author Contributions:** *Study concept and design:* Jencks, Huff, Cuerdon.
*Acquisition of data:* Jencks, Huff, Cuerdon.
*Analysis and interpretation of data:* Jencks, Huff, Cuerdon.

*Drafting of the manuscript:* Jencks, Cuerdon.
*Critical revision of the manuscript for important intellectual content:* Jencks, Huff, Cuerdon.
*Statistical expertise:* Huff, Cuerdon.
*Obtained funding:* Jencks.
*Administrative, technical, or material support:* Huff, Cuerdon.
*Study supervision:* Jencks, Cuerdon.
**Funding/Support:** All funding for this work was provided by the Centers for Medicare & Medicaid Services.
**Disclaimer:** The opinions herein are the authors' and

not necessarily those of the Centers for Medicare & Medicaid Services.
**Acknowledgment:** We especially thank Joyce V. Kelly, PhD, who coordinated the national PRO quality improvement efforts and Jeffrey Kang, MD, MPH, without whom this work would not have been possible. We also thank Dale Burwen, MD, Barbara Fleming, MD, Peter Houck, MD, Annette Kussmaul, MD, David Nilasena, MD, and Diane Ordin, MD, for their leadership on the individual clinical topics and Susan Arday, PhD, for support of the immunization survey.

**REFERENCES**

1. US Department of Health and Human Services. *Healthy People 2010, Understanding and Improving Health.* Washington DC: US Government Printing Office; 2000.
2. Kohn LT, Corrigan JM, Donaldson MS, ed. *To Err Is Human: Building a Safer Health System.* Washington, DC: National Academy Press; 1999.
3. Committee on Quality of Health Care in America. *Crossing the Quality Chasm.* Washington, DC: National Academy Press; 2001.
4. Jencks SF, Cuerdon T, Burwen DR, et al. Quality of medical care delivered to Medicare beneficiaries: a profile at state and national levels. *JAMA.* 2000;284: 1670-1676.
5. Behavioral Risk Factor Surveillance System resources page. Centers for Disease Control and Prevention Web site. Available at: http://www.cdc.gov /brfss. Accessed December 12, 2002.
6. Huff ED. Comprehensive reliability assessment and comparison of quality indicators and their components. *J Clin Epidemiol.* 1997;50:1395-1404.
7. *The State of Managed Care Quality, 2001.* Washington, DC: National Committee on Quality Assur-

ance. Available at: http://www.ncqa.org/somc2001 /KEY/SOMC_2001_key.html#patterns. Accessed December 12, 2002.
8. Quality Improvement Organization resource page. Centers for Medicare and Medicaid Web site. Available at: http://www.cms.hhs.gov/qio/default.asp. Accessed December 12, 2002.
9. Marciniak T, Ellerbeck EF, Krumholz HM, Radford MJ, Vogel RA, Jencks SF. Improving the quality of care for Medicare patients with acute myocardial infarction: results from the cooperative cardiovascular project. *JAMA.* 1998;279:1351-1357.
10. Leape LL, Berwick DM, Bates DW. What practices will most improve safety? *JAMA.* 2002;288:501-507.
11. Rogers WH, Draper D, Kahn KJ, et al. Quality of care before and after implementation of the DRG-based prospective payment system: a summary of effects. *JAMA.* 1990;264:1989-1994.
12. Kahn KJ, Keeler EB, Sherwood MJ, et al. Comparing outcomes of care before and after implementation of the DRG-based prospective payment system. *JAMA.* 1990;264:1984-1988.

13. Mangram AJ, Horan TC, Pearson ML, Silver LC, Jarvis WR, for the Hospital Infection Control Practices Advisory Committee. Guideline for prevention of surgical site infection, 1999. *Infect Control Hosp Epidemiol.* 1999;20:250-278.
14. Burke JP. Maximizing appropriate antibiotic prophylaxis for surgical patients: an update for LDS Hospital, Salt Lake City. *Clin Infect Dis.* 2001;33(suppl 2): S78-S83.
15. *Hospital Care National Performance Measures (Group 1) - Interim report,* 2002, Washington, DC: the National Forum for Healthcare Quality Measurement and Reporting, National Quality Forum. Available at: http://www.qualityforum.org/txhospGrp1publicweb .pdf. Accessed December 18, 2002.
16. Brown D. Hospitals will be rated on their performance. *Washington Post.* December 13, 2002:A1.
17. Sprague L. *Contracting for Quality: Medicare's Quality Improvement Organizations NHPF Issue Brief.* Washington DC: George Washington University; June 3, 2002. National Health Policy Forum. No. 774. Available at: http://nhpf.org/cfm2/results.cfm.

> True science teaches, above all, to doubt and to be ignorant.
> —Miguel de Unamuno (1864-1936)

   ©2003 American Medical Association. All rights reserved.

Downloaded from www.jama.com , on May 16, 2007

# APPENDIX A

2007 ANNUAL REPORT OF
THE BOARDS OF TRUSTEES OF THE
FEDERAL HOSPITAL INSURANCE AND
FEDERAL SUPPLEMENTARY MEDICAL INSURANCE
TRUST FUNDS

COMMUNICATION

From

THE BOARDS OF TRUSTEES,
FEDERAL HOSPITAL INSURANCE AND
FEDERAL SUPPLEMENTARY MEDICAL INSURANCE
TRUST FUNDS

Transmitting

THE 2007 ANNUAL REPORT OF
THE BOARDS OF TRUSTEES OF THE
FEDERAL HOSPITAL INSURANCE AND
FEDERAL SUPPLEMENTARY MEDICAL INSURANCE
TRUST FUNDS

## LETTER OF TRANSMITTAL

_____

BOARDS OF TRUSTEES OF THE
FEDERAL HOSPITAL INSURANCE AND
FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS,
Washington, D.C., April 23, 2007

HONORABLE Nancy Pelosi
Speaker of the House of Representatives
Washington, D.C.

HONORABLE Richard B. Cheney
President of the Senate
Washington, D.C.

DEAR MADAM SPEAKER AND MR. CHENEY:

We have the honor of transmitting to you the 2007 Annual Report of the Boards of Trustees of the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund, the 42nd such report.

Respectfully,

Henry M. Paulson, Jr.,
*Secretary of the Treasury,
and Managing Trustee of
the Trust Funds.*

Elaine L. Chao, *Secretary of
Labor, and Trustee.*

Michael O. Leavitt, *Secretary
of Health and Human
Services, and Trustee.*

Michael J. Astrue, *Commissioner
of Social Security, and Trustee.*

John L. Palmer, *Trustee.*

Thomas R. Saving, *Trustee.*

Leslie V. Norwalk, Esq., *Acting
Administrator of the Centers for
Medicare & Medicaid Services, and
Secretary, Boards of Trustees.*

# CONTENTS

I. INTRODUCTION ................................................................................1
II. OVERVIEW ...................................................................................2
   A. Highlights ................................................................................2
   B. Medicare Data for Calendar Year 2006 .......................................5
   C. Economic and Demographic Assumptions....................................6
   D. Financial Outlook for the Medicare Program.............................10
   E. Financial Status of the HI Trust Fund ......................................15
   F. Financial Status of the SMI Trust Fund....................................20
   G. Conclusion..............................................................................27
III. ACTUARIAL ANALYSIS ................................................................29
   A. Medicare Financial Projections .................................................29
   B. HI Financial Status.................................................................40
      1. Financial Operations in Calendar Year 2006.........................40
      2. 10-Year Actuarial Estimates (2007-2016) ..............................46
      3. Long-Range Estimates.........................................................54
      4. Long-Range Sensitivity Analysis ..........................................69
   C. SMI Financial Status ...............................................................75
      1. Total SMI ...........................................................................75
         a. 10-Year Actuarial Estimates (2007-2016)........................75
         b. 75-Year Actuarial Estimates (2007-2081)........................77
         c. Implications of SMI Cost Growth ....................................78
      2. Part B Account ...................................................................82
         a. Financial Operations in Calendar Year 2006...................82
         b. 10-Year Actuarial Estimates (2007-2016)........................89
         c. Long-Range Estimates ...................................................102
      3. Part D Account ...................................................................106
         a. Financial Operations in Calendar Year 2006...................107
         b. 10-Year Actuarial Estimates (2007-2016)........................112
         c. Long-Range Estimates ...................................................118
IV. ACTUARIAL METHODOLOGY .........................................................123
   A. Hospital Insurance ...................................................................123
   B. Supplementary Medical Insurance ............................................136
      1. Part B.................................................................................136
      2. Part D.................................................................................151
   C. Long-Range Medicare Cost Growth Assumptions.....................160
V. APPENDICES.................................................................................163
   A. Medicare Amendments since the 2006 Report .........................163
   B. Average Medicare Expenditures per Beneficiary....................165
   C. Medicare Cost Sharing and Premium Amounts......................168
   D. Supplementary Assessment of Uncertainty in Part B Cost
      Projections ...........................................................................175
   E. Medicare and Social Security Trust Funds and the Federal
      Budget ................................................................................185
   F. Fiscal Year Historical Data and Projections through 2016 .....192
   G. Glossary ...............................................................................203
      List of Tables.......................................................................222
      List of Figures......................................................................226
   H. Statement of Actuarial Opinion .............................................228

# I. INTRODUCTION

The Medicare program has two components. Hospital Insurance (HI), or Medicare Part A, helps pay for hospital, home health, skilled nursing facility, and hospice care for the aged and disabled. Supplementary Medical Insurance (SMI) consists of Medicare Part B and Part D.[1] Part B helps pay for physician, outpatient hospital, home health, and other services for the aged and disabled who have voluntarily enrolled. Part D initially provided access to prescription drug discount cards and transitional assistance to low-income beneficiaries. In 2006 and later, Part D provides subsidized access to drug insurance coverage on a voluntary basis for all beneficiaries and premium and cost-sharing subsidies for low-income enrollees.

The Medicare Board of Trustees was established under the Social Security Act to oversee the financial operations of the HI and SMI trust funds.[2] The Board comprises six members. Four members serve by virtue of their positions in the Federal Government: the Secretary of the Treasury, who is the Managing Trustee; the Secretary of Labor; the Secretary of Health and Human Services; and the Commissioner of Social Security. The other two members, John L. Palmer and Thomas R. Saving, are public representatives initially appointed by President William J. Clinton on October 28, 2000, and reappointed by President George W. Bush on April 18, 2006. The Administrator of the Centers for Medicare & Medicaid Services (CMS) is designated as Secretary of the Board.

The Social Security Act requires that the Board, among other duties, report annually to the Congress on the financial and actuarial status of the HI and SMI trust funds. This 2007 report is the 42nd to be submitted.

---

[1]Medicare also has a Part C, which provides Part A and Part B coverage and, optionally, Part D coverage through private health insurance plans.
[2]Technically, separate boards are established for HI and SMI. Because both boards have the same membership, for convenience they are collectively referred to as the Medicare Board of Trustees in this report.

*Overview*

## II. OVERVIEW

### A. HIGHLIGHTS

The major findings of this report under the intermediate set of assumptions are summarized below.

**In 2006**

In 2006, 43.2 million people were covered by Medicare: 36.3 million aged 65 and older, and 7.0 million disabled. Total benefits paid in 2006 were $402 billion. Income was $437 billion, expenditures were $408 billion, and assets held in special issue U.S. Treasury securities grew to $339 billion.

**Short-Range Results**

The HI trust fund is not adequately financed over the next 10 years under the intermediate assumptions. From the beginning of 2007 to the end of 2016, the assets of the HI trust fund are projected to decrease from $305 billion to $221 billion, which would be less than the recommended minimum level of 1 year's expenditures.

The SMI trust fund is adequately financed over the next 10 years and beyond because premium and general revenue income for Parts B and D are reset each year to match expected costs. Progress has been made toward rebuilding Part B assets, following significant declines in 1999-2004. Part B costs have been increasing rapidly, however, having averaged 11.0 percent annually over the last 6 years, and are likely to continue doing so. Under current law, an average annual growth rate of 6.6 percent is projected for the next 10 years. This rate is unrealistically constrained due to multiple years of physician fee reductions that would occur under current law. If Congress continues to override these reductions, as they have for 2003-2007, the Part B growth rate would instead average roughly 8 to 9 percent. For Part D, the average annual increase in expenditures is estimated to be 12.6 percent through 2016. The U.S. economy is projected to grow by 4.8 percent on average during this period, significantly more slowly than either Part B or Part D.

The difference between Medicare's total outlays and its "dedicated financing sources" is estimated to reach 45 percent of outlays in fiscal year 2013, the seventh year of the projection. As a result, under section 801 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (also known informally as the Medicare

2

Modernization Act, or MMA), the Board of Trustees is issuing a determination of projected "excess general revenue Medicare funding" in this report. Since this is the second consecutive such finding, a "Medicare funding warning" is triggered, which will require the President to submit to Congress, within 15 days after the release of the *Fiscal Year 2009 Budget*, proposed legislation to respond to the warning. Congress is then required to consider the legislation on an expedited basis.

**Long-Range Results**

Under the intermediate assumptions the HI trust fund is projected to be exhausted in 2019, 1 year later than in last year's report, due to slightly higher projected payroll tax income and slightly lower projected benefits than previously estimated. For the 75-year projection period, the actuarial deficit is little different from that in last year's report, at 3.55 rather than 3.51 percent of taxable payroll.

The HI annual cost rate is projected to increase from 3.01 percent of taxable payroll in 2006 to 11.79 percent in 2081—8.38 percent of taxable payroll more than the projected income rate for 2081. Expressed in relation to the projected Gross Domestic Product (GDP), HI cost is estimated to rise from the current level of 1.4 percent of GDP to 5.0 percent in 2081.

Part B outlays were 1.3 percent of GDP in 2006 and are projected to grow to about 4.0 percent by 2081. These cost projections, however, are understated as a result of the substantial reductions in physician payments that would be required under current law. Actual future Part B costs will depend on the steps Congress takes to address the situation but could exceed the current-law projections by 7 to 9 percent in 2010, growing to roughly 25 to 40 percent for 2030 and later.

Part D outlays are estimated to increase from 0.4 percent of GDP in 2006 to about 2.4 percent by 2081. Initially, these outlay projections are significantly lower than those shown in last year's report. The primary reason for the reduction is that the 2007 prescription drug plan bid submissions were about 10 percent lower than in 2006. In the long range, the outlay projections return to, and eventually exceed, the prior projected level.

3

*Overview*

**Conclusion**

The financial outlook for the Medicare program continues to raise serious concerns. In particular, a "Medicare funding warning" is triggered by the findings of this report. Total Medicare expenditures were $408 billion in 2006 and are expected to increase in future years at a faster pace than either workers' earnings or the economy overall. As a percentage of GDP, expenditures are projected to increase from 3.1 percent in 2006 to 11.3 percent by 2081 (based on our intermediate set of assumptions). Growth of this magnitude, if realized, would substantially increase the strain on the nation's workers, Medicare beneficiaries, and the Federal Budget.

HI tax income is estimated to fall short of HI expenditures in 2007 and is projected to do so in all future years. The HI trust fund does not meet our short-range test of financial adequacy, and fund assets are projected to be exhausted in 2019. In the long range, projected expenditures and scheduled tax income are substantially out of balance, and the trust fund does not meet our test of long-range close actuarial balance. Currently, this imbalance is relatively small, with tax income is estimated to cover 99 percent of costs in 2007, but will grow rapidly in the absence of changes to current law: taxes would cover 79 percent of estimated costs in 2019, and only 29 percent at the end of the long-range period. Closing deficits of this magnitude will require very substantial increases in tax revenues and/or reductions in expenditures.

The Part B and Part D accounts in the SMI trust fund are adequately financed under current law, since premium and general revenue income are reset each year to match expected costs. Such financing, however, would have to increase rapidly to match expected expenditure growth under current law and to finish rebuilding Part B assets to an appropriate level.

These projections demonstrate the need for timely and effective action to address Medicare's financial challenges. Consideration of such reforms should occur in the relatively near future. The sooner the solutions are enacted, the more flexible and gradual they can be. Moreover, the early introduction of reforms increases the time available for affected individuals and organizations—including health care providers, beneficiaries, and taxpayers—to adjust their expectations. We believe that prompt, effective, and decisive action is necessary to address these challenges—both the exhaustion of the HI trust fund and the anticipated rapid growth in HI, SMI Part B, and SMI Part D expenditures.

4

*Medicare Data*

## B. MEDICARE DATA FOR CALENDAR YEAR 2006

HI and SMI have separate trust funds, sources of revenue, and categories of expenditures. Table II.B1 presents Medicare data for calendar year 2006, in total and for each part of the program. The largest category of HI expenditures is inpatient hospital services, while the largest SMI expenditure categories are physician services and prescription drugs.

**Table II.B1.—Medicare Data for Calendar Year 2006**

| | HI or Part A | SMI Part B | SMI Part D | Total |
|---|---|---|---|---|
| Assets at end of 2005 (billions) | $285.8 | $24.0 | — | $309.8 |
| Total income | $211.5 | $177.3 | $48.2 | $437.0 |
| Payroll taxes | 181.3 | — | — | 181.3 |
| Interest | 15.7 | 1.8 | 0.0 | 17.5 |
| Taxation of benefits | 10.3 | — | — | 10.3 |
| Premiums | 2.6 | 42.9 | 3.5 | 48.9 |
| General revenue | 0.5 | 132.7 | 39.2 | 172.4 |
| Transfers from States | — | — | 5.5 | 5.5 |
| Other | 1.0 | 0.0 | — | 1.0 |
| Total expenditures | $191.9 | $169.0 | $47.4 | $408.3 |
| Benefits | 189.0 | 165.9 | 47.1 | 402.0 |
| Hospital | 121.0 | 27.2 | — | 148.2 |
| Skilled nursing facility | 19.9 | — | — | 19.9 |
| Home health care | 6.0 | 7.2 | — | 13.1 |
| Physician fee schedule services | — | 58.4 | — | 58.4 |
| Managed care | 32.9 | 31.5 | — | 64.4 |
| Prescription drugs | — | — | 47.1 | 47.1 |
| Other | 9.3 | 41.7 | — | 51.0 |
| Administrative expenses | $2.9 | $3.1 | $0.3 | $6.3 |
| Net change in assets | $19.6 | $8.3 | $0.8 | $28.7 |
| Assets at end of 2006 | $305.4 | $32.3 | $0.8 | $338.5 |
| Enrollment (millions) | | | | |
| Aged | 35.9 | 34.1 | n/a | 36.3 |
| Disabled | 7.0 | 6.1 | n/a | 7.0 |
| Total | 42.9 | 40.3 | 27.9 | 43.2 |
| Average benefit per enrollee | $4,410 | $4,121 | $1,690 | $10,221 |

Notes: 1. Totals do not necessarily equal the sums of rounded components.
2. "n/a" indicates data are not available.

For HI, the primary source of financing is the payroll tax on covered earnings. Employers and employees each pay 1.45 percent of wages, while self-employed workers pay 2.9 percent of their net income. Other HI revenue sources include a portion of the Federal income taxes that people pay on their Social Security benefits, and interest paid on the U. S. Treasury securities held in the HI trust fund.

For SMI, transfers from the general fund of the Treasury represent the largest source of income, currently covering about 79 percent of program costs. Also, beneficiaries pay monthly premiums for Parts B and D that finance a portion of the total cost. As with HI, interest is paid on the U. S. Treasury securities held in the SMI trust fund.

5

# APPENDIX B

Westlaw.

477 F.Supp. 595

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

Page 1

⚑
Public Citizen Health Research Group v.
Department of Health, Ed. and Welfare
D.C.D.C., 1979.

United States District Court, District of Columbia.
PUBLIC CITIZEN HEALTH RESEARCH
GROUP, Plaintiff,
v.
DEPARTMENT OF HEALTH, EDUCATION
AND WELFARE et al., Defendants,
American Association of Professional Standards
Review Organizations, Intervening Defendant.
**Civ. A. No. 77-2093.**

Sept. 25, 1979.

Nonprofit organization, which advocated delivery
of quality health care to patients in certain area,
sought documents disclosing and evaluating
federally funded medical services from National
Capital Medical Foundation, which was designated
by Department of Health, Education and Welfare as
Professional Standards Review Organization for
certain area. Parties filed motions for summary
judgment. The District Court, Gesell, J., held that:
(1) statutory language of applicable subsection of
Professional Standards Review Organization
legislation was not sufficiently precise to evidence
unambiguous congressional determination, thereby
qualifying requested documents for nondisclosure
as materials specifically exempted by collateral
statute; (2) Freedom of Information Act's
exemption, which protects from disclosure only
those documents normally privileged in civil
discovery context, was inapplicable, because neither
physician-patient privilege nor governmental
privilege applied to requested documents; and (3)
limited invasion of personal privacy of doctors
providing services, because of disclosure of certain
nonpatient identifiable records, was not "clearly
unwarranted" in light of important public interest at
stake, and thus another exemption of Act was
inapplicable.

Plaintiff's motion for summary judgment granted.
West Headnotes
**[1] Records 326 ⬬⟿55**

326 Records
 326II Public Access
  326II(B)  General  Statutory  Disclosure
Requirements
   326k53  Matters  Subject  to  Disclosure;
Exemptions
    326k55 k. Exemptions or Prohibitions
Under Other Laws. Most Cited Cases
The statutory language of applicable subsection of
Professional  Standards  Review  Organization
legislation was not sufficiently precise to evidence
unambiguous congressional determination, thereby
qualifying requested documents which described
and evaluated federally funded medical services, for
nondisclosure as material specifically exempted by
collateral statute. 5 U.S.C.A. § 552(b)(3), (b)(3)(A,
B); Social Security Act, §§ 1166, 1166(a, b) as
amended 42 U.S.C.A. §§ 1320c-15, 1320c-15(a, b).

**[2] Records 326 ⬬⟿55**

326 Records
 326II Public Access
  326II(B)  General  Statutory  Disclosure
Requirements
   326k53  Matters  Subject  to  Disclosure;
Exemptions
    326k55 k. Exemptions or Prohibitions
Under Other Laws. Most Cited Cases
Congress, in narrowing scope of Freedom of
Information Act's exemption, which permits
nondisclosure only if collateral statute substantially
delineates nature of or means for selecting material
to be withheld, limited applicability of such
exemption to statutes that "significantly inform" an
administrator's  discretion  to  choose  between
disclosure and secrecy, and if Congress confers no
administrative discretion at all, such exemption will
apply. 5 U.S.C.A. § 552(b)(3), (b)(3)(A, B).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

**[3] Records 326 🔑55**

326 Records
    326II Public Access
      326II(B) General Statutory Disclosure Requirements
        326k53 Matters Subject to Disclosure; Exemptions
          326k55 k. Exemptions or Prohibitions Under Other Laws. Most Cited Cases
Contention that Congress was "acutely aware" of need to preserve Professional Standards Review Organization confidentiality both before and after 1976 amendment narrowing scope of Freedom of Information Act's exemption, which permits nondisclosure only if collateral statute substantially delineates nature of or means for selecting material to be withheld, and that such legislative awareness should overcome any vagaries in statutory language of certain subsection of Professional Standards Review Organization legislation, was not supported by PSRO legislative history. 5 U.S.C.A. § 552(b)(3), (b)(3)(A, B); Social Security Act, §§ 1166, 1166(a)(1-3), (b) as amended 42 U.S.C.A. §§ 1320c-15, 1320c-15(a)(1-3), (b).

**[4] Records 326 🔑57**

326 Records
    326II Public Access
      326II(B) General Statutory Disclosure Requirements
        326k53 Matters Subject to Disclosure; Exemptions
          326k57 k. Internal Memoranda or Letters; Executive Privilege. Most Cited Cases
Freedom of Information Act's exemption, which authorizes nondisclosure of interagency or intra-agency memorandums or letters which would not be available by law to party other than agency in litigation with agency, protects from disclosure only those documents normally privileged in civil discovery context. 5 U.S.C.A. § 552(b)(5).

**[5] Records 326 🔑57**

326 Records
    326II Public Access
      326II(B) General Statutory Disclosure

Requirements
        326k53 Matters Subject to Disclosure; Exemptions
          326k57 k. Internal Memoranda or Letters; Executive Privilege. Most Cited Cases
Physician-patient privilege did not prevent disclosure of documents identifying number of admissions, average length of stay, and frequency of disapproved services for patients having specified diagnoses or undergoing particular medical procedures in certain hospitals, or physician profiles of physicians having greatest number of medicaid and medicare hospital admissions during certain period, or medical care evaluation studies completed by Professional Standards Review Organization for certain area, because, under circumstances, such documents would not lead to patient identification. 5 U.S.C.A. § 552(b)(5).

**[6] Administrative Law and Procedure 15A🔑704**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
      15AV(B) Decisions and Acts Reviewable
        15Ak704 k. Finality; Ripeness. Most Cited Cases

**Records 326 🔑57**

326 Records
    326II Public Access
      326II(B) General Statutory Disclosure Requirements
        326k53 Matters Subject to Disclosure; Exemptions
          326k57 k. Internal Memoranda or Letters; Executive Privilege. Most Cited Cases
An administrative decision is final if it takes form of a nonreviewable binding directive rather than a recommendation subject to further agency approval, and governmental privilege can never apply to an agency's final decisions or opinions, because finality precludes any effect publication might have on predecisional processes; any memoranda or analysis setting forth reasons for decision already made are likewise not covered by Freedom of Information Act's exemption, which protects from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595                                                                                              Page 3

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

disclosure only those documents normally privileged in civil discovery context. 5 U.S.C.A. § 552(b)(5).

**[7] Records 326 ☞57**

326 Records
    326II Public Access
        326II(B)    General    Statutory    Disclosure Requirements
            326k53 Matters Subject to Disclosure; Exemptions
                326k57 k. Internal Memoranda or Letters; Executive Privilege. Most Cited Cases
Governmental privilege did not prohibit disclosure of medical care evaluation studies completed by National Capital Medical Foundation, which was designated by Department of Health, Education and Welfare as Professional Standards Review Organization for certain area, because studies represented final agency reports, rather than advisory reports in ongoing deliberative process, where written recommendations that were included in reports were directives tied to certain documented deficiencies, they were not appealable to another agency, and follow-up assessment, to be completed within one year, focused only on whether directives had been executed. 5 U.S.C.A. § 552(b)(5).

**[8] Records 326 ☞58**

326 Records
    326II Public Access
        326II(B)    General    Statutory    Disclosure Requirements
            326k53 Matters Subject to Disclosure; Exemptions
                326k58 k. Personal Privacy Considerations in General; Personnel Matters. Most Cited Cases
In Freedom of Information Act's exemption, which allows agency to withhold personnel and medical files and similar files the disclosure of which would constitute clearly unwarranted invasion of personal privacy, phrase "clearly unwarranted" evidences congressional intention that courts balance competing interests between an individual's interest in privacy and the general public's interest in government information. 5 U.S.C.A. § 552(b)(6).

**[9] Records 326 ☞58**

326 Records
    326II Public Access
        326II(B)    General    Statutory    Disclosure Requirements
            326k53 Matters Subject to Disclosure; Exemptions
                326k58 k. Personal Privacy Considerations in General; Personnel Matters. Most Cited Cases
Hospitals do not have a cognizable privacy interest under Freedom of Information Act's exemption which allows agency to withhold personnel and medical files and similar files the disclosure of which would constitute clearly unwarranted invasion of personal privacy. 5 U.S.C.A. § 552(b)(6).

**[10] Records 326 ☞58**

326 Records
    326II Public Access
        326II(B)    General    Statutory    Disclosure Requirements
            326k53 Matters Subject to Disclosure; Exemptions
                326k58 k. Personal Privacy Considerations in General; Personnel Matters. Most Cited Cases
A minute risk of incidental identification of patients did not transform disclosure of requested documents from National Capital Medical Foundation, which was designated by Department of Health, Education and Welfare as Professional Standards Review Organization for certain area, into unwarranted invasion of patients' personal privacy, so as to come within applicable exemption of Freedom of Information Act, since to decide otherwise would, in effect, authorize withholding of all aggregate data concerning patients, a plainly erroneous conclusion. 5 U.S.C.A. § 552(b)(6).

**[11] Records 326 ☞58**

326 Records
    326II Public Access

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

326II(B) General Statutory Disclosure Requirements
    326k53 Matters Subject to Disclosure; Exemptions
        326k58 k. Personal Privacy Considerations in General; Personnel Matters. Most Cited Cases
Physicians, who provided medicare and medicaid services, had privacy interest which was implicated under applicable Freedom of Information Act exemption, because disclosure of certain requested documents raised prospect of misleading publicity, possibly unwarranted criticism and damage to professional reputation, but such privacy invasion was not overly intrusive so as to make exemption applicable, because nonprofit organization, which advocated delivery of quality health care to medicare and medicaid patients, did not seek disclosure of each physician's entire professional dealings, but, rather, only services that were compensated out of public funds were involved. 5 U.S.C.A. § 552(b)(6).

**[12] Records 326 ⬤═64**

326 Records
    326II Public Access
        326II(B) General Statutory Disclosure Requirements
            326k61 Proceedings for Disclosure
                326k64 k. Discretion and Equitable Considerations; Balancing Interests. Most Cited Cases
While contention that disclosure of certain documents describing and evaluating federally funded medical services would produce diminished participation by medical profession in Professional Standards Review Organization process and even in medicare and medicaid programs represented public interest consideration favoring secrecy, such contention was propounded only in broadest speculative terms, without evidentiary support, and thus the conceivable adverse effect on overall physician participation did not outweigh clear public interest in increased knowledge concerning quality of government-funded medical services. 5 U.S.C.A. § 552(b)(6).

**[13] Records 326 ⬤═59**

326 Records
    326II Public Access
        326II(B) General Statutory Disclosure Requirements
            326k53 Matters Subject to Disclosure; Exemptions
                326k59 k. Trade Secrets and Commercial or Financial Information. Most Cited Cases
Medical care evaluation studies completed by Professional Standards Review Organization for certain area were not "commercial information" or " trade secrets" of such Organization, so as to come within applicable Freedom of Information Act exemption, for no data concerning fees, payment schedules, or other commercial arrangements was sought, studies contained no information about secret formulas or rare treatment method, and under circumstances, such Organization could not suffer competitive injury from disclosure and disclosure would not impair its ability to gather information. 5 U.S.C.A. § 552(b)(4).

**[14] Records 326 ⬤═60**

326 Records
    326II Public Access
        326II(B) General Statutory Disclosure Requirements
            326k53 Matters Subject to Disclosure; Exemptions
                326k60 k. Investigatory or Law Enforcement Records. Most Cited Cases
Requested documents, which described and evaluated federally funded medical services, were not compiled for law enforcement purposes, so as to come within applicable Freedom of Information Act exemption, because only data of Professional Standards Review Organization for certain area that was even arguably covered under exemption was sanction reports and recommendations, and no such data was requested; rather, what was requested was precisely kind of ordinary medical review material that, despite occasionally alerting administrator to violations of law, was acquired essentially as matter of routine. 5 U.S.C.A. § 552(b)(7).

**[15] Records 326 ⬤═51**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595                                                                 Page 5

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

326 Records
    326II Public Access
        326II(B)    General    Statutory    Disclosure
Requirements
            326k51   k.   Agencies   or   Custodians
Affected. Most Cited Cases
To qualify as an agency under Freedom of
Information Act, an organization must exercise
substantial independent authority in performing its
particular functions, and it must be sufficiently
controlled by government to justify attributing
governmental character to its operations. 5
U.S.C.A. § 552(e).

**[16] Records 326 &#9756;51**

326 Records
    326II Public Access
        326II(B)    General    Statutory    Disclosure
Requirements
            326k51   k.   Agencies   or   Custodians
Affected. Most Cited Cases
National Capital Medical Foundation, which was
designated by Department of Health, Education and
Welfare as Professional Standards Review
Organization for certain area, was an "agency" for
purposes of Freedom of Information Act, and was
thus subject to Act's disclosure provisions, given
inapplicability of Act's various exemptions, since it
had the independent decisional authority to qualify
as an agency, and since it was sufficiently subject to
day-to-day federal control. 5 U.S.C.A. § 552(e).

David C. Vladeck, Diane B. Cohn, Ted Bogue,
Washington, D. C., for plaintiff.
Thomas W. Hussey, Atty., Justice Dept.,
Washington, D. C., for defendant Department of
Health, Education and Welfare.
John Lewis Smith, III, Lee T. Ellis, Jr., Lawrence
Lewis Lamade, Washington, D. C., for defendant
National Capital Medical Foundation, Inc.
Richard G. Vernon, William G. Kopit, Washington,
D. C., for intervening defendant American Assn. of
Professional Standards Review Organizations.

       **\*598 MEMORANDUM**
GESELL, District Judge.
This action, which is before the Court on

cross-motions of the parties, raises the important
question of whether or not certain documents
describing and evaluating federally funded medical
services are exempt from disclosure under the
Freedom of Information Act ("FOIA"), 5 U.S.C. s
552 (1976). Plaintiff, Public Citizen Health
Research Group ("Public Citizen"), a nonprofit
organization advocating the delivery of quality
health care to Medicare and Medicaid patients in
the District of Columbia, seeks access to four
categories of records reporting health care services
provided in the District. Defendant National Capital
Medical Foundation, Inc. ("NCMF"), designated by
defendant Department of Health, Education and
Welfare ("HEW") as the Professional Standards
Review Organization ("PSRO") for the District of
Columbia, pursuant to 42 U.S.C. s 1320c-1 (1976),
has possession of the records sought. The Court
held previously that NCMF is an "agency" for
purposes of FOIA, 5 U.S.C. s 552(e), and thus is
subject to the disclosure provisions of the Act.
Public Citizen Health Research Group v.
Department of HEW, 449 F.Supp. 937
(D.D.C.1978).

Plaintiff here moves for summary judgment, a
motion opposed by NCMF. HEW cross-moves for
reconsideration of the Court's earlier Order or,
alternatively, for summary judgment. Both NCMF
and HEW are joined by the intervenor-defendant,
American Association of Professional Standards
Review Organizations ("AAPSRO"). The issues
have been fully briefed, the parties have submitted
voluminous affidavits and the Court also has
benefitted from extensive oral argument.

The origins and functions of the PSRO program
were discussed at length in the Court's earlier
opinion. To summarize, Congress in 1972,
responding to the high cost of government-funded
inpatient medical services, authorized the Secretary
of HEW to designate PSROs as external monitors
of federally funded hospital-based health care
delivery. NCMF, the federally designated PSRO for
the District of Columbia since 1975, contracts with
HEW to review the professional services rendered
by individual practitioners and institutional
providers. NCMF is vested with final and binding
authority to determine that care rendered is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

necessary and conforms to appropriate professional standards, thereby qualifying for federal reimbursement. 42 U.S.C. s 1320c-7(c) (1976). [FN1] Specifically, NCMF must determine: (a) whether the inpatient services rendered are medically necessary; (b) whether such services meet professional standards of quality; and (c) whether appropriate care could be provided as effectively on an outpatient basis or more economically in a different type of inpatient facility. 42 U.S.C. s 1320c-4(a)(1).

> FN1. Although PSRO approvals are final and binding on HEW, disapproved claimants may appeal under limited circumstances. 42 U.S.C. s 1320c-8. In its first year of operation, NCMF approved nearly 99% Of the claims submitted.

In reviewing the delivery of hospital and surgical services, PSROs such as NCMF compile many distinct types of information. Public Citizen here requests four categories of documents: (1) transmissions identifying the number of admissions, average length of stay, and frequency of disapproved services for patients having specified diagnoses or undergoing particular medical procedures in Washington, D. C. hospitals,[FN2] broken down by hospital and physician. This material, which is available from patient records compiled by each hospital, is applied in the course of hospital self-monitoring or ongoing PSRO reviews. Public Citizen has agreed to the deletion of patient-identifiable data from these records; (2) physician profiles for each of the five identified physicians having the greatest number of Medicaid and Medicare hospital admissions during a specified 12-month period. Profiles **599** are to be developed, on individual practitioners and institutions, to assist PSROs in evaluating the quality and necessity of medical services. 42 U.S.C. s 1320c-4(a)(4). As defined by HEW regulations, " profiles" consist of "aggregated data in formats which display patterns of health care services over a defined period of time," PSRO Transmittal No. 61 at 4 (1978); they do not call for subjective, evaluative comments. NCMF generates a semi-annual Attending Physician Activity Report

which lists in tabular form the kind of descriptive data sought by plaintiff; [FN3] (3) hospital profiles for the five identified hospitals with the greatest number of Medicaid and Medicare admissions during a designated 12-month period. NCMF generates a series of hospital reports which, although once again not labelled "profiles," is deemed responsive by Public Citizen to its hospital profile request; (4) all Medical Care Evaluation (" MCE") studies completed by NCMF to date. MCE studies are in-depth medical service reviews aimed at effecting specific improvements in health care delivery. PSRO Program Manual, s 705.3 at VII:13-16 (1974). The studies generally deal with services rendered by a number of physicians in one or more hospitals, rather than with an individual patient or practitioner. PSROs choose MCE topics relating to widespread medical problems, and if the results of data collection reveal a failure to meet pre-established objective performance criteria, the PSRO directs that specific corrective measures be initiated and takes steps to assure that the deficiency is in fact being addressed. See generally PSRO Program Manual s 705.34 at VII:14 (1974); PSRO Transmittal No. 43 at 3-4 (1977). NCMF conducts regular area-wide MCE studies; it also delegates to individual hospitals the responsibility of identifying hospital-wide problem areas and performing MCEs on those topics. Abstracts and summary data on all MCEs are transmitted regularly to HEW, which uses the information to monitor PSRO performance and to identify potential areas for technical assistance to PSROs.

> FN2. Plaintiff's FOIA request specifies patients with a principal diagnosis of acute myocardial infarction, and patients undergoing cholecstectomy, tonsillectomy, or hysterectomy procedures.

> FN3. The Report lists for each physician who has 25 or more cases during the reporting period: (a) the number of cases, (b) the percentage of all cases, (c) total days of stay, (d) average age, (e) average length of stay, (f) average stay for comparable patient mix, (g) percentage of extensions referred to the physician

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

advisor, (h) number of extensions denied or terminated, (i) percentage of stays that are uncertified, and average length of these stays, (j) percentage of all cases that are surgical, average length of these stays, and average number of pre-operative days, (k) percentage discharged to home and percentage that died in hospital.

Public Citizen, in requesting the four categories of documents outlined above, expressly disavows any interest in information which would identify, directly or indirectly, individual patients. Moreover, since all of the records requested are compiled regularly, defendants do not face the unacceptable burden of creating additional materials to satisfy a FOIA request. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 161-62, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); Forsham v. Califano, 190 U.S.App.D.C. 231, 239, 587 F.2d 1128, 1136 (D.C. Cir. 1978), Cert. granted, -- U.S. --, 99 S.Ct. 2159, 60 L.Ed.2d 1044 (1979).

The Court has examined In camera document samples submitted by NCMF for each category, and is satisfied that they would be responsive to plaintiff's request. The requested material has, however, been withheld in its entirety, and defendants argue forcefully against disclosure on the basis of five different FOIA exemptions. The Court will address each claim for exemption separately.

*Exemption Three*

[1][2][3] Defendants contend that Congress, by enacting the PSRO legislation, determined explicitly that certain materials, including those sought here, were not to be disclosed. Exemption three, as recently amended, permits nondisclosure only if a collateral statute substantially delineates the nature of or means for selecting material to be withheld.[FN4]

FN4. Under 5 U.S.C. s 552(b)(3) (1976), the statutory disclosure requirements do not apply to matters that are:

specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld; . . . Government in the Sunshine Act, Pub.L.No.94-409, s 5(b), 90 Stat. 1247 (1976).

Congress added provisos (A) and (B) in 1976, following the Supreme Court's expansive reading of the exemption in Administrator of FAA v. Robertson, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975).

Under 42 U.S.C. s 1320c-15:

*600 (a) Any data or information acquired by any Professional Standards Review Organization, in the exercise of its duties and functions, shall be held in confidence and shall not be disclosed to any person except (1) to the extent that may be necessary to carry out the purposes of the part, (2) in such cases and under such circumstances as the Secretary shall by regulations provide to assure adequate protection of the rights and interests of patients, health care practitioners, or providers of health care, or (3) in accordance with subsection (b) of this section.

Subsection (b) authorizes disclosure to assist in investigating fraud and abuse, and in implementing health care planning or related activities; in both instances disclosure can occur only with PSRO consent. The issue presented is thus whether the statutory language of subsection (a) is sufficiently precise to evidence an unambiguous congressional determination, thereby qualifying the requested documents for nondisclosure as material specifically exempted by a collateral statute.

Congress, in narrowing the scope of exemption three, limited its applicability to statutes that " significantly inform" an administrator's discretion to choose between disclosure and secrecy. American Jewish Congress v. Kreps, 574 F.2d 624 (D.C. Cir. 1978). If Congress confers no administrative discretion at all, the exemption will of course apply.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

See Seymour v. Barabba, 182 U.S.App.D.C. 185, 559 F.2d 806 (D.C. Cir. 1977). Section 1320c-15 does not speak in definite terms; subsections (a)(1) and (a)(2) vest residual discretion in the hands of the Secretary.

Nor is the discretion so particularized in its designation of criteria for withholding or types of matters to be withheld as to fit within the compass of the exemption. Under subsection (a)(1), the administrator may disclose all information he deems necessary to fulfill the statutory purpose of " promot(ing) effective, efficient and economical delivery of health care services of proper quality . . ." 42 U.S.C. s 1320c. Such language fails to focus meaningfully on any category or class of items that Congress finds appropriate for exemption. Stretch v. Weinberger, 495 F.2d 639 (3d Cir. 1974). In this regard it differs crucially from the language of 35 U.S.C. s 122, withholding "patent applications and information concerning them." See Irons & Sears v. Dann, 196 U.S.App.D.C. -- at --, 606 F.2d 1215 at 1220 (1979). Moreover, there are no standards or guidelines to assist the Secretary in determining what matter is or is not integral to assuring quality health care services.

Subsection (a)(2) grants to the Secretary the same virtually limitless discretion (" . . . in such circumstances as the Secretary shall by regulations provide . . . .") as is conferred for Social Security data under 42 U.S.C. s 1306. That statute has been identified as one whose terms do not bring it within exemption three. S.Rep.No.1178, 94th Cong., 2d Sess. 25 (1976) (Conf.Report). The modifying directive that the Secretary disclose only when he can "adequately" protect "rights" and "interests" does not amount to a sufficient legislative particularization of secrecy criteria. Cf. The Founding Church of Scientology of Washington, D. C., Inc. v. Bell, 195 U.S.App.D.C. 363 at 370, 603 F.2d 945 at 952 (1979) (nondisclosure to protect against "annoyance, embarrassment, oppression or undue burden or expense" held insufficient guidance); American Jewish Congress v. Kreps, supra, 574 F.2d at 630-31 (nondisclosure unless " contrary*601 to national interest" held insufficient guidance).

Defendants argue that Congress was "acutely aware" of the need to preserve PSRO confidentiality both before and after the 1976 amendment narrowing the scope of exemption three and that such legislative awareness should overcome any vagaries in statutory language. The Court's reading of PSRO legislative history does not support defendants' contention. In 1972, the PSRO provisions were added by the Senate Finance Committee to the Social Security Amendments originating in the House of Representatives as H.R. 1. Neither the Senate Report nor the Conference Report contains any discussion of the confidentiality provisions, currently codified as 42 U.S.C. ss 1320c-15(a)(1) and (a)(2). S.Rep.No.1230, 92d Cong., 2d Sess. 254-68 (1972); H.R.Rep.No.1605, 92d Cong., 2d Sess. 58-59 (1972) (Conf.Report), Reprinted in (1972) U.S.Code Cong. & Admin.News pp. 5370, 5391. Section 5(h) of the Medicare-Medicaid Antifraud and Abuse Amendments of 1977, Pub.L.No.95-142, was intended to "expand and clarify" opportunities for disclosure consistent with legal requirements of confidentiality, and to this end Congress added 42 U.S.C. s 1320c-15(a)(3) & (b). While both House and Senate committee reports do advocate protecting the confidentiality of patient records, they take no position on what is at issue in this lawsuit, the status of records that do not identify individual patients. See H.R.Rep.No.393(II), 95th Cong., 1st Sess. 62-63 (1977), Reprinted in (1977) U.S.Code Cong. & Admin.News, pp. 3039, 3065-66; S.Rep.No.453, 95th Cong., 1st Sess. 22-23 (1977). Moreover, the 1977 amendments leave untouched the earlier discretionary provisions of subsections (a)(1) and (a)(2). Congressional attention to two specific areas in which disclosure is to be encouraged does nothing to narrow the broad discretion previously vested in the Secretary regarding disclosure of all other PSRO information. [FN5] If Congress wishes all such materials to remain secret, it must speak with a clearer voice. American Jewish Congress v. Kreps, 574 F.2d 624 (D.C. Cir. 1978).

FN5. The Secretary, in a recently published Notice of Proposed Rule concerning Confidentiality and Disclosure of PSRO Information, seeks to adopt

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

detailed distinctions between confidential and publicly available information and to designate both the types of confidential materials to be released and the identity of eligible recipients. 44 Fed.Reg. 3058-66 (January 15, 1979). These proposed regulations far exceed the statutory language of s 1320c-15(a); they reflect an administrative determination as to what material is to be exempted from disclosure.

*Exemption Five*

[4][5][6][7] Exemption five [FN6] protects from disclosure only those documents normally privileged in the civil discovery context. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); Vaughn v. Rosen, 173 U.S.App.D.C. 187, 194, 523 F.2d 1136, 1143 (D.C. Cir. 1975). Defendants claim as privileges relevant to this case both the physician-patient privilege and the executive or governmental privilege protecting opinions and recommendations that are part of an agency's decisional process. The physician-patient privilege is claimed for all documents in plaintiff's categories one, two and four, while governmental privilege is asserted only with regard to category four, the MCE studies.

> FN6. 5 U.S.C. s 552(b)(5) authorizes nondisclosure of:
> inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.

Critical to defendants' physician-patient privilege argument is the premise that disclosure of the records sought by Public Citizen will lead to patient identification. This premise is without adequate factual support. Category one includes no patient names, and the data items which would facilitate indirect patient identification, such as age, sex, race, place of residence, and admission and discharge dates, were omitted from Public Citizen's request. Plaintiff's affidavits are persuasive as to the virtual impossibility of identifying individual *602 patients under these circumstances. See Affidavits of George Annas at paragraph 4; Lawrence Kirsch at paragraphs 11-16. In contrast, NCMF's affidavits are couched in general, conclusory terms and offer no evidence beyond the mere possibility of identification; they must be rejected. See Affidavits of Norman Fuller at paragraphs 4-5; Paul Schlein at paragraphs 4-5; Alan Zuckerman at paragraphs 3-4.

The inability to identify patients based on data requested in category one applies A fortiori to information sought under categories two and four. Both physician profiles and MCE studies involve aggregated data organized under statistical or topical headings that bear no relation to individual patient identities. Since groupings must be large enough to allow for meaningful analysis of service patterns, profiles or MCE studies involving single or small numbers of patients would be of little value. See PSRO Transmittal No. 61 at 8 (profile group must contain minimum of 10-15 patients). Defendants' affidavits and In camera submission do not indicate that NCMF conducts any such small-scale profiles or studies.

Defendants also argue that because disclosure of MCE studies would chill the free exchange of ideas and opinions during the decision-making process the studies are protected under exemption five. Governmental privilege can never apply to an agency's final decisions or opinions; finality precludes any effect publication might have on predecisional processes. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150-55, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). An administrative decision is final if it takes the form of a nonreviewable binding directive rather than a recommendation subject to further agency approval. Id.; See also Renegotiation Board v. Grumman Aircraft Engineering Corp., 421 U.S. 168, 185-90, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). Any memoranda or analyses setting forth the reasons for a decision already made are likewise not covered by this exemption. Renegotiation Board, supra at 184, 95 S.Ct. 1491.

NCMF characterizes its MCE studies as advisory material containing opinions and recommendations, while Public Citizen claims them as authoritative directives.[FN7] After examining HEW's own guidelines on the conduct of MCEs, as well as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595                                                                              Page 10

477 F.Supp. 595
(Cite as: 477 F.Supp. 595)

MCEs submitted for In camera inspection, the Court concludes that the studies represent final agency reports and the exemption is therefore inapplicable. The MCE process aims not at expanding medical knowledge but at implementing specific improvements in health care delivery. The written recommendations that are included in the final MCE report are directives tied to certain documented deficiencies; they are not appealable to another agency. A follow-up assessment, to be completed by the PSRO within one year, focuses only on whether directives have in fact been executed. MCE studies thus are not advisory nor are they one step in an ongoing deliberative process; their status is comparable to an administrative order. [FN8] See generally PSRO Transmittal No. 43 at 3-6 (1977); Handbook for the Conduct of Medical Care Evaluation Studies (MCEs) at 1, 18-24 (1978). In this respect, and also because they contain no individually attributable remarks, they differ from the minutes of medical staff meetings that were held not discoverable**603 in Bredice v. Doctors Hospital, 50 F.R.D. 249 (D.D.C.1970), Aff'd mem., 156 U.S.App.D.C. 199, 479 F.2d 920 (1973).

FN7. Public Citizen declares in its summary judgment motion that it seeks only final MCE reports and not preliminary or interim communications by the MCE committee. Any request for information in its initial letter of September 30, 1977, that is inconsistent with this position is accordingly withdrawn. If the format of NCMF's actual MCE reports differs from that portrayed in Public Citizen's request, the former controls.

FN8. While the Court need not reach the issue of segregability in light of its conclusion that the report as a whole is not predecisional, defendants' contention that exemption five protects the entire MCE report is clearly overbroad. See EPA v. Mink, 410 U.S. 73, 87-91, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). MCE reports contain much information that is purely factual or investigative, such as

descriptions of pre-established evaluation criteria and statistical data on compliance with each criterion. NCMF has made no effort to segregate and release factual portions of the studies.

The Court is not insensitive to the importance of encouraging candid and conscientious evaluation by MCE committee members. The limits of such encouragement under exemption five, however, are that the document be a part of the deliberative give-and-take process. Vaughn v. Rosen, 173 U.S.App.D.C. 187, 195, 523 F.2d 1136, 1144 (D.C. Cir. 1975). An MCE report is not submitted until the committee has formulated its conclusions; furthermore, its recommendations are collective observations from the committee. Subjective opinions or disagreements among individual committee members do not appear in the report, and NCMF offers only conclusory assertions that such subjective expressions will be affected by disclosure of the final document.[FN9] This is not enough to satisfy defendants' burden under FOIA.

FN9. NCMF also asserts that disclosure of final MCE reports will restrict the future flow of information, factual as well as evaluative, to committee members, thereby diluting the quality of the MCE process. This assertion is addressed under exemption six.

*Exemption Six*

[8][9][10][11][12] Exemption six [FN10] contemplates a balancing test between an individual's interest in privacy and the general public's interest in government information. Plaintiff conceded, as it must, that the records sought fall within the "personnel or medical files" provision of the exemption. The factors to be considered, then, with respect to both patients and physicians, [FN11] are: (1) will disclosure result in an invasion of privacy and, if so, how seriously?; (2) what public interest factors favor, or oppose, disclosure and what weight should they be accorded?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

FN10. The exemption allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The phrase "clearly unwarranted" evidences a congressional intention that courts balance competing interests. H.R.Rep.No.1497, 89th Cong., 2d Sess. 11 (1966); Reprinted in (1966) U.S.Code Cong. & Admin.News, p. 2418; S.Rep.No.813, 89th Cong., 1st Sess. 9 (1965).

FN11. NCMF's assertion that hospitals have a cognizable privacy interest under FOIA is untenable. National Parks and Conservation Ass'n v. Kleppe, 178 U.S.App.D.C. 376, 388 n. 44, 547 F.2d 673, 685 n. 44 (D.C. Cir. 1976); Robertson v. Department of Defense, 402 F.Supp. 1342, 1348-49 (D.D.C.1975).

Patients have a substantial interest in not being identified to the general public. Protecting the intimate details of an individual's medical file is indeed a central goal of the privacy exemption. As discussed above, however, individual identification is extremely unlikely based on the data sought by Public Citizen, even in conjunction with information already publicly available. Further, a minute risk of incidental identification does not transform disclosure of the requested documents into an "unwarranted invasion." See Department of Air Force v. Rose, 425 U.S. 352, 381-82, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1975); Sears, Roebuck & Co. v. General Services Admin., 402 F.Supp. 378, 384-85 (D.D.C.1975), Aff'd in part, rev'd on other grounds, 180 U.S.App.D.C. 202, 553 F.2d 1378 (D.C. Cir.), Cert. denied, 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977). To decide otherwise would, in effect, authorize the withholding of all aggregate data concerning patients, a plainly erroneous conclusion. See Department of Air Force v. Rose, supra at 375-76, 96 S.Ct. 1592; H.R.Rep.No.1497, Supra at 11.

Defendants also claim a privacy interest on behalf of physicians who provide Medicare and Medicaid services. The Court finds that such an interest is

implicated under FOIA. Disclosure of physician identities in profiles or MCE studies raises the prospect of misleading publicity, possibly unwarranted professional and public criticism, and damage to professional reputation.

At the same time, this privacy invasion is not overly intrusive. Congress, in formulating exemption six, expressed particular concern over disclosure of " highly personal" information about individuals. S.Rep.No.813, Supra at 9; See ***604**Getman v. NLRB, 146 U.S.App.D.C. 209, 214, 450 F.2d 670, 675 (D.C. Cir. 1971). The revelation that a physician performs a large number of surgical procedures, or has requests for extension in hospital denied regularly, does not possess that "intimacy" which has protected records of a person's alcoholic consumption or the legitimacy of his children, Rural Housing Alliance v. Department of Agriculture, 162 U.S.App.D.C. 122, 498 F.2d 73 (D.C. Cir. 1974), or of his family status within the home, Wine Hobby USA, Inc. v. Internal Revenue Service, 502 F.2d 133 (3d Cir. 1974), or of the state of his personal finances, Ditlow v. Schultz, 170 U.S.App.D.C. 352, 517 F.2d 166 (D.C. Cir. 1975). Nor is the professional embarrassment suffered as likely to have consequences of an immediately personal nature as is disclosure of F.B.I. personnel names, which may lead to continuous harassment or threats of reprisal. See generally Lesar v. Department of Justice, 455 F.Supp. 921 (D.D.C.1978); Tarnopol v. Federal Bureau of Investigation, 442 F.Supp. 5 (D.D.C.1977). Unlike F.B.I. agents, physicians do not rely on anonymity or secret communications as virtual conditions of their employment.

Against these qualified values of patient and physician privacy, plaintiff presents an impressive array of affiants, experienced in the health care field, articulating important public interests that attach to disclosure of the four categories of records. Foremost is the interest in enabling the consuming public to make more fully informed choices among individual physicians and hospitals rendering Medicare and Medicaid services. The availability of objective comparative data from PSRO profiles and MCE studies would help patients facing a surgical procedure to evaluate the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595                                                                                                            Page 12

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

relative performance of providers; it would also assist physicians from outside the Washington, D.C. area who refer patients within the District. State agencies involved in health planning, institutional licensing, and Medicaid-Medicare evaluation would benefit from access to this information, as would academics conducting research on various health care delivery issues. See generally Exhibits A through N, attached to plaintiff's motion for summary judgment. Moreover, a better-informed public may be an added incentive to monitoring efforts by the PSROs themselves.

None of these interests reflects considerations of a purely or primarily private nature; the goal of scrutinizing government performance which is at the core of FOIA is a central aim of each of the groups mentioned. See Ditlow v. Schultz, 170 U.S.App.D.C. 352, 358, 517 F.2d 166, 172 (D.C. Cir. 1975). In this regard, it is important to emphasize the precise question of physician privacy that is before the Court. Plaintiff does not seek disclosure of each physician's entire professional dealings; only services that are compensated out of public funds are involved. Practitioners who contract with the government to provide medical services in exchange for federal payments perform a quasi-public function. The argument that substantial personal privacy rights attach to such performance loses much of its force when viewed in the context of Congress's abiding concern to deliver cost-efficient public health care and physicians' clear prerogative to avoid government business.

Although PSROs currently share some statistical information with state health planning and evaluation agencies, Public Citizen contends that information sought in this action is not otherwise available. NCMF's conclusory affidavits to the contrary are not persuasive in the face of Public Citizen's detailed supporting affidavits. Compare Affidavits of Norman Fuller at paragraph 9 And Paul Schlein at paragraph 9 With Affidavits of Beverlee Myers at paragraphs 4-7 And Michael Schonbrun at paragraphs 9-15.

It is argued that disclosure here will produce diminished participation by the medical profession in the PSRO process and even in the Medicare and

Medicaid programs. See Affidavit of Michael Goran at paragraphs 7, 21, attached to HEW's cross-motion to dismiss, February 22, 1978. While this represents a public interest consideration favoring secrecy, defendants propound it only in the broadest speculative terms. **\*605** There is no evidence of a probable reduction in the total number of physicians willing to participate as PSRO members. Nor have defendants shown in any way that information on the necessity and quality of federally reimbursed medical services, which by statute must be provided to PSROs, will be denied or provided only in attenuated form if the limited information sought here is in fact disclosed. The conclusory assertion that physicians in significant numbers will refuse to treat Medicare and Medicaid patients is likewise unsubstantiated. See Minnesota Medical Ass'n v. State, 274 N.W.2d 84, 92 (Minn.1978).

Disclosure of a physician's identity does nothing to intrude on his confidential relationship with patients, nor does it restrict the exercise of his professional medical judgment. The conceivable adverse effect on overall physician participation does not outweigh a clear public interest in increased knowledge concerning the quality of government-funded medical services. If Congress concludes that such a hypothetically adverse impact necessitates blanket protection against disclosure, it may of course act accordingly. It has not done so.

The Court concludes that the invasion of personal privacy resulting from disclosure of certain non-patient-identifiable records is not "clearly unwarranted" in light of the important public interests at stake. Getman v. NLRB, supra; Sears, Roebuck & Co. v. General Services Admin., supra.

*Exemptions Four and Seven*

[13][14] These two exemptions [FN12] need only be addressed briefly. The argument that MCE studies are the "commercial information" or "trade secrets" of a PSRO is frivolous. Plaintiff seeks no data concerning fees, payment schedules, or other commercial arrangements. Furthermore, MCE studies contain no information about secret

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

formulas or rare treatment methods; their object is the review of prevalent medical services, not esoteric experiments. Indeed, HEW regulations specifically instruct PSROs to study commonly used medical techniques and procedures. Handbook for the Conduct of Medical Care Evaluation Studies (MCEs) at 6 (1978). Finally, NCMF as the only PSRO serving Washington, D.C. cannot suffer competitive injury from disclosure; nor will disclosure impair its ability to gather information since physicians and hospitals are required to furnish the data. See National Parks and Conservation Ass'n v. Morton, 162 U.S.App.D.C. 223, 498 F.2d 765 (D.C. Cir. 1974).

> FN12. Under 5 U.S.C. s 552(b)(4), matters exempt from disclosure must be "trade secrets" or "commercial and financial information obtained from a person and privileged or confidential." Exemption seven, 5 U.S.C. s 552(b) (7), protects from disclosure certain investigatory records compiled for law enforcement purposes.

Exemption seven is also inapplicable because the records requested here are not compiled for law enforcement purposes. The only NCMF data even arguably covered under the exemption is sanction reports and recommendations, and Public Citizen requests no such data. What it does request is precisely the kind of ordinary medical review material that, "despite occasionally alerting the administrator to violations of the law, is acquired essentially as a matter of routine." Center for National Policy Review v. Weinberger, 163 U.S.App.D.C. 368, 371, 502 F.2d 370, 373 (D.C. Cir. 1974); Rural Housing Alliance v. Department of Agriculture, 162 U.S.App.D.C. 122, 130, 498 F.2d 73, 81 (D.C. Cir. 1974).

*Agency Status*

[15][16] In addition to the exemptions claimed, HEW and AAPSRO urge the Court to reconsider its ruling that NCMF is an "agency" under FOIA, in light of the subsequent decision in Forsham v. Califano, 190 U.S.App.D.C. 231, 587 F.2d 1128

(D.C. Cir. 1978), Cert. granted, -- U.S. --, 99 S.Ct. 2159, 60 L.Ed.2d 1044 (1979). Forsham involved raw data from a federally funded research study which formed the basis for recommendations by a federal agency, although the study itself was funded without any specific regulatory objectives in mind. Since neither the funding agency nor the agency making recommendations**606** had possession of the raw data requested, and the 13 recipients of research grants that did were not themselves an " agency," no "agency record" existed for purposes of FOIA. Id. 190 U.S.App.D.C. at 238-239, 587 F.2d at 1135-36.

The decision in Forsham does not disturb this Court's prior holding. The Circuit Court's primary line of reasoning, concerning the degree of federal involvement necessary to transform data into " agency records," need not be reached if the possessor and producer of the data is itself an agency. NCMF undisputedly possesses and controls the production of all relevant documents here; moreover, it satisfies the test for agency status previously promulgated by this Circuit and endorsed in Forsham. To qualify as an agency under FOIA, 5 U.S.C. s 552(e), an organization must exercise substantial independent authority in performing its particular functions, Washington Research Project, Inc. v. Department of HEW, 164 U.S.App.D.C. 169, 179, 504 F.2d 238, 248 (D.C. Cir. 1974), Cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); Soucie v. David, 145 U.S.App.D.C. 144, 152, 448 F.2d 1067, 1075 (D.C. Cir. 1971), and it must be sufficiently controlled by government to justify attributing governmental character to its operations. Rocap v. Indiek, 176 U.S.App.D.C. 172, 175, 539 F.2d 174, 177 (D.C. Cir. 1976). See H.R.Rep.No.876, 93d Cong., 2d Sess. 8 (1974), Reprinted in (1974) U.S.Code Cong. & Admin.News, pp. 6267, 6274; S.Rep.No.1200, 93d Cong., 2d Sess. 9 (1974) (Conf.Report), Reprinted in (1974) U.S.Code Cong. & Admin.News, pp. 6285, 6293.

The holding in Forsham that private medical centers receiving pure research grants lack the independent decisional authority to qualify as an agency is clearly distinguishable from the facts of this case. As noted above, NCMF has statutory authority to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 F.Supp. 595                                                                           Page 14

477 F.Supp. 595
**(Cite as: 477 F.Supp. 595)**

make final, binding decisions, and it exercises such authority on a regular basis just as Congress intended. The conclusion that the 13 medical centers in Forsham are not sufficiently subject to day-to-day federal control must also be distinguished here. The PSRO statute established pervasive procedural requirements for virtually every phase of PSRO activities, and organizational requirements governing selection of the PSRO entity and its members. These statutory obligations are supplemented extensively by HEW regulations and by the PSRO Transmittals and Program Manual which are binding on each PSRO. See NCMF Contract, Art. XIV, (July 1, 1977), attached to defendants' Affidavit of Michael Goran. In short, PSROs such as NCMF perform a characteristically governmental function and are subject to detailed government control in their program planning and implementation.

Defendants have failed to establish the applicability of any exemptions claimed. Accordingly, plaintiff's motion for summary judgment is hereby granted and defendants' motion for reconsideration or summary judgment is hereby denied. The Court in entering its earlier decision that NCMF is an " agency," felt that an immediate appeal would not materially advance the ultimate termination of the litigation. It denied NCMF's request for an interlocutory appeal, but assured defendants that a stay would be entered upon resolution of the entire controversy. All further proceedings in this action are now stayed for 30 days, to allow defendants to seek a stay pending appeal in the United States Court of Appeals for the District of Columbia Circuit.

SO ORDERED.

D.C.D.C., 1979.
Public Citizen Health Research Group v. Department of Health, Ed. and Welfare
477 F.Supp. 595

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.