UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSUMERS' CHECKBOOK, CENTER FOR THE STUDY OF SERVICES<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.<br><br>Defendants. | Case No: 06-02201 (EGS) |

**PLAINTIFF'S REPLY IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff has requested information that will shed light on whether the Medicare program is fulfilling its mission of providing quality services in an efficient manner. Defendants have declared their support for health care quality initiatives and for transparency in Medicare quality and cost information. Yet throughout this Freedom of Information Act (FOIA) request process and litigation, Defendants have tried to minimize the public interest in Plaintiff's request and obfuscate the issues. Defendants initially refused even to look for the requested records. Then, they demanded that Plaintiff pay approximately $20,000 before they would determine whether to release the records. They subsequently agreed to release the records for Washington, D.C. without redaction in three to four weeks. Six weeks after that promise (and eleven months after Plaintiff's initial request), Defendants raised for the first time an objection to disclosure based on physicians' privacy under Exemption 6 of FOIA. Defendants never answered the Complaint or Amended Complaint in this action. Instead, Defendants introduced the Exemption 6 issue,

without prior authorization by the Court, in a Supplement to Defendant's Motion for Summary Judgment, which had by that time been superseded by Plaintiff's Amended Complaint. Defendants continued the Exemption 6 argument in their Opposition to Plaintiff's Cross-Motion for Summary Judgment, but did not provide a statement of contested material facts, as required by Local Civil Rule 56.1.[1]

Despite Defendants' evasions and obfuscations, the record and the law clearly point to one conclusion: Plaintiff is entitled to release of the requested records in full and a fee waiver. With respect to Defendants' Exemption 6 claim, it is plain from the undisputed facts that the public interest in disclosure greatly outweighs any privacy interest in the information. And, on the fee waiver question, it is similarly evident that the likely contribution of the disclosure to the general public's understanding of the operations and activities of the Medicare program outweighs any commercial interest in the information Plaintiff may have.

**ARGUMENT**

**I.    Defendants Must Release the Requested Records in Full Because Disclosure of Physician Identifying Information Does Not Constitute a "Clearly Unwarranted Invasion of Personal Privacy" Subject to Exemption 6 or Prior Injunction.**

Defendants overstate the privacy interests in the requested records, while understating or ignoring the public interest in disclosure of the records. Viewed in any light, the public interest in disclosure of the types and volumes of specific procedures Medicare participating physicians perform on Medicare beneficiaries—which will help the public to scrutinize the quality and efficiency of services available under this government program—far outweighs any privacy interest in restricting access to the gross amount of physicians' Medicare reimbursements.

---

[1]    Out of this morass, two things are clear: (1) Defendant's Motion for Summary Judgment is no longer properly before the Court; and (2) Defendants have admitted all facts in Plaintiff's Statement of Material Facts as to Which Plaintiff Contends There Is No Genuine Issue.

Defendants similarly overstate the effect of Florida Med. Ass'n v. Dep't of Health, Educ. & Welfare, 479 F. Supp. 1291 (M.D. Fla. 1979), a decision that has long been superseded by Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 772 (1989) and changes in the Medicare program.

### A. Exemption 6 Does Not Apply to Any Portion of the Requested Records.

#### 1. Disclosure of the Requested Records Without Redaction of the Physician Identifying Information Will Not Implicate Any Significant Interest in Personal Privacy.

Defendants bear the burden of showing that release of the requested information would violate substantial personal privacy interests. Sims v. Cent. Intelligence Agency, 642 F.2d 562, 573 (D.C. Cir. 1980). Defendants have not met their burden. Disclosure of physician identifiers and procedure types and volumes, even if matched with publicly available fee schedules, will not implicate classic privacy interests because it will shed light only on physicians' voluntary business activities with the government as Medicare participating physicians.

Defendants do not contend, nor could they, that the requested records reveal any "intimate details" of individuals' personal lives of the sort that Congress sought to protect with Exemption 6.[2/] Instead, Defendants rely solely on the argument that releasing the requested records with physician identifiers could lead to the disclosure of physicians' Medicare reimbursement amounts and thereby "shed[]…light on an individual's income." Def.'s Opp'n 4.

---

[2/] Defendants assert that the requested records are "similar files" under Exemption 6 because the term "similar files" presumptively includes "[i]nformation identifiable as applying to some particular individual, and disclosure of which would cause special embarrassment to that individual." Def.'s Opp'n 2. Plaintiff does not dispute for the purposes of this motion that at least some of the requested records are "similar files," in that they are "Government records on an individual which can be identified as applying to that individual." Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982) (internal citations omitted). Plaintiff does not concede, however, that the disclosure of the records would cause "special embarrassment" to any individuals. See id. at 600 (rejecting argument that the phrase "similar files" is limited to files containing "intimate details" and "highly personal" information). Defendants have not demonstrated how disclosure of the records, even if someone could use them to calculate Medicare participating physicians' gross Medicare reimbursements, would cause any embarrassment.

Defendants ignore two keys factors, however. First, the requested data would not provide any information about revenue physicians receive from non-Medicare sources. Second, the data would not provide any information about the expenses (e.g., malpractice insurance, employee salaries, and rent) physicians must pay out of their gross Medicare reimbursements and non-Medicare revenue. Absent these two key factors, the requested information sheds little light on physicians' take-home income or overall finances. Cf. Washington Post Co. v. Dep't of Agric., 943 F. Supp. 31, 34 n. 3 (D.D.C. 1996) (disclosure of the individuals who received cotton subsidies, and the amounts they received, "reveals nothing about the success or failure of the farm or the wealth or poverty of the recipient").

As argued fully in the memorandum supporting Plaintiff's Cross-Motion for Summary Judgment, even if release of the requested records will lead to disclosure of physicians' gross Medicare reimbursements, such disclosure will not constitute a significant invasion of personal privacy, because the disclosures will reveal only the physicians' business activities with the government. Pl.'s Cross-Motion Mem. 26-28. The D.C. Circuit and District courts have repeatedly held that the disclosure of information relating to individuals' business affairs does not impinge significantly on personal privacy interests cognizable under Exemption 6. See Washington Post Co. v. Dep't of Justice, 863 F.2d 96, 100 (D.C. Cir. 1988); Washington Post Co. v. Dep't of Health and Human Services, 690 F.2d 252, 261-262 (D.C. Cir. 1982); Sims v. Cent. Intelligence Agency, 642 F.2d at 575; Washington Post Co. v. Dep't of Agric., 943 F. Supp. at 36. The claim for a personal privacy interest is particularly tenuous in the case of persons, including physicians, who voluntarily contract with the government to provide services in exchange for federal payments. Pub. Citizen Health Research Group v. Dep't of Health, Educ. & Welfare, 477 F. Supp. 595, 604-605 (D.D.C. 1979), rev'd on other grounds, 668 F.2d 537

(D.C. Cir. 1981).  In this case, the information at issue relates directly to physicians' role as federally-reimbursed providers of services under a government program.  Defendants have no response to this body of case law.

Instead, Defendants attempt only to dispute Plaintiff's observation that physician corporate group practices and business associations have no protectible privacy interests under FOIA Exemption 6.  Def.'s Opp'n 2-3.  Defendants note that this principle is limited when the business is a closely held corporation or similar small business.  Id.  But the cases Defendants cite either are not on point,[3/] or, as shown below, are distinguishable from the facts of this case or actually support Plaintiff's position on disclosure.

In Nat'l Parks and Conservation Ass'n v. Kleppe, 547 F.2d 673, 685-686 (D.C. Cir. 1976), the Court of Appeals held that the financial records of small or individually owned concessions in national parks were not exempt from disclosure under FOIA Exemption 4, but remanded the case to the district court to determine whether the records were so "personalized" as to fall under Exemption 6.  There, the requested records revealed the concessioners' assets, liabilities, and net worth.  Id. at 677-678.  Even under those circumstances, the Court of Appeals only assumed for the sake of argument, and did not decide, that the requested records might shed light on the owners' personal finances.  Id. at 685.  Here, the requested records would reveal only physicians' gross Medicare reimbursement amounts, hardly enough information to shed light on physicians' personal finances.  Moreover, unlike the records in Kleppe, the records at issue in

---

[3/]    Providence Journal Co. v. FBI, 460 F. Supp. 778 (D.R.I. 1978), rev'd on other grounds, 602 F.2d 1010 (1st Cir. 1979), and Atkinson v. Fed. Deposit Ins. Corp., No. Civ.A. 79-1113, 1980 WL 355660 (D.D.C. Feb. 13, 1980) did not concern the privacy interests of small businesses.  Providence Journal held that Exemption 7(C)—which the court acknowledged posed a lower standard for withholding than Exemption 6—covered information about an individual's family relationships and personal friendships, but not information about the individual's possible dealings with prominent persons, public officials, and members of organized crime.  460 F. Supp. at 789-790.  Atkinson concerned the financial information of "persons" other than the plaintiff, and information that identified certain "individuals" as being suspected of criminal activity.  1980 WL 355660 at *3.

this case pertain only to the monies physicians choose to receive from the federal government by participating in the Medicare program.[4/]

Multi Ag Media LLC v. Dep't of Agric., Civ. Act. No. 05-01908, 2006 WL 2320941 (D.D.C. Aug. 9, 2006), actually supports Plaintiff's position on disclosure. Multi Ag Media held that the public interest in disclosure of information about the livestock assets of family-owned farms that participate in USDA financial assistance programs, which "would support the goal of knowing whether USDA is distributing taxpayer money appropriately," outweighed the privacy interests at stake. Id. at *4-5. Multi Ag Media echoed Washington Post Co. v. Dep't of Agric., which held that the public interest in "shedding light on the workings of the Department of Agriculture and the administration of this massive [cotton] subsidy program" outweighed any privacy interests in the requested business information. 943 F. Supp. at 36. Together, Multi Ag Media and Washington Post Co. v. Dep't of Agric. should inform the Court's decision in this case.

### 2. The Public Interest in Disclosure of the Physician Identifying Information Greatly Outweighs Any Cognizable Privacy Interest.

Even assuming that there is some cognizable privacy interest in the requested records, Defendants have not met their burden of showing that the privacy interest is not outweighed by a public interest in disclosure. See Sims, 642 F.2d at 573. Defendants' new and unsupported argument that the public interest in the requested information is "insignificant," Def.'s Opp'n 5, flies in the face of Defendants' own admission in the course of this FOIA dispute, Plaintiff's explanations of how the information will shed light on Medicare's operations, and Defendants'

---

[4/]   Beard v. Espy, No. 94-16748, 1995 WL 792071 (9th Cir. Dec. 11, 1995) (unpublished opinion) does not provide a sufficient description of the information requested regarding loans to a closely held farming corporation to determine why the Court of Appeals for the Ninth Circuit assumed that disclosure would affect the privacy interests of the individuals involved. In any event, this decision, which cannot be cited as legal precedent in the Ninth Circuit, is not persuasive, much less binding, on this Court.

stated goal of providing the public with information about the quality and cost of services delivered by health care providers.

The parties agree that the weight of the public interest in disclosure turns on the disclosure's potential to assist the public in understanding the operations of government. Pl.'s Cross-Motion Mem. 31 (citing Reporters Comm., 489 U.S. at 772 (relevant inquiry is whether disclosure will "open agency action to the light of public scrutiny")); Def.'s Opp'n 5 (citing Lepelletier v. Fed. Deposit Ins. Corp., 164 F.3d 37, 46 (D.C. Cir. 1999) (relevant inquiry is whether disclosure would "shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to") (internal quotations omitted)). When Defendant Department analyzed the public interest issue in connection with Plaintiff's fee waiver appeal, it also agreed with Plaintiff:

> **We do not dispute that the requested records pertains [sic] to operations or activities of the Federal Government and that the disclosure of the records would reveal <u>meaningful information</u> about government operations or activities.**

Krughoff Second Declaration ("Krug. Second Dec.") Ex. 1, at 2 (letter denying fee waiver appeal) (emphasis added).[5/] Defendants' admission should be dispositive. Yet, without expressly repudiating or qualifying their previous admission, or explaining their about-face, Defendants now insist that the requested information "sheds little light on government operations." Def.'s Opp'n 4.

The Second Declaration of Robert Krughoff and Plaintiff's memorandum in support of the Cross-Motion for Summary Judgment gave numerous (but by no means exhaustive) examples of how the requested data will provide the public with a unique opportunity to better understand the operations of the Medicare program, evaluate the quality and efficacy of the

---

[5/] The Letter constituted the final decision of the Department. Krug. Second Dec. Ex. 1, at 5.

services it provides, and critically assess the quality enhancement efforts it has undertaken. Krug. Second Dec. ¶¶ 24-25; Pl.'s Cross-Motion Mem. 8-11, 32-33.[6/]  Plaintiff has also explained why physician-identifying information is essential for achieving the public benefits from the requested records.  See Krug. Second Dec. ¶ 25.  Like the disclosures ordered in Multi Ag Media and Washington Post Co. v. Dep't of Agric., full disclosure in this case will "support the goal of knowing whether [Medicare] is distributing taxpayer money appropriately," and will "shed[] light on the workings of [Medicare] and the administration of this massive [benefits] program."  See Multi Ag Media , 2006 WL 2320941 at *4-5; Washington Post Co. v. Dep't of Agric., 943 F. Supp. at 36.

Defendants do not—because they cannot—dispute the substance of Plaintiff's public interest arguments, or address a single one of the many possible uses for the requested data. Defendants' only response is that the Medicare statute does not permit them to "exercise any supervision or control over the practice of medicine or the manner in which medical services are provided."  Def.'s Opp'n 4 (quoting 42 U.S.C. § 1395).  Defendants' reference to the introductory section of the Medicare statute is inapposite on its face—Plaintiff is not asking Defendants to interfere with physicians' actual practice of medicine.

---

[6/] Disclosure of the number and types of particular procedures Medicare participating physicians perform on Medicare beneficiaries will shed light on, among other things: (1) whether or not Medicare is allowing and paying for physicians with less-than-optimal levels of experience in certain procedures to perform those procedures; (2) whether or not Medicare is allowing physicians with insufficient training and board certifications, histories of disciplinary actions, or poor scores on independent quality assessments to perform high volumes of procedures for which they may not be qualified; (3) whether or not Medicare physicians are exhibiting practice patterns that conform with existing guidelines (e.g., whether physicians treating patients with specific diagnoses are providing annual exams and screenings recommended for those patients); (4) for procedures for which there is evidence that over-utilization is common (and sometimes harmful), whether or not Medicare is allowing and paying physicians to perform numbers of procedures out of proportion to their patient load; (5) whether Medicare's value-based purchasing, pay-for-performance, managed care, and other initiatives are creating incentives that lead to better or worse care; (6) which physicians are, because of their high volume, the most important practitioners to survey and study to determine how the Medicare program affects, or could affect, the quality of their practices (i.e., through incentives, training, regulation, or other means).  Disclosure will also arm beneficiaries to serve as watchdogs for possible improper billing practices, if, for example, beneficiaries see that physicians are billing for procedures they know the physicians do not perform.  Krug. Second Dec. ¶¶ 24-25; Pl.'s Cross-Motion Mem. 8-11, 32-33.  More broadly, disclosure will help the public to assess whether the Medicare program is fulfilling its mission of providing quality services in an efficient manner, and will arm members of the public as individuals and as citizens to take action to avoid potential harms and increase potential benefits from the program.

If Defendants mean to argue that Plaintiff cannot shed light on Medicare operations by studying the quality and efficacy of Medicare participating physicians because Defendants cannot impose any quality or cost controls on Medicare, that argument is patently false. Congress has long authorized the Department to exercise cost and quality control powers, section 1395 notwithstanding. See Home Health Care, Inc. v. Heckler, 717 F.2d 587, 590 (D.C. Cir. 1983) (reviewing cases holding that section 1395 did not bar various Medicare cost and quality control measures); Pl.'s Cross-Motion Mem. 5-6 (discussing the Medicare Utilization and Quality Control Peer Review Program established in 1982, the Medicare Health Care Quality demonstration program established in 2003, and the Physician Quality Reporting Initiative authorized in 2006); Def.'s Opp'n 4 (citing http://www.hhs.gov/transparency for the proposition that "the Department is very supportive of health care quality initiatives"). Pursuant to the President's August 28, 2006 Executive Order "Promoting Quality and Efficient Health Care in Federal Government Administered or Sponsored Health Care Programs": (1) Medicare is now "experimenting with pay-for-performance incentives and competitive bidding for services where doctors and hospitals are rewarded for quality outcomes";[7] (2) the Centers for Medicare & Medicaid Services ("CMS") is funding Medicare's "Better Quality Information to Improve Care for Medicare Beneficiaries" ("BQI") project to "pioneer the pooling of private data with Medicare claims data to produce more accurate, comprehensive measures of quality of services at the provider level" to assist physicians "in improving the quality of care they deliver to Medicare beneficiaries" and to enable Medicare beneficiaries "to make more informed choices in

---

[7] Dep't of Health and Human Services, Incentives (last revised Nov. 29, 2006), http://www.hhs.gov/transparency/fourcornerstones/Incentives/index.html (last visited June 14, 2007). This, and the following two web pages can be accessed via http://www.hhs.gov/transparency.

obtaining Medicare covered services;"[8] and (3) the Department is working with the Departments of Defense and Veterans Affairs and the Office of Personnel Management to use their critical mass as, together, the nation's biggest purchaser of health care "to begin moving the marketplace."[9] Presumably Defendants do not take the position that any of these initiatives are improper under section 1395.

Moreover, section 1395 does not insulate Defendants from the fact that there is a public interest in disclosure of the requested information. In the Department's own words, "once transparency unveils price and quality information, and incentives are in place to drive quality-based decisions, real change starts to happen."[10]

### B. The <u>Florida Medical Association</u> Injunction Does Not Apply to the Present Case.

Defendants likewise cannot hide behind the decision in <u>Florida Med. Ass'n v. Dep't of Health, Educ. & Welfare</u>, 479 F. Supp. 1291 (M.D. Fla. 1979). As fully explained in the memorandum supporting Plaintiff's Cross-Motion for Summary Judgment, Supreme Court rulings and changes to the Medicare program in the intervening three decades have superseded that decision. Pl.'s Cross-Motion Mem. 21-26. In 1989, <u>Reporters' Comm. for Freedom of the Press</u> instructed courts to consider all the ways in which the requested disclosure would "open agency action to the light of public scrutiny," and not just the way in which the particular requester might use the information, when deciding whether disclosure will be in the public interest. 489 U.S. at 772. Congress and the Department have increasingly recognized the public

---

[8] Dep't of Health and Human Services, Pilot Programs (last revised June 5, 2007), http://www.hhs.gov/transparency/pilot/index.html (last visited June 14, 2007).

[9] Dep't of Health and Human Services, Federal Action (last revised Feb. 26, 2007), http://www.hhs.gov/transparency/federal/index.html (last visited June 14, 2007).

[10] Dep't of Health and Human Services, Incentives, http://www.hhs.gov/transparency/fourcornerstones/Incentives/index.html.

interest in transparency regarding the quality and cost of health care provided by Medicare. Here, Plaintiff has given numerous examples of how the physician-identifying records requested will to shed light on whether the Medicare program is fulfilling its mission of providing high-quality services in an efficient manner.

In contrast, the district court in Florida Med. Ass'n looked at only a single use for the information at issue: to serve the Secretary's asserted public interest "in knowing the amounts of public funds spent in reimbursing Medicare providers annually, especially in light of the ongoing legislative debate over national health insurance." 479 F. Supp. at 1304 (emphasis added). And the court determined that disclosure of specific physicians' reimbursement amounts was not necessary to inform that debate. Id. at 1305. Defendants nevertheless assert that Florida Med. Ass'n applied the public interest standard used today, because the court considered the Secretary's asserted public interest in "knowing the amounts of public funds spent in reimbursing Medicare providers." Def.'s Opp'n 5 (citing Florida Med. Ass'n, 479 F. Supp. at 1304). Defendants have taken the quotation from Florida Med. Ass'n out of context, and ignored that court's focus, contrary to Reporters' Comm. for Freedom of the Press, on a single use for the information requested—to inform an on-going legislative debate. See id. at 1305. Importantly, Defendants also have ignored the fact that, at the time of the Florida Med. Ass'n case, the agency was not under the clear quality or transparency directives that now apply, as cited above. In sum, Florida Med. Ass'n is the product of an outdated legal and factual environment, and does not dictate the resolution of the present case.[11]

---

[11] Even if it were valid, the injunction in Florida Med. Ass'n would bind only the parties to that case, not this Court.

**II.     Plaintiff Is Entitled to a Fee Waiver Because Release of the Requested Information Is in the Public Interest and Is Not Primarily in Plaintiff's Commercial Interest.**

Defendants also erred in denying Plaintiff's request for a fee waiver. Contrary to Defendants' characterizations, Plaintiff has explained how it will distribute the information it derives from the requested data to the public through a variety of outlets. The fact that Plaintiff has in the past charged for access to some (but by no means all) of these outlets does not detract from the disclosure's ability to contribute significantly to the general public's understanding of the operations of the Medicare program. Likewise, the fact that Plaintiff charges for some of its publications "is insufficient to render [its] actions 'primarily…commercial' for purposes of calculating a fee waiver." Campbell v. Dep't of Justice, 164 F.3d 20, 36 (D.C. Cir. 1998). Because the Court reviews the fee waiver denial de novo, Defendants' assertion that their conclusion to the contrary "was not unreasonable," see Def.'s Opp'n 6, carries no weight. Plaintiff is entitled to a fee waiver because the public interest in disclosure far outweighs any commercial interest on Plaintiff's part.

**A.     Disclosure of the Requested Information Will Contribute Significantly to the General Public's Understanding of the Operations and Activities of the Government.**

In making fee waiver decisions, the Department applies a four-part test to determine whether release of requested information is in the public interest. See 45 C.F.R. § 5.45(b). Defendants have conceded that Plaintiff's request satisfies the first two prongs of the test—"the requested records pertains [sic] to operations or activities of the Federal Government," and "disclosure of the records would reveal meaningful information about government operations or activities." Krug. Second Dec. Ex. 1, at 2 (letter denying fee waiver appeal). Defendants continue to challenge Plaintiff's ability to meet the third and fourth prongs: whether disclosure

will advance the understanding of the general public; and whether the contribution to public understanding will be significant. Id. at 2-3. Defendants misread the record and the law.[12]

In the administrative record, Plaintiff specifically identified at least six types of outlets for the information it seeks to derive from the requested data, including press releases, media reports, and internet publications that are entirely free of charge, as well as certain publications and subscriptions purchased by government agencies or libraries that are free to the public. Krughoff Declaration ("Krug. Dec.") Ex. 5, at 3-4. In Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003), the Court of Appeals found that a plaintiff with a similar distribution plan had sufficiently demonstrated how it would disseminate the requested information to the general public. Defendants' only argument in response is that disclosure would not advance the understanding of the general public because Plaintiff charges a fee for some of its publications. See Krug. Second Dec. Ex. 1, at 2-3. Common sense and the Department's own regulations undermine this argument. Newspapers and magazines regularly charge subscription fees, but the

---

[12] Defendants' claim that Plaintiff has attempted to add to the administrative record (Def.'s Opp'n 7-8) does not advance their cause. The supposedly added information consists of: (1) "information regarding the requested raw data being tabulated to display summary information about the Medicare program (such as the total number of procedures performed by specific Medicare providers)"; and (2) the 2007 Government Accountability Office report on Medicare. With respect to the first item, Plaintiff's initial FOIA request clearly sought information about Medicare reimbursement claims that identified physicians submitted for identified procedures. See Krug. Dec. Ex. 1 (FOIA request). Both the initial request and subsequent communications clearly indicated Plaintiff's intent to analyze the requested data. See, e.g., id. at 2 ("[T]hrough our analysis of the requested data . . . we will contribute significantly to the public's scrutiny of the operations and performance of CMS and the Medicare program."); Krug. Dec. Ex. 5, at 3 (fee waiver appeal) ("Once released, CSS will be able to study the data to analyze the quality of the medical services provided in the Medicare program . . . ."). Defendants cannot credibly claim to be surprised by Plaintiff's clarification that it intends to tabulate the data, particularly since Defendants' Exemption 6 argument assumes that disclosure of the requested records will allow the public to "know[] the number of times an individually identifiable provider performed a single service in a given year." See Def.'s Opp'n 1.

With respect to the GAO report, although the report itself (released in April 2007) was not part of the administrative record, its ideas regarding use of Medicare data to study physician quality and efficiency were. Compare Krug. Dec. Ex. 5, at 4 (fee waiver appeal) ("CSS will be able to study the [requested] data to analyze the quality of the medical services provided in the Medicare program…"), with GAO-07-307, MEDICARE Focus on Physician Practice Patterns Can Lead to Greater Program Efficiency at 17 (2007) ("Medicare's data-rich environment is conducive to conducting profiling analyses designed to identify physicians whose medical practices are inefficient compared with their peers."). Even if the Court decides not to consider the GAO report in reviewing Defendants' fee waiver denial, the report indisputably is properly before the Court on the substantive disclosure issue. In any event, the record is sufficient without these two items to demonstrate that Plaintiff is entitled to a fee waiver.

Department's regulations indicate that the Department gives deference to claims by representatives of the news media that the requested information will be disseminated among the public.[13]

Defendants argue that Plaintiff cannot meet the fourth prong of the public interest test, demonstrating that the disclosure's contribution to public understanding will be "significant," because Plaintiff cannot possibly present all of the requested data in a press release of a few pages in length. Krug. Second Dec. Ex. 1, at 3; Def's Opp'n 6-7. Again, Defendants' argument misses the mark. Even if Plaintiff cannot convey all the information derived from all of the requested data in a single press release, there is no reason why Plaintiff could not deliver various analyses of portions of the requested data in multiple press releases. Defendants have offered no legal or logical support for their position that only a single, bulk dissemination of the requested information can make a "significant" contribution to the public's understanding. Moreover, Plaintiff's public distribution plan includes multiple outlets in addition to press releases.[14] As fully argued above and in the memorandum supporting Plaintiff's Cross-Motion for Summary Judgment, the release of the requested information will significantly contribute to the public's

---

[13] See 45 C.F.R. § 5.45(b)(3):

> Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons? Under this factor we may consider whether the requester is in a position to contribute to public understanding. For example, we may consider whether the requester has such knowledge or expertise as may be necessary to understand the information, and whether the requester's intended use of the information would be likely to disseminate the information among the public. An unsupported claim to be doing research for a book or article does not demonstrate that likelihood, while such a claim by a representative of the news media is better evidence.

[14] Indeed, given Plaintiff's explanation of how it disseminates information, it is unreasonable to assume that Plaintiff would attempt to convey all the information derived from all of the requested data in a single press release. Plaintiff has explained how it disseminates information via its checkbook.org website; given an example in which Plaintiff disseminated information and ratings from one of its studies of hospitals through news accounts by 125 newspapers and television and radio stations, including the Miami Herald, the Washington Post, the Saint Louis Post Dispatch, the Today Show, KGO TV (San Francisco), WBEZ public radio (Chicago), and through AARP's Modern Maturity magazine (with more than 30 million readers); and described Plaintiff's regular segment on the Washington D.C. Fox News outlet, CHECKBOOK's Guide to Health Plans for Federal Employees (to which 700,000 federal employees had free online access in 2006-2007), and CHECKBOOK magazine (to which many public library systems subscribe). See Krug. Dec. Ex. 5, at 4 (fee waiver appeal).

understanding of Medicare's operations and activities, and whether the Medicare program is fulfilling its mission of providing high-quality, efficient services.

### B. The Public Interest in Disclosure Outweighs Any Commercial Interest of Plaintiff.

In denying Plaintiff's request for a fee waiver, Defendants have inappropriately focused on the fact that Plaintiff charges a fee for some of its publications. In <u>Campbell v. Dep't of Justice</u>, 164 F.3d 20 (D.C. Cir. 1998), the Court of Appeals held:

> The fact that a bona fide scholar profits from his scholarly endeavors is insufficient to render his actions "primarily . . . commercial" for purposes of calculating a fee waiver, as Congress did not intend for scholars (or journalists and public interest groups) to forego compensation when acting within the scope of their professional roles. The quasi-commercial nature of [Plaintiff's] research was therefore irrelevant for purposes of calculating an appropriate fee waiver.

<u>Id.</u> at 36. The <u>Campbell</u> court concluded that the plaintiff historian who stood to gain commercially from sale of his books was nevertheless entitled to a fee waiver. <u>Id.</u> Defendants point to the fact that Plaintiff has historically charged for some of its publications, but ignores the many ways in which Plaintiff, a non-profit research organization, Krug. Decl. ¶ 1, plans to distribute for free the information it derives from the requested data. Even if it were appropriate for Defendants to consider the potential "quasi-commercial" interests of the Plaintiff, those interests are clearly outweighed by the public interest in the information.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Cross-Motion for Summary Judgment and order Defendants to produce all of the requested Medicare claims records without assessing fees for the search, review, and duplication costs associated with the request.[15/]

Respectfully submitted,

 /s/ Patrick Carome
Patrick Carome (D.C. Bar No. 385676)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Phone: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Plaintiff Consumers'
CHECKBOOK, Center for the Study of Services*

June 22, 2007

---

[15/] As noted above, Defendant's Motion for Summary Judgment has been superseded by the Amended Complaint and is no longer properly before the Court, and in any event Defendants are in default for failing to file an answer to either the Complaint or the Amended Complaint. In the event the Court decides not to grant Plaintiff's Cross-Motion for Summary Judgment in its entirety, Plaintiff respectfully requests that the Court deny Defendant' motion and order Defendants to answer the Amended Complaint within ten (10) days.